UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DORIS DRURY and TERRY
KOCHNIARCZYK, on behalf
of themselves, and those
similarly situated,

                              CASE NO: 6:08-cv-152-ORL-28-DAB

          Plaintiffs,

vs.

COUNTRYWIDE HOME LOANS, INC.,
COUNTRYWIDE INSURANCE SERVICES,
INC., BALBOA INSURANCE COMPANY, and
and NEWPORT MANAGEMENT CORPORATION,


          Defendants.
_____/


        VIDEOTAPED DEPOSITION OF STEPHEN GRZESKOWIAK

                    VOLUME II


              THURSDAY, JULY 26, 2008
              12:13 p.m. - 7:21 p.m.

          420 SOUTH ORANGE AVENUE, 12TH FLOOR
              ORLANDO, FLORIDA  32801




REPORTED BY:
Stacy Pace, RPR, CSR, CRR, FPR
Notary Public, State of Florida
Esquire Deposition Services
Orlando Office - Job# 941683
Phone: 407-426-7676

Page 138

1  APPEARANCES:
2     On behalf of the Plaintiffs:
        Jill H. Bowman, Esquire
3       Jonathan B. Cohen, Esquire
        James, Hoyer, Newcomer
4       & Smiljanich, P.A.
        4830 West Kennedy Boulevard
5       Urban Centre One, Suite 550
        Tampa, Florida 33609
6
7     On behalf of the Defendants:
        William P. Heller, Esquire
8       Akerman Senterfitt
        350 East Las Olas Boulevard
9       Suite 1600
        Fort Lauderdale, Florida 33301
10
11
12  Also Present:  Alan Bennett, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 139

1              I N D E X
2  Testimony of STEPHEN GRZESKOWIAK
3     Direct Examination by Ms. Bowman ........... 6
4  Certificate of Oath ............................ 206
5  Certificate of Reporter ......................... 207
6  Errata Sheet ................................... 208
7  Read & Sign Letter .............................. 209
8              - - - -
9
10            E X H I B I T S
11  Plaintiffs'
12  Exhibit No. 1 .................................... 10
            (depo notice/Countrywide)
13  Exhibit No. 2 .................................... 10
            (depo notice/Newport)
14  Exhibit No. 3 .................................... 46
            (organizational chart)
15  Exhibit No. 4 .................................. 119
            (insurance services & outsourcing agreement)
16
            - - - -
17
18
19
20
21
22
23
24
25

Page 140

1           (Continued from Volume I.)
2              - - - -
3        THE VIDEOGRAPHER:  This is tape number
4     five.  We're back on the record at 5:18 p.m.
5  BY MS. BOWMAN:
6     Q   I'd like you to take a look at Exhibit 4,
7  again, the -- the Countrywide/Newport contract, page
8  four, also Bates page 127.  And it talks -- in
9  section 2.2 it talks about that:  The servicer will
10  develop reasonable criteria for determining what
11  constitutes acceptable insurance, and provide those
12  criteria in writing to Newport.  Do you see that?
13     A   I'm sorry, what number was it?
14     Q   2.2.
15     A   Yes.
16     Q   It says, "The servicer will develop
17  reasonable criteria for determining what constitutes
18  acceptable insurance and shall provide these
19  criteria in writing to Newport."  Do you see that?
20     A   Yes.
21     Q   Is the -- the servicer is Countrywide Home
22  Loans, correct?
23     A   Yes.
24     Q   Okay.  And when they say they're providing
25  it to Newport, it really means they're providing it

Page 141

1  to the employees in your group, or performing this
2  contract for Newport?
3     A   No.
4     Q   Well, who would they provide it to, if
5  they were providing it to Newport?
6     A   They would be providing it to our sales
7  force, our product area, that, in turn, would
8  provide it to my people.  We would follow those
9  rules.
10     Q   Okay.  When it says that they would
11  provide the criteria in writing to Newport, who
12  would that actually go to, to your knowledge?
13     A   I'm not sure of a person.
14     Q   It says that the servicer's initial
15  criteria are set forth in Appendix A.  So I'd like
16  you to -- to turn to Appendix A, which is page 23.
17     A   Yes.
18     Q   Also Bates page one -- 146, correct?
19     A   Yes.
20     Q   And there in Appendix A it says, at
21  numeral five, the coverage shall insure against
22  those losses required by the applicable security
23  agreement; is that correct?
24     A   Yes.
25        MR. HELLER:  Object to the form.

5956458e-18af-4613-8ce9-860e100aae71

Page 142

BY MS. BOWMAN:
1  Q   And I have a question about the next item,
2  numeral six. It says: Insurance information
3  transmitted by the electronic data interchange shall
4  not be subject to review for the above criteria.
5       Do you know what that means?
6  A   I understand what the electronic data
7  interchange is, receive insurance information from
8  insurance carriers. But I'm not sure exactly what
9  number six is saying.
10  Q   And in the paragraph following the --
11  enumerated paragraphs for the criteria for
12  acceptable insurance, could you read that and tell
13  me what it means?
14  A   Item number seven?
15  Q   No, below -- the paragraph -- short
16  paragraph below item number seven.
17  A   (Reviewing document.)
18      Okay. What was your question?
19  Q   I -- I'm trying to understand what it
20  means. And I'll tell you my understanding and then
21  you can tell me if I'm right. Maybe that's the
22  easiest way.
23      If there is acceptable insurance --
24  actually, I don't know what it means, so why don't

Page 143

1  you tell me what you think it means. I've read it,
2  like, 12 times.
3  A   A lender may request the servicer to send
4  out letters when the borrower's name that's on the
5  loan -- as with item one, the borrower's name that
6  is on the loan does not appear on the insurance
7  document. As an example, it could be a husband and
8  wife situation, the husband has the loan, the wife
9  has the insurance --
10  Q   Uh-huh.
11  A   -- a lender can request the servicer --
12  excuse me, the tracker to send out a letter at that
13  point in time.
14  Q   That the insurance doesn't meet the
15  servicer's requirements because it's not -- the
16  borrower is not identified as the insured?
17  A   As it says, it will be accepted --
18  Q   Okay.
19  A   -- however, a letter may go out, because
20  lenders understand that in today's environment, the
21  situation I described does happen.
22  Q   Okay. And would your -- would your group
23  issue those letters?
24  A   We would request -- yes, we would request
25  a letter.

Page 144

1  Q   And who would actually write and issue the
2  letter?
3  A   It would be all electronic.
4  Q   Okay. Who would the -- who would the
5  request go to? What other group?
6  A   No group. It would -- if -- if
7  Countrywide had this setup --
8  Q   Yes.
9  A   -- it would be set up in their system and
10  we'd click a button that says, send that letter out.
11  Q   Okay. So it would be a form letter within
12  the system to advise the customer of a particular
13  discrepancy between their insurance and the -- what
14  the servicer requires for that insurance?
15  A   Correct.
16  Q   But so long as it contained all the
17  criteria otherwise on Appendix A, it would still be
18  accepted by the company as adequate coverage?
19      MR. HELLER: Object to the form.
20      THE WITNESS: One of those letters may be
21  a letter about adequate coverage -- or
22  inadequate coverage, so I can't answer yes or
23  your question, or no.
24  BY MS. BOWMAN:
25  Q   Well, why would -- why would the insurance

Page 145

1  be accepted if there was inadequate coverage?
2  A   If --
3      MR. HELLER: Object to the form.
4      THE WITNESS: If a particular policy is --
5  is being written through an insurance company
6  and that policy cancels for whatever reason,
7  that policy may not be able to be reinstated
8  again, especially in -- in Florida, because
9  there are new rates always going in.
10      So we would want to accept that policy,
11  let the customer know what the deficiency is so
12  they can correct that deficiency, because we
13  wouldn't want that policy to cancel for fear
14  that it wouldn't be rewritten and -- excuse me,
15  wouldn't be reinstated, and the premium would
16  substantially increase.
17  BY MS. BOWMAN:
18  Q   Okay. Going back to page four of the
19  agreement, in section 2.3, it describes various
20  items of information that will be provided to the
21  service -- by the servicer to Newport.
22      Do you know how that happens?
23  A   Yes.
24  Q   How does that happen?
25  A   An example would be the information that

