UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DORIS DRURY and TERRY
KOCHNIARCZYK, on behalf
of themselves, and those
similarly situated,

CASE NO: 6:08-cv-152-ORL-28-DAB

      Plaintiffs,

vs.

COUNTRYWIDE HOME LOANS, INC.,
COUNTRYWIDE INSURANCE SERVICES,
INC., BALBOA INSURANCE COMPANY, and
and NEWPORT MANAGEMENT CORPORATION,

      Defendants.

_____/


VIDEOTAPED DEPOSITION OF STEPHEN GRZESKOWIAK

VOLUME III


FRIDAY, JULY 27, 2008
8:50 a.m. - 5:28 p.m.

420 SOUTH ORANGE AVENUE, 12TH FLOOR
ORLANDO, FLORIDA  32801


REPORTED BY:
Stacy Pace, RPR, CSR, CRR, FPR
Notary Public, State of Florida
Esquire Deposition Services
Orlando Office - Job# 941693
Phone:  407-426-7676

## Page 2

```
 1   APPEARANCES:
 2      On behalf of the Plaintiffs:
          Jill H. Bowman, Esquire
 3        Jonathan B. Cohen, Esquire
          James, Hoyer, Newcomer
 4        & Smiljanich, P.A.
          4830 West Kennedy Boulevard
 5        Urban Centre One, Suite 550
          Tampa, Florida 33609
 6
 7      On behalf of the Defendants:
          William P. Heller, Esquire
 8        Akerman Senterfitt
          350 East Las Olas Boulevard
 9        Suite 1600
          Fort Lauderdale, Florida 33301
10
11
12   Also Present:  Alan Bennett, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1   Exhibit No. 17 .......................... 65
          (New Century mortgage)
 2   Exhibit No. 18 .......................... 119
          (Countrywide monthly home loan statement)
 3   Exhibit No. 19 .......................... 123
          (3/12/06 letter to Ms. Drury)
 4   Exhibit No. 20 .......................... 128
          (4/19/06 letter to Ms. Drury)
 5   Exhibit No. 21 .......................... 134
          (6/1/06 notice to Ms. Drury)
 6   Exhibit No. 22 .......................... 147
          (Balboa insurance policy)
 7   Exhibit No. 23 .......................... 160
          (customer service training manual)
 8   Exhibit No. 24 .......................... 161
          (customer service retraining manual)
 9   Exhibit No. 25 .......................... 165
          (AS400 print screens, Drury refinance)
10   Exhibit No. 26 .......................... 167
          (Balboa procedures manual)
11   Exhibit No. 27 .......................... 173
          (Balboa intercompany services agreement)
12
13   Defendants'
14   Exhibit No. 28 .......................... 186
          (New Century insurance requirements)
15   Exhibit No. 29 .......................... 191
          (letter regarding hurricane/wind coverage)
16   Exhibit No. 30 .......................... 194
          (2/26/06 letter to Ms. Drury)
17   Exhibit No. 31 .......................... 195
          (3/12/06 letter to Ms. Drury)
18   Exhibit No. 32 .......................... 196
          (4/19/06 letter to Ms. Drury)
19   Exhibit No. 33 .......................... 204
          (wind-only rate table)
20   Exhibit No. 34 .......................... 207
          (hazard insurance requirements)
21
             - - - -
22
23
24
25
```

## Page 3

```
 1            I N D E X
 2   Testimony of STEPHEN GRZESKOWIAK
 3      Direct Examination by Ms. Bowman ........... 5
        Cross-Examination by Mr. Heller ........... 184
 4      Redirect Examination by Ms. Bowman ........ 211
        Recross-Examination by Mr. Heller ........ 224
 5
 6   Certificate of Oath ..................... 228
 7   Certificate of Reporter ................. 229
 8   Errata Sheet ............................ 230
 9   Read & Sign Letter ...................... 231
10          - - - -
11        E X H I B I T S
12   Plaintiffs'
13   Exhibit No. 5 ............................ 6
          (letter regarding hurricane/wind coverage)
14   Exhibit No. 6 ........................... 14
          (2/26/06 letter to Ms. Drury)
15   Exhibit No. 7 ........................... 20
          (corrected joint status report)
16   Exhibit No. 8 ........................... 20
          (policies & procedures manual)
17   Exhibit No. 9 ........................... 29
          (lender operational manual)
18   Exhibit No. 10 .......................... 39
          (wind coverage letter)
19   Exhibit No. 11 .......................... 40
          (hazard coverage letters)
20   Exhibit No. 12 .......................... 42
          (wind coverage letters)
21   Exhibit No. 13 .......................... 49
          (AS400 screens)
22   Exhibit No. 14 .......................... 55
          (memorandum of insurance)
23   Exhibit No. 15 .......................... 59
          (New Century underwriting documents)
24   Exhibit No. 16 .......................... 63
          (New Century wholesale funding control)
25
```

## Page 5

```
 1        Deposition taken before STACY PACE, RPR, CSR, CRR,
 2   FPR, and Notary Public in and for the State of Florida at
 3   Large, in the above cause.
 4            - - - -
 5        THE VIDEOGRAPHER:  This is the
 6   continuation of the deposition of Stephen
 7   Grzeskowiak, corporate representative of
 8   Countrywide Home Loans, Incorporated, and
 9   Newport Management, Incorporated.  Today's date
10   is June 27, 2008.  We're now on the record at
11   8:50 a.m.
12            - - - -
13   Thereupon,
14        STEPHEN GRZESKOWIAK,
15   having been previously duly sworn or affirmed, was
16   examined and testified as follows:
17        DIRECT EXAMINATION
18   BY MS. BOWMAN:
19   Q    Good morning, Mr. Grzeskowiak.
20   A    Good morning.
21   Q    Yesterday -- just to confirm again, you're
22   here to testify on behalf of Countrywide Home Loans
23   and Newport Management Corporation about matters
24   relating to insurance tracking and lender placed
25   policies; is that correct?
```

Page 6

1      A   Yes.
2      Q   Yesterday we talked -- we were talking
3  about a situation where a homeowner had a policy in
4  place for -- like a homeowner's policy on their
5  property, but in this situation where that
6  homeowner's policy did not include or potentially
7  did not include wind coverage. Do you recall that?
8      A   Yes.
9         (Exhibit No. 5 marked for identification.)
10 BY MS. BOWMAN:
11     Q   I'm going to hand you what I've marked as
12 Exhibit 5, which is a -- a letter that we have
13 referenced that's also attached to the Newport
14 notice of taking deposition, Exhibit 2, correct?
15     A   Yes.
16     Q   And you indicated, isn't it correct, that
17 this is a letter that would be sent to a consumer if
18 there was a question concerning whether that
19 consumer's -- or customer/borrower's hazard policy
20 had -- or included wind coverage; is that correct?
21     A   I don't believe so.
22     Q   Okay.
23     A   I need you to ask that question again.
24     Q   Sure. Is this a -- this is a letter that
25 would be sent to a borrower, or consumer, if there

Page 7

1  was some question about whether or not their hazard
2  policy included wind?
3      A   This letter would be sent when we
4  confirmed that it excluded wind.
5      Q   Okay. And that would be a part of your
6  functions in the insurance tracking group?
7      A   Yes.
8      Q   If a borrower in Florida had a -- has a
9  homeowner's policy that excludes wind, what kind of
10 policy -- and I'm talking about from 2003 to the
11 present, what kind of policy would Countrywide have
12 lender placed on that property as a result of that
13 exclusion?
14     A   A lender placed policy which included wind
15 coverage.
16     Q   Why would the -- why would the company not
17 simply place a lender placed wind policy?
18     A   The lender placed policy at that time
19 included wind. It was the product that was
20 available.
21     Q   Meaning that when Countrywide was placing
22 a lender placed policy that included wind, it was
23 placing an all risk policy?
24     A   I'm not sure of what the -- what you're
25 determining all risk to be.

Page 8

1      Q   Okay. It was a policy that had all the
2  coverages that Countrywide required the borrower
3  would have?
4      A   Yes.
5      Q   So what would you -- what do you call that
6  policy?
7      A   It would be a fire policy including
8  extended coverage, which includes wind.
9      Q   Now, if a homeowner already had a home --
10 homeowner's policy in place that you determined did
11 not have wind coverage or excluded wind coverage and
12 the -- this fire policy, lender placed policy with
13 the additional coverages was placed, that would, we
14 can agree, result in a homeowner having duplicative
15 coverage for many of the types of coverage apart
16 from wind; is that correct?
17         MR. HELLER: Object to the form.
18         THE WITNESS: Could you repeat that,
19     please?
20 BY MS. BOWMAN:
21     Q   Sure. If a -- if a borrower has a hazard
22 policy in place and the only problem is that it excludes
23 wind, and you force placed this fire and extended
24 coverage policy that includes wind, wouldn't it be
25 accurate to say that now the borrower has

Page 9

1  duplicative coverages apart from wind?
2         MR. HELLER: Object to the form.
3         THE WITNESS: There are additional
4     coverages that would be the same, yes.
5  BY MS. BOWMAN:
6      Q   So, for example, a homeowner's policy
7  would cover in a disaster or accident by fire,
8  correct?
9      A   Yes.
10     Q   So would the lender placed policy that you
11 force placed simply because they didn't have wind?
12     A   Yes.
13     Q   And there would be other kinds of
14 coverages that would be included in a homeowner's
15 policy that are also in the fire -- the lender
16 placed fire policy so that there would be coverages
17 coming from the preferred coverage provider or
18 policy that would be identical to or cover the same
19 kinds of losses as the fire policy that you lender
20 placed?
21         MR. HELLER: Object to the form.
22 BY MS. BOWMAN:
23     Q   Because wind was excluded?
24         MR. HELLER: Same objection.
25         THE WITNESS: I really need you to break

Page 10

1 that down because I've heard multiple things in
2 there that I need some clarification on.
3 BY MS. BOWMAN:
4    Q   There's a homeowner's policy in place, it
5 has -- it has coverages, but not wind, correct?
6    A   Correct.
7    Q   Okay. And the lender placed policy that
8 you put in place, because of the absence of wind,
9 has many of the same coverages that the homeowner's
10 policy does?
11       MR. HELLER: Object to the form.
12       THE WITNESS: Correct.
13 BY MS. BOWMAN:
14    Q   Do you discount the premium on the lender
15 placed policy that you placed because -- only
16 because wind is excluded when you issue that lender
17 placed policy?
18    A   No.
19    Q   So now the homeowner has coverage through
20 its preferred provider and a lender placed policy
21 that covers many of the same kinds of losses, and
22 they paid full premiums for both?
23       MR. HELLER: Object to the form.
24 BY MS. BOWMAN:
25    Q   Is that correct?

Page 11

1       MR. HELLER: Object to the form.
2       THE WITNESS: Yes.
3 BY MS. BOWMAN:
4    Q   We talked about -- looking at Exhibit 5
5 again, the letter that would go to a homeowner once
6 your group had identified that their hazard coverage
7 did not include wind, are there prior iterations of
8 this letter that were actually sent to borrowers
9 before January of 2006?
10    A   The format might be a little bit
11 different, but the content is exactly the same.
12    Q   And do -- would you have somewhere in your
13 systems, the historical records?
14    A   No, I do not.
15    Q   We talked yesterday about how you would
16 search the AS400 system in order to determine
17 whether a particular borrower had been sent a letter
18 like Exhibit 5. And you indicated that that was
19 possible, correct?
20    A   Yes.
21    Q   And that would be true for the prior
22 versions of this letter as well?
23    A   Yes.
24    Q   Okay. And any subsequent versions other
25 than the 1/13/06; is that correct?

