UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DORIS DRURY and TERRY KOCHNIARCZYK, on behalf of themselves, and those similarly situated,

Plaintiffs,

CASE NO: 6:08-cv-152-ORL-28-DAB

vs.

COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE INSURANCE SERVICES, INC., BALBOA INSURANCE COMPANY, and and NEWPORT MANAGEMENT CORPORATION,

Defendants.
_______________________________/

VIDEOTAPED DEPOSITION OF STEPHEN GRZESKOWIAK

VOLUME IV

FRIDAY, JULY 27, 2008
8:50 a.m. - 5:28 p.m.

420 SOUTH ORANGE AVENUE, 12TH FLOOR
ORLANDO, FLORIDA 32801

REPORTED BY:
Stacy Pace, RPR, CSR, CRR, FPR
Notary Public, State of Florida
Esquire Deposition Services
Orlando Office - Job# 941693
Phone: 407-426-7676

APPEARANCES:

On behalf of the Plaintiffs:
Jill H. Bowman, Esquire
Jonathan B. Cohen, Esquire
James, Hoyer, Newcomer & Smiljanich, P.A.
4830 West Kennedy Boulevard
Urban Centre One, Suite 550
Tampa, Florida 33609

On behalf of the Defendants:
William P. Heller, Esquire
Akerman Senterfitt
350 East Las Olas Boulevard
Suite 1600
Fort Lauderdale, Florida 33301

Also Present: Alan Bennett, Videographer

INDEX

Testimony of STEPHEN GRZESKOWIAK
Direct Examination by Ms. Bowman .......... 5
Cross-Examination by Mr. Heller .......... 184
Redirect Examination by Ms. Bowman .......... 211
Recross-Examination by Mr. Heller .......... 224

Certificate of Oath .......... 228

Certificate of Reporter .......... 229

Errata Sheet .......... 230

Read & Sign Letter .......... 231

- - - -

EXHIBITS

Plaintiffs'
Exhibit No. 5 .......... 6
(letter regarding hurricane/wind coverage)
Exhibit No. 6 .......... 14
(2/26/06 letter to Ms. Drury)
Exhibit No. 7 .......... 20
(corrected joint status report)
Exhibit No. 8 .......... 20
(policies & procedures manual)
Exhibit No. 9 .......... 29
(lender operational manual)
Exhibit No. 10 .......... 39
(wind coverage letter)
Exhibit No. 11 .......... 40
(hazard coverage letters)
Exhibit No. 12 .......... 42
(wind coverage letters)
Exhibit No. 13 .......... 49
(AS400 screens)
Exhibit No. 14 .......... 55
(memorandum of insurance)
Exhibit No. 15 .......... 59
(New Century underwriting documents)
Exhibit No. 16 .......... 63
(New Century wholesale funding control)

Exhibit No. 17 .......... 65
(New Century mortgage)
Exhibit No. 18 .......... 119
(Countrywide monthly home loan statement)
Exhibit No. 19 .......... 123
(3/12/06 letter to Ms. Drury)
Exhibit No. 20 .......... 128
(4/19/06 letter to Ms. Drury)
Exhibit No. 21 .......... 134
(6/1/06 notice to Ms. Drury)
Exhibit No. 22 .......... 147
(Balboa insurance policy)
Exhibit No. 23 .......... 160
(customer service training manual)
Exhibit No. 24 .......... 161
(customer service retraining manual)
Exhibit No. 25 .......... 165
(AS400 print screens, Drury refinance)
Exhibit No. 26 .......... 167
(Balboa procedures manual)
Exhibit No. 27 .......... 173
(Balboa intercompany services agreement)

Defendants'
Exhibit No. 28 .......... 186
(New Century insurance requirements)
Exhibit No. 29 .......... 191
(letter regarding hurricane/wind coverage)
Exhibit No. 30 .......... 194
(2/26/06 letter to Ms. Drury)
Exhibit No. 31 .......... 195
(3/12/06 letter to Ms. Drury)
Exhibit No. 32 .......... 196
(4/19/06 letter to Ms. Drury)
Exhibit No. 33 .......... 204
(wind-only rate table)
Exhibit No. 34 .......... 207
(hazard insurance requirements)

- - - -

(Continued from Volume III.)

- - - -

THE VIDEOGRAPHER: This is tape number three. We're back on the record at 12:49 p.m.

BY MS. BOWMAN:

Q Mr. Grzeskowiak, we have been looking at the Countrywide AS400 print of screens relating to insurance servicing activities in connection with the Drury New Century Loan; is that correct?

A Yes.

Q We've been looking at, the last little bit, the entries -- the entries dated February 21, 2006; is that correct?

A Yes.

Q And by the note under section five, you had indicated that a letter of the format of Exhibit 5 should have been sent to the borrower; is that correct?

MR. HELLER: Object to the form.

THE WITNESS: Based on this entry, I know that this letter was sent. Based on this entry.

BY MS. BOWMAN:

Q Okay. And how could you verify that that letter was actually sent?

6351ad5e-b970-4791-85af-9459661f4823

Page 108

A By the entry here and knowing that it's an automated process.
Q Do you have a -- a mail house that generates these letters that would maintain lists of names and addresses to who the letters went so you could verify that a letter went to Ms. Drury?
MR. HELLER: Object to the form.
THE WITNESS: These letters are printed in my mail services area --
BY MS. BOWMAN:
Q Okay.
A -- and they would mail that letter.
Q And do you -- does your mail services area then keep a log or catalog of the names and addresses that these letters are mailed to?
A No. It's based on this entry here (indicating) that I know that that occurred.
Q There's -- there's no way on the back end to -- to look and -- and see that, yes, this name and address was captured and an envelope was printed, or anything like that?
MR. HELLER: Object to the form.
THE WITNESS: This entry pulls the information from the name and address that's on this loan -- on this loan number, and it's

Page 109

window envelopes (indicating). So the name and address would print on the letter and be stuffed into a window envelope.
BY MS. BOWMAN:
Q And is there a log that is created of identifying the borrowers to whom these letters were sent, other than in the AS400 system?
A No.
Q The -- the letter -- the form letter that we have as Exhibit 5 has some symbols on it that indicate that it -- that it -- or it looks like it would be filled in with words; is that correct? For example, N3 HN3 recently received?
A Yes.
Q That would actually be populated with something, right?
A Correct.
Q What -- what would it be populated with?
A It would be populated with the name of the lender.
Q In this case, would that be you, as the servicer?
A Yes.
Q And in connection with the entry in Ms. Drury's AS400, there would also be a populated

Page 110

coverage effective date in the second paragraph, correct?
A Yes.
Q Okay. And in connection with this particular entry, would it be your expectation that that populated date would have been May of 2005?
A Yes.
Q And this letter was sent, according to the AS400 system's notes, on February of 2006, correct?
A Correct.
Q So the letter is asking for her to provide evidence that she has hurricane or windstorm coverage for a period of time that predates the letter?
A It is asking for required coverage that should have been in force back to May.
Q So it's -- it's asking her to provide proof of coverage that was in effect as of May 2005, correct?
A Correct.
Q And it's asking her that in February of 2006, correct?
A Correct.
Q Okay. Fair to say that Ms. Drury could not, on receipt of this letter, go out herself and

Page 111

buy that coverage?
MR. HELLER: Object to the form.
THE WITNESS: I would actually think that Ms. Drury would have had that coverage already.
BY MS. BOWMAN:
Q That wasn't my question. I asked you, can Ms. Drury, on receipt of this letter, go out and buy coverage, that would have an effective date of May 2005, in February 2006?
MR. HELLER: Object to the form.
THE WITNESS: I wouldn't know that for a fact. It would depend upon what her agent would be able to do for her.
BY MS. BOWMAN:
Q Are you saying that a person like Ms. Drury can go out and buy backdated wind coverage?
MR. HELLER: Object to the form.
THE WITNESS: I'm saying that it would depend upon her agent to be able to provide her with the coverage that she needs.
BY MS. BOWMAN:
Q And are you saying that an agent for an insurance company -- it would be a preferred insurance company in Florida, correct? She would

6351ad5e-b970-4791-85af-9459661f4823

have to buy that from a preferred insurance company in Florida?

A Correct.

Q And you're saying that an agent for an insurance company could sell, in February of 2006, to Ms. Drury, an individual, a policy for windstorm coverage with an effective date of May of 2005?

MR. HELLER: Object to the form.

THE WITNESS: What I'm saying is that she would have to contact her agent to make that determination. I do not know if her agent would be able to do that for her.

BY MS. BOWMAN:

Q In your experience in the insurance industry, can people, as a general matter, obtain backdated coverage as an individual?

A I have received policies with coverage that is prior to today's date.

Q Okay.

A How they have obtained that, I don't know.

Q Is it -- would it be your understanding that that would be generally available?

MR. HELLER: Object to the form.

THE WITNESS: I do not have that knowledge.

BY MS. BOWMAN:

Q Now, if -- it was your understanding at the time that you issued this letter that the Nationwide policy -- the hazard policy that Ms. Drury had excluded wind, correct?

A Could you repeat that, please?

Q Sure. It was your understanding at the time you issued this letter, Exhibit 5, that Ms. Drury's Nationwide policy excluded wind?

A Correct.

Q Okay. If Ms. Drury's Nationwide policy excluded wind, what provider in Florida would you have the expectation that she would have to get wind coverage from?

MR. HELLER: Object to the form.

THE WITNESS: I would again refer back to the agent. I don't know what the agent could do for Ms. Drury.

BY MS. BOWMAN:

Q Is it -- in your experience, is it a routine matter that you will receive a policy issued by a preferred provider that is backdated for any period of time?

MR. HELLER: Object to the form.

THE WITNESS: We routinely receive

documents that do have effective dates in the past.

BY MS. BOWMAN:

Q Okay. That's not what I was asking. I was asking if they were issued by the carrier with backdating.

MR. HELLER: Object to the form.

THE WITNESS: My last statement stays the same.

BY MS. BOWMAN:

Q Could you identify for me any -- any Florida carrier that, in your experience, routinely backdates wind policies for homeowners in Florida?

MR. HELLER: Object to the form.

THE WITNESS: I go back to my previous statement. I -- I know we receive in policies with effective dates in the past, that are, you know, prior to today's date.

BY MS. BOWMAN:

Q But can -- can you identify a particular carrier in Florida that was providing you with those kinds of backdated wind policies?

MR. HELLER: Object to the form.

THE WITNESS: Section six is an example of what I'm saying.

BY MS. BOWMAN:

Q What do you mean by that?

A The document date is February 7th, so that is the date that they produced that document with an effective date of 5/01/05.

Q And they had produced that -- an endorsement for the same -- or a bill for the same period on 3/16/05?

A Dated 3/9/2005, correct.

Q Okay. So the -- when -- when this records a document date, that's a document date received by you, correct?

A No.

Q What is that date?

A It's the date that is on the document.

Q Okay. And actually, this -- that document received was to show a reduction in the premium paid in March of 2005, correct?

MR. HELLER: Object to the form.

THE WITNESS: It was an endorsement that was received that had a decrease in premium. I do not know what that decrease in premium was for.

BY MS. BOWMAN:

Q When the -- on the same date that the

6351ad5e-b970-4791-85af-9459661f4823

letter that's Exhibit 5 would have been sent to Ms. Drury, 2/21/06 --
A Yes.
Q -- the lender placed policy was requested by your group, correct?
A Yes.
Q And it was, in fact, identified as being ordered that same day?
A Yes.
Q Okay. Now, that -- how did that happen simultaneously?
A The document that was received was presented to Melissa Leeth --
Q I'm sorry, how is there an F and an O that appears on the same date if the F should have been picked up by a nightly scan by Balboa and then returned with an O?
A If you look at -- if you recall, the O is the old information. The new (sic) is the new information.
Q Okay.
A If you go back up to section four, you will see where the F was populated.
Q And that's on the -- but that's on the same day?