Page 146

1   we discussed during the INS603 program feed. The
2   servicer, Countrywide, will provide, through that
3   feed, the necessary information that Balboa --
4   Balboa/Newport needs in order to begin the lender
5   placed process, as an example.
6       Q   When Countrywide either originates a loan
7   or acquires a loan, is -- is this specific
8   information for each and every loan communicated to
9   your group, just as a matter of course?
10      A   No, it's already in Countrywide's system,
11  the AS400, and we use the AS400 to perform the
12  tracking.
13      Q   Okay.  But they don't send you a screen
14  shot that contains this information, they -- it's
15  just made accessible to you by the loading of the
16  loan into the system?
17      A   Correct.
18      Q   Take a look at page seven for me, of the
19  agreement between Newport and Countrywide Home
20  Loans.
21      Do you see article three, which describes
22  the responsibilities of Newport?
23      A   Yes.
24      Q   And the services that are provided -- the
25  paragraph indicates that the purpose of the services

Page 147

1   to be provided by Newport is to ensure that
2   during -- all times during the agreement that
3   certain things are happening.
4       Could you identify those and read those
5   into the record?
6       A   You want me to read 3.1?
7       Q   Yes.
8       A   Newport shall perform the services
9   described in this agreement, which shall conform to
10  the service quality standards set forth in Appendix
11  B to this agreement.  The purpose of these services
12  is to ensure that all times during the term of this
13  agreement, acceptable insurance or lender placed --
14  excuse me, lenders protection insurance and lender
15  placed flood insurance is maintained in force for
16  all eligible properties unless such coverage is
17  waived by the servicer; we're in communications with
18  mortgagers regarding acceptable insurance, lenders
19  protection insurance, and lender placed flood
20  insurance are accurate and current; and three,
21  Newport provides servicer with information that
22  Newport has obtained from third party -- parties
23  regarding acceptable insurance, lender protection
24  insurance, or lender placed flood insurance for all
25  eligible properties.

Page 148

1       Q   In connection with purpose number two, as
2   stated there, the written communications with
3   mortgagors, just for the layperson, the mortgagor is
4   actually borrower; is that correct?
5       A   Correct.
6       Q   So this is talking about -- one of the
7   purposes of this agreement is to have Newport
8   provide borrowers with written communications that
9   are current and accurate regarding acceptable
10  insurance and lender -- and lender protection
11  insurance and lender placed flood insurance?
12      MR. HELLER:  Object to the form.
13      THE WITNESS:  Correct.
14  BY MS. BOWMAN:
15      Q   Take a look at section 3.3.2 on page eight
16  of the Newport CHL agreement.  Do you have that?
17      A   Yes.
18      Q   Okay.  It says -- it says that the
19  parties --
20      Which is CHL and Newport, correct?
21      A   Yes.
22      Q   -- acknowledge that CIS is an affiliate of
23  servicer and Balboa, the commissions paid to CIS by
24  Balboa will be consistent with market rates of
25  commissions paid to nonaffiliated insurance agents

Page 149

1   by Balboa for similar types of insurance as the
2   lender protection insurance contemplated by this
3   agreement.
4       Do you see that?
5       A   Yes.
6       Q   So in -- CIS is Countrywide Insurance
7   Services, correct?
8       A   Correct.
9       Q   CIS receives a fee in connection with the
10  issuance of a lender placed policy, or a commission;
11  is that correct?
12      A   No.
13      Q   Okay.  Was that true as of the date of
14  this agreement in November of 2001?
15      A   Yes.
16      Q   When did it change?
17      A   2003, 2004.
18      Q   And what was the basis for that change?
19      A   I don't know.  I wasn't part of that
20  decision.
21      Q   After -- in the 2003, 2004 timeframe, or
22  whenever that change occurred that CIS was no longer
23  receiving a commission on lender placed policies
24  that were issued by Balboa, were they still the
25  agent of record on those lender placed policies?

5956458e-18af-4613-8ce9-860e100aae71

Page 150

1    A   No.
2    Q   Who was?
3    A   I don't think anybody was.  There was no
4  agency involved.
5    Q   Do you know whether a lender -- a lender
6  placed policy or any kind of insurance policy can be
7  issued in the state of Florida without an insurance
8  agent?
9    A   I don't have that information.
10    Q   In connection with the -- prior to the
11  2003, 2004 timeframe, when CIS, you know, was
12  receiving a commission in connection with lender
13  placed policies, were they involved in the process
14  between your group and Balboa?
15    A   No.
16    Q   What was their role in that timeframe when
17  they were receiving a commission?
18    A   I don't know what their role was.
19    Q   Do you -- to your knowledge, did
20  Countrywide Insurance Services, when they were
21  receiving a premium in connection with lender placed
22  policies issued by Balboa, did they have employees?
23    A   Could you repeat that, please?
24    Q   Sure.  During the timeframe prior to the
25  '03, '04 time where Countrywide Insurance Services

Page 151

1  was receiving a commission on a lender placed
2  insurance premium, do you know whether Countrywide
3  Insurance Services actually had any employees?
4    A   Yes.
5    Q   Okay.  And where were they located?
6    A   They were located in Simi Valley,
7  California.
8        I'd like to make a clarification.
9    Q   Sure.
10    A   As we're discussing this, I did say
11  earlier that CIS did nothing.  They actually had a
12  claims group that would obtain and handle the claims
13  on the lender placed policies.
14    Q   They were not involved in the issuance of
15  the lender placed policies?
16    A   No.
17    Q   Section 3.5 of the CHL/Newport agreement,
18  page nine, it indicates that Newport shall provide
19  limited customer service to mortgagors, that we've
20  now identified also as borrowers.  Do you see that?
21    A   Yes.
22    Q   And I think -- I believe you indicated
23  earlier that whatever services, that -- customer
24  services, that would be -- that would not be
25  provided by your group; is that correct?

Page 152

1    A   Correct.  My -- my interpretation of this
2  is customer service, which would be customer service
3  inbound phone calls, that Countrywide handles their
4  own insurance phone calls, inbound phone calls.
5    Q   Okay.  And your -- your group would not
6  also -- would also not be making outbound calls to
7  borrowers?
8    A   No.
9    Q   If you'd take a look at page ten, section
10  3.93 (sic) from the CHL/Newport agreement.
11    A   Yes.
12    Q   It says:  No later than five days prior to
13  the date on which acceptable insurance is due to
14  expire with respect to an eligible property --
15  ya-ya-ya -- and then it talks about in a case where
16  there's an impound -- impound account, correct, in
17  circumstances where there's an impound account or
18  escrow account?
19    A   Yes.
20    Q   That Newport actually reaches out to the
21  insurance company or agent to verify insurance
22  information?
23    A   Yes.
24    Q   Is that one of the things that the nightly
25  scan would identify, if you're within five days of

Page 153

1  the expiration of an acceptable insurance policy for
2  an impound, but you hadn't received any renewal
3  information?
4    A   No.
5    Q   Okay.  How would that information come to
6  you?
7    A   It wouldn't come to me.  We don't handle
8  this function.
9    Q   Okay.  Who does?
10    A   Cust- --- excuse me, Balboa slash Newport's
11  customer care group.  They have a outbound group
12  that will make calls to insurance carriers and
13  agents to obtain this.
14    Q   Okay.  And when you say Balboa/Newport,
15  what are you -- what do you mean by that?
16    A   I go back to -- well, Newport's here in
17  the contract, everybody is known basically as
18  Balboa.
19    Q   So is it -- is that customer care group a
20  group that's set up inside Balboa Insurance Company?
21    A   It's -- no, it's not in Balboa Insurance
22  Company.
23    Q   Okay.
24    A   It's -- I apologize -- a global name,
25  Balboa, but it's not Balboa Insurance Company.

5956458e-18af-4613-8ce9-860e100aae71

Page 154

1    Q   Does that -- the global name refer to some
2    different entity?
3    A   Balboa Insurance Group.
4    Q   Where are those employees located?
5    A   The call -- the outbound call?
6    Q   Yes.
7    A   Okay. Sorry. It's actually performed in
8    India.
9    Q   So as -- as far as Newport performing
10   section 3.9.3 of this contract, it's actually
11   performed by a group of employees in India who come
12   under some sort of Balboa insurance group umbrella?
13   A   Yeah, Newport is under that umbrella, I'm
14   under that umbrella, but yes.
15   Q   But you don't know -- or do you know who
16   actually pays them?
17   A   No, I don't know who actually pays India.
18   Q   Section -- turning to page 11 of the
19   agreement, can you read that into the record,
20   please, section 3.13?
21   A   Newport shall provide programming
22   expertise and training regarding servicer's computer
23   interface with the computer system used by Newport
24   in rendering its services under and as reasonable --
25   reasonably requested by servicer.