Page 12

1    A   Yes.
2    Q   In the letter cycle associated with the
3 notification to a customer that they do not have
4 adequate wind coverage, does this letter have
5 subsequent letters that also talk about wind?
6    A   I didn't understand that question.
7    Q   There's a letter cycle that's associated
8 with advising a customer that you don't have
9 adequate information about their wind coverage
10 because it's excluded from their hazard policy,
11 correct?
12    A   Yes.
13    Q   Okay. And that letter cycle is more than
14 one letter, correct?
15    A   Yes.
16    Q   Okay. We're looking at one -- one letter,
17 and this would be, to my understanding, and correct
18 me if I'm wrong, the first letter that would go out
19 to a customer if there was a question about their
20 wind coverage?
21    A   This letter would go out if there was a
22 question about their wind coverage. However, we do
23 not consider this as part of the letter cycle.
24    Q   Okay.
25    A   When we reference letter cycle, that has

Page 13

1 to do with when lender placement is requested.
2    Q   Okay. So is this letter sent out when
3 lender placement is requested?
4    A   No.
5    Q   When is this sent out?
6    A   It's sent out prior to lender placement
7 being requested.
8    Q   Okay. So the letter cycle that you were
9 talking about yesterday is the letters that are
10 created once Balboa obtains the information that a
11 lender placed policy has been ordered; is that
12 right?
13    A   Could you repeat that, please?
14    Q   Balboa begins -- begins the letter cycle
15 once they have scanned your system and seen, in
16 connection with a particular borrower, that a lender
17 placed policy has been ordered?
18    A   Yes.
19    Q   And that letter cycle does not -- is there
20 a letter cycle for -- expressly for wind?
21    A   There's a letter cycle specifically for
22 any preferred policy that isn't acceptable with
23 adequate coverage.
24    Q   So if the -- if a homeowner had a hazard
25 policy that excluded wind and lender placed --

Page 14

1  lender placed policy was ordered, the letter cycle
2  that would be begun by Balboa is a letter cycle that
3  does not include the letter that's Exhibit 5?
4      A   Correct.
5      Q   And, actually, is letters that -- that
6  talk about that there's a question about their
7  hazard or homeowner's insurance; is that right?
8      A   It's not a question. I believe it states
9  homeowner's insurance that may not be adequate.
10     Q   Yeah, but that letter cycle doesn't
11  specifically describe what the inadequacy is that
12  has been identified?
13         MR. HELLER: Object to the form.
14         THE WITNESS: I believe it does.
15         MS. BOWMAN: Okay.
16         (Exhibit No. 6 marked for identification.)
17  BY MS. BOWMAN:
18     Q   I'm going to hand you what I've marked as
19  Exhibit 6 -- sorry for the slide -- which is a
20  letter dated February 26, 2006, that was sent to
21  Ms. Drury, who's the plaintiff in this case, in
22  connection with insurance.
23         Can you tell me if this is the first
24  letter in the letter cycle that would have been sent
25  by Balboa?

Page 15

1          MR. HELLER: Object to the form.
2          THE WITNESS: This is the first letter
3       within our letter cycle.
4  BY MS. BOWMAN:
5      Q   Okay. So once the -- once your group
6  determined that Ms. Drury -- Ms. Drury's policy
7  excluded wind, and you ordered lender placed -- a
8  lender placed policy, then Balboa would have sent
9  this letter, correct?
10     A   I didn't understand that question.
11     Q   Sure. Once a lender placed policy was
12  ordered, based on your -- your group's determination
13  that Ms. Drury's hazard policy excluded wind, Balboa
14  would have sent this letter --
15         MR. HELLER: Object to the form.
16  BY MS. BOWMAN:
17     Q   -- correct?
18     A   Yes.
19     Q   And this letter would have been sent
20  actually after the order was placed with the lender
21  placed policy?
22         MR. HELLER: Object to the form.
23         THE WITNESS: Could you repeat that?
24  BY MS. BOWMAN:
25     Q   Sure. This -- this letter would have been

Page 16

1  sent after the -- your group had made the order to
2  Balboa for a lender placed policy?
3      A   Correct.
4      Q   And can you tell me -- well, first of all,
5  is it accurate that it indicates that "Our records
6  indicate that we do not have your homeowner's
7  insurance information on the property referenced
8  above"? Do you see that?
9      A   Yes.
10         MR. HELLER: Object to the form.
11  BY MS. BOWMAN:
12     Q   And with regard to a policyholder or a --
13  a borrower like Ms. Drury, where you did have
14  information about her homeowner's policy, that would
15  not exactly be an accurate statement, would it?
16         MR. HELLER: Object to the form.
17         THE WITNESS: I would believe that we
18      would need to read on further in this -- in
19      this letter.
20  BY MS. BOWMAN:
21     Q   Okay. And can you tell me where, in the
22  letter itself to Ms. Drury, it indicates that the
23  determination that you've made is that there is
24  inadequate wind coverage?
25     A   Well, I -- I think if we read the second

Page 17

1  sentence, it does state that it's a requirement to
2  maintain acceptable insurance coverage. If we read
3  further through the letter, it refers the reader to
4  the insurance requirements that are attached.
5      Q   Nowhere in the letter does it indicate
6  that the -- that what is missing or what the concern
7  is of Countrywide is that there's an absence of wind
8  coverage in -- in the homeowner's policy?
9          MR. HELLER: Object to the form.
10         THE WITNESS: I believe on the third page,
11      it does.
12  BY MS. BOWMAN:
13     Q   No, I said in the letter, before -- before
14  the -- in the -- in the two-page letter, it has an
15  attachment, I agree, okay?
16     A   Uh-huh.
17     Q   In the two-page letter, it nowhere tells
18  Ms. Drury, Countrywide has identified your
19  homeowner's policy as having a problem because it
20  excludes wind, correct?
21     A   Correct.
22     Q   And this would be the first letter in the
23  letter cycle that would have preceded the actual
24  payment of the lender placed policy; is that
25  correct?

d64b1a2a-03c0-4134-b10b-472de2aea1df

Page 18

1     MR. HELLER: Object to the form.
2     THE WITNESS: No. Could you repeat your
3   question again?
4   BY MS. BOWMAN:
5     Q   Sure. We -- we know that by the time
6   Ms. Drury is sent this letter, there has already
7   been an order placed for a lender -- a lender placed
8   policy, the fire policy with all the additional
9   coverages, by Balboa, correct?
10    A   Correct.
11    Q   Okay. And this letter comes and it says,
12  you have 60 days to provide us evidence of your
13  adequate insurance, correct?
14    A   Correct.
15    Q   And at the end of that 60 days is when
16  that -- she's going to be actually required to pay
17  for that policy; is that correct?
18    A   She will be charged for the policy at that
19  time, yes.
20    Q   And in your -- between this first letter
21  and the end of that 60-day period, there are
22  subsequent letters; is that correct?
23    A   Correct.
24    Q   Okay. And the process that we have
25  described as it -- as it relates to Ms. Drury, that

Page 19

1   would be applied to all borrowers in the state of
2   Florida that you had identified as not having
3   adequate wind coverage; is that correct?
4     MR. HELLER: Object to the form.
5     THE WITNESS: Correct.
6   BY MS. BOWMAN:
7     Q   You said -- you indicated yesterday that
8   there was a point in time in December of 2007 where
9   you could begin tracking that a lender placed policy
10  related to wind coverage was what was -- was the
11  kind of lender placed policy issued; is that
12  correct?
13    A   Sorry, could you ask that again?
14    Q   Yeah, let's wait for the siren.
15        Beginning in December of 2007, is it
16  correct that you could be -- you could begin
17  tracking, in the AS400 system, the imposition of a
18  lender placed policy in connection with a loan
19  because Balboa actually had a wind lender placed
20  policy?
21    A   Yes.
22    Q   So it's actually identified as a separate
23  wind policy, correct?
24    A   Yes.
25    Q   And that was -- that wind policy,

Page 20

1   stand-alone wind policy, was this available for the
2   first time in December 2007, through Balboa?
3     A   That's my understanding.
4        (Exhibit No. 7 marked for identification.)
5   BY MS. BOWMAN:
6     Q   I'd like to hand you what I've marked as
7   Exhibit 7, and this is a filing that was made by the
8   parties to the Court, which I'm not expecting you to
9   be familiar with. But if you would turn to the
10  second page of this document where it identifies
11  Newport production.
12    A   Yes.
13    Q   Were you involved in the gathering and
14  collection of documents to be produced in this case?
15    A   Some, yes.
16    Q   With regard to Newport, can you identify
17  for me what the policies and procedures and
18  protocols would be, relating to insurance tracking
19  and verification, that would have been produced on
20  behalf of Newport?
21        MR. HELLER: Object to the form.
22        THE WITNESS: There were a policy and
23  procedure manual that was produced.
24        (Exhibit No. 8 marked for identification.)
25  BY MS. BOWMAN:

Page 21

1     Q   I'm going to hand you what I've marked as
2   Exhibit 8. And let me just ask you: Is this the
3   policies and procedures man- -- policy and
4   procedures manual that you were referring to in
5   response to my question about item one in Exhibit 7?
6     A   Yes.
7     Q   Now, is this the -- a manual that's
8   available to the representatives in your group for
9   purposes of insurance tracking?
10    A   Yes.
11    Q   And who else would this manual be
12  available to?
13    A   The Countrywide customer service group.
14    Q   Anyone else?
15    A   No.
16    Q   Now, this particular manual is dated
17  May 9, 2003, in the lower left-hand corner of the
18  first page. Do you see that?
19    A   Correct.
20    Q   Okay. Have you, in your preparation for
21  your depositions, with regard to Countrywide Home
22  Loans and Newport Management Corporation, reviewed
23  this document?
24    A   I'm aware of this document. I haven't
25  paged through every single page, but I'm aware of

d64b1a2a-03c0-4134-b10b-472de2aea1df

Page 22

1   this document.
2       Q   In general, based on your experience in
3   the insurance tracking department, would the manual
4   dated May 9, 2003, generally reflect the policies
5   and procedures that had been in place since -- from
6   2003 to the present?
7           MR. HELLER: Object to the form.
8           THE WITNESS: Yes.
9   BY MS. BOWMAN:
10      Q   Were there any other -- is there
11  anything -- any other document, other than the
12  document that's Exhibit 8, that you would think of
13  if you were trying to identify the policies and
14  procedures and protocols used in connection with
15  insurance tracking or verification?
16      A   No.
17      Q   And do the employees at -- in your group,
18  the insurance tracking group, do they have desk
19  manuals or reference items that they use -- they use
20  that would be in addition to this?
21      A   No.
22      Q   So if they actually had a question of what
23  they were doing, apart from asking one of their
24  supervisors, they would refer to this manual,
25  correct?

Page 23

1       A   Correct.
2       Q   And is this available electronically
3   through an intranet system?
4       A   Yes.
5       Q   Is that how it's updated as well --
6       A   Yes.
7       Q   -- through the intranet?
8           It would be your testimony that -- that
9   you're not aware of any material changes in the way
10  in which those policies and procedures are laid out
11  since the date, May 9, 2003, correct?
12          MR. HELLER: Object to the form.
13          THE WITNESS: Correct.
14  BY MS. BOWMAN:
15      Q   Going back to Exhibit 7, Newport
16  production item two, policies, procedures,
17  protocols, processes, quotas or efficiency measures
18  governing employees involved in insurance tracking
19  or verification.
20          We talked a little bit yesterday about the
21  performance standards and criteria used to evaluate
22  cust--- the service representatives within your
23  group.
24      A   Yes.
25      Q   Do you recall that?