A Correct.
Q So does that mean there was like a midday scan where Balboa returned that information to you?
A No, the ordered -- the O -- means that we sent it to Balboa.
Q Okay. The O is not returned back to you by Balboa indicating that they had received the order?
A Correct.
Q The -- that -- the entry that we were just looking at with the F and the O, under the FO LTR section relating to lender placed insurance --
A Section seven?
Q Section seven.
A Yes.
Q -- it shows an estimated premium of a thousand dollars? Is that what you said? Is that what that is?
A A thousand dollars is in the premium amount, yes.
Q And in section eight we have -- we have a new date, 2/27/06. Do you see that?
A Correct.
Q And that indicates that the first lender placed policy was sent to borrower on 2/26/06; is

that right?
MR. HELLER: Object to the form.
THE WITNESS: The date of the first lender placed letter is 2/26, which was sent on 2/27.
BY MS. BOWMAN:
Q Okay. Take a look at Exhibit 6 for me.
A Yes.
Q Is that the letter being referenced by section eight?
A Yes.
Q And it's actually dated February 26, '06?
A Yes.
Q And then would it be fair to say, then, Balboa returned that information to the AS400 system on February 27, '06, which creates the entry date?
A Yes.
Q Okay. On 3/6/06, do -- do you have that, the entry that's section nine?
A Yes.
Q This indicates that a document was received by your group; is that correct?
A Yes.
Q And it was a fax of Ms. Drury's homeowner's policy?
A It was a fax of an endorsement, yes.

Q And the letter that she received on 2/26/06, asks her, on the front page, about her homeowner's insurance, correct?
A Yes.
Q Turning to the next page of the AS400 record, Bates page 598, we have here a 3/13/06 entry. Do you see that? Section ten?
A Yes.
MS. BOWMAN: Actually, before we move on to that...
(Exhibit No. 18 marked for identification.)
BY MS. BOWMAN:
Q I'm going to hand you what I've marked as Exhibit 18. Is it correct to say that this is an account -- monthly home loan statement that would have been sent to Ms. Drury by Countrywide in connection with the loan and the loan history we're looking at?
A Yes.
Q And the date of this statement is February 27, 2006?
A Yes.
Q So that -- this would have been generated by the AS400 system on that date; is that correct?

6351ad5e-b970-4791-85af-9459661f4823

A Approximately, yes.
Q And when we were looking at -- and flipping back a page on Exhibit 13, this -- this invoice was generated the day after the first LPP letter was sent to Ms. Drury, correct?
A Yes.
Q And if you take a look at the second page of Exhibit 18, do you see the indication -- the information regarding the escrow expenses?
A Yes.
Q And it has county taxes, correct --
A Yes.
Q -- that were paid out of her escrow homeowner's insurance to Nationwide?
A Yes.
Q And then something called subsidence insurance; do you see that?
A Yes.
Q What is that?
A It's subsidence insurance.
Q Is that -- sorry.
A It's subsidence insurance. We talked about it yesterday, I believe.
Q Is there -- is there any indication in the insurance activities that there was a policy for

subsidence insurance?
A No.
Q Is there any indication that there was a lender placed policy for subsidence insurance?
A No.
Q The only -- the only information in the insurance activities section relates to either this letter cycle for the lender placed policy or Ms. Drury's Nationwide policy; is that correct?
A Could you repeat that, please?
Q Sure. The information that's in the insurance activities section refers either to Ms. Drury's Nationwide policy or the lender placed policy that's indicated to relate to wind coverage?
A Correct.
Q But the amount of the -- the amount due in connection with the, quote, subsidence insurance matches the 2/21/06 estimate for the lender placed policy?
A Correct.
Q Is that generated by that section?
A Don't know.
Q Who --
A It's a little difficult for me, based on what I see here, that this entry on this monthly

statement pertains to what we see on insurance servicing activities. I do see a couple of fields that look identical, but based on what I see here (indicating), I don't know how it would have put in subsidence insurance here (indicating) with that information.
Q Because the -- what you're seeing is the 2/21/06 entry related to the ordering of the lender placed policy has an amount due of -- or an estimated amount of a thousand dollars that is the same as the identified subsidence insurance, correct?
A Yes.
Q It has a expiration -- or some category of number identified as 999?
A Yes.
Q And actually that would be the policy description?
A Yes.
Q And is there anything in the 2/21/06 entry in -- that's in section seven that -- that correlates with either a wind policy or a subsidence policy?
A No.
(Exhibit No. 19 marked for

identification.)
BY MS. BOWMAN:
Q I'm going to hand you what I've -- what I've marked as Exhibit 19, and ask you: Is this the letter sent to Ms. Drury as the second LLP (sic) letter identified in section ten of the AS400 insurance activities section?
A The -- the date is the same, but I do see -- I don't know if it was redacted or -- or what happened here, but part of it's missing.
Q What is -- what's missing?
A It appears, "Dear Doris Dr".
Q And there's language missing from the print?
A Yes.
Q Okay. Now, this was a document that was produced by Countrywide. Would this have been generated from the Balboa's imaging system?
A From the letter database, yes.
Q And would this -- does this match the format of a second letter in the letter cycle that would have been in place by Balboa at that time?
A Yes.
Q So we just happen to be missing some language which may be a result of an inaccurate

6351ad5e-b970-4791-85af-9459661f4823

Page 124

image --
MR. HELLER: Object to the form.
BY MS. BOWMAN:
Q -- of the letter?
A I don't know.
Q Would you -- would you know what would -- what would cause the absence of information there?
A I do not.
Q On April 4th of 2006, which is section 11 of Exhibit 13, insurance activities --
A Yes.
Q -- you received a renewal notice for Ms. Drury's Nationwide policy; is that correct?
A A -- an electronic renewal notice, yes.
Q And then as -- your group set that to pay; is that correct?
A The EDI process is automated.
Q Okay. So explain to me how that works differently from the mail coming in to your group.
A No documents are received. It is just an electronic transmission that will run through the business rules and perform whatever is necessary.
Q All right. And so as a result, pertaining to the business rules, this premium of 391.51 was set to pay?

Page 125

A Correct.
Q And that was for a policy -- homeowner's policy with an effective date of May 1, 2006?
A Yes.
Q And an expiration date of May 1, 2007?
A Yes.
Q Referencing your -- your comment about this part of the process being handled electronically, when a customer service representative, as we talked about yesterday, was -- were to update information in the AS400 relating to insurance, and input that information, in other words, maybe they got a call from an agent providing the renewal information --
A Yes.
Q -- would that likewise go electronically through the business rules and generate a note in the servicing activities if no other action was necessary?
A It would not go through the business rules, but it would update servicing activities.
Q Okay. There would have to be something done in your group that would cause that updated information to be run through the business rules; is that correct?

Page 126

A Through the Track Source business rules, yes.
Q Okay. So the fact that a customer service representative input updated information about a policy into the insurance information screen because they were talking to an agent, that would not necessarily result in the payment of that renewal, correct?
A It could. There's business rules on the customer service screens as well.
Q Okay. So it could be that something that was done in customer service actually results in the issuance of a lender placed policy?
MR. HELLER: Object to the form.
THE WITNESS: We discussed yesterday in -- when we were going over my groups, my units, that if customer service identified that a payment needed to be made, they would update that information and it would go into the queues for us to do something with.
BY MS. BOWMAN:
Q Okay. Would that be true if, for instance, an agent or an insurance company used the web-based access to Countrywide's system to update insurance information? It would go into a queue?

Page 127

A Actually, no, that would go through the business -- my business rules.
Q Okay. Would that be true if a borrower updated the information?
A Yes.
Q So those updates, those web updates, would automatically run through your business rules and then appear as an activity in the insurance activities section of the AS400?
A Correct.
Q It's just that customer service representatives can't put something directly through your business rules?
A Correct.
Q And are your -- are there customer service business rules that would ever result in the issuance of a lender placed policy?
A That would trigger something to go into our queues.
Q So it has to stop at you before there is a request for a lender paced -- placed policy, one way or another?
A Correct.
Q In section -- section 12 of the Exhibit 13, in the insurance activities section of the AS400

print, do you see the entry for April 17, 2006?
A Yes.
Q This is actually the transaction that resulted in the payment of the $1,265 premium for a lender placed policy; is that correct?
A Correct.
Q And that lender placed policy would have been the fire and other coverages policy that was issued by Balboa?
MR. HELLER: Object to the form.
THE WITNESS: Correct.
(Exhibit No. 20 marked for identification.)
BY MS. BOWMAN:
Q I'm going to hand you what I've marked as Exhibit 20, which is CHL Bates pages 108 to 110, and this is a -- this would be the, quote, third letter in the letter cycle from Balboa to Ms. Drury regarding the lender placed policy?
A Yes.
Q And it's dated April 19, 2006?
A Yes.
Q And, again, it appears that there probably is some information that's missing or some text that's missing; is that correct?

A Yes.
Q And it identifies -- it calls itself a certificate of coverage placement; is that correct?
A Yes.
Q And it indicates that the coverage placed has resulted in a hazard insurance annual premium amount, under Countrywide's policy, of $1,265, correct?
A Yes.
Q Now, can you tell me why the lender placed policy that was paid on April 17, '06, was not paid 30 days from -- I mean, I'm sorry, was paid before 60 days had expired from the original letter to Ms. Drury on 2/26/06?
A It's approximately 60 days, based on the letter cycle, based on the timing of the letters that are sent.
Q Okay. So why was this cycle shorter than 60 days?
MR. HELLER: Object to the form.
THE WITNESS: It's approximately 60 days. The weeks go in seven days increments, and it turns out that dependent upon -- on the night that the scan would run to produce the letter, it's approximately 60 days.

BY MS. BOWMAN:
Q But you would agree with me that the original letter says she has 60 days to provide you with evidence of coverage?
A Correct.
Q The next entry of 4/17/06, on section 13 of Exhibit 13, can you explain what that is showing?
A Which -- which section?
Q Thirteen. It appears on the bottom – starts on the bottom of the page – Bates page 598 and goes over to Bates page 599.
A Yes. That is the renewal request information for the next policy term being transmitted to Balboa.
Q So on the same date you paid the original lender placed policy, you sought a renewal of that policy from Balboa?
A It's an automated process --
Q Uh-huh.
A -- that prior to the expiration date of that lender placed policy, that a renewal letter will be generated prior to the issuance of that renewal lender placed policy.
Q Okay. Now, this entry indicates that -- it just says, reported renewal request to CIS?

A Correct.
Q So is that really the transmission to Balboa for the renewal request?
A Yes.
Q No information is going to CIS?
A No.
Q And what do the P's mean, under the FO LTR section there?
A Same as what they meant previously, which means paid. So it's sending a renewal request, but it's stating that that policy that's listed there, 5/1/06 -- excuse me, the 5/1/05 to 5/1/06 term has been paid. Because if -- if you look at the top of page 22 --
Q Okay.
A -- everything is the same with the exception of the effective date; it's 5/1/06.
Q Right.
A Which means that that 5/1/06 is a request for renewal, the --
Q And it's paid through 5 of '06?
A Correct, meaning that that policy number to the right --
Q Uh-huh.
A -- is paid through 5 of '06.

Q Okay. So it's not showing the renewal period?
A No.
Q And as a result of -- of this entry, Balboa would have, in the normal course, sent a renewal notice to Ms. Drury; is that correct?
A Correct.
Q Now, the next entry, at 5/19/06, indicates that there's been a payoff of the loan?
A Correct.
Q And that's being reported to, again, Balboa?
A Correct.
Q So -- and it's showing again that the prior policy through 5 of '06 was paid --
A Correct.
Q -- at that time.
Now, at the time that that loan was paid off on 4/19/06, would Balboa have then prorated the premium on that lender placed policy and refunded some of the money?
MR. HELLER: Object to the form.
THE WITNESS: They would have refunded the unearned premium at that time of payoff.