Page 155

1    Q   Is that the interface that is used by your
2    group? Because that's what -- is that the interface
3    it's talking about?
4    A   Yes.
5    Q   And your group provides its own -- its own
6    training of your employees with regard to that
7    interface?
8    A   Yes.
9    Q   Is the interface that it's talking about
10   there, that's not the Track Source system, correct?
11   A   No.
12   Q   That's the interface with the AS400
13   system, correct?
14   A   Yes.
15   Q   The interface it's talking about in
16   section 3.13 is your group's interface with the
17   AS400 system?
18   A   No.
19   Q   No? What interface is it talking about
20   there?
21   A   It's the interface with CCS.
22   Q   Okay. When it says Newport then shall
23   provide programming expertise and training regarding
24   the servicer's computer interface with the computer
25   system used by Newport, it's really talking about

Page 156

1    Balboa's CCS system?
2    A   Correct, the interface between the AS400
3    to the CCS system.
4    Q   And in that context, who is providing the
5    training?
6    A   We are now. I mean, back in 2001, it
7    would have been the training department that --
8    Q   How long have you provided that training
9    to your own employees in your insurance tracking
10   unit?
11   A   Probably shortly after 2001.
12   Q   And the programming expertise that they're
13   talking about, so that the systems communicate with
14   one another, who actually accomplishes that, what
15   group or --
16   A   It would be the IT group.
17   Q   And would that be an IT group within
18   Balboa or CHL?
19   A   It actually would be both.
20   Q   And that -- that programming has resulted
21   in the creation of this INS603 system?
22   A   No.
23   Q   Okay. That's not what -- the programming
24   they're talking about?
25   A   It is.

Page 157

1    Q   Okay.
2    A   But it's not the creating of it. INS603
3    has been in existence for many years; so enhancing
4    it.
5    Q   Just using it to cause the systems to
6    communicate appropriately?
7    A   Yes.
8    Q   Do you know who the -- we'll take them one
9    at a time. Do you know who the vendor is for the
10   AS400 system, the original AS400 platform?
11   A   It's -- it's Countrywide's system.
12   Q   They developed it on their own, the AS400
13   system?
14   A   Yeah. They -- Countrywide did not develop
15   the original AS400 system. However, they've -- have
16   all the program code to it and they've enhanced it
17   over the years.
18   Q   Do you know who the original vendor of the
19   AS400 system is?
20   A   My understanding, that it was IBM.
21   Q   What about the INS603, do you know who the
22   original vendor is on that program?
23   A   That's a Countrywide program.
24   Q   Countrywide developed that program?
25   A   Yes.

5956458e-18af-4613-8ce9-860e100aae71

Page 158

1    Q   And what about the CCS system at Balboa,
2 do you know who the original vendor on that system
3 was or whether it was developed in-house?
4    A   It was not developed in-house. And I
5 don't recall -- I do not recall who is the
6 originator -- actual owner of that system.
7    Q   Continuing on page 11, in section 3.15,
8 with regard to written communications by Newport
9 to -- to mortgagors or borrowers, is that just
10 describing the fact that the servicer has to agree
11 and approve the letters that are sent to borrowers?
12    A   Correct.
13    Q   And is that always the case?
14    A   Yes.
15    Q   Who does that? Who approves the letters?
16    A   Legal. Countrywide's legal.
17    Q   In section 3.1.6 (sic), the contract
18 indicates that Newport shall implement the follow-up
19 cycle schedule attached as Appendix D for the
20 purpose of providing mortgagors with disclosures
21 regarding lender protection insurance and lender
22 placed flood insurance. Do you see that?
23    A   Yes.
24    Q   Okay. Is that referring to the letter
25 cycle, that you've mentioned previously, to advise

Page 159

1 borrowers concerning the possibility of lender
2 placed insurance?
3    A   Yes.
4    Q   Let's take a look at Appendix D --
5 actually it's called letter cycle and letter text.
6 See that?
7    A   Yes.
8    Q   It says the FOH insurance system -- do you
9 know what that is?
10    A   Yes.
11    Q   Okay. What is that?
12    A   It's basically CCS.
13    Q   It says it's designed to give the borrower
14 ample time to obtain insurance coverage from the
15 open market. Is that correct?
16    A   Yes.
17    Q   And that would -- that would be the
18 purpose of indicating that there's some change in
19 the status of someone's insurance such that -- so
20 that they could go out and obtains (sic) the
21 appropriate preferred insurance and not have to have
22 lender -- lender placed protection; is that correct?
23    A   Could you repeat that, please?
24    A   Sure. That -- the purpose of providing
25 the information to the borrower that there might be

Page 160

1 a lender placed policy that has to be placed is to
2 do it in time for them to go out and get their own
3 preferred insurance; is that correct?
4    A   No.
5    Q   Okay. Well, what -- what is the purpose
6 of telling the borrower that there may be -- they
7 may be placing lender placed insurance?
8    A   Well, it is to provide them with time to
9 obtain and provide the necessary insurance, yes.
10    Q   Okay. And the reason it would be in the
11 best interest of a borrower to obtain preferred
12 insurance or private insurance is because most
13 lender placed policies do not cover the borrower's
14 loss, only the lender's loss; is that correct?
15    A   No.
16    Q   Is it accurate, then, that a lender placed
17 policy does not insure the borrower, only the
18 lender?
19    A   No.
20    Q   Is it fair to say the lender placed policy
21 is more expensive, on a premium basis, than most
22 preferred insurance policies that could be obtained
23 by the borrower?
24    A   Yes.
25    Q   And that the only named insured on the

Page 161

1 lender placed policy is the lender?
2    A   No.
3    Q   That's not accurate?
4    A   No.
5    Q   Okay. In the -- connection with the
6 lender placed policies issued by Balboa, then, is
7 the borrower fully covered for any loss that they
8 would be covered for under a regular insurance
9 policy?
10        MR. HELLER: Object to the form.
11        THE WITNESS: No.
12 BY MS. BOWMAN:
13    Q   Well, what would the borrower be covered
14 for?
15    A   The structure.
16    Q   Would that be true only if the lender
17 chose to make a claim on the lender placed policy?
18    A   No.
19    Q   What do you mean by the structure, then?
20    A   The improvements, the -- the house, the --
21 the house.
22    Q   So if there's a lender placed -- and this
23 is not my understanding, so excuse the question --
24 but if a lender placed policy is placed on a
25 borrower property and there's a fire, and the

5956458e-18af-4613-8ce9-860e100aae71

Page 162

1  structure is destroyed, you're saying the borrower
2  can make a claim on that policy to have the house
3  rebuilt?
4      A   Yes.
5      Q   And can the lender decline that claim and
6  say, we just want the mortgage paid off, we don't
7  want you to rebuild the house?
8      MR. HELLER:  Object to the form.
9      THE WITNESS:  Based on the deed of trust,
10     the note, there is language in there that
11     states "mutually agreed," is the way I believe
12     it's phrased, that the borrower can use those
13     phones -- those funds to pay off the loan,
14     whether it's lender placement or any insurance,
15     preferred insurance as well --
16 BY MS. BOWMAN:
17     Q   Uh-huh.
18     A   -- both the borrower and lender can mutual
19  agree -- mutually agree to do that, yes.
20     Q   Okay.  But can the lender force the
21  borrower to pay off the loan as opposed to rebuild
22  the house?
23     A   I don't believe so.
24     MR. HELLER:  Object to the form.
25

Page 163

1  BY MS. BOWMAN:
2      Q   If a lender placed policy is put in place,
3  the money to pay that premium is either advanced by
4  the borrower's impound or escrow account or
5  recovered by increased monthly payments; is that
6  correct?
7      A   No.
8      Q   Let's put it this way:  The -- the premium
9  for the lender placed insurance is collected from
10 the borrower; is that correct?
11     A   Can you be more specific?
12     Q   Sure.  If there's a lender placed policy
13  that's issued in connection with a particular
14  borrower's property, the premium for that policy is
15  collected from the borrower?
16     A   The -- the cost is transferred to the
17  borrower.
18     Q   And that can result in monies being
19  transferred out of the borrower's escrow account in
20  some instances?
21     A   It's one way.
22     Q   Could it result in increases in the
23  borrower's monthly payment to cover the amounts of
24  the premium?
25     A   It could.