Page 24

1           Are there written guidelines for
2   efficiency measures that your group is required to
3   meet under the CHL/Newport contract?
4       A   Yes.
5       Q   Where -- where would those be located?
6       A   In the same intranet site as the manuals,
7   as the procedures.
8       Q   And can those be printed and produced?
9       A   Yes.
10          MR. HELLER: Object to the form.
11  BY MS. BOWMAN:
12      Q   Were you asked to retrieve those for
13  purposes of your deposition today?
14          MR. HELLER: Don't -- object -- instruct
15  not to answer with respect to any
16  communications between counsel -- with counsel.
17  BY MS. BOWMAN:
18      Q   Did you make any attempt to retrieve those
19  in order to be -- prepare for your deposition?
20      A   I can't answer that.
21      Q   Whether you did or did not make any
22  attempt to retrieve them?
23      A   I was just advised not to answer that.
24      Q   No, he advised you not to say whether you
25  were instructed to -- whether you were instructed to

Page 25

1   retrieve them.
2           I asked you simply, did you make any
3   attempt to retrieve those quotas, efficiency
4   measures governing employees with regard to
5   insurance tracking?
6       A   Yes.
7       Q   Were you successful in that retrieval?
8       A   Yes.
9           MS. BOWMAN: For the record, as stated in
10  the corrected joint status report for June 17,
11  2008, those documents were to be provided to me
12  prior to the deposition, which was begun
13  yesterday.  I'd like to have counsel, for the
14  record, explain why that was not provided.
15          MR. HELLER: This is a discovery
16  deposition.  It's not a forum for lawyer talk
17  or legal argument.
18          MS. BOWMAN: So you can't explain why it
19  wasn't provided?
20          MR. HELLER: I'm not going to have a
21  discussion with you on the record in a
22  deposition about a discovery dispute.  If you
23  want to talk off the record, I'm happy to do
24  that.
25          MS. BOWMAN: Okay.  Well, I don't think

d64b1a2a-03c0-4134-b10b-472de2aea1df

Page 26

1    there's a dispute, because it says they will be
2    provided before the deposition.
3         MR. HELLER: My understanding is, you've
4    had discussions with Michael Duncan about this,
5    but I'm not going to change what I said. My
6    view is, this is not the forum for discussion
7    between counsel. Please ask your next
8    question.
9    BY MS. BOWMAN:
10        Q   The incentive -- yesterday we talked about
11   the incentive programs that were available to your
12   employees with regard to meeting those or doing
13   better than the standards set by the contract
14   between CHL and -- and Newport, correct?
15        A   Yes.
16        Q   And you indicated that those incentives
17   were likewise in -- available in written format?
18        A   Yes.
19        Q   And that would -- would that be also on
20   the intranet?
21        A   Yes.
22        Q   Did you -- I'm sorry.
23        A   Excuse me. I believe I said yesterday I'm
24   not 100 percent sure that they're on the intranet.
25   I do know we have copies of it.

Page 27

1         Q   Did you retrieve those for purposes of
2    your deposition here yesterday and today?
3         A   No.
4         Q   Are you capable of retrieving them?
5         A   Yes.
6         Q   And would that be for the entire time
7    period, 2003 to the present, the incentives?
8         A   I'm not 100 percent sure that we had them
9    in 2003 or '4. But there is a time period that we
10   had those incentives, and I could produce it for
11   that time period.
12        Q   Were there different kinds of incentives
13   during that -- during that earlier period?
14        A   The rewards were different.
15        Q   And what would be the reason that that --
16   that the rewards that were available during that
17   timeframe would not be something you could retrieve?
18        MR. HELLER: Object to the form.
19        THE WITNESS: I believe I could retrieve
20        the reward program. The actual award to the
21        individuals changed.
22   BY MS. BOWMAN:
23        Q   Was the award program that was in place
24   prior to the ones that you described as being able
25   to retrieve, were those again tied to the

Page 28

1    obligations of Newport under the CHL/Newport
2    insurance tracking agreement?
3         A   Could you repeat that, please?
4         Q   Sure. Were the incentives tied to the
5    objectives or the -- the goals that were set for
6    employees in the Newport/CHL agreement?
7         A   I don't believe so.
8         Q   What do you recall as the incentive
9    being -- was at that time?
10        A   It's the same incentive program that's in
11   place today, which is based on productivity and
12   quality, as I described, the -- which is different
13   than what's in the contract.
14        Q   Okay. So you could receive -- you
15   could -- you could retrieve those program documents
16   all the way back to 2003?
17        A   I could retrieve them back to when we had
18   them in place. I don't recall if they were in
19   place -- 2003 or 2004 was when we implemented it.
20        Q   Okay.
21        A   So it's the effective date of the
22   implementation of that --
23        Q   Of the program?
24        A   Correct.
25        Q   Okay. And was there a prior -- a program

Page 29

1    prior to that that created incentives for the people
2    that were working under your direction in insurance
3    tracking?
4         A   I don't believe so.
5         Q   Taking a look at item seven on Exhibit 7,
6    which talks about policies and procedures or
7    protocols relating to borrower notifications
8    concerning insurance coverage and the issuance of
9    lender placed policies, do you see that?
10        A   Yes.
11        Q   Okay. What documents would contain the
12   policies and procedures for borrower notifications
13   of lender placed policies?
14        A   The lender manual.
15        (Exhibit No. 9 marked for identification.)
16   BY MS. BOWMAN:
17        Q   I'm going to hand you what I've marked as
18   Exhibit 9. And is this the manual that you were
19   referring to when you identified a lender's manual
20   that would have contained the policies and
21   procedures relating to borrower notification of the
22   issuance of lender placed policies?
23        MR. HELLER: Object to the form. Also,
24        Ms. Bowman, that was really fast. Could you --
25        could you slow it down a little bit?

d64b1a2a-03c0-4134-b10b-472de2aea1df

Page 30

1  THE WITNESS: Could you repeat the
2  question, please?
3  BY MS. BOWMAN:
4  Q  Yes. I said, is this the document that
5  you were referring to when you identified the
6  document that would contain the policies or
7  procedures relating to borrower notification in
8  connection with the issuance of lender placed
9  policies?
10  A  Yes.
11  Q  Now, this -- do you know when this lender
12  -- lender operations manual came into effect?
13  A  Specific date, no, but in yesterday --
14  yesterday's testimony I had mentioned that there was
15  a servicer manual.
16  Q  That predated this?
17  A  Predated this. Servicer manuals became
18  lender manuals.
19  Q  Would you have access to the servicer
20  manual that predated this lender manual?
21  A  I do not.
22  Q  And if you could take a look and review
23  this lender manual and tell me the -- identify for
24  me the parts of the lender manual that refer to the
25  notification of borrowers concerning the issuance of

Page 31

1  lender placed policies.
2  A  (Reviewing document.) It would be chapter
3  seven.
4  Q  It's entitled "Warning and Notification"?
5  A  Yes.
6  Q  And have you, in connection with
7  preparation for your deposition on behalf of
8  Countrywide Home Loans and Newport Management
9  Corporation, reviewed this lender's manual?
10  A  No, but I am familiar with it.
11  Q  Can you tell me, based on a review -- and
12  you can take the time to do it now if you need to --
13  but based on your experience and knowledge of
14  insurance tracking and borrower notification, is --
15  are the policies and procedures that are laid out in
16  Exhibit 7 -- I mean, in chapter seven of Exhibit 9,
17  the lender's manual, the policies that have
18  generally been in place for the notification of
19  borrowers since 2003?
20  A  Yes.
21  Q  If you could take a look at Exhibit 9,
22  chapter seven, which is Bates page 124.
23  A  Yes.
24  Q  Can you explain to me the box at the
25  bottom of that page and what it's identifying?

Page 32

1  A  Yes. That's identifying the letter cycle
2  for these class codes that are listed here. And the
3  description of those class codes is in the second
4  column.
5  Q  And can you tell me what -- what those
6  class codes are used for?
7  A  They're used to categorize specific
8  situations, such as if you look at class code 51,
9  it's a residential escrow. If you looked at class
10  code 52, it's a residential non-escrowed loan.
11  Q  Would the classification of a loan as a
12  class 51 or, alternatively, a class 52 result in
13  them getting a different letter cycle; in other
14  words, would there be different language in the
15  letters?
16  A  There may be different language
17  surrounding the collection of the premium, escrowed,
18  it would say something about your escrow account.
19  If it's non-escrowed, it would have --
20  wouldn't reference the escrow account because there
21  is no escrow account.
22  But from a coverage or requirement
23  standpoint, it would be the same, the letters would
24  be the same.
25  Q  And that would be -- that would be true

Page 33

1  for a borrower who had an impounded loan with an
2  escrow account and for a borrower that had -- did
3  not have an escrow account, correct?
4  A  I didn't understand that clarification.
5  Q  Sure. So the -- the text of the letters
6  would largely be identical for an escrow and
7  non-escrow account?
8  A  Largely identical, yes.
9  Q  And the letter cycles that are identified
10  for those two types of borrower accounts are
11  identical as far as the days upon -- the days on
12  which the letters are sent?
13  A  Yes, based -- it's defined here what the
14  letter cycle is for each of those.
15  MR. HELLER: I need to take a one-minute
16  break.
17  THE VIDEOGRAPHER: We're off the record at
18  9:32 a.m.
19  (Off the record.)
20  THE VIDEOGRAPHER: We're back on the
21  record at 9:33.
22  BY MS. BOWMAN:
23  Q  Mr. Grzeskowiak, I've just been handed a
24  document by your counsel that you were also shown;
25  is that correct?

Page 34

1    A   Yes.
2    Q   Can you tell me what that is?
3    A   It's the policies and procedures
4  surrounding the quality control program that is used
5  to measure the employees.
6    Q   And is this also reflective of the
7  incentive program?
8    A   That is used -- that's the procedure, how
9  to perform and how we evaluate the quality control;
10  that would be a part of -- that would be used in
11  conjunction with the incentive programs.
12    Q   Okay. But this doesn't include the
13  incentive program -- the written incentive program
14  that you described?
15    A   No, it does not.
16    Q   Maybe we'll have an opportunity to talk
17  about this if I can get a chance to review it at
18  some point today.
19        Returning again to Exhibit 7, and under
20  the section C, Newport Production, see indication
21  and request for form letters used for borrower
22  notifications for insurance coverage and issuance of
23  lender placed policies?
24    A   Yes.
25    Q   Okay. Did you retrieve the copies or

Page 35

1  forms of those letters that are sent to borrowers?
2    A   Yes.
3    Q   The document that we identified, I believe
4  it's Exhibit 5, this morning, do you -- do you know
5  what the background of that letter is; in other
6  words, why it was created?
7    A   As a courtesy to notify the customer.
8    Q   Okay. And were you involved in any
9  discussions about the need for the creation of a
10  letter that specifically referenced a concern about
11  the homeowner's policy not including wind coverage?
12    A   Yes.
13    Q   And what -- what were those discussions
14  that led to the creation of that letter -- this
15  letter?
16    A   Well, it was during our review of a change
17  in process where we wanted to inform the borrower of
18  inadequate coverage prior to the lender placed cycle
19  beginning.
20    Q   Okay. And were there other -- other forms
21  that were contemplated as well, in addition to a
22  hurricane wind letter, for that purpose?
23    A   No, because all the -- all the discussions
24  were surrounding this process.
25    Q   What was the impetus of that discussion?

Page 36

1    A   Well, I don't know. Could you be a little
2  bit more specific for me?
3    Q   Sure. Were you finding or discovering, in
4  your work in insurance tracking, that there were
5  more and more borrowers whose policies were
6  excluding homeowner's and maybe they didn't know it?
7    A   I'm not sure of the exact year. But
8  regarding all the storms that have occurred -- and
9  it was actually prior to -- I know it was prior to
10  2003 -- more and more insurance carriers were
11  excluding wind, and wind/pool associations in
12  certain states were being developed.
13        So with that occurring, there was going to
14  be, in my opinion, more notice to the borrower to
15  let them know that something was going on, you know,
16  that their insurance was inadequate.
17    Q   And that was based on your understanding
18  of what was going on in the industry insofar as
19  maybe insurance companies that had previously
20  covered wind under their homeowners' policies, were
21  no longer going to be covering wind under those
22  policies?
23    A   Correct.
24    Q   So a homeowner could get a renewal of --
25  of a homeowner's policy and, you know, not fully