BY MS. BOWMAN:
Q Okay. And based on the insurance activities reflected here, did that happen?
A Yes.
Q Where?
A Section 16.
Q Are you sure that -- are you sure that is not -- okay, okay. It says, refund for LLP (sic)?
A Yes.
Q Okay. So $42 was put back into Ms. Drury's original escrow account?
A Yes.
Q Explain to me in that section 16 what is reflected in the line that starts with "effective date."
A The effective date is the effective date of the line 20, the hazard policy, the expiration date of the hazard policy, and the premium amount of the hazard policy. The policy type is H for the homeowner's or hazard.
Q Okay. And why is that information sitting in the middle of this information relating to a refund on a lender placed policy?
A Because that is the last information that we have on the escrow line remaining; being that the

line 27 has now paid off, the last information that's out there is the homeowner policy information. It's the information from the Nationwide policy.
Q Yeah, okay. I just couldn't figure out why it was in this section.
A Yeah.
(Exhibit No. 21 marked for identification.)
BY MS. BOWMAN:
Q I'm going to hand you what I've marked as Exhibit 21, which is a -- a notice dated June 1st of 2006 from Countrywide Home Loans to Ms. Drury, with an annual escrow account disclosure statement. See that?
A Yes.
Q And that would have been sent to Ms. Drury in June of 2006 because of the payoff of the loan, the New Century loan, correct?
In other words, it's not a full -- it's not -- it's not a full year. It's not sent in December of '06; it's sent early because of the payoff of the loan?
A Yes.
Q Take a look at the information on page

two. This shows a transaction history on Ms. Drury's escrow account related to that -- that New Century loan, correct?
A Yes.
Q And it shows, again, for two thousand and -- I guess it's -- yeah, it's showing the actual dates of escrow disbursements on the right-hand column in 2006, correct?
A Yes.
Q And it shows that there was a disbursement for hazard insurance -- okay, actually, I'm going the wrong way. It actually goes in ascending order, starting with the earliest date of March of '06, correct?
A Yes.
Q And that shows a regular payment, means -- meaning that money is coming into the escrow account, correct?
A Yes.
Q And then there's a payment for hazard insurance, dated 4/4/06, for 391.51; is that correct?
A Correct.
Q And that would be the payment for the Nationwide renewal that was reflected in the

insurance activities report?
A Yes.
Q And then there's a payment on 4/17/06 for subsidence insurance, correct?
A Yes.
Q And the amount of that is $1,265; is that correct?
A Yes.
Q Okay. And that matches the amount of the lender placed policy that was placed by Balboa; is that correct?
MR. HELLER: Object to the form.
THE WITNESS: Yes.
BY MS. BOWMAN:
Q Based on the information in the AS400 -- I'm sorry.
Based on your review of the insurance activities in the AS400, is this -- is this statement wrong?
A I do see where it is stating subsidence insurance -- and it should -- or subsidence, and it should not.
Q What should it state?
A It should state lender placement.
Q Do you have any idea what would have

resulted in that being shown on Ms. Drury's escrow statement as subsidence insurance?
A I didn't understand the question.
Q Sure. Do you have any idea what electronic information would have resulted in the generation of the escrow statement showing that that amount was paid for subsidence insurance?
A Could you repeat that, please?
Q Sure. What, to your understanding, would have resulted in this escrow statement showing the payment of subsidence insurance?
A I'm still not understanding the question.
Q How did -- how did subsidence insurance appear on this as opposed to lender placed policy?
MR. HELLER: Object to the form.
THE WITNESS: I don't know.
BY MS. BOWMAN:
Q Now, if the -- the refund check that was $42, as a result of the cancellation of the lender placed policy on page 22 of the AS400, Exhibit 13 --
A Yes.
Q -- that was the last entry in insurance activities in connection with this particular loan; is that correct?
A Yes.

Q Okay. And is it fair to say that at this point your group in insurance tracking is unlikely to receive any further information in connection with this loan?
A No.
Q You may still get information about that loan?
A Correct.
Q And what would be the sources of that information?
A Same as if the loan was in force, something from the insurance company, from borrower, from agent.
Q Uh-huh. Would you necessarily receive correspondence from the borrower to Countrywide about that loan?
MR. HELLER: Object to the form.
THE WITNESS: Countrywide could receive correspondence, sure.
BY MS. BOWMAN:
Q Okay. But I'm saying, would that -- would you receive that correspondence necessarily?
MR. HELLER: Object to the form.
THE WITNESS: If it had -- yes, if it had my P.O. box on it, the P.O. box for insurance.

BY MS. BOWMAN:
Q And if you had prepared a -- if your group had prepared a response to correspondence from Ms. Drury relating to the New Century loan, would that have been -- or resulted in additional insurance activities being identified in the AS400?
A Yes.
Q Because when your group undertakes to perform some action with regard to a -- a loan, that's where that information would be recorded, correct?
A Correct.
Q And would it be true in the same way as other mail coming in to your group, that any incoming information from borrowers, as opposed to agents or insurance companies, would also only be maintained for one year?
A You would need to be more specific.
Q Sure. For -- for example, if you received a -- a letter from Ms. Drury regarding the -- regarding insurance inquiring into a particular situation, even after the payoff of the New Century loan, would that correspondence be saved by your group, or would it be discarded in the normal pattern of discarding imaged mail after 12 months?

MR. HELLER: Object to the form.
THE WITNESS: If we receive correspondence -- and my definition of correspondence is something other than an insurance document -- we would -- the insurance department would pass that on to Countrywide's correspondence unit.
BY MS. BOWMAN:
Q So you wouldn't respond to that directly?
A No.
Q If the -- if the correspondence was inquiring concerning insurance, would the inquiry get passed back to you?
A No.
Q So if there was a response, it would be for Country- -- from Countrywide's correspondence folks who would have then responded to the correspondence from the borrower?
A Yes.
Q And would that responsive correspondence from Countrywide be recorded anywhere in the AS400 history on that loan?
A Correspondence is -- there are updates for correspondence in the AS400, yes.
Q I guess what I'm asking is, would there --

would there be an indication in the AS400 if a responsive letter went out, then, if one did?
A I'm not sure. There is a correspondence system. I know that receipt of correspondence is updated to the AS400. And being that -- anything received is normally updated to the AS400, and things that are sent out are updated to the AS400. So my answer would be, yes, there would be.
THE VIDEOGRAPHER: We have to change the tape, please.
MS. BOWMAN: Okay.
THE VIDEOGRAPHER: This concludes tape number three. We're off the record at 1:49 p.m.
(Brief recess.)
THE VIDEOGRAPHER: This is tape number four. We're back on the record at 2:07 p.m.
BY MS. BOWMAN:
Q Mr. Grzeskowiak, in engaging in the insurance activities that you did in connection with Ms. Drury's loan originally through New Century, would you agree that you simply engaged in activities governed by your regular business rules?
A Engaged in --
MR. HELLER: Object to the form.

THE WITNESS: Engaged in activities based on Fannie and Freddie guidelines, based on insurance practices, yes.
BY MS. BOWMAN:
Q And you didn't treat this account in any special way doing something uniquely different in connection with Ms. Drury's insurance activities than you would have done in connection with any other loan, correct?
MR. HELLER: Object to the form.
THE WITNESS: With regards to insurance in general?
BY MS. BOWMAN:
Q No. All I'm asking is -- is, did you deviate from any of your usual policies or practices in connection with the insurance activities undertaken in connection with Ms. Drury's New Century loan?
MR. HELLER: Object to the form.
THE WITNESS: No.
BY MS. BOWMAN:
Q And so when you issued -- or, I'm sorry, when you ordered the lender placed policy in February of 2006 for Ms. Drury's property for a time period that predated the ordering of that policy,

that was in accordance with your regular policies and procedures?
MR. HELLER: Object to the form.
THE WITNESS: It was in accordance with Freddie and Fannie guidelines that specifically state what insurance is required. So, no, it didn't deviate.
BY MS. BOWMAN:
Q And if there was a person in a similar situation to Ms. Drury's, you would have undertaken exactly the same conduct?
MR. HELLER: Object to the form.
THE WITNESS: Yes.
BY MS. BOWMAN:
Q Now, when you -- when the lender placed policy was issued in connection with Ms. Drury's property in February of 2006, the term of the policy that was actually issued was already nine months expired; is that correct?
MR. HELLER: Object to the form.
THE WITNESS: Could you repeat that, please?
BY MS. BOWMAN:
Q Sure. When you ordered the -- the lender placed policy in February of 2006, in connection

Page 144

with Ms. Drury's property, it had an effective date of 5/1/06, correct?

A Yes.

Q And that -- and as of February of 2006, then, nine months of that policy period was expired?

MR. HELLER: Object to the form.

THE WITNESS: It was nine months into that policy period, yes.

BY MS. BOWMAN:

Q And did you do anything in February of 2006 to determine whether or not during that period, from May of 2005 to February of 2006, there was, in fact, any wind damage to Ms. Drury's property?

A No.

Q And in connection with the issuance of the lender placed policy on Ms. Drury -- Ms. Drury's property, is that the same lender placed policy that would have been issued in connection with any loan in which you identified it as having -- not having adequate wind coverage?

MR. HELLER: Object to the form.

THE WITNESS: Yes.

BY MS. BOWMAN:

Q There's no other form of insurance policy that would have been issued for a borrower, other

Page 145

than Ms. Drury, who had the exclusion for wind?

MR. HELLER: Object to the form.

THE WITNESS: Could you repeat that, please?

BY MS. BOWMAN:

Q Sure. I'm just trying to find out if there's another Balboa or another -- even another company's policy that you would have been issuing in connection with some other loan, not Ms. Drury's, if you determined that they had an exclusion for wind?

MR. HELLER: Object to the form.

THE WITNESS: No.

BY MS. BOWMAN:

Q So is it fair to say from the -- during the period from the beginning of 2003 to December 2007, if you determined that a borrower had a hazard policy that excluded wind, the policy that you would issue through Balboa was the fire policy that you issued to Ms. Drury?

MR. HELLER: Object to the form.

THE WITNESS: It would be the same fire policy which includes wind coverage.

BY MS. BOWMAN:

Q And in those instances where you did determine that the -- that the borrower's hazard

Page 146

policy excluded wind, resulting in the issuance of that lender placed policy, each of those borrowers would be in the same situation as Ms. Drury, in that they would have policies which had potentially duplicative coverages --

MR. HELLER: Object to the form.

BY MS. BOWMAN:

Q -- for the same period?

MR. HELLER: Object to the form.

THE WITNESS: They would have the same coverages in effect, yes.

BY MS. BOWMAN:

Q Okay. And that would be through their preferred hazard policy and through the lender placed policy?

MR. HELLER: Object to the form.

THE WITNESS: They would have additional coverages, meaning that, you know, if there were a loss, the lender placed policy -- if there were a fire loss, as an example --

BY MS. BOWMAN:

Q Uh-huh.

A -- the lender placed policy could be used as excess coverage. So there's a benefit to the borrower if the preferred coverage didn't have

Page 147

enough to cover their entire claim. They could use the ex- -- excuse me, the lender placed policy as an excess policy.

Q Are you sure about that?

A Yes.

(Exhibit No. 22 marked for identification.)

BY MS. BOWMAN:

Q I'd like to hand you what I've marked as Exhibit 22. Is it -- you can take a look through it if you'd like, but is this a copy of the Balboa policy that was issued in connection with Ms. Drury's property relating to her New Century loan?

A This is a copy of the master policy, yes.

Q And the -- and the -- and the information here relates specifically -- on the front page, relates specifically to Ms. Drury?

A I do see that her name is on this, yes.

Q Okay. And maybe -- maybe a better way to phrase it is, this is reflecting that as of May 1, 2005, the master policy is being issued to Ms. Drury -- or regarding Ms. Drury's property, I guess is another way to say it?

A I have actually never seen where the

borrower's name is on a particular document like this.
Q Can you take a look at page two of Exhibit 22?
A Yes.
Q This is a declarations page for the lender placed policy, correct?
A Yes.
Q And that -- that is the lender placed policy issued in connection with Ms. Drury's property?
A The master policy, yes.
Q And it identifies in item one the named insured as Countrywide Home Loans; is that correct?
A Yes.
Q Does it indicate that there's an additional insured, Ms. Drury?
A (Reviewing document.) I do not see her name on this document.
Q And it indicates also that the agent on the issuance of this policy is Countrywide Insurance Services, Inc.; is that correct?
A Yes.
Q But it's your -- been your testimony that in ordering the lender placed policy, you did not

transmit any information to Countrywide Service -- Insurance Services; is that correct?
A Correct.
Q The next two pages is identified as -- as Bates 2-111 and 2-112. Do you see that?
A Yes.
Q Okay. And it -- it's called the Lender's General Form; do you see that?
A Yes.
Q And there it -- it indicates that the -- in the definition section, that "you, your and yours" is as defined in the residential property fire insurance form and other forms, correct?
A Yes.
Q Turning over to the next series of pages, can you tell me what this is, beginning at Bates page 2-113?
A I would only be able to tell you what I'm reading in front of me, which is an insuring agreement.
Q And it -- at the top, it says, "Residential Property Fire Insurance Form"?
A Yes.
Q And would it be -- would it be your understanding that this was the insuring agreement

related -- related to Ms. Drury's property on the lender placed policy?
MR. HELLER: Object to the form.
THE WITNESS: It would be the insurance agreement under the master policy that would apply to, yes, Ms. Drury's property.
BY MS. BOWMAN:
Q And under the -- it says, "Whenever used in this Residential Property Form, the following words shall have the meanings as shown herein."
Do you see that?
A Yes.
Q And it says: You, your, yours mean the named insured shown under item one of the declarations page. Is that correct?
A Yes.
Q The named insured on the declarations page is Countrywide Home Loans, correct?
A Yes.
Q Okay. Is it still your understanding that this policy provides coverage to the borrower?
A Yes.
Q And what is that based on?
A Based on my knowledge of lender placed insurance and the fact that if ever there is a

claim, the borrower is able to file a report of claim under that policy.
Q Do you know of any reference to the borrower, or Ms. Drury, in this insuring agreement that would identify her as an insured?
MR. HELLER: Object to the form.
THE WITNESS: The certificate of placement that was provided to Ms. Drury would, in my knowledge, provide her with a -- a -- provide her as -- like a loss payee under this policy.
BY MS. BOWMAN:
Q Taking a look -- let me just ask you this question: In connection with who would be covered under this policy, would Balboa be the one that would have the best information about that?
A Yes.
Q Okay. Can you take a look at the Lender's General Form, page two, which is at Bates page 2-112 of this lender placed policy?
A Yes.
Q And at the top of that page, do you see right before number four?
A Yes.
Q There's a provision that talks -- it's number three, that talks about other insurance?