Page 164

1      Q   But the whole policy premium is paid for
2  by the borrower?
3      MR. HELLER:  Object to the form.
4      THE WITNESS:  No.
5  BY MS. BOWMAN:
6      Q   What part of -- what part of the premium
7  is not paid for by the borrower?
8      A   It goes back to timing.  There's a
9  possibility that that escrow account does not have
10 enough money to pay for the lender placed premium,
11 so the lender will front that money to pay for the
12 policy, and ultimately, yes, it will be collected
13 from the borrower.
14     Q   Okay.  So it's a matter of timing, but the
15  lender is going to collect the premium from the
16  borrower?
17     A   Correct.
18     MR. HELLER:  Object to the form.
19 BY MS. BOWMAN:
20     Q   In Appendix D, it talks about a class code
21  section of the manual.  Do you see that?
22     A   In parentheses?
23     Q   Yes.
24     A   Yes.
25     Q   What manual is it talking about?

Page 165

1      A   If I -- it's actually the lender manual.
2      Q   And that was in existence in 2001, there
3  was a lender manual?
4      A   At that time, it was probably called a
5  servicer manual, and the name's changed from
6  servicer manual to lender manual.
7      Q   And where -- I mean, was that like a
8  written document?  Was it something available on the
9  computer?  How would you know -- how would you
10 get -- have access to that manual?
11     A   I wouldn't.  I wouldn't need access to
12 that manual.
13     Q   Okay.  Would you need access to the class
14  codes described there?
15     A   I would need to know what those class
16  codes are, yes.  But the specific manual in the
17  past -- especially 2001, I actually had no need to
18  look at it, because, again -- I don't know if you've
19  had an opportunity to look at the lender manual, but
20  it was, again, how we're going to code the system in
21  order for it to do what it needs to do.  So I could
22  always look in the system, CCS system, and obtain
23  this information.
24     Q   Okay.  So the class codes described here
25  would have been available to you, during the

5956458e-18af-4613-8ce9-860o100aae71

Page 166

1    timeframe 2003 to the present, in the CCS system?
2        A   Correct.
3        Q   Have you ever seen the servicer manual, or
4    a servicer manual in existence from 2003 to the
5    present?
6        A   No.  The name changed to lender manual.
7        Q   Right.  And the lender manual you're
8    describing is -- is the one that was created by
9    Balboa in 2006?
10       A   I believe the last revision date was 2007,
11   yeah.
12       Q   I'd like to go back to page 11 or 12,
13   section 3.17?
14       A   I'm sorry, what was that number again?
15       Q   Section 3.17.
16       A   Yes.
17       Q   What is that describing, if you can tell
18   me?
19       A   (Reviewing document.)
20           I mean, I can read it and tell you what --
21   what it's saying.  Exactly why that's in there and
22   why we would do that, to me, whether it's a
23   sub-prime loan or a prime loan, we would do the
24   exact same thing.
25       Q   Okay.  Do you -- do you know if there was

Page 167

1    different treatment by Newport of sub-prime loans?
2        A   No.
3        Q   So what's being described here is making
4    contact with the prior insurance agent or company,
5    that was the same activity being -- that you
6    described as being performed by the
7    Newport/Balboa/India group?
8        A   Correct.
9        Q   And, to your understanding, would they
10   also be the ones that would be performing this
11   aspect of this contract for Newport?
12       A   Whether -- I go back to whether it's
13   sub-prime or not, the calls would still be made, and
14   yes, India would be performing that outbound call
15   function.
16       Q   Okay.  Are you aware of any reason for the
17   different treatment of sub-prime loans in connection
18   with contacting the insurance companies?
19           MR. HELLER:  Object to the form.
20           THE WITNESS:  No.
21   BY MS. BOWMAN:
22       Q   Are you aware of any policy to contact the
23   insurance company of a sub-prime -- in connection
24   with a sub-prime loan that happened at the time of
25   the acquisition of the loan as opposed to at the

Page 168

1    time of your -- of there being some information
2    received, or a change?
3        A   No, I'm not.
4        Q   On page 12 of the agreement, at section
5    3.2, it indicates that Newport is supposed to have a
6    recovery plan to allow for data restoration to the
7    servicer's system should Newport directly or
8    incorrectly cause erroneous information to be put
9    into the servicer's system.
10           Do you know what recovery plan is in
11   place?
12       A   I do not.
13       Q   Do you know who would be responsible for
14   the preparation of a recovery plan relating to
15   electronic data for your group?
16       A   I need to go back to what we were talking
17   about earlier today, and these processes are backed
18   up nightly, and there's programs in place to
19   identify, and programs are notified when something
20   like this occurs, and they correct the issue so the
21   program can continue on.  And so I'm not sure what
22   the recovery plan would be, being that we have, you
23   know, all that is in existence.
24       Q   Okay.  And that's operated by the -- or
25   set up by the IT group?

Page 169

1        A   Correct.
2        Q   Let's turn to page 15 of the agreement.
3    It talks about -- in section 7.2, that audits are
4    permissible by the servicer of Newport.  Do you see
5    that?
6        A   7.2?
7        Q   Yes.
8        A   Yes.
9        Q   Are you aware of what audits the CHL does
10   of Newport?
11       A   No.
12       Q   Are there audits that are performed in
13   connection with the work performed by your group?
14       A   No.
15       Q   Does CHL, to your knowledge, have an audit
16   group to audit various business units?
17       A   Yes.
18       Q   And your group is not subject to any kind
19   of audit by that audit group?
20       A   Yes.
21       Q   What kinds of audits are done?
22       A   There's like a SAS-70 audit --
23       Q   What's that?
24       A   -- that identifies controls that you have
25   in place, or lack of controls that you have in

5956458e-18af-4613-8ce9-860e100aae71

1    place.
2        Q    And how often is that performed?
3        A    It just -- I can't recall if it's
4    quarterly or annually.
5        Q    What kind of controls, in connection with
6    insurance tracking, are they evaluating in that
7    audit?
8        A    As I mentioned earlier today, the
9    disbursement reconciliation, that -- that is one of
10   the particular items that they look at.
11       Q    Do they audit the identification of -- the
12   appropriate identification of loans for lender
13   placed insurance?
14       A    No.
15       Q    Does anybody audit that?
16       A    We have a group that does our quality
17   control, and through that quality control process it
18   could be identified that -- not could be.  Lender
19   placement is a part of that.  Did that technician
20   process that document properly?  Was a need for
21   lender placement?  Was it requested properly?  So
22   that would be part of the quality control.
23       Q    And is that group within your group, the
24   quality control group?
25       A    Not within my organization.

1        Q    Do they come in -- how -- how do they make
2    those kinds of assessments?
3        A    That group random samples four items per
4    person per day to -- you know, that's what the
5    quality control program calls for.
6        Q    And how often do they provide reporting
7    information to you?
8        A    Monthly.
9        Q    And is that on a per-person basis?
10       A    Yes.
11       Q    Is there any other more global-type review
12   of the work of the insurance tracking group?  What I
13   mean is not down to a per-person level, but, like,
14   for instance, by area?
15       A    By area, no.
16       Q    So there's no evaluation of, say, the
17   flood insurance group and their functions, apart
18   from the person-by-person evaluation?
19       A    There is quality assurance --
20       Q    Okay.
21       A    -- where, on a monthly basis, a random
22   sample of the disbursements are looked at to ensure
23   that they were done properly.  On a quarterly basis,
24   your example of flood, there is a review to ensure
25   that the National Flood Act guide -- guidelines were

1    followed appropriately.
2        There's a quarterly review to look at flat
3    cancellations of lender placement, you know, why was
4    that lender placed policy canceled flat?  Should it
5    have been?
6        Q    And by flat cancellation, you mean that it
7    was fully canceled for the entire period of lender
8    placement?
9        A    Correct.
10       Q    And then does that report identify the
11   reasons for the flat -- flat cancellations?
12       A    No.
13       Q    Well, what does it identify?
14       A    It identifies the percentage of flat
15   cancellations.
16       Q    As compared to what?
17       A    As compared to the number of policies that
18   were issued, the number of policies that canceled
19   flat, and you get the percentage.
20       Q    What is that used for?
21       A    A trend.  If it's high, well, why are we
22   canceling so many policies?  You would want to then
23   look into that and see the reasons why.
24       Q    And who would -- who looks at that report
25   or information and makes that kind of underlying