Page 37

1  understand that that -- that maybe now it doesn't
2  include wind?
3        MR. HELLER: Object to the form.
4        THE WITNESS: I don't know if I would
5    agree with that.
6  BY MS. BOWMAN:
7    Q   But what you were trying to do was alert
8  homeowners to what was going on -- what your
9  particular knowledge was about what was going on in
10  the industry and how it might affect them?
11        MR. HELLER: Object to the form.
12        THE WITNESS: As a courtesy. And even in
13    yesterday's discussions, or testimony we were
14    talking about, you asked me if we get
15    prenotification of changes. We don't, but the
16    policyholders do, the borrowers do.
17        There's usually, from my experience,
18    letters that will go out to the borrower
19    advising them that there's going to be a change
20    to their renewal to their existing policy.
21  BY MS. BOWMAN:
22    Q   You're -- you're talking about from the
23  insurance company, not from --
24    A   From the insurance company, yes.
25    Q   And apart from this letter that's

d64b1a2a-03c0-4134-b10b-472de2aea1df

Page 38

1  Exhibit 5, are there other form letters that are
2  used for borrower notification of insurance -- of
3  insurance coverage inadequacy in the issuance of
4  lender placed policies?
5       MR. HELLER: Object to the form.
6       THE WITNESS: Could you repeat that,
7    please?
8  BY MS. BOWMAN:
9    Q   Sure. Are there other forms, other than
10 Exhibit 5, that a borrower -- a form letter the
11 borrower would be sent in connection with an
12 indication by Countrywide that there was a question
13 about the adequacy of their insurance?
14      MR. HELLER: Object to the form.
15      THE WITNESS: No.
16 BY MS. BOWMAN:
17   Q   Okay. There would be the letters in the
18 letter cycle, correct?
19   A   Correct.
20   Q   Okay. And we don't have exemplars of
21 those letters -- I haven't shown you exemplars of
22 those letters; is that correct?
23   A   Correct.
24   Q   I have -- I'll just show you -- did you
25 retrieve exemplars of those form letters that are

Page 39

1  used in the letter cycle?
2    A   I did.
3    Q   Did you retrieve the forms or -- or copies
4  of letters specific to Ms. Drury?
5    A   Retrieved copies of the lender placed
6  letters that are in existence today for hazard and
7  wind.
8       (Exhibit No. 10 marked for
9    identification.)
10 BY MS. BOWMAN:
11   Q   I'm going to hand you what I've marked as
12 Exhibit 10.
13      Okay. Are these the letters that you
14 were -- is this one of the letters you were just
15 describing?
16   A   Yes.
17   Q   And were these -- this particular letter
18 that's Exhibit 10 has across the top of it B863
19 test; is that correct?
20   A   Correct.
21   Q   But these are, in fact, the forms that --
22 that are currently in use for notification of
23 customers?
24   A   Yes.
25   Q   What I'll do is hand you a composite

Page 40

1  exhibit.
2       (Exhibit No. 11 marked for
3    identification.)
4  BY MS. BOWMAN:
5    Q   I'm handing you what's been marked as
6  Exhibit 11. Can you flip through that package and
7  tell me if those are the letters that you were
8  describing of the -- in the letter cycle relating to
9  hazard coverage and wind at present?
10   A   (Reviewing documents.) Yes.
11   Q   And if we could just go through and
12 identify them. Do you have B873?
13   A   Yes.
14   Q   And that's Bates -- starts with Bates page
15 115 through Bates page 117?
16   A   Yes.
17   Q   And then you have B874?
18   A   Yes.
19   Q   And that's Bates pages 118 to 120?
20   A   Yes.
21   Q   Then do you have E 873?
22   A   Yes.
23   Q   Which is Bates pages 121 -- or 7-121 to
24 123?
25   A   Yes.

Page 41

1    Q   Do you have letter E874?
2    A   Yes.
3    Q   And that's Bates pages 7-124 to 126?
4    A   Yes.
5    Q   And do you have letter G873?
6    A   Yes.
7    Q   And that's Bates pages 7-127 through 129?
8    A   Yes.
9    Q   And do you have letter G873?
10   A   Yes.
11   Q   That's Bates -- that's Bates page 7-130?
12   A   Yes.
13   Q   And do you have letter H873?
14   A   Yes.
15   Q   And that's Bates page 7-131?
16   A   Yes.
17   Q   And do you have letter H873F?
18   A   Yes.
19   Q   And that's Bates page 7-12 -- 132?
20   A   Yes.
21   Q   Do you have letter 7-13 -- I'm sorry -- I
22 can't tell if that's an I or a 1. I873?
23   A   Yes.
24   Q   And that's Bates page 7-133?
25   A   Yes.

Page 42

1    Q   Do you have letter J873?
2    A   Yes.
3    Q   And that's Bates page 7-134?
4    A   Yes.
5    Q   And do you have letter P873?
6    A   Yes.
7    Q   And that's Bates page 7-137?
8    A   Yes.
9    Q   And that concludes the composite
10   Exhibit 11?
11   A   Yes.
12       MR. HELLER: The copies you gave me is a
13   different number series.
14       MS. BOWMAN: Number series?
15       MR. HELLER: I was handed, as Exhibit 11,
16   the B863 series of letters, and you're
17   referring to the B873 series. So we can work
18   off Mr. Grzeskowiak's set. I'll just need to
19   look with him.
20       MS. BOWMAN: Let me mark this as Exhibit
21   12.
22       (Exhibit No. 12 marked for
23   identification.)
24   BY MS. BOWMAN:
25   Q   If you could flip through the composite

Page 43

1    Exhibit 12 and tell me -- tell me if those are the
2    B863 letters that were just identified by
3    Mr. Heller.
4    A   (Reviewing documents.) There are seven
5    letters attached that do have the stamp of a alpha
6    code with 863 numeric, so all seven of them have
7    863.
8    Q   And the other group of documents, the one
9    that's Exhibit 11, has a alpha code 873?
10   A   Correct.
11   Q   What's the difference?
12   A   873 are for the hazard insurance, and 863
13   are the letters for wind.
14   Q   Okay. The documents that are in the group
15   marked 863, then, you said those were the wind --
16   A   Yes.
17   Q   -- letters?
18       Okay. Now, does that mean that currently
19   you have a separate set of letters that are sent on
20   a cycle for a wind policy?
21   A   Yes.
22   Q   And that's something new since the --
23   since Balboa created a wind-only policy; is that
24   correct?
25   A   Yes.

Page 44

1    Q   The prior set of documents that's
2    Exhibit 11 -- 11, with the alpha code 873, that
3    relates to the hazard or homeowner's policy; is that
4    correct?
5    A   To the hazard coverage, yes.
6    Q   And it would have been letters or
7    predecessors to those letters that would have been
8    sent in -- in your -- it's to all borrowers relating
9    to questions about the adequacy of insurance, even
10   to people who had missing wind coverage prior to the
11   development of the wind-only policy?
12       MR. HELLER: Object to the form.
13       THE WITNESS: Yes.
14   BY MS. BOWMAN:
15   Q   And is there a way for you to retrieve any
16   predecessor letters to that 873 series?
17   A   I don't believe so.
18   Q   You can retrieve copies of current
19   letters, but not historical letters?
20   A   I can retrieve historical letters with
21   specific loan numbers.
22   Q   Who -- who was involved in the creation of
23   those -- of -- of the letters that go to borrowers?
24   A   A number of groups. Primarily Balboa's
25   legal area and Countrywide's legal area.

Page 45

1    Q   Do you know whether anyone at Balboa keeps
2    copies of prior forms of those letters?
3    A   That's where I retrieved these.
4    Q   From Balboa?
5    A   Yes.
6    Q   And did you -- was -- was an inquiry made
7    concerning prior -- prior forms, other than the
8    current forms being used, for hazard coverage?
9    A   Yes.
10   Q   Okay. And the -- they could not produce
11   those to you?
12   A   Only with specific loan numbers.
13   Q   And is that -- is that because those --
14   those letters are imaged in connection with -- or
15   put into the loan file? Why can they receive -- why
16   can they retrieve them with regard to specific loan
17   files?
18   A   Copies of lender placed letters are kept
19   after mailing, so we have the ability to reproduce
20   that mailed letter by specific loan number.
21   Q   Where are they kept?
22   A   I'm sorry?
23   Q   Where are -- where are the letters --
24   letters kept with respect to a particular loan?
25   A   On a database.

Page 46

1    Q   Is that -- is that a database that is
2 maintained by Balboa or Countrywide?
3    A   Balboa.
4    Q   So there's -- in the AS400 system used by
5 Countrywide, you couldn't actually retrieve those
6 lender placed letters; is that correct?
7    A   No.
8    Q   You would have to go to Balboa with a
9 particular loan number and ask them to retrieve all
10 the lender placed letters sent to that particular
11 borrower?
12   A   Correct.
13   Q   And then they could print them from some
14 sort of an imaging database?
15   A   Correct.
16   Q   Mr. Grzeskowiak, did you, in connection
17 with your preparation for your deposition on behalf
18 of Countrywide Home Loans and Newport, review the
19 loan history and all related documents relating to
20 the plaintiffs?
21       MR. HELLER:  Object to the form.
22       THE WITNESS:  Could you be more specific
23   or define loan history and documents?
24 BY MS. BOWMAN:
25   Q   Sure.  Why don't you just tell me what you

Page 47

1 reviewed, relating to the named plaintiffs, in
2 connection for -- in connection with the preparation
3 for your depositions.
4       MR. HELLER:  Object to the form.
5       THE WITNESS:  The AS400.
6 BY MS. BOWMAN:
7    Q   The AS400 what?
8    A   Screens, insurance activities.
9    Q   Anything else?
10   A   That was -- that was it.
11   Q   Have you reviewed any of the underlying
12 loan documents with regard to either the plaintiffs'
13 New Century loan that was acquired by Countrywide in
14 December 2004 or the later Countrywide refinance of
15 that loan in April of 2006?
16       MR. HELLER:  Object to the form.
17       THE WITNESS:  I have seen documents
18   associated with the loans.
19 BY MS. BOWMAN:
20   Q   And have you undertaken to review all the
21 documents available to Countrywide Home Loans in
22 connection with those two loans to plaintiffs?
23   A   No.
24   Q   You indicated yesterday when -- when
25 Countrywide acquires a loan as part of an

Page 48

1 acquisition pool, that what happens is that loan is
2 loaded onto the system electronically; is that
3 correct?
4    A   Yes.
5    Q   I think you -- I believe you called that
6 boarding?
7    A   Yes.
8    Q   And that's where the information that is
9 electronically transferred from the original lender
10 is then captured in the AS400 system; is that
11 correct?
12       MR. HELLER:  Object to the form.
13       THE WITNESS:  Could you repeat that,
14   please?
15 BY MS. BOWMAN:
16   Q   Sure.  The boarding process is to load the
17 information from the original lender into the
18 AS400 --
19       MR. HELLER:  Object to the form.
20 BY MS. BOWMAN:
21   Q   -- servicing system?
22   A   Yes.
23   Q   And at that time, the insurance
24 information that was available with the acquired
25 loan would be loaded into the AS400 regarding the

Page 49

1 coverage in place for that acquired loan, correct?
2    A   Yes.
3    Q   But at that point in time when the loan is
4 initially boarded, no one from your group would
5 review that information and compare it with the
6 underlying documents in order to determine its
7 accuracy?
8    A   Correct.
9    Q   And, to your knowledge, no one at
10 Countrywide does that, correct?
11   A   Prior to the sale of -- of loans, there's
12 discussions, there's agreements, and the seller is
13 advising that that information is complete and
14 accurate.  So to my understanding, no, no one at
15 Countrywide reviews the loan file.
16       (Exhibit No. 13 marked for
17   identification.)
18 BY MS. BOWMAN:
19   Q   I'm going to hand you what I've marked as
20 Exhibit 13.  And if you just take a minute to
21 look at that and tell me what it is.
22   A   (Reviewing document.)  This is a -- excuse
23 me -- a printout of the AS400 screens for
24 Ms. Drury's loan, original loan.
25   Q   And this -- that is the loan that was

Page 50

1  acquired from New Century in December of 2004 by
2  Countrywide for servicing, correct?
3        MR. HELLER: Object to the form.
4        THE WITNESS: Correct.
5  BY MS. BOWMAN:
6    Q  This -- the -- this printout is broken
7  down into various sections that contain different
8  types of information; is that fair to say?
9    A  Yes.
10   Q  The first one I see is the account status
11 listing. Do you see that?
12   A  Yes.
13   Q  Followed by something called original
14 information?
15   A  Correct.
16   Q  And the next section, Bates page 579 of
17 Exhibit 13, indicates that it's going to show the
18 loan history ascending?
19   A  Yes.
20   Q  The next section, Bates page 580, shows
21 that there's a section called Fees Due Listing?
22   A  Correct.
23   Q  The next section, Bates page 581, is
24 identified as an Impound/Escrow Account Review
25 section?