A Yes.
Q And on the top of Bates page 2-112, it actually says: "In no event shall this insurance apply on a pro rata or contributing basis. Insurance under this policy does not supplement other insurance that provides inadequate limits of coverage or that contains more restrictive terms than the terms of this policy."
Do you see that?
A Yes.
Q Does that change your testimony with regards to Ms. Drury's ability to use this policy as supplemental insurance?
A I stand by my testimony, based on my knowledge, that it would be used in excess if -- I would suggest, to get the appropriate definition, that we would talk to the Balboa representative being deposed in the next few days.
Q Is the -- is the provision that I just read to you from the Lender's General Form then inconsistent with your understanding about the treatment of this policy as excess coverage?
MR. HELLER: Object to the form.
THE WITNESS: It would -- it would make me believe that I would have to interpret this

particular paragraph, and I don't believe that I'm capable of doing that.
BY MS. BOWMAN:
Q Did -- to your knowledge, in connection with Ms. Drury's payment for the lender placed policy, did -- or why don't you tell me, what companies other than Balboa received a portion of that premium?
A It would just be Balboa.
Q Does Countrywide receive a commission in connection with the issuance of lender placed policies?
A No.
Q Take a look at Exhibit 9 for me, the lender manual.
A Yes.
Q If you could take a look at Appendix D, which is at Bates page 3-203, very near the end.
A Yes.
Q See that page is entitled "Countrywide Commission"?
A Yes.
Q Do you know what that means?
A I believe I testified yesterday that at one time Countrywide Insurance Services was

involved. However, that stopped, to my knowledge, 2003, 2004. And as you see, this is a blank page.
Q Uh-huh.
A The information that would have been here has been pulled out because that no longer happens.
Q Okay. So that -- it's your understanding that that reference to Countrywide is to Countrywide Insurance Services?
A Yes.
Q I'd like to go back to Exhibit 8 for a minute, which is the policies and procedures from the intranet related to insurance.
Do you have that?
A Yes.
Q Taking a look -- take a look at page 209 of the policies and procedures that are Exhibit 9, it's 4-209. It says, "Role of the Insurance Department." Do you see that?
A Yes.
Q Is that, to your understanding, referencing your group?
A Yes.
Q So to the customer service representatives who are answering the phones for Countrywide, your group is known as the insurance department or

insurance group?
A Correct.
Q And if you could turn to page 4-210.
A Yes.
Q This is the insurance codes that we've identified in some of the AS400 materials?
A Yes.
Q And those continue on to the next page; is that correct?
A Yes.
Q And that's just simply how they're identified in the system regarding the type of coverage?
A Correct.
Q If you could turn to page 4-213.
A Yes.
Q And that page and the following page describe the minimum insurance requirements; is that correct?
A I'm sorry, which page was that?
Q Page 4-213 and 4-214 provide -- or describe the minimum insurance requirements; is that correct?
A Yes.
Q Taking a look at the bottom of page 4-214,

6351ad5e-b970-4791-85af-9459661f4823

Page 156

do you see the -- the section, "Understanding the Insurance Information Screen"? See that heading?
A Yes.
Q Now, the insurance information screen, is that the interface that would be used by the customer service representative, or a representative from your group, to update insurance information in the AS400?
A This would be a screen that customer service would see.
Q Okay. So it would not be a screen that would be used in your group?
A Correct.
Q So is it fair to say that this section, "Understanding the Insurance Information Screen," is geared towards the customer service representatives?
A Yes. This information would be pulled from the insurance screens and files to be presented in this format.
Q Okay. To the -- to the people on their desktops who are handling customer service calls?
A Correct.
Q Do you -- do you, in your group, prepare these policies and procedures for use by your group and customer service?

Page 157

A Both entities are involved. Depending upon which section it might be, it's possible that -- or probable that it would be approvals and discussions going back and forth.
Q Take a look at page 4-219.
A Yes.
Q It's called "Updating Insurance Lines Reflecting Current Policy"?
A Yes.
Q Would that be a -- I'm sorry, are those instructions to a customer service representative about how to update insurance information regarding a current policy?
A It would actually be both.
Q Be -- to both --
A Yes.
Q -- your group and customer service?
A Correct.
Q Now, if that information was updated by the customer service representative and that updated information identified through your business rules, or through the customer service business rules, a need for the issuance of lender placed insurance, that would simply result in that information appearing in a queue in your group?

Page 158

A Correct.
Q And somebody in your group would have to take some action with regard to that queued item in order for a lender placed policy to be issued?
A Correct.
Q Take a look at Bates page 4-221 of the manual. It says, "Updating Insurance Information Screen and Setting a Policy to Pay." Do you see that?
A Yes.
Q Now, that is also information that's used by both customer service representatives and your group?
A Correct.
Q And if that information was updated with, as we indicated, a little Y for set to pay by the customer service representative, would that payment still have to be authorized by your group?
A For -- yes.
Q So it would again come up into a -- some sort of disbursement queue for it to be analyzed by the insurance department?
A Correct.
Q Section 4-224 -- sorry, page 4-224 of the insurance manual regarding manual payments, now, is

Page 159

that something that's for -- both for your group and the customer service group?
A This is for my group.
Q Fair to say the only group that's authorizing manual payments of insurance premiums is your group?
A Yes.
Q Would that true (sic) -- would you -- sorry -- would that answer be the same for rush payment requests?
A Yes.
Q And would your group also have to authorize a request that a payment be sent to a different address?
A Customer service could obtain that information and provide it to us, but we would be the ones making the payment.
Q And would that be true for the payment of additional premiums as well?
A Yes.
Q If you go to the section marked 4-235, lender placed insurance. Would this be information for your group or for the customer service department?
A Customer service department.

6351ad5e-b970-4791-85af-9459661f4823

Page 160

Q And they could actually do what they're calling creation of a forced order -- forced order insurance?
A That would -- if they did that, that would go into the queue for us to perform that transaction.
Q And how would it come to them first? Would it be an agent calling customer service saying he's going to cancel the policy?
A Agent or -- or borrower calls that, you know, their policy canceled.
(Exhibit No. 23 marked for identification.)
BY MS. BOWMAN:
Q I'm going to hand you what I've marked as Exhibit 23. Can you tell me what this is, please?
A (Reviewing document.) This is a newer improved version of this manual (indicating) as well.
Q And is this used by both your group and the customer service group?
A This is used primarily by customer service.
Q It's -- actually on page two of the document, Bates page 4-101 indicates it's the

Page 161

customer service training service new hire --
A Correct.
Q -- kind of document?
And did you assist in the preparation of this material based on what's in the insurance manual?
A I would have approved it.
Q Does it have the same kind of information in it that we saw in the insurance manual, teaching people in the customer service group how to handle calls related to insurance, and update information in the insurance screens?
A Correct.
(Exhibit No. 24 marked for identification.)
BY MS. BOWMAN:
Q I'm going to hand you what I've marked as Exhibit 24.
A Yes.
Q Okay. And can you tell me what this is?
A Periodically customer service will have retraining of individuals, and as it says here, "Renew Your Knowledge of Insurance."
Q The -- the documents we've marked as Exhibit 23 and Exhibit 24 --

Page 162

A Uh-huh.
Q -- both have dates or -- approval dates of 2005. Do you see that?
A Revised dates, yes.
Q Was that based on the -- these revisions in the newer improved versions of these customer training manuals, was that brought about by the need for a better understanding by the customer service representatives of the insurance -- of the role of insurance, given the 2004 storms?
A I don't know.
Q Were they -- were they created -- or revised in 2005 based on any information that you might have been providing out of the insurance department indicating that customer service representatives were not appropriately handling insurance calls?
A I do not recall providing anything like that.
Q Would you, as a matter of your regular business practices, provide feedback to the customer service managers regarding the handling of insurance matters by customer service representatives?
A Yes. We have a weekly call.
Q Is there any kind of a written report that

Page 163

you would provide to them?
A No.
Q So the call is just kind of a troubleshooting "let's all talk about it" call?
A Correct.
Q And who would that be with from customer service?
A With our liaison.
Q And who is that?
A Her name is escaping me right now. I can picture her face, I just -- the name is not coming to me.
Q Where is she located?
A She's in Fort Worth.
MS. BOWMAN: Let's take a five-minute break. I'm going to go through and see what I've got left.
THE VIDEOGRAPHER: We're off the record at 2:47.
(Brief recess.)
THE VIDEOGRAPHER: We're now back on the record at 3:19 p.m.
BY MS. BOWMAN:
Q Mr. Grzeskowiak, you have, in a couple of your answers this afternoon, talked about the

6351ad5e-b970-4791-85af-9459661f4823

Freddie and Fannie insurance requirements. Do you recall making -- or using that phraseology?
A Yes.
Q And with regard to that, are you talking about the insurance requirements for a loan that would be sold to Freddie Mac or Fannie Mae?
A Yes.
Q Is it fair to say that during this era of sub-rime lending through the -- even beginning back well before 2003, that loans were being pulled, securitized, and sold without any involvement of Freddie or Fannie?
A I don't have that knowledge.
Q You just don't know one way or the other?
A Correct.
Q Do you know whether all of the sub-prime lenders were using the insurance requirements used by Freddie -- Freddie and Fannie?
A Based on my knowledge of all the loans that I've dealt with over the years, just about all investors that I've seen have adopted the Freddie and Fannie guidelines or they have similar Freddie and Fannie guidelines.
Q You mean guidelines similar to Freddie and Fannie?

A Correct.
Q Okay.
A Thank you.
(Exhibit No. 25 marked for identification.)
BY MS. BOWMAN:
Q I'm going to hand you what I have marked Exhibit 25. And just for purposes of identification, is this the AS400 print relating to the history of Ms. Drury's Countrywide refinanced loan?
A This is a loan that was bordered -- excuse me, boarded to Countrywide's system approximately 6/29/2006. It does have a date -- date of mortgage of 4/14/2006.
Q And do you understand that to be Ms. -- Ms. Drury's refinance of her New Century mortgage through Countrywide Home Loans?
A Yes.
Q If you could take a look at Exhibit 4. We tried to put them in order for you there. This, again, is the insurance services agreement between Newport Management Corporation and Countrywide Home Loans, correct?
A Yes.

Q And taking a look at Bates page 2-151 --
A Yes.
Q -- this appears to be an amendment to the Newport and CHL agreement dated January 1, 2007. Do you see that?
A Yes.
Q Okay. Given the addition of that amendment and the original date on this contract of November 1, 2001, do we have before us as Exhibit 4 the complete agreement between CHL and Newport for insurance services and tracking?
A That's my understanding, yes.
Q Okay. Can you tell me who Pat -- Patrick Driscoll is? And I'm looking at 2-145, Bates page 2-145. It's also document page 22.
A I don't know him personally, but I do know that he is part of our product area.
Q Okay.
A For --
Q Is that loan products?
A -- insurance products.
Q And to your understanding, is he, like you, employed by Countrywide Home Loans?
A I don't know.
Q Is Mr. Driscoll still with the company,

any of the Countrywide companies?
A I don't know.
Q Take a look at Appendix B, which is document page 24, Bates page 2-147.
You were talking earlier today, and yesterday, about the service quality standards that would be applied in connection with the work that your insurance department was doing on behalf of performing Newport's portion of this insurance -- of this insurance servicing agreement.
Are these the service quality standards that you are -- are and have been expected to maintain during the term of this contract?
A Yes.
Q And are these the standards that you were discussing that were applied to your employee in connection with the provision of insurance services?
A No.
(Exhibit No. 26 marked for identification.)
BY MS. BOWMAN:
Q I'm going to hand you what I'm marking as Exhibit 26.
MS. BOWMAN: You gave me this one. I don't have an extra copy.