1    "why" analysis?
2        A    Why what?
3        Q    Why -- why is this percentage of -- why
4    are we having this percentage of flat cancellations?
5        A    I look at it, because I manage my
6    business.  My entire management staff looks at it,
7    my superiors look at it.  Who makes a determination?
8    Any one of us.
9        Q    What do you do to analyze the data to try
10   to get a better idea of what's causing the
11   underlying cancellations?
12       A    Could you repeat that?
13       Q    Sure.  What -- if you had a question, for
14   instance, you had a -- what you considered to be
15   a -- a high percentage of flat cancellations of
16   lender placed policies, what would you do to -- to
17   analyze the underlying information to figure out why
18   that was happening?
19            MR. HELLER:  Object to the form.
20            THE WITNESS:  We would obtain the loan
21   numbers and review those loan numbers -- I'm
22   sorry, review the insurance process that caused
23   that lender placement and caused the
24   cancellation.
25            THE VIDEOGRAPHER:  We need to change the

Page 174

1    tape. This concludes tape number five. We're
2    off the record at 6:18 p.m.
3        (Brief recess.)
4        THE VIDEOGRAPHER: This is tape number
5    six. We're back on the record at 6:28 p.m.
6    BY MS. BOWMAN:
7        Q    If you could turn to Exhibit 4, page 25 of
8    the Newport/CHL agreement, there's a reference there
9    to operational reports. Do you see that?
10       A    Yes.
11       Q    What are those?
12       A    I'm not exactly sure. I'm not exactly
13   sure.
14       Q    Do you know whether or not operational
15   reports are run in connection with insurance
16   tracking?
17       A    The only thing I can point this to is a
18   monthly report. It -- it actually has to be this
19   monthly report that is produced and provided to
20   Countrywide on a number of items we get in, a number
21   of items that were processed, a number of outbound
22   phone calls that were made.
23       Q    Anything else?
24       A    Specifically, no. That's the -- I can
25   only gather that that's what it is.

Page 175

1        Q    Okay. I mean, is there -- do you recall
2    any other things that would be in that report to
3    Countrywide?
4        A    Not off the top of my head, no.
5        Q    Would that include the number of lender
6    placed policies that were put in place?
7        A    I believe it has letters issued, first
8    letter, second leather -- letter, and the final
9    letter, the certificate.
10       Q    Does it have any information relating to
11   the cancellation of certificates or policies?
12       A    I believe it does include cancellation
13   letter, renewal letter. It would just be the volume
14   of that.
15       Q    Do you -- do you know who you send that to
16   at Countrywide, who that report is sent to?
17       A    It's actually -- it's not sent to anyone.
18   It's actually put out on a database known as Client
19   Source.
20       Q    And who is that information available to
21   on the database?
22       A    Anyone who has access. And I'm not sure
23   from Countrywide who has access.
24       Q    Do you have access?
25       A    Yes, I do.

Page 176

1        Q    And what kind of information would you be
2    looking for on Client Source?
3        A    I really don't look at Client Source. I
4    have access to it, but I really don't look at it.
5    These reports -- this report that I mentioned is out
6    there, the lender manual is out there.
7        Q    Anything else?
8        A    No.
9        Q    Take a look at Appendix C of the
10   Newport/CHL agreement. Do you see the identified
11   information required in Newport's written reports
12   section?
13       A    Yes.
14       Q    Are these reports that are prepared by
15   your group?
16       A    These reports are basically what we talked
17   about in data integrity. They're no longer reports.
18   They're queues now. So Appendix C really does not
19   happen anymore.
20       Q    If you wanted to, from the information
21   systems available to you, run a cancellation report
22   that included the information identified in Appendix
23   C, could you do it?
24       A    This type of information would come from
25   the CCS system.

Page 177

1        Q    That's Balboa's system?
2        A    Yes.
3        Q    And can you run reports from the Balboa
4    system?
5        A    I cannot, no.
6        Q    If you wanted to know, for example, for a
7    given year, the number of lender placed policies
8    that were issued in the state of Florida, could you
9    run that report from the information systems
10   available to you?
11       A    I could not run it, but that information
12   could be available.
13       Q    And who would it be available -- available
14   from?
15       A    I could make a request to have that done.
16       Q    Okay. And who would do it?
17       A    IT.
18       Q    And could you ask for a report of all the
19   lender placed policies issued in the state and
20   include all of these requests for -- that include
21   these requests for information, like loan number,
22   borrower name, policy number, policy issue date,
23   effective and expiration date, previous cancellation
24   date if an adjustment, cancellation adjustment
25   effective date, original premium charge, and refund

Page 178

1    or adjustment amount and cancel (inaudible) --
2         THE COURT REPORTER:  And cancel what?
3         MS. BOWMAN:  Method.
4         THE WITNESS:  I would have to check.
5    BY MR. BOWMAN:
6         Q    With the IT group?
7         A    Yeah.
8         Q    Okay.  Would that information be extracted
9    from the CCS system, to your knowledge?
10        A    Yes.
11             THE WITNESS:  Can I get some water?
12        Sorry.  Do you mind?  I didn't want to move and
13        get up.
14   BY MS. BOWMAN:
15        Q    So the level of information -- or the --
16        the types of information that you would be able --
17        that you would be able to gather for the lender
18        placed policies issued in Florida, that would be the
19        information available in the CCS system?
20        A    Yes.
21        Q    Okay.  And who would you ask if you wanted
22        that information?
23        A    I would submit one of those requests that
24        we talked about earlier, like a change request or a
25        request for information.

Page 179

1         Q    If you could take a look at the
2    Countrywide Home Loans' notice of taking corporate
3    deposition that was Exhibit 1, and go to the topics
4    of inquiry at page five.
5         MR. HELLER:  Give me a second to catch up,
6         please.  (Pause.)  Okay.
7    BY MS. BOWMAN:
8         Q    Actually, if you could turn to page eight
9    of the notice of taking corporate deposition, and at
10   topic 19 -- do you see that?
11        A    Yes.
12        Q    It says:  "The number of borrowers who
13   were sent Exhibit 2 in connection with Florida
14   property and loans serviced by CHL."  If you could
15   take a look at Exhibit 2.
16             Exhibit 2 is attached, attached to the
17        end.
18        A    I don't see Exhibit 2.
19        Q    You're right.  It's not attached.
20             Okay.  Switch to Exhibit 2, the Newport.
21   For some reason it's not attached to Exhibit 1.  And
22   on page seven of that exhibit, it has the same
23   inquiry:  "The number of borrowers who were sent
24   Exhibit 2 in connection with Florida property and
25   loans serviced by CHL."

Page 180

1         Do you see Exhibit 2?
2         A    Yes.
3         Q    Okay.  What did you do in order to prepare
4    to testify on that topic for today?
5         MR. HELLER:  Object to the form.
6         THE WITNESS:  I looked at this document.
7    BY MS. BOWMAN:
8         Q    Did you make a request or an inquiry, in
9    the manner you suggested to the IT group, to
10   determine whether you could, in fact, identify the
11   number of borrowers who were sent Exhibit 2 in
12   connection with Florida property and loans serviced
13   by CHL?
14        MR. HELLER:  Object to the form.
15        THE WITNESS:  For this particular one, I
16        would not have to make a request to the IT
17        department to perform that.  I could obtain
18        this -- this information from the AS400.
19   BY MS. BOWMAN:
20        Q    And how would you do that?
21        A    By running a query.
22        Q    And you can do that from your desktop?
23        A    I could if I had it, but I -- I can have
24   it done in my organization.
25        Q    Okay.  And you could extract then, from

Page 181

1    the AS400 system, the number of borrowers in Florida
2    who were sent the letter that's Exhibit 2?
3         A    Yes.
4         Q    Okay.  And what information would the
5    query be looking for in the AS400 in order to do
6    that?
7         A    That this letter was generated.
8         Q    Is there -- would there be a code
9    associated with that letter that you would be
10   searching for in the AS400?
11        A    It's not a code.  It -- it would be
12   multiple things.
13        Q    Okay.  What would the query be?
14        A    It would be looking for a specific
15   program, looking for a specific letter type, looking
16   for a specific time period.
17        Q    Could you select any time period?
18        A    Yes, I could.
19        Q    So, for instance, if you wanted to capture
20   all of the letters, like Exhibit 2, that have been
21   sent to persons in Florida in 2003, you could run
22   that query in the AS400 and receive that information
23   in what form back?
24        MR. HELLER:  Object to the form.
25        THE WITNESS:  I'm not understanding "what

5956458e-18af-4613-8ce9-860e100aae71

Page 182

1    form back."
2  BY MS. BOWMAN:
3    Q   In other words, you run the query and you
4  get -- you get an answer to your query in electronic
5  form?
6    A   Yes.
7    Q   Okay.  And could you ask that the query
8  also send back to you the loan numbers associated
9  with those letters?
10    A   Yes.
11    Q   And the borrower associated with those
12  letters?
13    A   Yes.
14    Q   And the borrower address associated with
15  those letters?
16    A   The current address, yes.
17    Q   And you could specify the time period
18  during which you wanted the query to analyze the
19  information in the AS400?
20    A   Yes.
21    Q   Could you also determine -- ask it to
22  determine, in connection with the loans it was
23  identifying, as having been set in Exhibit 2,
24  whether there was a letter-placed policy that was
25  issued?