Page 51

1    A  Correct.
2    Q  The next section is identified as a
3  Customer Delinquent Contact section?
4    A  Correct.
5    Q  The next section begins at -- at Bates
6  page 586 and is entitled a Bankruptcy Department
7  section?
8    A  Yes.
9    Q  The next section is entitled the Wholesale
10 Division section on that same page?
11   A  Yes.
12   Q  And the next section is entitled, FC
13 Collections?
14   A  Correct.
15   Q  What does FC stand for?
16   A  I'm not sure.
17   Q  The next section -- and it's a little bit
18 confusing because it's way at the bottom of Bates
19 page 586 -- is entitled, Customer Service
20 Department?
21   A  Correct.
22   Q  The next section after the Customer
23 Service Department section would be found at Bates
24 page 592 and is entitled, Field Inspections?
25   A  Correct.

Page 52

1    Q  And the section following that would be
2  the CFC Foreclosure section?
3    A  Correct.
4    Q  The section following that on the same
5  Bates page 592 would be the Escrow
6  Analysis/Distribution (sic) section?
7    A  And that's disbursement; Escrow Analysis,
8  slash, Disbursement.
9    Q  Okay.
10   A  Yes.
11   Q  Sorry if I misspoke.
12       The section following that would be the
13 Loan Loss Mitigation section?
14   A  Correct.
15   Q  Following that would be the CFC Real
16 Estate Management section?
17   A  Correct.
18   Q  Following that is the Payoff and
19 Assumption section?
20   A  Yes.
21   Q  And the next section, appearing at Bates
22 page 596, is the Insurance Activities section?
23   A  Correct.
24   Q  And that's the section that you identified
25 would be used and updated by the people in your

Page 53

1  group, in customer service, in connection with the
2  insurance tracking; is that correct?
3    A  Correct.
4    Q  The next section in the AS400 report is
5  the Tax Department section?
6    A  Correct.
7    Q  And the final section in the AS400 report
8  would be the Office of the President section?
9    A  Correct.
10   Q  And as -- as we've gone through this
11 report, there's been categories of information that
12 had no information under it in connection with
13 Ms. Drury's loan; is that correct?
14   A  Correct.
15   Q  And there are other of those categories of
16 information that had underlying information about
17 her loan, correct?
18   A  Correct.
19   Q  So are those all of the fields and screens
20 that are available in the AS400?
21   A  Yes.
22   Q  And in connection with insurance tracking
23 and verification that's being performed by your
24 group, that, we should look at the insurance
25 activities section for, correct?

d64b1a2a-03c0-4134-b10b-472de2aea1df

Page 54

1    A   Correct.
2    Q   Now, would it be your understanding that
3  when Ms. Drury closed her loan with New Century in
4  July of 2004, obviously, prior to the Countrywide
5  acquisition of that loan, that she would have had to
6  provide evidence of insurance prior to closing?
7    A   Yes.
8    Q   Have you reviewed the underlying documents
9  relating to Ms. Drury's New Century loan regarding
10  the insurance information that was provided?
11    A   I have not.
12    THE WITNESS:   You think after this next
13  question we can take a break?
14    MR. HELLER:   We can take a break now.
15  Ms. Bowman is looking for a document.   This
16  probably would be a good time for a break.
17    MS. BOWMAN:   Yeah, that's fine.   Let's go
18  off the record.
19    THE VIDEOGRAPHER:   This concludes tape
20  number one.   We're off the record at 10:08.
21    (Brief recess.)
22    THE VIDEOGRAPHER:   This is tape number
23  two.   We're back on the record at 10:25 a.m.
24  BY MS. BOWMAN:
25    Q   Mr. Grzeskowiak, in connection with your

Page 55

1  department's business of insurance tracking, you are
2  familiar with the kind of documents that are
3  provided by insurance companies to reflect evidence
4  of insurance; is that correct?
5    A   Yes.
6    (Exhibit No. 14 marked for
7    identification.)
8  BY MS. BOWMAN:
9    Q   I'm going to hand you what I've marked as
10  Exhibit 14.
11    THE WITNESS:   We need a smaller table.
12  BY MS. BOWMAN:
13    Q   If you could take a look at page one of
14  Exhibit 14 and tell me if this is a policy
15  endorsement that you would routinely, as a lender,
16  receive as evidence of insurance in connection with
17  a loan.
18    MR. HELLER:   Object to the form.
19    THE WITNESS:   This is a typical document
20  that we would receive.   You did mention
21  endorsement.   Endorsement has a different
22  meaning.   This particular document is a
23  memorandum of insurance.
24  BY MS. BOWMAN:
25    Q   Okay.   And that is something that you

Page 56

1  routinely receive when you are receiving evidence of
2  insurance for Countrywide or Countrywide loans?
3    A   Yes.
4    Q   This particular Nationwide Insurance
5  Company Florida memorandum of insurance is dated
6  6/28/04.   Do you see that?
7    A   Yes.
8    Q   It relates to a policy with an inception
9  date of 5/1/04, an expiration date of 5/1/05.   Do
10  you see that?
11    A   Yes.
12    Q   And this has been issued in connection
13  with the property that is 591 East Ridgewood Avenue,
14  Ormond Beach, Florida 32174-7046, in connection with
15  the Drury property at that location?
16    A   Correct.
17    Q   And it's being issued relating to a first
18  mortgage by New Century Mortgage; is that correct?
19    A   To answer your question, I don't know if
20  it's related to the first mortgage for New Century.
21  I do see mortgage -- the mortgagee name as New
22  Century on here, yes.
23    Q   What would -- what do you mean you don't
24  know if it's related to the New Century mortgage?
25    A   To their first mortgage.   I just look at

Page 57

1  this and I note New Century is the mortgagee, so it
2  is providing evidence that there is insurance for
3  this time period.
4    Q   Okay.   And what you're saying is, you
5  don't know from this whether it's the first
6  mortgage -- that New Century holds the first
7  mortgage?
8    A   It's -- I don't know if it was the first
9  mortgage with New Century.
10    Q   Oh, okay.   And it's executed by an
11  insurance agent; is that correct?
12    A   I do see that there's an agent's name on
13  here, and signature.   If they executed that, I'm not
14  sure.   But I do see there's an agent on here, yes.
15    Q   And -- and would that be one of the
16  ways -- kind of documents that you would receive
17  from an insurance agent in Florida issuing a
18  memorandum of -- of insurance, or proof of
19  insurance, would be a document like this signed by
20  an agent?
21    A   Yes.
22    Q   If you take a look at page two of
23  Exhibit 14, there's a document entitled Request for
24  Evidence -- Evidence of Insurance, do you see that?
25    A   Yes.

Page 58

1    Q   And it is sent in connection with, again,
2 the same Drury property that's identified on the
3 memorandum of insurance on page one?
4    A   Yes.
5    Q   And the mortgagee is again identified as
6 New Century Mortgage?
7    A   Yes.
8    Q   The estimated closing date that appears on
9 their request for evidence of insurance is -- is on
10 June 30th of 2004. Do you see that? Is that
11 correct? It's box --
12    A   Yes.
13    Q   And in request -- the request for evidence
14 of insurance on behalf of New Century, do you see
15 the box 17 on that request?
16    A   Yes.
17    Q   And there's three types of insurance
18 identified in box 17: Flood, windstorm and hazard.
19 Do you see that?
20    A   Yes.
21    Q   And the request for evidence of insurance
22 contains a check mark only in the hazard insurance
23 box; is that correct?
24    A   Yes.
25    Q   And then it indicates that the insurance

Page 59

1 would be escrowed; is that correct?
2    A   Yes.
3    Q   Now, this is something that would have
4 been sent and received, prior to the closing, by
5 Ms. Drury on the New Century loan; is that correct?
6       MR. HELLER: Object to the form.
7       THE WITNESS: That would be difficult for
8    me to answer. This is New Century's form,
9    which I'm not familiar enough with their
10    procedures. But typically, it would be
11    required that the insurance is provided prior
12    to the closing.
13 BY MS. BOWMAN:
14    Q   Okay. And the estimated closing date on
15 the request for evidence of insurance is 6/30/04?
16    A   Yes.
17    Q   And the memorandum of insurance is dated
18 on page one as 6/28/04, correct?
19    A   Correct.
20       (Exhibit No. 15 marked for
21       identification.)
22 BY MS. BOWMAN:
23    Q   I'm going to hand you what I've marked as
24 Exhibit 15. And just for verification, Exhibit 15
25 contains Bates pages CHL 313 through Bates page

Page 60

1 CHL 325, correct?
2    A   Correct.
3    Q   And if you could just flip through and
4 tell me whether you recognize these as underwriting
5 documents that would have been received with the
6 acquired loan of Ms. Drury from New Century.
7       MR. HELLER: Object to the form.
8       THE WITNESS: (Reviewing document.)
9       By flipping through the pages and reading
10    these documents, I do see that it does say the
11    word "underwriting" on it, and it does look
12    like something for the loan for New Century.
13 BY MS. BOWMAN:
14    Q   For Ms. Drury, correct?
15    A   Yes.
16    Q   Taking a look at Bates page 313 through
17 316, do you see that? Do you see those pages?
18    A   Yes.
19    Q   Okay. And at the top of those pages it
20 has a title, "Loan Approval," correct?
21    A   Yes.
22    Q   Bates -- turning to the second page of
23 Exhibit 15, Bates page 314.
24    A   Yes.
25    Q   Do you see loan -- the document heading

Page 61

1 "Loan Approval and Conditions"?
2    A   Yes.
3    Q   And this is again the -- relating to
4 Ms. Drury's loan from New Century Mortgage, correct?
5    A   Again, I'm not familiar with these
6 particular documents. I do see that it's loan
7 approval and conditions for Ms. Drury, but it does
8 say Money Tree Mortgage Associates, Inc.
9    Q   And down under the underwriting
10 conditions, New Century Mortgage is identified,
11 correct?
12    A   I do see that, yes.
13    Q   And Money Tree Mortgage Associates is very
14 likely, in this -- in this circumstance, the broker
15 that's involved in the issuance of the loan,
16 correct?
17    A   It is under the broker title, yes.
18    Q   Down under the underwriting conditions, do
19 you see that?
20    A   Yes.
21    Q   It indicates on point one that the
22 underwriting condition for hazard insurance coverage
23 has been satisfied by Ms. Drury?
24       MR. HELLER: Object to the form.
25       THE WITNESS: It does say hazard, which

d64b1a2a-03c0-4134-b10b-472de2aea1df

Page 62

1    includes many perils, yes.
2    BY MS. BOWMAN:
3        Q   And it says "satisfied," with initials
4    underneath it --
5        A   Yes.
6        Q   -- correct?
7            Looking again at Exhibit 15, if you could
8    turn to page -- Bates page 323.
9        A   Yes.
10       Q   And it's a document entitled "Wholesale
11   Final Loan Quality Checklist." Do you see that?
12       A   Yes.
13       Q   And that's actually signed on June 30,
14   2004; is that correct?
15       A   Yes.
16       Q   And it indicates that each of the final
17   quality checklist items have been satisfied?
18           MR. HELLER: Object to the form.
19           THE WITNESS: I do not see where it states
20   satisfied.
21   BY MS. BOWMAN:
22       Q   There's a -- a check mark indicator in
23   each of the columns and a signature at the bottom,
24   correct?
25       A   No.