BY MS. BOWMAN:
Q Can you tell me what this document is?
A This document is procedures that will identify the steps that are needed to -- let me just go through this for a minute.
Q Okay.
A (Reviewing document.) There are actually multiple procedures in this -- in this packet. But primarily it's surrounding the quality control function that is performed on my individuals, procedures, how to dispute an error, correct an error. And also -- there's also procedures in here regarding analysis that I mentioned yesterday on -- that we perform on flat cancellations of lender placed policies.
And there's one other one, the lender placement -- placement analysis. Basically, did the technician request lender placement properly.
Q So this is a -- a series of policies and procedures that describes the kinds of reviews that will be performed in connection with the services being performed by your group?
A Quality controlling my services, yes.
Q And this document, however, does not contain the standards that you apply to your

employees that we were just discussing?
A Correct.
Q Are they -- are those maintained somewhere else?
A Yes.
Q And can you retrieve a copy of those standards?
A Yes.
Q Would they be different for each of the groups in your unit?
A Yes.
Q Do any of those standards relate to the speed with which the representative is handling incoming queries or materials?
A I'm not understanding the question.
Q Sure. In other words, do some of the standards that are -- you apply to your employees, do they have to do with how quickly that employee is processing something coming to them, whether it's a document or a request in a queue?
A It identifies what's expected of the individuals in those particular functions that you've named.
Q Including the timeframes for completion of activities?

A The timeframe is based on a production standard per hour.
Q Okay.
A And it's -- again, it goes back to a percentage of standard that the individuals are at.
Q And so the -- what it would show is what the standard was for hourly production for the particular type of employee?
A What the standard is --
Q Yes.
A -- and how they're -- how they're meeting that standard.
Q Why, in -- why, in particular, is there a specific quality control review of flat cancellations of lender placed policies?
A To identify if there is a potential issue with the issuance of lender placed policies.
Q Take a look at Exhibit 26, Bates page 9-120.
A Yes.
Q This is a quality control review regarding lender placed insurance placement analysis; is that correct?
A Yes.
Q They're actually analyzing quarterly

information about lender placed policies, correct?
A Correct.
Q So these would be placed policies as opposed to policies that were placed and then flat -- flat canceled? Or would it include all lender --
A Could be one and the same.
Q Okay. In other words, the second group could include the first?
A Correct.
Q So this is just all lender placements issued through your group?
A Yes.
Q What is Balboa's DataMart database?
A That is a database that houses the lender placed policy information.
Q And when -- in the review -- in the procedure portion of this quality control procedure, it says that a population of lender placed insurance and consumer placed insurance policies are pulled on a quarterly basis from Balboa's DataMart database. See that?
A Yes.
Q This says, a typical sample is selected for each lender. What does that -- what does that

mean?
A There are multiple lenders that Newport outsources for -- performs outsourcing for.
Q And that -- and those -- is it talking about loans -- only loans being serviced by Countrywide there, or is it talking about insurance services being provided to other lenders on loans not being serviced by Countrywide?
A The data to be reviewed would be specifically for Countrywide that would be reviewing to gather the information for.
Q When they -- when they say that they're selecting it for a particular lender, the lender wouldn't necessarily be Countrywide; is that correct?
A When they're doing the review for my area --
Q Yes.
A -- they would pull Countrywide as the lender.
Q And so is there another Newport group that does what you do for Countrywide, for other lenders?
A Yes.
Q And are those employees located within your department?

A No.
Q Where are they at?
A I believe I mentioned Tempe, Arizona, yesterday.
Q Yes.
A And we do have a Pittsburg operation that is heavily involved in CPI, which is automobile.
Q Okay. So it's providing insurance tracking services to other mortgage lenders and other kinds of lenders all together?
A Yes.
Q It has nothing to do with the contract between Newport and Countrywide Home Loans?
A Correct.
MS. BOWMAN: We have to switch tapes.
THE VIDEOGRAPHER: This concludes tape number four. We're off the record, 3:28 p.m.
(Off the record.)
THE VIDEOGRAPHER: This is tape number five. We're back on the record at 3:39 p.m.
(Exhibit No. 27 marked for identification.)
BY MS. BOWMAN:
Q I'm going to hand you what I've marked as Exhibit 27. And can you tell me what this is,

please?
A I cannot.
Q It's identified on page one as the Balboa Insurance Group Intercompany Services Agreement. Do you see that?
A Yes.
Q And if you look at the -- nearly last page -- Bates page 2-182, it's identified as -- sorry. I'll let you get there.
It's identified as having an effective date of January 1, 2006?
A Yes.
Q In your role and responsibility for insurance tracking and performing the Newport portion of the Countrywide/Newport insurance services and outsourcing agreement, are you then part of this Balboa Insurance Group Intercompany Services Agreement?
A I've never seen this before; I don't know what this is.
Q Okay. And on page 2-161, it says, "Services provided by Balboa, LLC"?
A Yes.
Q Can you tell me what the business of Balboa, LLC, is?

MR. HELLER: Object to the form.
THE WITNESS: I cannot.
BY MS. BOWMAN:
Q Are you familiar with an entity called Balboa, LLC?
A I am not.
Q Insofar as a contractual relationship between Countrywide Home Loans and Balboa, are you aware of any agreement that covers that relationship?
MR. HELLER: Object to the form.
THE WITNESS: Could you repeat that, please?
BY MS. BOWMAN:
Q Sure. As far as the business relationship between Countrywide Home Loans and Balboa Insurance Company, are you aware of any contract between those two companies governing that relationship?
A No.
Q In connection with the relationship between Newport Management Corporation and Balboa Insurance Company, are you aware of any contract between those two entities governing that relationship?
MR. HELLER: Object to the form. Same

objection.
THE WITNESS: No.
BY MS. BOWMAN:
Q I'd like to take a look at Exhibit 9, the lender manual.
A Yes.
Q Is it fair to -- have you reviewed this lender manual?
A No.
Q Not in detail?
A No.
Q Okay. Was this, to your understanding, prepared by Balboa?
A It was prepared by the product and client operations area, generally under the umbrella of Balboa, yes.
Q If you could take a look at Bates page 3-107.
A Yes.
Q And I realize it says "Introduction," but can you tell me, is Balboa now providing the comprehensive training to your insurance department concerning insurance tracking services?
A No.
Q That's still being provided by Countrywide

Home Loans?
A It's being provided by myself and my area.
Q Take a look at page 3-108.
A Yes.
Q This indicates that a -- Countrywide has been assigned an account management team responsible for training and visits to the lender site. Do you see that?
A Yes.
Q Do you know who is -- who are -- is account -- in the account management team provided by Balboa to Countrywide?
A I'm sorry, could you repeat that?
Q Sure. It says there's an assigned account management team. Can you identify the people on that team?
A Yes.
Q Who are they?
A John Meadows, Kimberly McNamara, and Sheila Myrick.
Q And in connection with the lender's manual on page 3-207 -- it's the last page.
A Thank you.
Still can't get there.
Yes.

Q Ms. McNamara and Ms. Myrick are actually identified as having been updaters or editors to this lender manual?
A Yes.
Q Do they work underneath John Meadows?
A Yes.
Q And back on page 3-108 --
A Yes.
Q -- it indicates there would be an operational area manager?
A Yes.
Q Who was that?
A Sheila.
Q What about the regional operation account manager?
A Kimberly.
Q And are those folks -- Mr. Meadows, Ms. McNamara, and Ms. Myrick, are they located in your group at CHL?
A Sheila is.
Q And what are the services that she provides to you? I mean, to the insurance department?
A If we have conference calls with the lender, such as customer service -- I had mentioned

earlier that we have a weekly conference call with customer service -- she would like coordinate that call, schedule.
Q Okay. Does she provide you information about Balboa policies or anything relating to Balboa?
A No.
Q She's just essentially an administrative assistant?
A She does handle troubleshooting things. If someone at Countrywide, other than the insurance department, has a question, they will call Sheila.
Q A question about insurance?
A Yes.
I do need to clarify something.
Q Uh-huh.
A We talked about a reporting relationship with John Meadows.
Q Yes.
A I want to say that's a dotted-line reported relationship for them. They do have another manager that I neglected to tell you.
Q Who is that?
A That's Sean Turner.
Q And what is his position?

Page 180

A He is responsible for what we call the ROAMs and OAMs, the regional office account managers and operational account managers.
Q And is he located at your location at CHL?
A No, he's not.
Q He's at Balboa?
A Yes.
Q What about Mr. Meadows, where is he located?
A At Balboa.
Q What about Ms. McNamara?
A She's actually in another Countrywide facility in Simi Valley.
Q And does that facility engage in insurance tracking?
A No.
Q Is it the customer service facility?
A There's a number of operations there, and it's actually a convenience for her.
Q But she's coordinating work with your group?
A Yes.
Q If you could take a look at page 3-187 for me.
A Yes.

Page 181

Q There it talks, at the bottom, about multiple insurance lines transactions?
A Yes.
Q And there appears to be some issue with the automated process of scanning and identifying exposures for the absence of wind coverage. Do you see that?
A Yes, I see that. And I want to say it's not only for wind coverage --
Q Uh-huh.
A -- it's also for that front and back property that I was describing yesterday. And that's why we have that process in place, because of this issue.
Q The duplicative coverage process?
A The -- yes, where we had multiple policies on one loan --
Q Yes.
A -- that we discussed yesterday.
Q Right. That would -- that would enter into a queue in someone's exception reports or --
A Correct.
Q -- something, so that -- so that they could then do what it says here, which is manually identify which of -- which LLP (sic) policy was

Page 182

needed?
A Correct.
Q Why would CIS be copied with error notifications?
A Where's that?
Q In that -- in the same section on multiple insurance lines transactions, the third paragraph, it says, CIS would be copied on the error notification.
A I do not know, unless it just wasn't pulled out when CIS was pulled out. It might be just an over- -- a miss of extracting it out.
Q Take a look at page 3-190.
A Yes.
Q At the bottom, it talks about acquisitions of loan portfolios.
A Yes.
Q That's talking about acquisitions by Countrywide of loan portfolios so that it can engage -- engage in the loan servicing?
A Yes.
Q It says, "Countrywide may select a different processing cycle and/or different letters for the acquired loans."
A Yes.

Page 183

Q Are you aware of any circumstance in which that has occurred?
A I am not.
Q Have you ever, to your knowledge, placed a lender placed policy that was not a Balboa policy, other than flood?
A No. And I'm going by our agreement in the beginning of this that it's 2003 to 2007.
Q Yes, that's fine.
And just to confirm, the reason that you use an insurance company for lender placed flood that is not Balboa is because Balboa doesn't write lender placed flood; is that correct?
A Correct.
MS. BOWMAN: All right. I think we're all set. You can make your plane.
THE WITNESS: Thank you.
MR. HELLER: My turn. I'm going to get organized, so why don't you take a quick break. Five minutes.
THE VIDEOGRAPHER: We're off the record at 3:56 p.m.
(Brief recess.)
THE VIDEOGRAPHER: Okay. We're now back on the record at 4:05 p.m.

6351ad5e-b970-4791-85af-9459661f4823

CROSS-EXAMINATION

BY MR. HELLER:

Q Good afternoon, Mr. Grzeskowiak.

A Hello.

Q All right. Sir, I'm going to ask you some questions going – that will touch upon Ms. Bowman's examination, starting with the requirements -- the insurance requirements for the New Century loan in July 2004.

Sir, do you know whether -- do you know whether windstorm coverage was required by that New Century loan in July 2004?

A Yes.

Q Was it?

A Based on my knowledge and experience of investigator guidelines, of carrier guidelines, lender guidelines, wind coverage is included in extended coverage known in the insurance industry -- that it's included in extended coverage. And with that knowledge, I believe that it was required and Ms. Drury knew that it was required.