Page 183

1    A   Could you be more specific?
2    Q   Sure.  Could -- could the query include a
3  parameter that would identify not just the letter
4  sent, but also a letter sent in -- that resulted in
5  a lender placed policy?
6    A   A generically lender placed policy, yes.
7    Q   And could you get any information about
8  that lender placed policy in addition to that, in
9  other words, what the effective date of that policy
10  was?
11    A   Yes.
12    Q   And what the end date of that policy was
13  or the term --
14    A   Yes.
15    Q   -- of the coverage?
16        Could you also get the issue date of that
17  policy?  In other words, the effective date and the
18  issue date may not be identical.  The date on which
19  that policy was issued?
20    A   No.
21    Q   Could you get the date on which the letter
22  was generated?
23    A   Which letter?
24    Q   The letter that's Exhibit 2.
25    A   Yes.

Page 184

1    Q   And could the query in the AS400 then
2  compile that information into a report that could be
3  printed so that you had each of those items of
4  information for each of those loans that was in the
5  kind of running report?
6    A   Yes.
7    Q   Could that -- could that query also
8  include or capture whether there was a -- a
9  preferred coverage hazard insurance policy in place
10  for that same time period?
11    A   There wouldn't be.  It's one or the other.
12    Q   Okay.  Well, for instance, if there -- if
13  there was a -- a preferred policy in place and a
14  lender placed policy had been issued, could -- could
15  the AS -- could the query that you're talking about
16  capture both pieces of information?  In other words,
17  the lender placed policy, its effective date and
18  expiration date, and -- and the regular preferred
19  policy and its effective date and expiration date?
20    MR. HELLER:  Object to the form.
21    THE WITNESS:  It's one or the other.  I go
22  back to that, because if there's lender
23  placement, lender placement is out there, not
24  preferred.
25

Page 185

1  BY MS. BOWMAN:
2    Q   Okay.
3    A   If there's no lender placement out there,
4  preferred is out there.
5    Q   Take -- take, for example, a -- a
6  situation where, in connection with a particular
7  loan, there was a person who had a hazard -- hazard
8  policy, but that -- but did not have a flood policy.
9  So a lender placed flood policy was -- was put in
10  place.  Could it capture both of those pieces of
11  information in the query?
12    A   No.
13    Q   Okay.  Why not?
14    A   There's either a lender placed policy out
15  there or there's a preferred policy out there.
16    Q   On the AS400?
17    A   On the AS400.
18    Q   Would the query be able to capture two
19  preferred policies?
20    A   Two preferred policies?  I'm not
21  understanding the question.
22    Q   Okay.  For instance, if -- if a borrower
23  has a hazard policy in place and a separate flood
24  policy in place, could the query capture that
25  information, including the effective date and

Page 186

1   expiration date and the term of coverage?
2       A   Yes.
3       Q   Okay.  Assume now for me that only one of
4   those policies was canceled, the flood policy, and a
5   lender placed flood policy was put in place, could
6   the query now capture the in-place preferred hazard
7   and the lender placed flood --
8           MR. HELLER:  Object to the form.
9   BY MS. BOWMAN:
10      Q   -- in the query?
11      A   Could you repeat that?
12      Q   Sure.  Assume, in the first instance, a
13  borrower has two policies, a hazard policy and a
14  flood policy, that are separate policies.
15      A   Yes.
16      Q   Those would actually show up in the AS400
17  on different lines, correct?
18      A   Yes.
19      Q   And what I'm saying is, in connection with
20  the AS400 query that we've been talking about, could
21  the query capture the fact that both of those
22  policies existed during a particular timeframe?
23      A   Yes.
24      Q   Okay.  Now assume that that same borrower
25  allows their flood policy to lapse, they don't --

Page 187

1   they don't pay the renewal premium, and -- or it's
2   canceled by the -- by the flood insurance company,
3   and your group, the business rules, as a result of
4   receiving a cancellation, causes a lender placed
5   flood policy to be issued.
6           If you looked at that -- that period of
7   time where the lender placed flood policy was in
8   place, could you also see the separate hazard policy
9   that was still the preferred policy --
10          MR. HELLER:  Object to the form.
11  BY MS. BOWMAN:
12      Q   -- in the query?
13      A   Yes.
14      Q   If you were running a query on the AS400
15  to identify loans in which Exhibit 2 had been
16  received, Exhibit 2 to the Newport -- to Exhibit 2,
17  could you see -- could you run a query that showed
18  the lender placed policy and the prior hazard
19  policy?
20      A   What lender placed policy?
21      Q   The lender placed policy that was issued
22  as a result of the letter cycle that was started
23  with Exhibit 2.
24          MR. HELLER:  Object to the form.
25          THE WITNESS:  I need -- I need you to

Page 188

1   repeat that, please.
2   BY MS. BOWMAN:
3       Q   Okay.  The -- Exhibit 2 is a -- is a
4   letter that -- let's just take a look at it real
5   quick.  Exhibit 2 is a letter relating to --
6   notifying the customer that there's inadequate
7   information about their having wind or hurricane
8   coverage; is that correct?
9       A   Yes.
10      Q   So what I'm asking is, is if that letter
11  was issued to a customer and a lender placed policy
12  was placed, okay, because of the absence of wind
13  coverage, could you, in an AS400 query, identify
14  that the letter was sent -- we've already
15  established that, right?
16      A   Yes.
17      Q   And could you also extract the information
18  that would show the period of the coverage of the
19  lender placed policy?
20      A   Just because this letter was sent does not
21  necessarily mean there's lender placement.
22      Q   I agree.
23      A   Okay.
24      Q   So what I'm saying is, if -- if you're
25  querying for these different items, can they all

Page 189

1   appear in the same report?  You're querying for
2   people that were sent that letter that -- and it
3   resulted in a lender placed policy that was issued
4   because they did not have adequate wind coverage,
5   and you could also capture any other insurance
6   coverage they had in place for that same time
7   period?
8           MR. HELLER:  Object to the form.
9           THE WITNESS:  Not in all the same query.
10  BY MS. BOWMAN:
11      Q   Okay.  How -- how would you have to -- to
12  do it to have all of that information related to one
13  loan number?
14      A   Probably have to start from the beginning.
15  What letter went out is the first query.
16      Q   Okay.
17      A   Second query would be, is there lender
18  placement?  If there is lender placement and a
19  preferred hazard, without looking at each and every
20  loan to determine that, I don't think I could come
21  up with an accurate number.
22      Q   Okay.  When you extract the information
23  about the people who were issued the letter, you can
24  get their loan number, their name, their current
25  address, and that the letter was issued to them,

5956458e-18af-4613-8ce9-860e100aae71

Page 190

1  correct?
2      A   Correct.
3      Q   When you then -- can you then search those
4  loan numbers, that you collected in connection with
5  that query, to determine whether there was a lender
6  placed policy that was issued?
7      A   I could.
8      Q   Okay.  And in connection with those loan
9  numbers in which you had -- that you had from the
10  first query, and you got to the second query and
11  determined whether there was a lender placed policy
12  issued, could you then take those loan numbers, and
13  maybe it would be less than the first, fewer loan
14  numbers, and run a query to determine whether there
15  was a hazard policy in place during the effective
16  dates of the lender placed policy?
17      A   I'm not sure.  It's very possible that my
18  results will come back with information, but was
19  that lender placed policy put out there because of
20  this (indicating)?  I would have to run the query
21  month by month by month by month and compare.
22      Q   To know if the lender placed policy was --
23  resulted from that letter?
24      A   Correct.
25      Q   Okay.  Would there be a way to query

Page 191

1  the -- the AS400 system to determine whether a
2  lender placed policy was issued because of the
3  absence of wind -- or adequate wind coverage?
4      A   After December of 2007.
5      Q   Why?  Because there's a wind -- there's a
6  wind policy?
7      A   Correct.
8      Q   So if you were querying the system prior
9  to December 2007, and you were looking for lender
10  placed policies that were issued because of
11  inadequate wind coverage, what query would you run?
12      A   That's what we've been discussing.
13      Q   Uh-huh.
14      A   In order to run that query -- I don't know
15  why that lender placed policy could be out there.
16  That lender placed policy could be out there because
17  it was due to the hazard policy expiring, or it
18  could be due to inadequate wind coverage.  The only
19  way to come up with inadequate wind coverage --
20      Q   Uh-huh.
21      A   -- would be to identify the potential
22  population and review every single loan, screen by
23  screen by screen, to see why that was out there; if
24  it was out there because of this reason
25  (indicating).