Page 63

1        Q   Which -- what is not correct about that?
2        A   I do not see check marks on everything.
3        Q   What's missing a check mark?
4        A   The second item.
5        Q   Relating to -- relating to income, a
6    handwritten 1003?
7        A   Yes.
8        Q   Okay. And that -- it appears to be maybe
9    something other than a check mark?
10       A   Yes.
11       Q   And it's signed at the bottom, dated
12   6/30/04?
13       A   Yes.
14           (Exhibit No. 16 marked for
15           identification.)
16   BY MS. BOWMAN:
17       Q   I'm going to hand you what I've marked as
18   Exhibit 16, which, for reference, is Bates pages
19   CHL 416 and 418, apparently missing 417.
20       A   Yes.
21       Q   At the top of Exhibit 16, it indicates
22   that there is a document called Wholesale Funding
23   Control?
24       A   Yes.
25       Q   And the second document in this composite

Page 64

1    exhibit indicates it's a free -- a prefunding audit
2    worksheet; is that correct?
3        A   Yes.
4        Q   On Bates page 418, the second document in
5    this composite exhibit, this is a prefunding audit
6    worksheet relating to Ms. Drury's loan with New
7    Century; is that correct?
8        A   Yes.
9        Q   And in connection with the loan with New
10   Century, the prefunding audit worksheet indicates in
11   section entitled, "Miscellaneous Information" --
12           Do you see that?
13       A   Yes.
14       Q   -- a -- a capital N in the column for
15   wind, slash, VOL insurance? Do you see that?
16       A   Yes.
17       Q   Same for earthquake insurance, also a
18   capital N?
19       A   Yes.
20       Q   And same for flood insurance, also a
21   capital N?
22       A   Yes.
23       Q   And other -- otherwise, in connection with
24   this prefunding audit worksheet, it indicates that
25   there is a hazard insurance policy through

Page 65

1    Nationwide?
2        A   Yes.
3        Q   In connection with the closing of the --
4    Ms. Drury's loan -- I'm sorry, the -- on the front
5    of Exhibit 16, the wholesale funding control
6    indicates that that loan was funded for Ms. Drury on
7    July 7th of 2004; is that correct?
8        A   Yes.
9        Q   Now, the closing for that -- the loan that
10   Ms. Drury obtained from New Century, that was
11   subsequently acquired for servicing by Countrywide,
12   actually closed on July 1st of 2004; is that
13   correct?
14       A   I don't know.
15           (Exhibit No. 17 marked for
16           identification.)
17   BY MS. BOWMAN:
18       Q   I'm going to hand you what's been marked
19   as Exhibit 17. Would you agree with me that that is
20   the New Century mortgage issued to Ms. Drury as of
21   July 1, 2004?
22       A   Yes.
23       Q   And would the closing date on -- would
24   the -- would the date on the mortgage, July 1, 2004,
25   in normal circumstances, match the date of the

Page 66

1  closing?
2      A   Yes.
3      Q   Now, in connection with the real estate
4  closing on the New Century Mortgage, that you have
5  in front of you as Exhibit 17, Ms. Drury and her
6  partner, Mr. Kochniarczyk, would have been signing
7  paperwork that would have been identified in a
8  closing package; is that correct?
9      A   Generally speaking, yes.
10     Q   And generally -- generally, that involves
11  the signing of the mortgage and note, correct?
12     A   Yes.
13     Q   Okay.  And there's also a lot of other
14  documents that the -- that the -- that Ms. Drury
15  would have been signing that day in connection with
16  the closing of a loan?
17     A   That would be, again, New Century's
18  process that I'm not 100 percent familiar with.
19     Q   Just based on your general familiarity
20  with the residential closing of a mortgage loan,
21  would you agree with me that there would be a number
22  of documents that would be signed at the closing by
23  Ms. Drury and Mr. Kochniarczyk -- I can't say his
24  name either -- at -- at the closing table or on
25  closing day?

Page 67

1      A   Yes.
2      Q   And those would include a good -- good
3  faith estimate; is that correct?
4      A   Yes.
5      Q   Okay.  Would -- would include a HUD 1
6  settlement statement?
7      A   Generally, yes.
8      Q   It would include several notices of right
9  to cancel the mortgage?
10         MR. HELLER:  Object to the form.
11         THE WITNESS:  Difficult to answer.  It
12     would depend upon the mortgage.
13  BY MS. BOWMAN:
14     Q   And other truth in lending type documents
15  might also be included in that closing package?
16         MR. HELLER:  Object to the form.
17         THE WITNESS:  Yes.
18  BY MS. BOWMAN:
19     Q   The document that is Exhibit 17, the
20  mortgage with New Century, do you have that --
21     A   Yes.
22     Q   -- in front of you?
23         Could you turn to the section at Bates
24  page 462?
25     A   Yes.

Page 68

1      Q   See that?  And that's the section that
2  deals -- in the mortgage that deals with property
3  insurance, correct?
4      A   Yes.
5      Q   And identifies that the borrower has to
6  keep certain kinds of property insurance, what
7  happens, if that doesn't -- if that does not occur,
8  as a result, correct?
9      A   Yes.
10     Q   It also indicates that a -- a servicer or
11  lender can change the insurance requirements during
12  the course of the mortgage; is that correct?
13     A   Could you be more specific?
14     Q   Sure.  Do you -- are you looking at
15  paragraph five?
16     A   Yes, I am.
17     Q   Okay.  Go about four lines down with the
18  line that begins, "requires."  Do you see that?
19     A   Yes.
20     Q   And the mortgage indicates what lender
21  requires, pursuant to the preceding sentences, can
22  change during the term of the loan.  Do you see
23  that?
24     A   Yes.
25     Q   Okay.  And so that's an indication that

Page 69

1  the insurance requirements, with regard to the
2  borrower, in connection with a particular loan can
3  be changed by the lender or servicer, correct?
4      A   Yes.
5      Q   And if, in fact, a servicer, such as
6  Countrywide Home Loans, were to change a -- change
7  the -- the insurance obligations of the borrower,
8  then your department would give that borrower notice
9  in advance of that change so that they could go out
10  and obtain the additional coverage; is that correct?
11     A   If there was a change to the original
12  requirements stated further up in this document,
13  yes.
14     Q   Okay.  And for -- take, for example, if
15  there was a -- there was no -- there was no initial
16  requirement for flood insurance in connection with a
17  particular property, and as a result of FEMA's
18  remapping of the flood zones, a property then came
19  under -- came into a flood zone that required
20  insurance, would you -- would your group be the ones
21  to alert the borrowers that now they were going to
22  be required to carry flood insurance because of that
23  remapping?
24     A   Yes.
25     Q   And that would be done prior to your

d64b1a2a-03c0-4134-b10b-472de2aea1df

Page 70

1    imposing the obligation to carry flood insurance,
2    giving the borrower an adequate period of time to
3    obtain private insurance; is that correct?
4        MR. HELLER: Object to the form.
5        THE WITNESS: Based on the National Flood
6    Act guidelines, yes, that is correct.
7    BY MS. BOWMAN:
8        Q   And so the only instance in which a lender
9    placed flood policy would be issued in those
10   circumstances is if you notified the borrower the
11   time period passed for the borrower to obtain
12   private coverage and they had not provided and sent
13   you proof of that coverage, correct?
14       A   Correct.
15       Q   Because the purpose would be to allow the
16   borrower to go out and get that coverage before it
17   became obligated to have it?
18       MR. HELLER: Object to the form.
19       THE WITNESS: Correct.
20   BY MS. BOWMAN:
21       Q   This mortgage is -- if you could turn back
22   to page one of Exhibit 17, the New Century mortgage,
23   this is the Florida single-family Fannie Mae,
24   Freddie Mac uniform instrument; is that correct?
25       A   Yes.

Page 71

1        Q   Taking a look at section five of that
2    mortgage, do you see that? Do you have that back
3    again?
4        A   Yes.
5        Q   Okay. Would you agree with me that there
6    is nowhere in paragraph five -- and you're welcome
7    to read the entire thing beginning to end -- the
8    term, windstorm or hurricane?
9        MR. HELLER: Object to the form.
10       THE WITNESS: Based on my knowledge, I
11   know that the term "extended coverage" includes
12   windstorm and hurricane.
13   BY MS. BOWMAN:
14       Q   No, you're not --
15       A   But I do not see the words windstorm or
16   hurricane in this sentence -- in this paragraph.
17       Q   And -- and have you studied Florida law to
18   determine whether the term "extended coverage" under
19   Florida law includes the term "windstorm"?
20       MR. HELLER: Object to the form.
21       THE WITNESS: I'm not a lawyer, no, I have
22   not reviewed the law.
23   BY MS. BOWMAN:
24       Q   Okay. So you don't know whether extended
25   coverage, as defined under Florida law, includes the

Page 72

1    term -- includes windstorm or hurricane coverage or
2    not?
3        MR. HELLER: Object to the form.
4        THE WITNESS: Not based on the law; based
5    on my knowledge of insurance.
6    BY MS. BOWMAN:
7        Q   And you -- and you did agree that there is
8    no reference in paragraph five of the mortgage to --
9    sorry -- there -- the terms windstorm or hurricane
10   coverage are never used in paragraph five of the
11   mortgage?
12       MR. HELLER: Object to the form.
13       THE WITNESS: I need you to clarify your
14   question, please.
15   BY MS. BOWMAN:
16       Q   I'm asking you, reading paragraph five of
17   the mortgage, you do not see -- you would agree
18   there is -- the term windstorm or hurricane is not
19   in that paragraph?
20       MR. HELLER: Object to the form.
21       THE WITNESS: I need you to be more
22   specific.
23   BY MS. BOWMAN:
24       Q   I'm looking -- it's -- it's a very simple
25   question. Do you see in paragraph five the word

Page 73

1    windstorm?
2        A   No.
3        Q   Do you see in paragraph five the term
4    hurricane?
5        A   No.
6        Q   Now, when Countrywide acquired this --
7    this loan from New Century Mortgage, the -- the loan
8    by Ms. Drury, it would have gone through the
9    boarding process that you had described that would
10   occur whether the loan was closed by Countrywide or
11   whether it was acquired from some other lender into
12   the AS400 system; is that correct?
13       A   Correct.
14       Q   And according to Exhibit 13, the AS400
15   history, Countrywide acquired this loan on -- in
16   December of 2004; is that correct?
17       A   Yes.
18       Q   It actually has a -- date -- and maybe
19   this is the date it was loaded in the system -- of
20   12/10/2004; is that correct?
21       A   Yes.
22       Q   Would that date have been the date in
23   which the -- the loan information was boarded onto
24   the Countrywide system?
25       A   That is the approximate date that it was

Page 74

1  boarded to the system, and when it is boarded; yes,
2  insurance information comes along with it, if
3  available.
4     Q   Take a look at the insurance activities
5  section of this AS400 report on Ms. Drury's --
6  Ms. Drury's New Century loan beginning at Bates
7  page 596. Do you have that?
8     A   Yes.
9     Q   Okay. And there are different entries
10 with spaces between them that appear in that
11 section; is that correct?
12    A   Yes.
13    Q   The first entry is dated January 7th of
14 2005. Do you see that?
15    A   Yes.
16    Q   Now, can you explain what that entry is?
17    A   Yes. There was a change to the flood
18 information that was on Countrywide's system.
19    Q   Okay. And so that change -- change to the
20 flood information on Countrywide's system would have
21 been -- appeared on each and every borrower's
22 insurance activities, is that correct, or no?
23    A   No.
24    Q   Okay. What -- what caused this 1/7/05 map
25 change to appear on Ms. Drury's AS400 history?