Q I'll direct your attention back to what was shown to you as Exhibit Number 17, if you have that in front of you. It is the July 1, 2004, mortgage from -- given by Ms. Drury to New Century.

Once you have that document in front of you, I'll ask you to look at page six of 16. We've been using Bates numbers; if you'll look for 462.

A Yes.

Q Looking at paragraph five, would you please read the first sentence of paragraph five following the heading "Property Insurance"?

A Borrower shall keep the improvements, now -- now existing and hereafter erected on the property, insured against loss by fire, hazards included within the term extended coverage, and any other hazards including, but not limited to, earthquakes and floods, which the lender requires insurance.

Q Stopping there for a moment, Mr. Grzeskowiak, is it your understanding of that language that it covers -- it encompasses windstorm or hurricane insurance?

MS. BOWMAN: Objection. Leading.

THE WITNESS: I go back to what I said previously, that in the insurance industry, extended coverage includes windstorm and hail -- windstorm and hurricane.

BY MR. HELLER:

Q Can you read the next sentence, please?

A "This insurance shall be maintained in the amounts, including deductible levels, and for the periods that the Lender requires."

Q For that sentence that you just read, do you know who the -- capital L -- "Lender" is?

A In this case, it would be -- it would be the lender that's on this document, which is New Century Mortgage Corporation.

MR. HELLER: I believe we're up to exhibit number 28.

If somebody could please provide me with an exhibit sticker.

MS. BOWMAN: (Handing.)

MR. HELLER: Thank you.

(Exhibit No. 28 marked for identification.)

BY MR. HELLER:

Q I'm going to show you what has just been marked as Exhibit Number 28 for this deposition. Please take as much as time as you need to read it. Let me know when you're done.

A (Reviewing document.) Yes.

Q Can you identify Exhibit Number 28, please?

A Yes, this looks -- this looks like it's

New Century's specific insurance requirements document.

Q I'll direct your attention to paragraph 16 of Exhibit 28. What does it say, sir?

A "Windstorm/hurricane insurance is required coverage in high risk areas. It is usually included in the homeowner policy but may be excluded in states of Hawaii, coastal areas of Florida, and the Gulf, where a separate policy is written."

It isn't -- "If it isn't included in the homeowner policy, we will require a separate windstorm policy."

Q First question: As – as you sit here today, do you know whether Florida is a high risk area, as the term is used in Exhibit 28?

A Yes.

Q Is it?

A Yes. Based on the document here, it states it, and based on the fact that there are a number of insurance carriers within the state of Florida that they do exclude wind from homeowner policies.

Q The question of whether or not New Century required Ms. Drury to have windstorm, slash, hurricane insurance for this July 2004 loan, what is

6351ad5e-b970-4791-85af-9459661f4823

your understanding of this document, Exhibit 28, on that issue?
MS. BOWMAN: Object to the form.
THE WITNESS: Could you repeat the question, please?
BY MR. HELLER:
Q From Exhibit Number 28, do you have an understanding whether or not New Century required Ms. Drury to have hurricane, slash, windstorm insurance?
A Yes.
Q And what is your understanding?
A This was presented to Ms. Drury. And I do see a signature for Ms. Drury that she acknowledged that she received this document.
Q And what is your understanding of the requirement?
A The requirement would be that Ms. Drury was to have windstorm and hurricane insurance in place.
Q Directing your attention back to Exhibit 17, the same paragraph five that we were referring to, and specifically to the last sentence that you just read into the record, where it says in paragraph five: This insurance shall be maintained

in the amounts -- parenthetically -- including deductible levels, and for the periods that -- capital L -- Lender requires. See that, sir?
A Yes.
Q So referring to that sentence, does that mean with -- now looking back at Exhibit 28, that windstorm was required?
MS. BOWMAN: Objection. Leading.
THE WITNESS: Yes.
BY MR. HELLER:
Q Is that your understanding of the document?
A Yes.
Q Still looking at Exhibit 17, Mr. Grzeskowiak, Ms. Bowman has been -- Ms. Bowman asked you a number of questions about duties and obligations related to force placed insurance.
Would you please read the second paragraph of paragraph five titled "Mortgage Insurance" that begins, "If borrower fails..."
A If borrower fails to maintain any of the coverages described above, lender may obtain insurance coverage at lender's option and borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage.

Therefore, such coverage shall cover lender but might not -- excuse me -- but might or might not protect borrower, borrower's equity in the property, or the contents of the property against any risk, hazard, or liability, and might provide greater or lesser coverage than was previously in effect.
Borrow acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that borrower could obtain -- could have obtained. Any amounts disbursed by lender under this section five shall become additional debt of the borrower secured by this security instrument.
These amounts shall bear interest at the note rate from the date of the disbursement and shall be payable with such interest upon notice from lender to borrower requesting payment.
Q Mr. Grzeskowiak, do you know whether this is standard language for residential mortgages in Florida?
A This is a standard document that, to my knowledge, all lenders use.
Q And that language specifically is -- is that, to your knowledge, standard language?
A Yes.

Q Ms. Bowman also asked you a number of questions about letters that Countrywide sent to Ms. Drury relating to insurance requirements. I'm going to start with the February 26th -- the February 21st letter. I believe it's Exhibit 5, but just to be clear on the precise letter, I'm going to mark this as Exhibit Number 29.
(Exhibit No. 29 marked for identification.)
MR. HELLER: I'm going to show it to Ms. Bowman first so that she has the chance to compare it to Exhibit Number 5 or Exhibit Number 2.
MS. BOWMAN: It's not Exhibit 5. It's Exhibit 6. You can use your --
MR. HELLER: I'm going to get you another copy of it so that you have something to refer to. Can you please present that to Mr. Grzeskowiak?
MS. BOWMAN: Sure. (Handing.)
MR. HELLER: (Handing.)
MS. BOWMAN: They're not the same. I don't know which one you're intending to use, but they're not the same.
MR. HELLER: Let me see. (Pause.)

6351ad5e-b970-4791-85af-9459661f4823

Page 192

You're right, because Exhibit Number 29 that I marked was the February 26th letter.
Can I see the exhibit?
THE WITNESS: I believe I gave it back to you.
MR. HELLER: You gave it back to me? Can I have --
MS. BOWMAN: Twenty-nine is there (indicating).
MR. HELLER: Can I have an exhibit sticker?
MS. BOWMAN: I'm just putting a little triangle so I know you marked it instead of me.
BY MR. HELLER:
Q While I'm getting an extra copy out, I'll show you what is now Exhibit Number 29 and ask if you can identify it.
A Yes.
Q What is that, please, sir?
A This is the letter that is sent out prior to the beginning of the lender placed -- oh, no, it's not.
MR. HELLER: Can I see what I just gave you, Ms. Bowman? I'm having a little trouble pulling this exhibit.

Page 193

MS. BOWMAN: (Handing.)
THE WITNESS: Yes, this is the letter that goes out prior to the beginning of the lender placed cycle.
BY MR. HELLER:
Q You have in front of you Exhibit -- let me just grab the list. (Pause.)
Does that appear to be the same document as previously marked Exhibit 5?
A Yes.
Q What does this letter do?
A This letter is the first letter that is generated once we receive in a document that has identified that that particular policy has a wind exclusion appearing, and we review that document and then initiate this letter prior to the lender placement cycle.
Q And I believe, Mr. Grzeskowiak, that you responded to Ms. Bowman that the AOS -- AS400 reflects the sending of that letter to Ms. Drury?
A Yes.
Q Is it Countrywide's regular course of business to record the sending of Exhibit 5, also marked as Exhibit 29, in that manner?
A Yes.

Page 194

Q Putting back in front of you Exhibit Number 6, I'm going to show you what I'd appreciate having an exhibit sticker for to mark as Exhibit Number 30.
MR. HELLER: I need -- can I just have those, please?
THE COURT REPORTER: (Handing.)
MR. HELLER: Thank you.
(Exhibit No. 30 marked for identification.)
BY MR. HELLER:
Q You were shown Exhibit Number 6, and I'm going to show you now Exhibit Number 30, and I'm going to ask you if these are the same letters?
A They are dated the same. They have the same information in it, with the exception -- Exhibit Number 6 does have some information that's missing; however, Exhibit 30 has all the information for this particular letter.
Q Right. I believe during Ms. Bowman's examination, she remarked that Exhibit Number 6 was produced to her with some of the information omitted. And I am showing to you -- presenting to you Exhibit 30, that was produced in discovery, that is complete?

Page 195

A Yes.
Q What is Exhibit 30?
A Exhibit 30 is the first letter in a three-letter cycle advising the borrower that the homeowner policy that was received does not have acceptable -- does not -- doesn't have all the acceptable insurance coverage that is needed on that home.
Q So Exhibit Number 30 is sent after Exhibit Number 29?
A Correct.
(Exhibit No. 31 marked for identification.)
BY MR. HELLER:
Q I'm going to show you what I've just marked as Exhibit 31. And I'm also putting a little defendant triangle on there, a little delta, so we can recognize it's the defendant's presented document.
MS. BOWMAN: Thirty-one?
MR. HELLER: Three one.
BY MR. HELLER:
Q Can you identify Exhibit 31?
A Yes. Identi- -- excuse me -- Exhibit Number 31 is the March 12th letter, which is the

6351ad5e-b970-4791-85af-9459661f4823

Page 196

second letter in this series of three, identifying that Countrywide has not received verification of acceptable homeowner's insurance.

Q Is it Countrywide's practice to send these letters that we've just looked at, Exhibit 29, Exhibit 30, Exhibit 31 -- is that the regular practice to send letters like this to borrowers when there's a concern that the loan does not have required insurance?

A It's the process that is in place specifically for policies that exclude wind coverage. And it's the typical practice -- process that we go through.

Q Is the practice to charge the borrower for the premium at the time of these letters, Exhibit 31, Exhibit 30, Exhibit 29?

A No, we do not charge the borrower.

Q Does Exhibit 31 appear to you to be a complete photocopy or reproduction of the letter, original letter?

A Yes, it does.

(Exhibit No. 32 marked for identification.)

BY MR. HELLER:

Q I'm showing you Exhibit 32. If you could

Page 197

please identify it?

A Yes, this is the final letter in the three-letter cycle that is advising the borrower that, unfortunately, we still have not received acceptable homeowner's insurance, and that we are now issuing a certificate of insurance and advising them that we are billing them for this premium.

Q Is this the time, Exhibit 32 -- is this the time that the borrower is charged for the force placed insurance premium?

A The -- the premium is paid by Countrywide out of the borrower's escrow account, and it's advising them that this document is a bill and they can even -- either pay now or it will be part of their escrow account, their monthly -- become part of their monthly payment.

Q Is it upon the third letter in the letter cycle that the borrower is billed for the insurance premium? Is that the practice?

A Yes.

Q Still asking you about Exhibit 32, where -- the paragraph -- it's the second paragraph after the "Dear Doris Drury" line, the introduction line, there's a paragraph "We previously notified you..." Then there's the paragraph, "In the event

Page 198

that a payment for our lender placed coverage was paid from your escrow account and you have your own policy..."

It then goes on to bullet points to say -- to indicate that there would be a refund of the payment provided the insurance coverage dates back to the expiration date of the previous policy.

Could you explain -- is it important to have insurance force placed to the expiration date of the previous policy?

A Yes. It's a requirement actually to have continuous coverage in place to ensure that the property does have insurance in order to protect the structure, in order -- and also to protect the lender.

Q During your examination by Ms. Bowman, I believe the term "earned premium" was used.

Are -- is the premium paid for coverage that goes back to the previous expiration date, the previous policy expiration date, is that -- is that considered an earned premium?

A It would depend upon the cancellation of a particular policy, the date of -- if a policy is canceled midterm, there would be a premium that is earned from the effective date to the cancellation

Page 199

date of that policy.

Q Provided the borrower didn't have coverage during that period that was complete; is that right?

A Correct.

Q Ms. Bowman asked you whether you do anything to see whether or not there's been, as I understood the question, hurricane damage. Is that something that Countrywide can know when it force places insurance?

A No, that's really the basis for lender placed insurance. Lender placed insurance, the insurance carrier is actually insuring that property site unseen. They're not going out and doing any inspections. They wouldn't know whether or not a particular property has damage. It's just not normal course of business to do that.

Q Would Countrywide know?

A No.

Q Is there -- with force placed insurance, when it's placed on a loan like Ms. Drury's, is that insurance underwritten?