Page 192

1      Q   Could you run a query that would show you
2  that there was a -- a preferred hazard -- hazard
3  policy in place for this same period of time as the
4  lender placed policy?
5      A   Not without running it month by month by
6  month.
7      Q   Okay.  And if you -- if you did run, for
8  instance, a monthly report for January of 2006, you
9  could identify the loans in the AS400 where there
10  was a preferred hazard policy in place and also a
11  lender force placed policy through Balboa in place?
12          MR. HELLER:  Object to the form.
13          THE WITNESS:  Could you please clarify it
14      again?
15  BY MS. BOWMAN:
16      Q   Sure.  If you ran a report -- or ran a
17  query for January 2006, you could run a query that
18  would tell you whether, in connection with
19  particular loan numbers, there was a lender placed
20  policy in place through Balboa, and a preferred
21  hazard policy in place?
22          MR. HELLER:  Object to the form.
23          THE WITNESS:  I believe I could do that.
24  BY MS. BOWMAN:
25      Q   And in connection with that query, could

Page 193

1  you not only get the loan number but also the name
2  of the borrower and the address of that property?
3      A   Yes.
4      Q   And could you also identify in that
5  inquiry -- or query -- whether or not a wind letter,
6  like Exhibit 2, had been sent to that borrower?
7      A   Still based on, I believe you said,
8  January of 2006, yes.
9      Q   Okay.  So it -- so the letter would have
10  had to have been sent in January 2006 for it to be
11  identified that way?
12      A   No.
13      Q   Okay.  So the query could pick up the --
14  if the letter was in the January 2006 query, what --
15  if the letter was sent to the borrower in 2006,
16  would it pick it up?
17      A   No.
18      Q   Uh-huh.
19      A   It would still have to be multiple
20  queries.
21      Q   Okay.  Could you run a query in the AS400
22  that would identify, by loan number, borrower, and
23  property, a lender placed policy, the coverage
24  period for which predated the letter cycle to the
25  borrower?

5956458e-18af-4613-8ce9-860e100aae71

Page 194

1    A   I'm not understanding that.
2    Q   Sure.  Take a look at number 21 in the
3    Countrywide Home Loans Exhibit 1, Topics of Inquiry.
4    See that?
5    A   (Reviewing document.) I'm sorry, I'm
6    really getting tired.  I can't -- I can't think.
7    Give me a minute -- another minute, and I'll try to
8    get through this.  But I am getting tired right now.
9    (Reviewing document.)
10        This is, my opinion, every single lender
11   placed policy that is issued for anything.  Based on
12   what this is saying -- please, I need clarification
13   if I'm saying this wrong, what you think this is,
14   but we have an effective date that -- from testimony
15   earlier today, it's that cancellation date for the
16   lack of insurance --
17   Q   Okay.
18   A   -- right?
19   Q   Yes.
20   A   So today is that cancellation date.  The
21   request for insurance goes out to Balboa today, a
22   letter is either generated the following day, or
23   possibly 14 days later, so, in essence, it's every
24   single lender placed policy that is requested, the
25   policy period is prior to the first notice.

Page 195

1    Q   Okay.
2    A   Is that what that's saying?
3    Q   Yes.  Here's -- here's the next question:
4    Can you then identify, through a query, the -- let's
5    start it this way:  A usual letter cycle -- letter
6    cycle in a lender placed policy is no more than 60
7    days; is that correct?
8    A   Approximately 60 days.
9    Q   So the cancellation of the insurance comes
10   in, you send the information to Balboa, the letter
11   cycle starts, 60 days later you're issuing a
12   certificate of insurance that's backdated to the
13   cancellation date, correct?
14   A   Correct.
15   Q   Okay.  And it runs for a policy period of
16   a year?
17   A   Correct.
18   Q   Now, can you, through a query in the
19   AS400, determine the date upon which the first
20   letter was sent, along with the loan number, the
21   borrow information, and the address of the property?
22   A   No.
23   Q   Okay.  Why not?
24   A   The dates of the letter --
25   Q   Yes.

Page 196

1    A   -- the lender placed letters were not
2    in -- were not populating the AS400 during that
3    entire time period.
4    Q   Okay.  How long have they been populating
5    the AS400?
6    A   I'm recalling 2004, 2005 right now.  But I
7    could obtain that date.
8    Q   Could that information be obtained from
9    the CCS system, the date of the initial letter to
10   the borrower?
11   A   Yes.
12   Q   And it could be obtained in connection
13   with the lender placed policy that was ultimately
14   placed?
15   A   Yes.
16   Q   Could you then run a query in the CCS
17   system, or have someone do it, that would show you
18   lender placed policies that predated the first
19   letter to the borrower by greater than 60 days?
20   A   I don't know.
21   Q   Who would you go to to get the answer to
22   that question?
23   A   I would submit the request and see if we
24   could do it.
25   Q   Is there someone in particular that you

Page 197

1    could contact that works with the CCS system to say,
2    I'd like this information, I'm going to submit a
3    query, do you think we can do it?
4    A   I could.
5    Q   Who is that?
6    A   Mike McKenzie.
7    Q   And he's in -- in CHL's IT department?
8    A   No.
9    Q   Balboa's?
10   A   Yes.
11   Q   Would you, in your role and responsibility
12   for the insurance tracking group, get information
13   from either Balboa or other resources concerning
14   insurance companies in Florida that were excluding
15   wind?
16   A   Could you repeat that, please?
17   Q   Sure.  As a part of your ongoing
18   management of the insurance tracking group, would
19   you receive information or research and obtain
20   information about which carriers in the state of
21   Florida were excluding wind in the issuance of
22   hazard policies?
23        MR. HELLER:  Object to the form.
24        THE WITNESS:  I would know that
25        information from the types of documents that

Page 198

1    we're receiving in.
2  BY MS. BOWMAN:
3    Q   Would you do anything to get advanced
4  notice of that?
5    A   No.
6    Q   Would you, based on the information you
7  were getting in, alert your staff or team:  Looks
8  like Nationwide has dropped wind coverage from their
9  Florida policies, we've got to keep an eye on this
10  kind of a thing?
11    A   Yes.
12    Q   Okay.  And how would that happen?
13    A   Actually, most likely the staff would be
14  alerting me, because they see it on the documents
15  coming in.
16    Q   Sure.  And would that be then communicated
17  to the entire group in some fashion?
18    A   Yes.
19    Q   How would that happen?
20    A   During their team meetings.
21    Q   And the team meetings are done based on
22  the individual groups that are identified in
23  Exhibit 3?
24    A   Yes.
25    Q   Would there be any kind of written

Page 199

1  information that would be available to the people
2  that were reviewing the incoming materials and
3  scanning that, to look out for, like, a hit list of
4  insurance companies doing particular things that
5  they would have available to them?
6    A   No.
7    MR. HELLER:  Object to the form.
8  BY MS. BOWMAN:
9    Q   Take a look at -- I want to go back to
10  something that you said about if you were running a
11  query in AS400 after December of 2007.  You could
12  tell that the lender placed policy that was issued
13  was issued because of inadequate windstorm coverage;
14  is that correct?
15    A   Correct.
16    Q   Because there was now a separate windstorm
17  policy that was being issued; is that correct?
18    A   Correct.
19    Q   And before that, what would -- if there
20  was a lender placed policy that was issued because
21  there was inadequate windstorm coverage in
22  connection with a particular loan, would that have
23  shown up in the AS400 system as simply a lender
24  placed hazard policy?
25    MR. HELLER:  Object to the form.