Page 75

1     A   There could have been a map change done by
2  FEMA that would affect only certain properties.
3     Q   Okay. What -- what did you -- what do you
4  understand from that entry, though?
5     A   I understand that there was a new flood
6  certificate produced and updated on Countrywide's
7  system that day.
8     Q   And that would be a flood certificate from
9  Ms. Drury's loan file transferred from New Century?
10    A   No.
11    Q   Okay. That would -- what -- what kind of
12 flood certificate would it have been?
13    A   If you look at the first line underneath
14 all the wording --
15    Q   Yes.
16    A   -- you'll see an O to the right.
17    Q   Yes.
18    A   That's the information that was loaded at
19 the time of the transfer. The next line down, all
20 the way to the right where you see new -- excuse me,
21 N --
22    Q   Yes.
23    A   -- that's the new information that was
24 updated on 1/7/2005.
25    Q   And looking at that information,

Page 76

1  can -- can you determine whether there is any change
2  in connection with the flood zone for Ms. Drury's
3  property?
4     A   The flood zone remained the same.
5     Q   The next entry under the insurance
6  activities on Ms. Drury's Nationwide -- I'm sorry,
7  Nationwide -- her New Century loan is dated
8  January 26th of 2005; is that correct?
9     A   Yes.
10    Q   And the reference next to that, MSCAN, do
11 you see that?
12    A   Yes.
13    Q   Is that something that would be indicated
14 if it was a document that was being electronically
15 boarded into the system?
16    A   Yes. That is -- that is the predecessor
17 of Track Source.
18    Q   And the notation next to that, INSR311, do
19 you see that?
20    A   Yes.
21    Q   What does that refer to?
22    A   The program name.
23    Q   The program name for what program?
24    A   For MSCAN.
25    Q   Okay. So it's the -- is that the template

Page 77

1  that's being used to upload the information?
2     A   It's the program that is loading the
3  information from MSCAN to I -- AS400.
4     Q   And the entry that's made indicates that
5  there is a policy with an effective date of 5/1/04
6  and an expiration date of 5/05; is that correct?
7     A   Where are you, please?
8     Q   I'm on the two lines -- two lines below
9  INSR311, the 1/26/05 entry.
10    A   Yes.
11    Q   So you -- can you go across that -- across
12 that line and tell me what that would be indicating
13 in the system?
14    A   The first number two is identifying that
15 it's an escrowed loan. The TY is for type, which
16 is -- 20 is for hazard. FR is frequency, which is
17 12 -- for 12 months. Pay code. The first five
18 digits of that is the carrier -- excuse me, the
19 first four digits of that is the carrier. The last
20 five are the agent. Has your effective date, your
21 premium amount, your expiration month and year, your
22 policy number, and the O, again, stands for old.
23    Q   Meaning that was information that you --
24 was retrieved from the New Century electronic file?
25    A   Yes.

d64b1a2a-03c0-4134-b10b-472de2aea1df

Page 78

1    Q   Okay.  Now, in the -- in the next line
2  where you have the N at the end, I think what you
3  indicated is "new"?
4    A   Correct.
5    Q   Okay.  So there's been an update to that
6  information relating to the homeowner's policy; is
7  that correct?
8    A   Correct.
9    Q   Okay.  And following along, it still
10 indicates that this -- it's a two, an escrowed
11 account?
12   A   Yes.
13   Q   It's a type 20, hazard policy?
14   A   Yes.
15   Q   It's on a 12-month cycle?
16   A   Yes.
17   Q   And the insurance company is identified as
18 still the same, 0605?
19   A   Correct.
20   Q   And it appears that the agent number has
21 changed; is that correct?
22   A   Correct.
23   Q   And do you know what that -- that two is
24 in the middle there?
25   A   That is associated with what we call

Page 79

1  option, and option two would mean if a payment is
2  needed on the premium, it would be sent to the
3  agent.
4    Q   And then it has an effective date of May 1
5  of 2004?
6    A   Yes.
7    Q   And the premium amount is a dollar more
8  than in the old line?
9    A   Yes.
10   Q   And it has a -- an expiration date of
11 5/05?
12   A   Yes.
13   Q   And it again identifies the policy number,
14 which is the same -- well, actually, it's slightly
15 different, correct?
16   A   Yes.
17   Q   Okay.  And this was on 1/26/05.  This
18 information was scanned into the system based on
19 your group's receipt of a document called END?
20   A   Yes.
21   Q   What would that stand for?
22   A   That stands for endorsements.
23   Q   Is that one of the kinds of policies that
24 you -- proof of insurance as you routinely receive
25 in your group's insurance tracking business?

Page 80

1    A   Yes.
2    Q   It actually indicates that document was
3  dated 1/18/05?
4    A   Correct.
5    Q   So that would have been received either
6  from the agent or from Nationwide; is that correct?
7    A   I'm not sure if 0605 is Nationwide, but
8  based on what I looked at for the policy for
9  Nationwide, et cetera, it's the same number, so,
10 yes, it would have been received either from the
11 agent or from Nationwide.
12   Q   The next entry under the insurance
13 activities is dated March 16th of 2005?
14   A   Yes.
15   Q   And that indicates that your unit received
16 a document, type EIL?
17   A   Yes.
18   Q   That would be a bill, right?
19   A   Correct.
20   Q   And they're seeking payment for a policy
21 to be in effect for May 1 -- sorry, for 5/1/2005 to
22 5/2006?
23   A   Correct.
24   Q   And this would, based on the information
25 available under that 3/16/05 entry, have been the

Page 81

1  renewal of -- of the policy previously recorded on
2  1/26/05?
3    A   I'm sorry, I didn't understand the full
4  question.
5    Q   Sure.  Is this 3/16/05 entry showing a
6  request for a premium for the renewal of the policy
7  identified as new in the 1/26/05 entry?
8    A   Yes.
9    Q   And the receipt of this -- this
10 information on 3/16/05 would have resulted in your
11 group's disbursement of a check from Ms. Drury's
12 escrow account to pay for that renewal premium; is
13 that correct?
14   A   Correct.
15   Q   Is that -- is that usually noted
16 somewhere, about the disbursement of a premium?
17   A   Yes.
18   Q   And is it noted here?
19   A   Yes.
20   Q   Okay.  And can you show me the line where
21 it's noted that that premium is paid?
22   A   It's at the very beginning of the line
23 where you were talking about bill.  It says, "set
24 pay."
25   Q   And it has the little Y?

Page 82

1    A   Yes.  That means yes.
2    Q   So that means you received a bill that's
3  already set to pay out of Ms. Drury's escrow
4  account?
5    A   We received the bill and set it to pay --
6    Q   Okay.
7    A   -- by this transaction.
8    Q   Now, in the last -- in connection
9  with the last two insurance activities, we have been
10  identifying across the lines the information that
11  was in each of the underlined lines based on a -- a
12  kind of ledger that describes in brief format the
13  types of information that are being included here,
14  correct?
15    A   Yes.
16    Q   Okay.  So we have -- we start out with an
17  S in that ledger line, correct?
18    A   Yes.
19    Q   Okay.  And that -- that is -- stands for
20  whether it's an impound or non-impound account, or
21  what does the S stand for?
22    A   The S stands for status, escrow status.
23    Q   And the TY stands for the type, the type
24  of policy, correct?
25    A   Yes.

Page 83

1    Q   The FR stands -- stands for the frequency
2  or the term of the coverage, correct?
3    A   Yes.
4    Q   The payee, CD, stands for the payee code;
5  is that correct?
6    A   Correct.
7    Q   The OPT -- actually, it doesn't exactly
8  align here -- is for the option two code, which here
9  would show us that the agent should be paid in
10  connection with the policy?
11    A   Either the agent or the carrier.  The two
12  would be agent, yes.
13    Q   Okay.  And so if there was a one there, it
14  would be carrier?
15    A   Correct.
16    Q   And then the next entry, although again
17  not exactly aligned, is the effective date of the
18  policy?
19    A   Yes.
20    Q   Followed by the amount of the policy?
21    A   Yes.
22    Q   The expiration date of the policy?
23    A   Yes.
24    Q   And the description or policy number?
25    A   Yes.

Page 84

1    Q   And then what does PROP stand for?
2    A   PROP stands for property.  It may show
3  that -- it identifies if there's multiple
4  properties, front, back type properties.
5    Q   Okay.  And because these aren't exactly
6  aligned, I'm trying to figure out where this -- this
7  old and new symbol should be.
8    A   It should be all the way to the right.
9    Q   Under LTR?
10    A   All the way -- further.
11    Q   Further, okay.  So it's -- it's just
12  indicating old and new, and it doesn't have like a
13  little header like every -- like everything else?
14    A   Correct.
15    Q   Okay.  What does FO stand for after
16  property?
17    A   That would be the indicator for lender
18  placement.
19    Q   So if there was something under FO, that
20  would be your group indicating a need for a lender
21  placed policy?
22    A   Yes.
23    Q   And what about LTR?
24    A   The FO and LTR are together.
25    Q   Okay.  And you would agree, in connection

Page 85

1  with the payment of the premium for the '05, '06
2  policy on Ms. Drury's property, there's nothing
3  indicated under the FO LTR?
4    A   Correct.
5    Q   So your group did not request a lender
6  placed policy be issued at that time?
7    A   No.
8    Q   No, you did not request it?
9    A   We did not request it.
10    MR. HELLER:  Before you start another
11  entry, I need a quick break.
12    THE VIDEOGRAPHER:  We're off the record at
13  11:17.
14    (Brief recess.)
15    THE VIDEOGRAPHER:  We're back on the
16  record, 11:36 a.m.
17  BY MS. BOWMAN:
18    Q   Mr. Grzeskowiak, we have been looking at
19  the insurance activities that are identified in
20  Exhibit 13, which is the AS400 screen print of
21  information relating to Ms. Drury's New Century
22  loan; is that correct?
23    A   Please restate that.
24    Q   We have been looking at the insurance
25  activities section of the AS400 screen print, that

d64b1a2a-03c0-4134-b10b-472de2aea1df

Page 86

1   is Exhibit 13, relating to Ms. Drury's New Century
2   mortgage; is that correct?
3       A   No.
4       Q   We've not been looking at that?
5       A   Countrywide is now servicing that
6   mortgage.
7       Q   Okay.  This is Countrywide's AS400 screen
8   print relating to Ms. Drury's New Century mortgage
9   now being serviced by Countrywide?
10      A   Correct.
11      Q   And we just looked at an entry under
12  insurance activities, dated 1/26/05, in which your
13  group received an endorsement concerning Ms. Drury's
14  hazard policy; is that correct?
15      A   Yes.
16      Q   And we also looked at an entry, dated
17  March 16th of 2005, where your group identifies the
18  receipt of a bill related to the renewal of that
19  policy, correct?
20      A   Yes.
21      Q   And both of those dates, 1/26/05 and
22  3/16/05, precede the effective date of the renewal
23  policy, which is May 1, 2005, correct?
24      A   Correct.
25      Q   And at this time, either at 1/26/05 or

Page 87

1   3/16/05, did — neither of those instances did your
2   group indicate that there was any need for lender
3   placed insurance?
4       A   Based on the information that was most
5   likely received on these two types of documents that
6   came in, there was no — nothing on those documents
7   that would make us believe that we would need lender
8   placed insurance.
9       Q   Okay.  And your -- do you have copies of
10  those documents?
11      A   I do not.
12      Q   Okay.  And you had the original underlying
13  loan file, if you had chosen to examine it; is that
14  correct?
15          MR. HELLER:  Object to the form.
16          THE WITNESS:  If there was a — as I
17      described yesterday, if there was some
18      necessary or required incomplete information at
19      the time of boarding, we would have looked at
20      that new loan file.
21  BY MS. BOWMAN:
22      Q   And on 1/26/05 when the endorsement came
23  in on Ms. Drury's hazard policy, you would have had
24  access at that time to those same underwriting
25  documents, if you had chosen to look at them?

Page 88

1           MR. HELLER:  Object to the form.
2           THE WITNESS:  If we needed to look at
3       them, yes.
4   BY MS. BOWMAN:
5       Q   Okay.  And the same thing would be true
6   when the bill came in for the renewal of that policy
7   on 3/16/05, you could have chosen at that time to
8   access the underwriting documents; is that correct?
9           MR. HELLER:  Object to the form.
10          THE WITNESS:  If needed, yes.
11  BY MS. BOWMAN:
12      Q   And at that time in 3/16/05, when you paid
13  for the renewal of Ms. Drury's hazard policy, your
14  group did not call for the issuance of a letter
15  regarding the absence of windstorm coverage; is that
16  correct?
17      A   Based on a document type of bill.  That
18  information regarding any type of exclusion is not
19  usually located on a bill, so because the document
20  didn't request us to send a letter based on missing
21  information, no lender placed letter was sent.
22      Q   Okay.  My question was simply that when
23  you entered this transaction and renewed that
24  policy, you did not send a letter to Ms. Drury
25  indicating that she needed windstorm coverage; is

Page 89

1   that correct?
2       A   Correct.
3       Q   And you did not send a letter to Ms. Drury
4   indicating that that policy was inadequate; is that
5   correct?
6       A   Correct.
7       Q   The next entry under insurance activities
8   in the AS400 print log relating to Ms. Drury's New
9   Century loan is on -- is on Bates page 597; is that
10  correct?
11      A   Yes.
12      Q   Now, by the time of this entry dated
13  2/21/06 --
14          Do you see that?
15      A   Yes.
16      Q   -- Countrywide has now been servicing this
17  loan for over a year; is that right?
18      A   Yes.
19      Q   And what is indicated here that happens --
20  happened on 2/21/06 -- under the 2/21/06 entry at
21  the top of Bates page 597, what was it that your
22  group received that caused this entry?
23      A   It would be in section six where an
24  endorsement was received.
25      Q   So we actually have three entries dated

Page 90

1   2/21/06; is that correct?
2   A   No.
3   Q   Take a look at section four.
4   A   Yes.
5   Q   That's dated 2/21/06?
6   A   Yes.
7   Q   Then we have section five dated 2/21/06?
8   A   Yes.
9   Q   And then we have section six dated
10  2/21/06?
11  A   Yes.
12  Q   I guess we also have section seven dated
13  2/21/06, correct?
14  A   Yes.
15  Q   Okay.  So one, two, three, four entries
16  with that same date?
17  A   Correct.
18  Q   Okay.  Would -- should they appear in the
19  order in which they occurred?
20  A   Yes.
21  Q   Okay.  So beginning in section four,
22  2/21/06, there's a document type that says AUD.  Do
23  you see that?
24  A   Yes.
25  Q   Okay.  What does that mean?