A No. There's -- there's no underwriting involved, there's no inspections that are involved. The property is -- is insured site unseen.

Q So do you believe there's value in having

Page 200

the insurance cover the property back to the expiration date of the previous policy, besides your previous testimony that it's a requirement?

A Well, sure. There's -- there's -- there would be continuous coverage in place. The property would be insured against the type of loss that the policy is covering, and if there were damage, a claim could be filed under that policy.

Q If you could find Exhibits 8 and 23, please.

Starting with Exhibit 8 -- sorry, I'm not trying to rush you, Mr. Grzeskowiak. Starting with Exhibit Number 8 --

A Yes.

Q -- is that -- are these insurance guidelines effective May 9, '03?

A Yes.

Q Could you please turn to -- using the Bates stamps, the last three digits -- it will be 400, with the last three digits 239. The title of this section is Florida Risk Based Lender Placed Insurance," parenthetically, "Florida." See that, sir?

A Yes.

Q Ms. Bowman was asking you whether or not

Page 201

borrowers like Ms. Drury are covered by lender placed insurance. Reading this page, last three numbers, four -- excuse me, 239; 239, it says page 32 on it as the actual document page number of Exhibit 8. Does it -- do you understand it to touch upon that issue?

A Yes, I do.

Q What is your understanding?

A The first question there: What is risk based lender placed insurance? And the definition is: This type of lender placed insurance is currently only -- only for properties located in Florida; it will not only cover CHL's interest in the property, but the customer's as well.

Q If you could please turn, within Exhibit 8, to the Bates stamp 4-251 that has the document page number 43. On the topic of whether or not windstorm coverage is required --

MS. BOWMAN: What was the Bates page, I'm sorry?

MR. HELLER: It's 251, last three digits.

BY MR. HELLER:

Q Do you understand this first paragraph, under windstorm policies, to touch upon the windstorm, slash, hurricane requirement?

Page 202

A Yes.

Q What does it say in the first sentence?

A Windstorm coverage is a required coverage in high risk areas.

Q Again, is Florida a high risk area?

A Yes.

Q If I could direct your attention now to Exhibit 23, which I believe is the February '05 version or update of Exhibit 8. This time I'm going to direct your attention to the Bates number 4-00141. The header is "Lender Placed Insurance." The subheading is "Florida Risk Based."

Would you please read the sentence that follows the dash, beginning "This type of lender placed..."

A "This type of lender placed insurance will not only cover Countrywide's interest in the property, but the customer's as well."

Q Could you now turn to 4-15 -- 4-00152. It's the document page 53. It's titled "Windstorm and Earthquake Insurance." Under the subheading "Windstorm," there's a dash. Would you read that line?

A "Windstorm coverage is required in high risk areas."

Page 203

Q Can you read the second dash?

A "If a policy does not include windstorm and the customer is required to carry coverage, we will create another insurance escrow line."

Q Is -- within the meaning of this document, is Florida a high risk area?

A Yes, it is.

Q I started out my questions asking you about the New Century loan, and I showed you Exhibit 28 that was the New Century document stating insurance requirements. I'm going to show you now --

MR. HELLER: Exhibit 33?

THE WITNESS: Yes.

(Pause in proceedings.)

BY MR. HELLER:

Q Before 33, I'm going to go back to something else Ms. Bowman asked you. Ms. Bowman was asking you about the force-placed insurance policy obtained for the Drury loan. Do you recall that, sir?

A Yes.

Q And she asked you a series of questions, many of them about the policy having both wind and other insurance, such as fire. Do you recall that?

6351ad5e-b970-4791-85af-9459661f4823

A Yes.
Q At the time that Countrywide force-placed insurance on the Drury loan -- so we're in April '06 -- did Balboa offer a wind-only product?
A No.
Q Balboa later, I believe in December of '07, did have available a wind-only product, correct?
A Correct.
Q Are you familiar with the cost of that wind-only product?
A Yes, I am.
Q I'm going to show you what I'm going to instead mark as Exhibit 33 -- what I'm marking as Exhibit 33.
(Exhibit No. 33 marked for identification.)
BY MR. HELLER:
Q And this was previously given to Ms. Bowman.
Can you identify that?
A Yes. This is the wind-only rate table that identifies the dollar amount per $100 worth of coverage that would be used in the calculation of the premium of a wind-only policy.

Q My question, Mr. Grzeskowiak, is this: On the Drury loan, Countrywide force placed a policy that had wind in addition to a fire component. Was that policy that was force placed on the Drury loan more or less expensive than the wind-only product?
MS. BOWMAN: Object to the form.
THE WITNESS: The lender placed policy that was issued, it was much cheaper than what a wind-only product premium would have been. The rates that are charged for wind are dependent upon the type of structure -- dependent upon the location of the property, could be, in the state of Florida, between $2.50 and $3.25 per $100 worth of insurance; where the policy that was placed, the rate for that policy is approximately 79 cents per $100 worth of insurance.
MR. HELLER: We need to change the tape?
THE VIDEOGRAPHER: This concludes tape number five. We're off the record at 4:47 p.m.
(Brief recess.)
THE VIDEOGRAPHER: This is tape number six. We're back on the record at 4:54 p.m.
BY MR. HELLER:
Q Mr. Grzeskowiak, before we broke to change

the tape, I had asked you to explain your testimony that the force placed insurance policy that was obtained for the Drury loan was less expensive than the wind-only product. Could you please continue your explanation?
A The rates are substantially different. And the primary reason for that is, on the full lender placed policy, the risk of -- of that is spread across the entire country because you're dealing with policies that are throughout the country.
On a wind-only policy, you're dealing with high risk areas and insuring for the specific peril of -- of wind or hurricane. So the rates for a wind policy will be higher, simply because you're not spreading it across the country, you're spreading it across X amount of states.
In this particular case, we're spreading it across specifically Florida. And -- and we know Florida is a high risk area.
Q So is the bottom line, Mr. Grzeskowiak, that had the Drury loan received a wind-only policy, the cost to Ms. Drury for that policy would have been greater -- greater for the wind-only policy than for the policy that was force placed by

Countrywide?
MS. BOWMAN: Objection. Leading.
THE WITNESS: The -- yes, based on this information with regards to the rates, the -- the wind-only policy would have been higher in 2006.
(Exhibit No. 34 marked for identification.)
BY MR. HELLER:
Q Going back to the issue of insurance required at loan origination, the beginning of the loan, we talked about New Century's requirements and New Century's document describing requirements.
Let me show you Exhibit 34 and ask you if you can identify this document?
A Yes. This is the insurance requirements that were provided to Ms. Drury during her refinance with Countrywide Home Loans.
Q In the part one, Homeowner, slash, Fire Insurance, if you could look at item number one and read the second sentence after the parenthetical concluding with the word "Texas."
A "The insurance must not limit or exclude from coverage, in whole or in part, windstorm, hurricane, hail damages, or any other perils that

are normally included under an extended coverage endorsement."

Q I believe you've already testified -- I want to make sure the record is clear -- is this -- from your observation of the documents in this deposition today and certainly knowledge of the insurance industry, is this the requirement of loans that originated in Florida, to have that hurricane, slash, wind insurance?

MS. BOWMAN: Objection.

THE WITNESS: Yes.

BY MR. HELLER:

Q Ms. Bowman asked you questions about a reference in a February payment coupon, or invoice, to subsidence insurance.

In all of your years working at Countrywide, have you ever seen force placed insurance referred to as subsidence insurance?

A I've never seen that. It's not part of our normal processes to do something like that. I've never seen that occur before.

Q How would you characterize it if it was -- if the term subsidence was used in the Drury loan on a document, how would you characterize that usage?

A You know, I -- I've never seen it

affiliated with lender placed insurance. There isn't a product. There -- I mean, this has to be an isolated incidence, it has to be. I've just never seen it before in all my, you know, 14, 15 years I've been there.

Q Follow-up questions on the premium -- on the force placed policy that was applied on the Drury loan.

We looked at Exhibit 7 -- Exhibit 17, Exhibit 17 that Ms. Bowman introduced, the New Century mortgage, referring to paragraph five on page six of 16, that's Bates label 462. We looked at the language that says "If borrower fails to maintain any of the coverages described above, lender may obtain insurance coverage at lender's option under borrower's expense."

We looked at the language in this paragraph that says, "Lender is under no obligation to purchase any particular type or amount of coverage." Correct, sir?

A Yes.

Q And the language that says, among other things, the insurance may provide greater or lesser coverage than was previously in effect. Correct, sir?

A Yes.

Q And borrower acknowledges that the cost of the insurance coverage so obtained may be -- may significantly exceed the cost of insurance that borrower could have obtained.

We read that together, too, sir, correct?

A Yes.

Q Based on your experience and your reading of this document and your understanding of the force placed insurance on the Drury loan, is there any doubt in your mind that the force placed insurance on the Drury loan complies with this?

MS. BOWMAN: Objection to form. Leading.

THE WITNESS: The lender placed policy that was issued, to me, is in accordance with this.

BY MR. HELLER:

Q And you believe -- you also testified today that you believe the -- the policy that had some other coverage, which was fire, offered a benefit to Ms. Drury?

A Yes.

Q And we most recently discussed that the force placed insurance policy applied on the Drury loan was less expensive than a wind-only product --

than a wind-only product?

MS. BOWMAN: Objection. Leading.

THE WITNESS: Yes.

(Pause in proceedings.)

MR. HELLER: I'm just taking one moment, please, to review and make sure that we are finished. (Pause.)

Unless Ms. Bowman has questions following mine, I have no additional questions.

MS. BOWMAN: I have some.

REDIRECT EXAMINATION

BY MS. BOWMAN:

Q Mr. Grzeskowiak, Mr. Heller showed you the re-identified letters, Exhibits (sic) 29, Exhibit 30, Exhibit 31, and Exhibit 32, that you had indicated, based on the information in the AS400, were sent to Ms. Drury in connection with her New Century loan; is that correct?

A The loan that was originated with New Century, yes.

Q Can you get those in front of you, please?

A (Witness complies.)

Q Now, is it fair to say that your system can document the sending of a letter, but it can't document the receipt of a letter by a borrower? Is

that correct?
A Correct.
Q So you can't testify here one way or another that Ms. Drury received any one or more of these letters?
MR. HELLER: Object to the form.
THE WITNESS: No.
BY MS. BOWMAN:
Q Apart from the letter that's Exhibit 29, looking at the letters that are Exhibits 30, 31 and 32, are those the same letters that would have been sent to Ms. Drury or any other borrower if their homeowner's insurance had been fully canceled and you were lender placing a policy based on the cancellation of a homeowner's policy?
MR. HELLER: Object to the form.
THE WITNESS: These are the same letters that would go out for a hazard lender placement, yes.
BY MS. BOWMAN:
Q And that would include circumstances where the -- the borrower was -- had absolutely no insurance coverage in place at the time?
A The letter states that it -- it is both, yes.

Q It actually talks about home- -- talks about homeowner's insurance information, correct?
A Yes. "Our records indicate that we do not have your homeowner's insurance information on the properties. It is a requirement on the loan that you maintain acceptable insurance on your home."
Q And in this context, these letters were sent to Ms. Drury during a period of time where she had homeowner's -- a homeowner's policy in place, you just determined that it excluded windstorm?
MR. HELLER: Object to the form.
THE WITNESS: Concluded that it was not acceptable insurance and it did exclude windstorm, yes.
BY MS. BOWMAN:
Q But you -- but it was homeowner's insurance?
MR. HELLER: Object to the form.
THE WITNESS: It was a homeowner policy that excluded wind insurance.
BY MS. BOWMAN:
Q And so when this was sent to her and said homeowner's insurance information, you did have some homeowner's insurance information regarding Ms. Drury's property?