Page 200

1    THE WITNESS:  Yes.
2  BY MS. BOWMAN:
3    Q   Okay.  And if you wanted to identify
4  whether that lender placed hazard policy was issued
5  based on the absence of wind -- based on the
6  inadequate windstorm coverage, could you find that
7  out from the CCS system?
8    MR. HELLER:  Object to the form.
9    THE WITNESS:  What time period?
10  BY MS. BOWMAN:
11    Q   Well, obviously before December of 2007.
12    A   No.
13    Q   So the reason code for the issuance of the
14  lender placed policy in the CCS system would not be
15  D as opposed to HO?
16    A   It would not.
17    Q   They wouldn't record that?
18    A   No.
19    Q   Then how would you know, even researching
20  on a file-by-file basis, whether it was issued
21  because of the inadequate lender placed policy --
22  inadequate wind coverage?
23    A   I would have to go loan by loan and review
24  each transaction, each document that came in, to see
25  if it was missing -- if it had a wind exclusion.

Page 201

1    Q   Okay.  Would there be -- would there ever
2  be an instance in a loan file where you had a lender
3  placed hazard policy that covered the same time
4  period as a preferred hazard policy, that was not
5  the result of inadequate wind coverage?  Could that
6  happen for some other reason?
7    MR. HELLER:  Object to the form.
8    THE WITNESS:  Please repeat that.
9  BY MS. BOWMAN:
10    Q   Sure.  If you were looking at a particular
11  person's loan file and you saw that there was a
12  hazard policy -- a preferred hazard policy in place
13  for a particular time period, okay, and you saw that
14  there was also a lender placed hazard policy in
15  place for that same time period, could that happen
16  in any circumstance other than the person had
17  inadequate wind coverage?
18    MR. HELLER:  Object to the form.
19    THE WITNESS:  That would have been caught
20  by the reconciliation that the data integrity
21  group does.  All right?
22  BY MS. BOWMAN:
23    Q   Okay.
24    A   And they would have made a determination
25  whether or not that stays or goes.

5956458e-18af-4613-8ce9-860e100aae71

Page 202

1    Q   Right.
2    A   Can I query for that? I need to go month
3    by month by month.
4    Q   And my question is: Would they have
5    determined that it's -- that both policies stay in
6    circumstances other than the hazard policy that was
7    in place didn't have adequate wind coverage?
8        MR. HELLER: Object to the form.
9        THE WITNESS: I didn't understand that.
10   BY MS. BOWMAN:
11   Q   Okay. You're saying that if there was a
12   preferred hazard policy in place and a lender hazard
13   policy in place for the same time period, something
14   would have popped up in the reconciliation report?
15   A   Correct.
16   Q   Okay. And your folks would have
17   investigated that to determine why it had occurred?
18   A   Correct.
19   Q   And I'm trying to understand, in what
20   circumstances would they have determined that it was
21   appropriate that both of those policies exist
22   together? In other words, would that occur in any
23   circumstance other than the absence of wind
24   coverage?
25       MR. HELLER: Object to the form.

Page 203

1        THE WITNESS: It could --
2    BY MS. BOWMAN:
3    Q   Okay.
4    A   -- based on the other scenario of a front
5    property and a back property. There could be lender
6    placement on the front property and preferred on the
7    back property. But the preferred doesn't cover
8    both.
9    Q   All right. Other than those two
10   circumstances, is there any instance in which that
11   would -- would occur?
12   A   Not that I can think of.
13   Q   Can you -- can you tell me how many times
14   you've seen that front property/back property
15   scenario?
16   A   I have no idea.
17   Q   Could you then, having identified the
18   loans in which there was the hazard policy in place
19   during the same period as the lender placed policy,
20   determine whether a hurricane letter, such as the
21   one that's Exhibit 2, was sent to that borrower?
22   A   I didn't understand the question.
23   Q   Sure. In those instances where you could
24   determine that there was a hazard -- a preferred
25   hazard policy in place at the same time as the

Page 204

1    lender placed hazard policy, which you said you
2    could do on a month-to-month basis --
3    A   Yes.
4    Q   -- could you then also determine for those
5    same loan numbers, whether -- whether those
6    borrowers had been sent a wind letter?
7    A   In a separate query, yes.
8    Q   And then you would just have to match
9    the --
10   A   Correct.
11   Q   -- reports?
12       Could you get from that query regarding
13   the wind letter, the date of each of those letters?
14   A   Yes.
15   Q   Can you tell me for what period of time
16   you've had separate letters for lender placed
17   insurance relating -- or identifying to the borrower
18   that there was some inadequacy with regard to wind
19   coverage?
20   A   I didn't understand that question.
21   Q   Take a look at Exhibit 2, to the Newport
22   Exhibit 2. Do you have that in front of you?
23   A   Yes.
24   Q   That particular letter has a date on the
25   bottom right-hand corner of 1/13/2006. Do you see

Page 205

1    that?
2    A   Yes.
3    Q   Were there letters like this that went to
4    borrowers before that date, January 2006, that
5    indicated to them that the -- there was some
6    inadequacy or some information you needed about
7    their hurricane coverage?
8    A   Yes.
9    Q   Okay. So we're not just talking about you
10   could identify those -- those borrowers who were
11   sent a wind-related letter back only to 2006; you
12   could do it for the entire timeframe back to 2003?
13   A   Yes.
14       MS. BOWMAN: Let's go off the record.
15       THE VIDEOGRAPHER: It's basically the end
16   of this tape now.
17       This concludes tape number six. We're off
18   the record at 7:21 p.m.
19       (Deposition adjourned at 7:21 p.m.)
20
21
22
23
24
25

5956458e-18af-4613-8ce9-860e100aae71

Page 206

## CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF ORANGE

I, the undersigned authority, certify that
STEPHEN GRZESKOWIAK personally appeared before
me on the 26th day of June, 2008, and was duly
sworn.

WITNESS my hand and official sea
day of July, 2008.

Stacy Pace, RPR, CSR, CRR, FPR
Notary Public - State of Florida
Commission No. DD 761417
Expires: April 30, 2012

---

Page 207

## CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF ORANGE

I, STACY PACE, RPR, CSR, CRR, FPR, State of
Florida at large, do hereby certify that the
foregoing pages, numbered 1 through 205, inclusive,
are a true and correct transcription of my shorthand
notes of said deposition.

I further certify that I am not an attorney
or counsel of any of the parties, nor am I a
relative or employee of any attorney or counsel
of parties connected with the action, nor am I
financially interested in the action.

The foregoing certification of this
transcript does not apply to any reproduction
of the same by any means unless under the direct
control and/or direction of the certifying
reporter.

IN WITNESS WHEREOF, I have hereunto set my
hand this 9th day of July, 2008.

_____

Stacy Pace, RPR, CSR, CRR, FPR

---

Page 208

ERRATA SHEET
IN RE: DRURY V. COUNTRYWIDE
DEPOSITION OF: STEPHEN GRZESKOWIAK
TAKEN: 6-26-08
JOB# 941683

PAGE # LINE #   CHANGE       REASON

Under penalty of perjury, I declare that I have read
my deposition and that it is true and correct subject
to any changes in form or substance entered here.

SIGNATURE OF DEPONENT: _____  DATE: _____

---

Page 209

DATE:  July 9, 2008
TO:  Stephen Grzeskowiak
    c/o William P. Heller, Esquire
    Akerman Senterfitt
    350 East Las Olas Boulevard
    Suite 1600
    Fort Lauderdale, Florida 33301

IN RE: DRURY V. COUNTRYWIDE
    Please take notice that on June 26, 2008,
you gave your deposition in the above-referenced
matter. At that time you did not waive signature.
It is now necessary that you read and sign your
deposition should you still choose to do so.
    As previously agreed to, the transcript will be
furnished to you through your counsel. Please read
the following instructions:
    At page 208, you will find an errata sheet. As
you read your deposition, any changes or corrections
that you wish to make should be noted on the errata
sheet, citing page and line number of said change.
DO NOT write on the transcript itself. Once you have
read the transcript and noted any changes, be sure to
sign and date the errata sheet and return these pages
to our office.
    If you do not read and sign the deposition
within a reasonable time period, the original, which
has already been forwarded to the ordering attorney,
may be filed with the Clerk of Court.
    If you wish to waive your signature, sign your
name in the blank at the bottom of this letter and
return it to us.
            Sincerely,

            Stacy Pace, RPR, CSR, CRR, FPR
            Esquire Deposition Services
I do hereby waive my signature:

_____
STEPHEN GRZESKOWIAK

cc. via transcript: Jill H. Bowman, Esquire

5956458e-18af-4613-8ce9-860e100aae71