Page 91

1   A   It's a term for audit.
2   Q   Okay.  So that was not a document that you
3   received from an insurance company or agent,
4   correct?
5   A   It is a subsequent transaction that was
6   done from the receipt of a document from an
7   insurance carrier.
8   Q   And you believe that document to be the
9   document identified in section six, the endorsement?
10  A   Yes.
11  Q   Okay.  Who -- what does M. Leeth stand
12  for?
13  A   That is a person's — an employee's user
14  ID.
15  Q   And is that an employee of your group?
16  A   Yes.
17  Q   What's that employee's name?
18  A   Melissa Leeth.
19  Q   And what group is Ms. Leeth -- was
20  Ms. Leeth employed in in February of 2006?
21  A   Exception processing.
22  Q   Now, in section six, the paper document
23  you indicate you received of 2/21/06, again is an
24  endorsement?
25  A   Yes.

Page 92

1   Q   Okay.  You indicated, with regard to the
2   prior entry, did you not, that the endorsement --
3   the prior receipt of an endorsement on 1/26/05?
4   A   There was an endorsement received then as
5   well, yes.
6   Q   Okay.  Your testimony about that 1/26/05
7   endorsement was that there would not be an
8   indication -- may not be an indication on that
9   document with regard to whether or not the policy
10  excluded wind coverage; is that correct?
11  A   Correct.
12  Q   And the same would be true for the paper
13  document received on 2/21/06 in section six,
14  correct?
15  A   Not necessarily.
16  Q   There was a material change in the
17  endorsement in '06?
18  A   Yes.
19  Q   How do you know that?
20  A   Based on the premium amount.
21  Q   Okay.  I see there's a drop in the premium
22  amount.
23  A   Correct.
24  Q   Okay.  It's actually -- but it has the
25  same policy number?

Page 93

1   A   Correct.
2   Q   And we know from looking at the -- well,
3   what do you -- what are you saying is causing the --
4   the drop in premium?
5   A   Usually when there's a drop in premium,
6   there is reduced coverage, removed coverage,
7   excluded coverage.
8   Q   Uh-huh.  Okay.  And what was the reduced
9   or excluded coverage that occurred in -- in February
10  of '06?
11  A   I would need to see the document to
12  determine that.
13  Q   Okay.  And the document that you would
14  have received at that time is no longer in
15  existence, correct?
16  A   Correct.
17  Q   So you can't say, as you sit here, why
18  that premium was reduced, correct?
19  A   There is no indication on here why that
20  premium was reduced.
21  Q   All right.  So your testimony, based --
22  that based on the reduction in premium, you might
23  see in this endorsement some reduction of coverage,
24  is just based on your general information, not on
25  your review of this specific document?

Page 94

1     MR. HELLER: Object to the form.
2     THE WITNESS: Based on the knowledge for
3   premiums decreasing, yes.
4   BY MS. BOWMAN:
5     Q   Okay. But there's -- there's nothing here
6   that would indicate to you, looking at this history
7   now, that a reduction in coverage was actually --
8   actually what resulted here in the reduction in
9   premium?
10    A   I'm sorry, I didn't understand that
11  question.
12    Q   Sure. There's nothing here in entry
13  number six that indicates that the endorsement
14  stated what was resulting in the reduction in
15  premium; is that correct?
16    A   Correct.
17    Q   And we know, from having reviewed the
18  underwriting documents related to the New Century
19  loan, that this particular reduction in premium
20  would have absolutely nothing to do with the
21  exclusion of windstorm, correct?
22    A   Could you repeat that?
23    Q   Sure. We know, from having reviewed the
24  underwriting documents, that at the time Ms. Drury
25  provided proof of her underlying insurance, she

Page 95

1   never had coverage for windstorm; is that correct?
2     MR. HELLER: Object to the form.
3     THE WITNESS: I don't believe we've made
4   that determination.
5   BY MS. BOWMAN:
6     Q   Okay. In the underwriting documents, in
7   the prefunding report -- let's take a look at
8   Exhibit 14 again. On page two of Exhibit 14, the
9   request for evidence of insurance for the New
10  Century loan --
11    A   Yes.
12    Q   -- we agree that the only item selected
13  was hazard coverage, correct?
14    MR. HELLER: Object to the form.
15    THE WITNESS: Yes.
16  BY MS. BOWMAN:
17    Q   Windstorm is not checked; is that correct?
18    A   Correct.
19    Q   In connection with -- on the front of
20  Exhibit 14, the memorandum of insurance relates to a
21  hazard policy; is that correct?
22    MR. HELLER: Object to the form.
23    THE WITNESS: (Reviewing document.)
24    (Pause in proceedings.)
25

Page 96

1   BY MS. BOWMAN:
2     Q   Did you answer the question?
3     MR. HELLER: Was there a question pending?
4     MS. BOWMAN: Yeah, I said, the memorandum
5   of insurance that's on the front of Exhibit 14
6   relates to a hazard policy; is that correct?
7     MR. HELLER: Object to the form.
8     THE WITNESS: I do not see the word
9   "hazard" on here. However, I do see a policy
10  number that it's an HO, which normally would
11  stand for homeowner's insurance.
12  BY MS. BOWMAN:
13    Q   And on Exhibit 16 -- see that --
14    A   Yes.
15    Q   -- have that? The prefunding report,
16  which is page two of the composite exhibit of the
17  New Century loan, plainly indicates that there's no
18  wind coverage; is that correct?
19    MR. HELLER: Object to the form.
20    THE WITNESS: I do not -- do not know this
21  form. I do not know what the N stands for.
22  BY MS. BOWMAN:
23    Q   If you had reviewed this as an underlying
24  document to determine whether there was wind
25  coverage in connection with Ms. Drury's original

Page 97

1   mortgage with New Century, would you have
2   interpreted that to mean that there was no wind
3   coverage?
4     MR. HELLER: Object to the form.
5     THE WITNESS: I am not familiar with this
6   document. I do not know what N means.
7   BY MS. BOWMAN:
8     Q   As a part of your business in connection
9   with insurance tracking, you're called upon to
10  review underwriting documents and other insurance
11  documents that are produced in the original loan
12  files from other lenders from time to time; is that
13  correct?
14    A   No.
15    Q   You don't ever review underlying (sic)
16  documents to determine whether there's adequate
17  insurance in place when you received an acquired
18  loan?
19    MR. HELLER: Object to the form.
20    THE WITNESS: My testimony has stated that
21  we would look at the insurance document.
22  BY MS. BOWMAN:
23    Q   Okay. And if there was some question
24  about that insurance document, you would look at the
25  underlying (sic) documents?

Page 98

1    A   No.
2    Q   Going back to the entries on Bates
3  page 597 of the AS -- AS400 Drury account history on
4  the New Century loan.
5    A   Yes.
6    Q   The information that you're receiving in
7  the endorsement is for the policy period for 2000 --
8  May of 2005 to May of 2006; is that correct?
9    A   Yes.
10   Q   And the policy number on that endorsement
11 is identical to the policy number on the bill you
12 paid on 3/16/05; is that correct?
13   A   Yes.
14   Q   So the actual policy has not changed; is
15 that correct?
16   A   No.
17   Q   If the policy number hasn't changed, how
18 has the policy changed?
19   A   By endorsement.
20   Q   Okay. So they can -- they can change --
21 they changed the policy 2/21/06, in the middle of
22 it?
23   A   Based on what I see here, yes.
24   Q   Okay. And you do not know, sitting here
25 today, what that change was, do you?

Page 99

1    A   I do know that that document that was
2  received excluded wind.
3    Q   But you don't know if that was a change
4  from the prior -- from the policy endorsement
5  received in -- on 1/26 of '05?
6    A   No.
7    Q   The section five, do you see that?
8    A   Yes.
9    Q   Okay. That indicates on 2/21/06, which is
10 the same day that you received the -- the document
11 and the same day it was reviewed by Ms. Leeth --
12   A   Yes.
13   Q   -- that there was a -- a request by
14 Ms. Leeth for the issuance of a letter identified as
15 ILA 200; is that correct?
16   A   That's the program name, ILA 200.
17   Q   Okay. What does that stand for? Isn't
18 that an internal letter?
19   A   The program name?
20   Q   No, no, no. ILA 200, is that referencing
21 an intranet program?
22   A   Yes.
23   Q   And the 200, does that identify a
24 particular letter within the intranet program?
25   A   No.

Page 100

1    Q   So what is Ms. Leeth asking to -- asking
2  to happen here through this program, ILA 200?
3    A   She's requesting a hurricane letter to be
4  sent to the borrower.
5    Q   And who would send that letter?
6    A   It's automated.
7    Q   Is that done by -- through CHL's systems
8  or Balboa's?
9    A   This is CHL's system.
10   Q   And can you retrieve from that system a
11 copy of the letter that was sent?
12   A   Not the actual letter; it would just be
13 a -- as we saw in one of the exhibits we went
14 through, a copy of what the letter would look like.
15   Q   A copy of a form?
16   A   Yes.
17   Q   Okay. And what -- what on this section
18 tells you which form it is?
19   A   By where it says "print" --
20   Q   Uh-huh.
21   A   -- to borrower to request hurricane
22 coverage.
23   Q   Okay. But my question is, is there -- is
24 the form itself identified in any other way?
25   A   No.

Page 101

1    Q   On the next entry that is section seven,
2  also dated 2/21/06, do you see that?
3    A   Yes.
4    Q   There's a reference to CIS 100 R3. What
5  is that?
6    A   That is the program name.
7    Q   Okay. Is that a program by Countrywide
8  Insurance Services?
9         MR. HELLER: Objection to form.
10 BY MS. BOWMAN:
11   Q   Does the CIS stand for Countrywide
12 Insurance Services?
13   A   It does.
14   Q   And what does the rest of that mean after
15 CIS?
16   A   It's -- it's just the program code.
17   Q   So is this information being transmitted
18 to Countrywide Insurance Services, then?
19   A   It's actually being transmitted to Balboa.
20   Q   And would that happen based on Balboa --
21 the nightly scan picking up this information out of
22 the AS400 system and then transferring it to the CCS
23 system at Balboa?
24   A   Yes.
25   Q   So -- and this is -- actually, the 2/21/06

Page 102

```
 1    section seven entry is -- shows that there has been
 2    an F placed in the forced order section; is that
 3    correct?
 4        A   Correct.
 5        Q   So there's been a request for the ordering
 6    of a lender placed policy?
 7        A   Correct.
 8        Q   And it indicates that the amount of the
 9    policy would be a thousand dollars?
10        A   Yes, approximately a thousand dollars.
11        Q   And this information is never
12    communicated -- that information is never passed to
13    Countrywide Insurance Services?
14        A   No.
15            MS. BOWMAN:  We're going to have to break.
16            THE VIDEOGRAPHER:  This concludes tape
17    number two.  We're off the record at 12:04 p.m.
18        (Lunch recess.)
19            - - - -
20        (Continued in Volume IV.)
21
22
23
24
25
```

d64b1a2a-03c0-4134-b10b-472de2aea1df