MR. HELLER: Object to the form.
THE WITNESS: But it did not supply all the acceptable coverages.
BY MS. BOWMAN:
Q That wasn't my question. My question was: You did have some information about homeowner's insurance related to Ms. Drury's property when you sent these letters?
MR. HELLER: Object to the form.
THE WITNESS: My answer was, we had a homeowner's policy that excluded wind.
BY MS. BOWMAN:
Q Okay. The document that Mr. Heller identified as Exhibit 28 --
A Yes.
Q You have that in front of you?
A Yes.
Q This is a document that you would have anticipated Ms. Drury would sign at the closing; is that correct?
A Yes.
MR. HELLER: Object to the form.
BY MS. BOWMAN:
Q And that would have been included in the package of closing documents that would be signed by

any borrower at a closing, which includes the mortgage, the note, and a variety of other documents?
A Yes.
Q If you could take a look again at Exhibit 14.
A Yes.
Q This is where we looked at the Nationwide memorandum of insurance and the request for insurance made on behalf of New Century Mortgage; is that correct?
A Yes.
Q Looking at the second page again, the request for evidence of insurance made on behalf of New Century Mortgage, the only type of coverage that is requested evidence of is the hazard coverage; is that correct?
MR. HELLER: Object to the form.
THE WITNESS: Hazard coverage, and most hazard coverages include extended coverage, which includes wind.
BY MS. BOWMAN:
Q There's actually a whole separate box here, though, if they're seeking evidence of insurance for wind; is that correct?

A Yes.
Q And that's not checked?
A No.
Q No, it's not checked?
A It's not checked.
Q Thank you.
In connection with the document that is Exhibit 28, under paragraph 16, which Mr. Heller directed you to, it says, "An acceptable policy with endorsements and/or assignments must be forwarded to and received by the lender before the loan can be funded." Is that correct?
A Could you repeat that, please?
Q Sure. I'm reading the -- the all caps paragraph -- you're not looking at the right document -- of Exhibit 28.
There you go. My apologies.
It says, "An acceptable policy with endorsements and/or assignments must be forwarded to and received by the lender before the loan can be funded." Do you see that?
A Yes.
Q And we do know that New Century funded the loan?
A Yes.

Q And at the time it funded the loan, that it did -- it did not enforce any lender placed policy through Safeco Insurance Company?
MR. HELLER: Object to the form.
THE WITNESS: I don't have that information.
BY MS. BOWMAN:
Q When Countrywide obtained the loan in December of 2004, was there a lender placed policy in place in connection with the Drury property?
A I do not know.
Q Okay. Would that have been uploaded into your system if it had been in place?
A No.
Q Why not?
A As with the pay-off of -- of Countrywide's loan, the insurance policy was canceled. Now that the sub -- the servicing has been transferred from New Century to Countrywide, that lender policy would not protect Countrywide.
Q Okay.
A So it would not come over.
Q Mr. Heller asked you some questions about the issuance of a lender placed policy that dates back to the expiration of the prior year's policy;

is that correct?
A Yes.
Q Okay. There -- the lender placed policy that was initiated for the Drury loan in February of 2006 dated back to July of -- sorry -- May of 2005; is that correct?
A Could you repeat those dates, please?
Q Sure. The lender placed policy that was ordered in February of 2006 on the Drury property was -- actually had an effective date of May of 2005; is that correct?
A Correct.
Q Okay. And prior -- prior to May 2005, can you state one way or another whether or not Ms. Drury had wind coverage under her homeowner's policy?
A Prior to which date?
Q Prior to May of 2005.
MR. HELLER: Object to the form.
THE WITNESS: The May of 2005 was the effective date of their homeowner policy. I cannot tell from Exhibit 14 if there was a prior policy -- actually, there was a prior policy in force, 5/1 of '04 to 5/1 of '05.

BY MS. BOWMAN:
Q Right. And what I -- my question was, can you tell whether that policy included or excluded wind?
A It excluded wind.
Q You believe it excluded wind?
A Yes.
Q The 5/1/04 to 5/1/05 policy?
A Correct.
Q Based on what?
A On the document.
Q The document that's Exhibit 14?
A Yes.
Q Okay. Taking a look at the mortgage that's Exhibit 17.
A Yes.
Q And taking a look at our favorite clause, clause five on page 462.
A Yes.
Q You see -- see the term "fire and hazard" included within the term extended coverage? See that phrase?
A Yes.
Q The -- the term "extended coverage," do you know if that term is defined somewhere else in

6351ad5e-b970-4791-85af-9459661f4823

the mortgage?
MR. HELLER: Object to the form.
THE WITNESS: I do not.
BY MS. BOWMAN:
Q Can you take a look at the definition section of the mortgage beginning at page -- Bates page 458?
A Yes.
Q Do you see a definition for the term "extended coverage" on either page 458 or 459?
A (Reviewing document.) I do not.
Q Taking a look at Exhibit 34 -- which you identified as Countrywide's insurance requirements given to a homeowner at a closing of a residential mortgage loan; is that correct?
A Yes.
Q This is actually dated 4/14 of '06; is that correct?
A Yes.
Q So Ms. Drury would not have had that document, Exhibit 34, when she closed on the New Century mortgage, correct?
A Correct.
Q And in section one of Exhibit 34, it says that coverage must be at least fire and extended

coverage. Do you see that?
A Yes.
Q Then it goes on to clarify that the insureds must not limit or exclude from coverage, in whole or in part, windstorm, hurricane, hail damage or other perils. See that?
A Yes.
Q Okay. So it's actually making a clarification that a fire and extended coverage policy cannot exclude those -- those things identified in this sentence, number two?
A It's stating that if they are excluded from extended coverage, that those coverages are needed.
Q Okay. And that's because in risk areas like Florida or coastal Florida, windstorm is excluded from fire and extended coverage policies?
MR. HELLER: Object to the form.
THE WITNESS: For most insurance carriers, yes.
BY MS. BOWMAN:
Q If you could take a look at Exhibit 28 again?
A Yes.
Q And can you tell me, is the -- is the term

"a high risk area" defined anywhere in this document for Ms. Drury?
A (Reviewing document.) Yes.
Q Okay. Where is that?
A In item number 16.
Q There -- there's a definition of high risk area?
A Based on reading this, that -- I would agree that the sentence -- the next sentence defines high risk areas.
Q But there's no definition that says "high risk area" means?
MR. HELLER: Object to the form.
BY MS. BOWMAN:
Q Is that correct?
MR. HELLER: Same objection.
THE WITNESS: No.
(Pause in proceedings.)
BY MS. BOWMAN:
Q That's all the -- (Pause.)
Taking a look at Exhibit 8, Bates page 4-210 in the Countrywide insurance manual --
A I'm sorry, what page?
Q Sure. Exhibit 8, page 4-210, the Countrywide insurance manual.

A Yes.
Q This was a manual dated in May of 2003?
A Yes.
Q Based on the information on -- on page 4-210, it would be accurate to say that it was well known in the Countrywide's insurance department that homeowners' policies in Florida routinely excluded windstorm coverage?
MR. HELLER: Object to the form.
THE WITNESS: I think it's well known throughout the insurance industry and -- and the mortgage industry.
BY MS. BOWMAN:
Q Including by Countrywide's insurance department?
A Yes.
Q In connection with your testimony about Exhibit -- I don't know which one this is (indicating).
A Thirty-three.
Q Exhibit 33. These rates for a wind-only policy were not in effect at all at any time in Florida in 2006; is that correct?
A These rates -- if a wind-only product was in effect, the rates would have been similar. These

6351ad5e-b970-4791-85af-9459661f4823

specific rates were not in effect.
Q Because there was no wind-only product in effect in 2006?
A Correct.
MS. BOWMAN: I don't have anything else.

RECROSS-EXAMINATION

BY MR. HELLER:
Q In -- Mr. Grzeskowiak -- let me start over. Did Countrywide service Ms. Drury's loan for New Century Mortgage?
A No.
Q Did Countrywide's insurance requirements, while it was servicing Ms. Drury's mortgage, require wind, slash, hurricane insurance?
A Could you repeat that, please?
Q Sure. Did -- while Countrywide was servicing Ms. Drury's loan, did Countrywide's requirements require wind, slash, hurricane insurance to be maintained?
A Yes.
Q Same question for Countrywide's investor, while it was servicing -- while it has been servicing -- let's put it in context: When it was servicing Ms. Drury's loan in '06, was the investor requirement that continuous wind, slash, hurricane

insurance be continuously maintained?
MS. BOWMAN: Objection. Vague and leading.
THE WITNESS: The investor requirements state almost verbatim what Countrywide's insurance requirements state.
BY MR. HELLER:
Q And what is that?
A That there should be continuous coverage with an extended coverage endorsement not to exclude, in whole or in part, wind, hurricane, hail damage, and any other perils normally usually -- normally under an extended coverage endorsement.
Q Ms. Bowman asked you to look back on the document I showed you first, Exhibit 28, that is, the New Century document itemizing the insurance requirements?
A Yes.
Q Actually what I want -- let me -- what I want to clarify -- what I want to go back to, I'm sorry, is Exhibit 34, which she was asking you about, I believe, after the Countrywide insurance requirement document. Sorry to switch that on you. Do you have it available?
A Yes.

Q I believe Ms. Bowman was asking you about this Exhibit 34, or some of her questions were -- were inquiring about the term "extended coverage." Do you recall that?
A Yes.
Q The last sentence of paragraph one, under the heading Homeowner, slash, Fire Insurance, then it writes -- then it reads, "Your lender and FHA/VA have basic minimum hazard insurance requirements related to your home mortgage loan, which are described below."
And number one -- and we read this before in your testimony, the second sentence Ms. Bowman referred you back to: The insurance must not limit or exclude from coverage -- parenthetically -- in whole or in part, windstorm, hurricane, hail damages -- hail damage or other perils that are normally included under an extended coverage endorsement.
My question is: Is your understanding of that language, that this document is saying -- is it your understanding that this document is saying that windstorm and hurricane are normally included under extended coverage?
MS. BOWMAN: Objection.

THE WITNESS: Yes.
BY MR. HELLER:
Q And is that the way you view extended coverage, it normally includes hurricane and windstorm?
A Normally includes this type of coverage throughout the country. Throughout the country, normally this is included in extended coverage.
Q When you say "this," what specifically do you mean?
A Windstorm, hurricane, hail damages.
MR. HELLER: I have no further questions.
MS. BOWMAN: I have nothing else.
MR. HELLER: We will read.
THE VIDEOGRAPHER: Okay. That concludes tape number six and the deposition. We are off the record at 5:28 p.m.
(Deposition was concluded at 5:28 p.m.)
(Reading and signing of the deposition was reserved.)

6351ad5e-b970-4791-85af-9459661f4823

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF ORANGE

I, the undersigned authority, certify that STEPHEN GRZESKOWIAK personally appeared before me on the 27th day of June, 2008, and was duly sworn.

WITNESS my hand and official s[redacted] day of July, 2008.

Stacy Pace, RPR, CSR, CRR, FPR
Notary Public - State of Florida
Commission No. DD761417
Expires: April 30, 2012

Electronic copy, original file was signed using esquire's technology, transcript

ERRATA SHEET

IN RE: DRURY V. COUNTRYWIDE
DEPOSITION OF: STEPHEN GRZESKOWIAK
TAKEN: 6-27-08
JOB# 941693

PAGE # LINE # CHANGE REASON

Under penalty of perjury, I declare that I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.

SIGNATURE OF DEPONENT: ____________ DATE:_____

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF ORANGE

I, STACY PACE, RPR, CSR, CRR, FPR, State of Florida at large, do hereby certify that the foregoing pages, numbered 1 through 227, inclusive, are a true and correct transcription of my shorthand notes of said deposition.

I further certify that I am not an attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of parties connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of July, 2008.

Stacy Pace, RPR, CSR, CRR, FPR

DATE: July 10, 2008
TO: Stephen Grzeskowiak
c/o William P. Heller, Esquire
Akerman Senterfitt
350 East Las Olas Boulevard
Suite 1600
Fort Lauderdale, Florida 33301

IN RE: DRURY V. COUNTRYWIDE

Please take notice that on June 27, 2008, you gave your deposition in the above-referenced matter. At that time you did not waive signature. It is now necessary that you read and sign your deposition should you still choose to do so.

As previously agreed to, the transcript will be furnished to you through your counsel. Please read the following instructions:

At page 230, you will find an errata sheet. As you read your deposition, any changes or corrections that you wish to make should be noted on the errata sheet, citing page and line number of said change. DO NOT write on the transcript itself. Once you have read the transcript and noted any changes, be sure to sign and date the errata sheet and return these pages to our office.

If you do not read and sign the deposition within a reasonable time period, the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of Court.

If you wish to waive your signature, sign your name in the blank at the bottom of this letter and return it to us.

Sincerely,

Stacy Pace, RPR, CSR, CRR, FPR
Esquire Deposition Services

I do hereby waive my signature:

____________________
STEPHEN GRZESKOWIAK

cc. via transcript: Jill H. Bowman, Esquire