UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


DORIS DRURY and TERRY
KOCHNIARCZYK, on behalf of
themselves, and those similarly situated,

        Plaintiffs,

vs.                CASE NO: 6:08-cv-152-ORL-28DAB

COUNTRYWIDE HOME LOANS,
INC., COUNTRYWIDE
INSURANCE SERVICES, INC.,
BALBOA INSURANCE COMPANY
and NEWPORT MANAGEMENT
CORPORATION,

        Defendants.

_____/


VIDEOTAPE DEPOSITION OF JOHN MEADOWS

Wednesday, July 2, 2008
9:00 a.m. - 5:11 p.m.


420 South Orange Avenue
12th Floor
Orlando, Florida


Reported by:
Rita G. Meyer, RDR, CRR, CBC
Notary Public, State of Florida
Esquire Deposition Services
Orlando Office - 942143
Phone - (407) 426-7676

Electronically signed by Rita Meyer (101-199-755-0709)                    dfd7bbc8-9a35-4442-872b-76341a77f7cb

## Page 2

1   APPEARANCES:
2   On Behalf of the Plaintiffs:
     JILL H. BOWMAN, ESQUIRE and
3   JONATHAN B. COHEN, ESQUIRE
     JAMES, HOYER, NEWCOMER & SMILJANICH, P.A.
4   One Urban Centre, Suite 550
     4830 West Kennedy Boulevard
5   Tampa, FL 33609
6   On Behalf of the Defendants:
     WILLIAM P. HELLER, ESQUIRE
7   AKERMAN SENTERFITT
     Las Olas Centre II, Suite 1600
8   350 East Las Olas Boulevard
     Fort Lauderdale, FL 33301-2229
9
     ALSO PRESENT:
10  Alan D. Bennett, JD, CLVS, Bennett Legal Video Service

## Page 3

(blank)

## Page 4

1     THE VIDEOGRAPHER: This is the videotape
2  deposition of John Meadows taken in his capacity as
3  corporate representative of the Defendant Balboa
4  Insurance Company. This deposition is taken on
5  behalf of the Plaintiffs in the case of Doris Drury
6  and Terry Kochniarczyk on behalf of themselves and
7  those similarly situated, versus Countrywide Home
8  Loans Incorporated, et al, Defendants.
9     This case is filed in the United States
10 District Court for the Middle District of Florida,
11 Orlando Division. The Case Number is
12 6:08-cv-152-ORL-28DAB.
13    This deposition is being held at 420 North
14 Orange Avenue, Orlando, Florida, on July the 2nd,
15 2008.
16    My name is Alan Bennett. I'm a Certified Video
17 Specialist in attendance. The court reporter with us
18 today is Rita Meyer with Esquire Deposition Services.
19    Will the attorneys please introduce themselves,
20 starting with Plaintiff's counsel.
21    MS. BOWMAN: Jill Bowman and Jonathan Cohen
22 from the James Hoyer law firm here on behalf of
23 Plaintiffs.
24    MR. HELLER: Bill Heller from Akerman Senterfitt
25 for Defendants Balboa Insurance Company, Countrywide

## Page 5

1  Home Loans, Countrywide Insurance Services and
2  Newport Management Corporation.
3     THE VIDEOGRAPHER: Would you administer the
4  oath, please.
5     (Witness sworn by the Court Reporter)
6     THE VIDEOGRAPHER: We're now on the Record at
7  9:16 a.m.
8       JOHN MEADOWS,
9  having been first duly sworn, testified as follows:
10      DIRECT EXAMINATION
11 by Ms. Bowman:
12   Q.  Please state your name for the Record, please.
13   A.  John Meadows.
14   Q.  Mr. Meadows, could you tell me what your
15 position is at Balboa Insurance Company?
16   A.  Senior vice-president of the product
17 department.
18   Q.  And how long have you held that position?
19   A.  I've been a senior vice-president for seven
20 years.
21   Q.  Since about 2001?
22   A.  Yes.
23   Q.  What is your role and responsibility as senior
24 vice-president of the products department at Balboa
25 Insurance Company?

## Page 6

1    A.   I have responsibility for the lender-placed
2  property business.
3    Q.   All aspects of that?
4    A.   The, the product design, profitability of the
5  product.
6    Q.   And by product, when you're talking, speaking
7  on behalf of Balboa Insurance Company, you're talking
8  about their actual insurance policy products?
9    A.   I guess I'm not quite clear on what you mean.
10   Q.   Sure.  Well, you're using the term product.
11 Design product, profitability.  What do you mean by
12 product?  Do you mean the type policy?
13   A.   Yes, lender-placed policies.
14   Q.   Could you describe for me briefly your
15 education, work history prior to your role as senior
16 vice-president at Balboa Insurance Company?
17   A.   Start thinking in terms of education?
18   Q.   Mm-hmm.
19   A.   I have an MBA from Webster University.
20   Q.   When did you earn that degree?
21   A.   1989.  I'm sorry, 1991.
22   Q.   What did you do after that?
23   A.   Well, at the time I was working for Citicorp
24 Mortgage.
25   Q.   Sorry, Citicorp?

## Page 7

1    A.   Citicorp Mortgage.
2      (Discussion off the Record)
3      THE VIDEOGRAPHER:  Off the Record.  We're off
4  the Record at 9:19.
5      (Proceedings recessed at 9:19 a.m.)
6      (Proceedings resumed at 9:25 a.m.)
7      THE VIDEOGRAPHER:  We're now back on the
8  Record at 9:25 a.m.
9  BY MS. BOWMAN:
10   Q.   Mr. Meadows, we were talking about your
11 background and work history and you mentioned that after
12 your completion of your MBA in 1991, you went to work for
13 Citicorp Mortgage; is that correct?
14   A.   No, I was working at Citicorp at that time.
15   Q.   And what were you doing there?
16   A.   I worked in the escrow department.
17   Q.   What was your first job related to the issuance
18 of lender-placed insurance?
19   A.   When I was working for Citicorp in the escrow
20 department, I had exposure to lender-placed insurance.
21   Q.   What was that exposure?
22   A.   From the servicing standpoint of the mortgage,
23 it was just the purchase of the, of the insurance
24 coverage.
25   Q.   Were you then receiving the requests for

## Page 8

1  payment for lender-placed policies out of the escrow
2  accounts of borrowers?
3    A.   I'm not clear on your question.
4    Q.   Sure.  In your role in the escrow department at
5  Citicorp, were you receiving requests for the payment of
6  lender-placed policies from the escrow of borrowers?
7      MR. HELLER:  Object to the form.
8    A.   Working for Citicorp, we were actually making
9  the requests for coverage.
10   Q.   Okay.  From the escrow department?
11   A.   Hazard insurance company, part of the escrow
12 department.
13   Q.   What was your job after that?
14   A.   In 1992, I went to work for Balboa Insurance
15 Company.
16   Q.   In what capacity?
17   A.   Initially, it was assistant vice-president.
18 Just for special projects.
19   Q.   And did your work at that time involve
20 lender-placed insurance?
21   A.   The area that I was in was involved with
22 lender-placed insurance.
23   Q.   What were you doing?
24   A.   It was more related to services that we could
25 provide to the clients.

## Page 9

1    Q.   And by clients, do you mean lenders such as
2  Countrywide Home Loans?
3    A.   Lenders, yes.
4    Q.   What was your job after your position as
5  assistant vice-president for special projects at Balboa
6  Insurance Company?
7    A.   I went into the role as vice-president over
8  product.
9    Q.   Which is your current position as well,
10 correct?
11   A.   Yes.
12   Q.   Could you describe for me the set up at Balboa
13 Insurance Company for your department relating to
14 lender-placed products?
15     MR. HELLER:  Object to the form.
16   A.   When you say set up, I'm not clear on that.
17   Q.   Sure.  Do you have people working for you,
18 various departments reporting to you?
19   A.   I do have people that work for me.
20     MR. HELLER:  Object to the form.
21   Q.   Describe for me how your department is set up.
22   A.   Well, I've got an administrative assistant that
23 works for me.  I have a couple of other individuals in
24 the product area that work for me.  And then I have the
25 account management team that works for me.

Electronically signed by Rita Meyer (101-199-755-0709)                    dfd7bbc8-9a35-4442-872b-76341a77f7cb

1    Q.   Okay. What do the other folks in the products
2  group do?
3    A.   My product group?
4    Q.   Yes.
5    A.   That's giving you everybody that works for me.
6    Q.   No, no, I know, but what do they do? You said
7  there was a couple of people, other people in the
8  products group that work for you. What do they do?
9    A.   I understand. Um, one of them actually works
10 with getting product set up in the system. Involves any
11 rate changes if rates change. The other one is more
12 analytical in nature.
13   Q.   I'm sorry?
14   A.   More analytical in nature.
15   Q.   And what does the analyst do?
16   A.   Well, review, you know, information as far as,
17 you know, product performance.
18   Q.   In your capacity as vice-president of the
19 products, are you involved in the process by which
20 Countrywide Home Loans orders and obtains lender-placed
21 policies from Balboa Insurance Company?
22   A.   When you say orders and obtains, what do you
23 mean?
24   Q.   Sure. Are you involved in the process whereby
25 Countrywide requests and obtains the placement of a

1  lender-placed policy from Balboa?
2    MR. HELLER: Object to the form.
3    A.   Balboa is not involved in that process.
4    Q.   Why don't you describe for me then, what, what
5  you understand, which companies you understand are
6  involved from Countrywide financial's perspective in the
7  process by which Countrywide Home Loans orders
8  lender-placed policies from Balboa Insurance Company.
9    MR. HELLER: Object to the form.
10   A.   Can you just -- I just want a little bit of
11 clarification on exactly what you're looking for.
12   Q.   I'm just asking which companies are involved in
13 the forced placement of lender-placed policies for
14 Countrywide Home Loans. Which Countrywide Financial
15 companies.
16   MR. HELLER: Object to the form.
17   A.   Well, countrywide Home Loans, they're the ones
18 that actually request the insurance.
19   Q.   And they don't request that from Balboa?
20   A.   They do request it of Balboa, yes.
21   Q.   What other companies are involved in, in that
22 process?
23   A.   Newport Management Corporation.
24   Q.   Any others?
25   A.   No.

1    Q.   So I'm trying to understand from your
2  perspective what your group does. Is your, is your group
3  and Balboa Insurance Company, involved in the process
4  with Countrywide Home Loans of placing lender-placed
5  policies?
6    MR. HELLER: Object to the form.
7    A.   Well, Balboa Insurance Company underwrites the
8  risk.
9    Q.   Okay. Is your group involved in any of the
10 administrative process by which that occurs? By which
11 Countrywide Home Loans orders a lender-placed policy and
12 it gets placed or ordered from Balboa?
13   MR. HELLER: Object to the form.
14   A.   Well, Balboa Insurance Company bills the
15 premium.
16   Q.   Yes. And how does it know to do that?
17   MR. HELLER: Object to the form.
18   A.   We receive a file from Newport Management
19 Corporation.
20   Q.   Okay. I'm going to hand you what I've marked
21 as Exhibit 35 --
22   (Received and so marked)
23   Q.   -- for purposes of your deposition today. I'd
24 just ask you, is it your understanding that you're here
25 to testify on behalf of Balboa Insurance Company in

1  connection with this lawsuit?
2    MR. HELLER: Do you want him to look at 35 or
3  answer the question?
4    Q.   Answer the question.
5    A.   Yes.
6    Q.   Take a look with me at the topics of inquiry at
7  the top of page five of Exhibit 35 and then running
8  through page ten. There's 32 topics. Are you familiar
9  with those topics?
10   MR. HELLER: Object to the form. Take your
11 time to read them all.
12   A.   Exactly in number one, I'm uncertain what
13 you're looking for there.
14   Q.   Policies and procedures used by you relating to
15 your interest of lender-placed insurance provided to CHL.
16   A.   Balboa Insurance Company underwrites the risk.
17 That's what we do.
18   Q.   Okay. Can you tell me whether or not you have
19 been designated on the topics identified in Exhibit 35,
20 to provide testimony on behalf of the company?
21   MR. HELLER: Object to the form.
22   A.   Yes.
23   Q.   Have you seen the topics that are identified in
24 Exhibit 35 prior to today?
25   A.   Yes.

Page 14

1    Q.   What did you do in order to prepare for your
2  deposition today to provide testimony on those identified
3  topics in Exhibit 35?
4    A.   Spent some time with the attorney.
5    Q.   Did you review any documents, files?
6    A.   I did preview some documents.
7    Q.   Did you make any inquiries of any persons
8  working for you in connection with your preparation to
9  testify on these topics?
10       MR. HELLER: To be careful here, to the extent
11    those inquiries are with, were with attorneys within
12    Countrywide in-house lawyers or within Balboa or
13    outside counsel such as Akerman Senterfitt, I
14    instruct you not to answer with respect to those
15    communications. Otherwise, answer.
16    A.   I only had discussions with attorneys.
17    Q.   Okay. Have you read the complaint in this case
18  or the amended complaint?
19       MR. HELLER: Object to the form.
20    A.   I don't know that I have.
21    Q.   What is your understanding about what the case
22  is about?
23       MR. HELLER: Object to the form. And
24    instruction if your understanding of what the case is
25    about comes from communications with attorneys either

Page 15

1    within Countrywide or Balboa, in-house lawyers, or
2    outside counsel such as Akerman Senterfitt, then I
3    instruct you not to answer question to the extent
4    that doing so requires you to divulge that
5    information from counsel. Otherwise, answer.
6    A.   I've only had discussions with the attorneys.
7    Q.   Can you -- you were in your current position at
8  Balboa Insurance Company since at least 2003; is that
9  correct?
10    A.   I believe I answered earlier, since 2001.
11    Q.   The matters we're going to be discussing today,
12  I'd like to focus on the time frame from 2003 to the
13  present. So can we agree that if there is some
14  difference in the practices of Balboa Insurance Company
15  during that time frame, that you'll try to make it clear
16  what time frame you're talking about when you're
17  answering the question?
18       MR. HELLER: Object to the form.
19    A.   That was a lot in that question. Can you break
20  it down? I'm not certain what you're looking for.
21    Q.   There is -- we're looking at a time frame here
22  between 2003 to the present. Do you understand that?
23    A.   Okay.
24    Q.   Okay. And what I'm asking you is if your -- if
25  I ask you a question and your answer would be different

Page 16

1  for two different time frames between 2003 to the
2  present, could you please clarify that?
3       MR. HELLER: Object to the form.
4    A.   If possible.
5    Q.   Can you describe for me what Balboa Insurance
6  Company's involvement is in the issuance of the
7  lender-placed policy on a, like a day-to-day basis for
8  Countrywide Home Loans?
9       MR. HELLER: Object to the form.
10    A.   Well, the policy issued to Countrywide is a
11  master policy and Balboa Insurance Company issued it.
12    Q.   And how does, how -- what is -- what does
13  Countrywide do that results in your issuance of a
14  lender-placed policy?
15    A.   Can you be more, more specific as to what you
16  mean by what they do?
17    Q.   Yeah. I'm just looking for you to describe the
18  actual process of how Countrywide communicates to Balboa,
19  a desire for a lender-placed policy, and what Balboa does
20  in response to that.
21    A.   Well, Countrywide Home Loans has an obligation
22  to its investors to insure that there's continuous
23  insurance on the loan. And when they determine that
24  there is no insurance, then that's when they request
25  coverage from Balboa.

Page 17

1    Q.   Are you familiar with the information systems
2  at Balboa that are involved in the process by which
3  Countrywide Home Loans orders lender-placed policies from
4  Balboa?
5    A.   Can you be more specific as to which systems
6  you're referring to?
7    Q.   The systems that are at Balboa that are used in
8  conjunction with Countrywide systems for the ordering of
9  lender-placed policies.
10    A.   Well, Balboa has the CCS system and that is the
11  system that we get the requests from Countrywide to send
12  letters out on their behalf. And then ultimately, if
13  they need to purchase insurance, then they -- that system
14  also would actually issue the certificate of insurance on
15  behalf of Countrywide.
16    Q.   Can you describe for me how that works? How
17  the system does that?
18    A.   I mean it's automated.
19    Q.   Okay. But what information is it looking for
20  from Countrywide?
21    A.   Generally, from the file from Countrywide,
22  you're getting the loan number, the, you know, property
23  address, the borrower's name, the potential coverage
24  amount they want to purchase.
25    Q.   Are you familiar with the, the system that

Electronically signed by Rita Meyer (101-199-755-0709)

dfd7bbc8-9a35-4442-872b-76341a77f7cb

## Page 18

1 retrieves that file information from Countrywide Home
2 Loans?
3      MR. HELLER: Object to the form.
4      A.  Do you know which system you're referring to?
5      Q.  The system that creates the file that you say
6 you receive.
7      A.  I'm not --
8      MR. HELLER: Excuse me.  Same objection.
9      A.  I'm not familiar with the Countrywide system.
10      Q.  Okay.  Tell me about the, the CCS system.  Once
11 you, once that systems receives the file from Countrywide
12 Home Loans, what happens to that, to that data in the CCS
13 system?
14      A.  CCS can read the file and determine if it needs
15 to begin the letter cycle, or if, in fact, in the same
16 file, if evidence of insurance was received by
17 Countrywide, they will cancel the lender-placed insurance
18 so they will cancel it through that system.  And then
19 that system will actually interact with another one to
20 cause letters to be mailed out to the borrowers.
21      Q.  Okay.  So is it fair to say that in addition to
22 the underwriting of lender-placed policies, Balboa
23 Insurance Company is also, on behalf of Countrywide Home
24 Loans, providing notices and information to borrowers
25 about lender-placed policies?

## Page 19

1      MR. HELLER: Object to the form.
2      A.  Newport Management does send out the letters on
3 behalf of Countrywide to the borrowers.
4      Q.  And, and you're talking about Newport
5 Management as a part of, of Balboa?
6      MR. HELLER: Object to the form.
7      A.  Newport Management is, is part of Balboa.
8      Q.  Okay.  When the CCS, when the CCS system at
9 Balboa Insurance Company receives the information from
10 Countrywide, you said it results in a letter cycle; is
11 that correct?
12      A.  Yes.
13      Q.  Okay.  And that, that is a result of the CCS
14 system communicating with some other system to generate
15 letters for Countrywide Home Loans?
16      A.  It's a letter writing system.
17      Q.  And is that all automated?
18      A.  Yes.
19      Q.  So there's no Newport Management Corporation
20 employee sitting and issuing letters; is that correct?
21      A.  There may be Newport Management Corporation
22 that would do some, you know, quality checks of letters,
23 but that's all.
24      Q.  But the letters that actually get sent to the
25 borrowers as a result of the interface with the CCS

## Page 20

1 system, are all automated.
2      A.  Yes.  The letter writing system, you know,
3 generates the letters, and, and then as I said, you know,
4 some people may do a quality check on some of them.
5      Q.  Can you tell me, do you have any employees of
6 Newport Management Corporation working for you in your
7 group?
8      A.  No.
9      Q.  So where, where would these Newport Management
10 Corporation employees be that would be doing potential
11 quality check on the letters that are being sent as a
12 result of the interface with the CCS system?
13      A.  Well, that could be in Fort Worth.  They may be
14 in Irvine, too.
15      Q.  Where are you at?
16      A.  I'm in Irvine.
17      Q.  When the CCS system interfaces with Countrywide
18 Home Loans' system or the file that you receive from
19 them, can you describe for me the fields of information
20 that the CCS system is, is picking up and incorporating
21 into its own database?
22      MR. HELLER: Object to the form.
23      A.  You know, I'm not totally familiar with all the
24 fields that come in all that file.
25      Q.  Who would be?

## Page 21

1      A.  Our head of IT would be.
2      Q.  And who is that?
3      A.  Michael MacKenzie.
4      Q.  Can you spell that, MacKenzie?
5      A.  M-A-C capital K-E-N-Z-I-E.
6      Q.  And is he at your location in Irvine?
7      A.  Yes.
8      Q.  That's Irvine, California, correct?
9      A.  Yes.
10      Q.  Apart from generating the letter cycle, what
11 else does the CCS system do?
12      A.  Well, I mentioned earlier that it does issue
13 the, the certificate of insurance after payment of the
14 premium by Countrywide Home Loans, and I mentioned
15 earlier that it does bill the premium.
16      Q.  Bills the premium to Countrywide Home Loans?
17      A.  Yes.
18      Q.  And is that all part of the interface with
19 Countrywide Home Loans' system?
20      A.  Yes.
21      Q.  So there's, this -- that's not a, it's not --
22 neither of those things are a manual process then, it's
23 all automated?
24      A.  Yes.
25      Q.  I'm going to hand you what I've marked as

6  (Pages 18 to 21)

**Page 22**

1 Exhibit 36 --
2    (Received and so Marked)
3   Q. -- which is some answers to interrogatories
4 provided by Balboa Insurance Company. I'd like you to
5 take a look at the answer to Interrogatory Number Two on
6 page five. Do you have that?
7   A. Yes.
8   Q. The inquiry for Interrogatory Number Two asks
9 for the number of Florida properties or number of
10 mortgage loans, Florida mortgage loans owned or serviced
11 by Countrywide for which lender-placed insurance had been
12 underwritten or otherwise issued by Balboa during the
13 time frame from 2003 to the present.
14    Did you provide this response?
15    MR. HELLER: Object to the form.
16   A. I worked with the attorneys on providing the
17 response, yes.
18   Q. And can you tell me, the numerical responses
19 that are provided, is that the total number of
20 lender-placed policies issued in Florida for the adjacent
21 years?
22    MR. HELLER: Object to the form.
23   A. Let me just clarify adjacent years.
24   Q. For example, it has 2003, 17,920. Is that the
25 tote number of lender-placed policies issued in Florida

**Page 23**

1 by Balboa for Countrywide in 2003?
2   A. Yes.
3   Q. Would the answer be the same with regard to
4 each of the subsequent years?
5   A. Yes.
6   Q. And would you be able to provide a year to date
7 for 2008?
8   A. Yes.
9   Q. Can you tell me, taking, for example, the year
10 2003, whether this total number 17,920, includes fully
11 canceled lender-placed policies?
12    MR. HELLER: Object to the form.
13   A. The numbers shown are the number of policies
14 that were actually issued.
15   Q. So that what -- does that mean that they were
16 not later canceled in total --
17    MR. HELLER: Object to the form.
18   Q. -- or in full?
19    MR. HELLER: Same.
20   A. I'm, I mean, I understand cancellation, but I
21 don't, I'm still not clear on what you want.
22   Q. I'm trying to -- I'm wondering whether or not
23 this is, this is, this number is capturing policies that
24 may have been later canceled.
25   A. Well, no. I mean, they may have been later

**Page 24**

1 canceled, but this number doesn't represent that.
2   Q. Okay. So if, if it appears in this number
3 17,920 for 2003, this was a lender-placed policy that was
4 issued in Florida that remained in effect for some term.
5   A. The policy could've, at a later date, been
6 canceled with no earned premium.
7   Q. And it would include those policies -- that
8 number, 17,920, would include policies that were
9 canceled, no earned premium.
10   A. Yes.
11   Q. Would the same be true for the subsequent
12 years?
13   A. Yes.
14   Q. Now, with regard to these numbers, could you
15 obtain from your system, where it's CCS or some
16 combination of other systems, could you obtain the total
17 number of policies issued on Florida properties on behalf
18 of Countrywide that excluded the numbers of, the number
19 of policies that were fully canceled with no earned
20 premium?
21    MR. HELLER: Object to the form.
22   A. Yes.
23   Q. And for those policies, could you identify the
24 borrower?
25   A. Yes.

**Page 25**

1   Q. Could you identify the loan number?
2   A. Yes.
3   Q. Could you identify the effective date of the
4 lender-placed policy?
5   A. Yes.
6   Q. Could you identify the expiration date of the
7 lender-placed policy?
8   A. Yes.
9   Q. Could you identify the issue date of the
10 lender-placed policy?
11   A. I can identify the issue date of the
12 certificate that was sent, yes.
13   Q. And can you identify the first date on which
14 the letter cycle began?
15   A. Yes.
16   Q. Can you identify the type of lender-placed
17 policy?
18    MR. HELLER: Object to the form.
19   A. What do you mean by type?
20   Q. For example, whether a, a hazard policy was
21 issued.
22   A. Well, Countrywide is purchasing a lender-placed
23 fire policy is what it is.
24   Q. Are there other -- sorry. Could you identify
25 the address for the property on which the insurance was

Electronically signed by Rita Meyer (101-199-755-0709)

dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 26

1   being placed?
2   A.   Yes.
3   Q.   What other fields of information would be
4   available to you when -- in identifying these Florida
5   properties where lender-placed insurance was issued?
6   A.   Premium.  Coverage amount.  I think that's it.
7   Q.   Is that all stored in the CCS database?
8   A.   Yes.
9   Q.   Could you, could you run a report by year that,
10  that showed all the items that we've discussed?
11  A.   I think so.
12  Q.   What, I'm sorry, and that would -- and you
13  could, as part of the, part of that report, exclude any
14  policies that were fully canceled; is that right?
15  A.   Yes.
16  Q.   Now, when Balboa receives an order for
17  lender-placed insurance from Countrywide, in the file
18  that goes into the CCS system, does that file contain any
19  information about the reason for which Countrywide is
20  requesting a lender-placed policy?
21       MR. HELLER:  Object to the form.
22  A.   I'm not aware of any reason that's in the file.
23  Q.   Does the information received by Balboa contain
24  any information relating to the borrower's own private
25  insurance or prior private insurance?

Page 27

1   A.   Can you repeat that?
2   Q.   Sure.  In the information that's communicated
3   from the Countrywide system to Balboa, does Balboa
4   receive any information about the borrower's private
5   insurance?
6   A.   No.
7   Q.   So when Balboa receives a request for a, the
8   placement of a lender-placed policy from Countrywide,
9   fair to say that it has no information about whether that
10  particular borrower has private insurance in place?
11       MR. HELLER:  Object to the form.
12  A.   Balboa does not receive any private insurance
13  information.
14  Q.   So you can't tell one way or the other from
15  what you receive, whether or not the person, the
16  borrower, has a private policy in place, correct?
17       MR. HELLER:  Object to the form.
18  A.   No, we don't get any private information on the
19  borrower.
20  Q.   Is Balboa Insurance Company involved in the
21  development of the letters that are, the letter cycle
22  that is sent as a result of the CCS system?
23  A.   Internal counsel does review the letters.
24  Q.   At Balboa Insurance Company?
25  A.   Yes.

Page 28

1   Q.   Are you involved in the development or writing
2   of those letters?
3   A.   No.
4   Q.   Was anybody, anyone in your group involved in
5   that?
6   A.   Just in the administrative process between
7   Countrywide and our internal counsel.
8   Q.   Was there anyone in your group that was
9   involved in the preparation of those letters?
10  A.   Not in my group.
11  Q.   Was there anybody else in any other of the
12  groups at Balboa Insurance Company that you know of that
13  was involved in the preparation of those letters?
14  A.   To my knowledge, only internal counsel.
15  Q.   Do you know what -- I'm sorry.  We talked about
16  some -- the information that was available from the CCS
17  system to Balboa when they receive information from
18  Countrywide; is that correct?
19  A.   We have talked about information received from
20  Countrywide, yes.
21  Q.   And we talked about the type of information
22  that you receive in connection with the requests for the
23  issuance of a lender-placed policy, right?
24  A.   Yes.
25  Q.   Do you know whether there is additional

Page 29

1   information, other than what you've described as being
2   available in the CCS database, that is communicated by
3   CHL to Balboa in the initial file?
4   A.   There may be.  I'm just familiar with the
5   information we receive that's, that I've already spoken
6   about.
7   Q.   Who, who would know the answer to that
8   question?  About whether there was additional information
9   in that original file communicated to Balboa?
10  A.   Again, I would, you know, probably someone from
11  Countrywide since they create the file.
12  Q.   Okay.  And who, who would you believe at
13  Countrywide would know the answer to that?
14  A.   I wouldn't have an idea.
15  Q.   How is that file delivered to Balboa's CCS
16  system?
17  A.   It's transmission.
18  Q.   Electronic transmission?
19  A.   Yes.
20  Q.   Okay.  And if you wanted to know who at
21  Countrywide to talk to about that file, who would you
22  ask?
23  A.   Probably Steve Grzeskowiak.
24  Q.   Can you describe for me what reports from the
25  CCS system you run on a regular basis?

8 (Pages 26 to 29)

## Page 30

1      MR. HELLER: Object to the form.
2      A.   Can you clarify as far as types of reports
3   you're thinking about?
4      Q.   Sure. I'm talking about reports relating to
5   the issuance of lender-placed policies.
6      A.   Well, I would receive reports that shows the
7   amount of premium produced. Shows the losses incurred.
8   Typical information on, you know, someone would look at.
9      Q.   Is there, is there a CCS system manual?
10     A.   If there is, I'm not aware of it.
11     Q.   Before we were talking about the generation of
12  a report that would include the various borrower-related
13  items concerning the issuance of a lender-placed policy.
14  Who would you have run that report?
15     A.   I'd go to the analyst that I mentioned.
16     Q.   And what's his or her name?
17     A.   Jennifer Kobata.
18     Q.   Can you spell that, please?
19     A.   K-O-B-A-T-A.
20     Q.   And is she the one the most, in your group the
21  most familiar with the capability of the CCS system for
22  providing reports and information?
23     A.   Yes. In my group.
24     Q.   Going back to the information that is received
25  by the CCS system that you could provide in the confines

## Page 31

1   of a report, does Balboa also receive information
2   concerning whether or not there is an impound or escrow
3   account related to the particular borrower for whom the
4   request is being made?
5      A.   We may. I don't know for sure.
6      Q.   Okay. What would you need to see in order to
7   be sure that that was a part of the CCS system?
8      A.   I'd have to see a file layout from Countrywide.
9      Q.   I'm talking about in the CCS system. If you
10  were to pull up information related to a lender-placed
11  policy in the CCS system, would that system -- in that
12  system, would one of the items of information in addition
13  to the ones we've already talked about, be whether or not
14  there was an impound account?
15     A.   Probably screen print from the system.
16     Q.   Is what you would need to see to figure that
17  out?
18     A.   If the information is there, yes.
19     Q.   Okay. Mr. Meadows, I'm going to hand you what
20  I've marked as Exhibit 37 for your deposition today.
21        (Received and so marked.)
22     Q.   And can you tell me what this is? And it's a
23  multi-page exhibit, so why don't we start with page one.
24  Can you tell me what that is?
25     A.   Page one looks like a screen print from CCS.

## Page 32

1      Q.   It contains an upper and lower box at Bates
2   page 10-100. Do you see that?
3      A.   Are you talking about down here at the bottom?
4      Q.   I'm talking about page one. Contains the top
5   box and a bottom box of information.
6      A.   Okay.
7      Q.   Would those -- are those identical?
8      A.   These, these are history screens and they are
9   identical in a lot of the information. And it looks
10  like, it shows on the bottom screen some additional
11  transactions.
12     Q.   Okay. How many history screens would you
13  accept, expect to see in connection with the issuance of
14  a lender-placed policy?
15     A.   I have no idea.
16     Q.   Have you reviewed this document that's Exhibit
17  37?
18     A.   Yes.
19     Q.   Can you tell me if this is the CCS history for
20  the lender-placed policy issued on the Drury property?
21     A.   It does appear to be so.
22     Q.   Can you take a look at page three of Exhibit
23  37? You'll see at the bottom it has an a Bates page
24  10-00102. Do you have that?
25     A.   Yes.

## Page 33

1      Q.   Can you tell me is this, is this an additional
2   history page or a clarified page from Exhibit One or from
3   the first page of Exhibit 37?
4      A.   It appears just to be a duplicate of the bottom
5   screen on page one.
6      Q.   And based on the screen print that you have
7   here before you in connection with the Drury property --
8   just a minute for the train to pass.
9         In connection with the screen print that's
10  Exhibit 37, relating to the Drury property, can you now
11  determine whether or not the information that is
12  available in the CCS system includes whether an impound
13  account is associated with the property and borrower for
14  which the request is being made?
15     A.   I do see in the middle the word impound.
16     Q.   Based on your understanding of the CCS system
17  and these screen prints, would that be an indication to
18  you that there was, in fact, an escrow account associated
19  with Ms. Drury's property?
20     A.   I would think that field that we got from
21  Countrywide, had the word impound in there and then we
22  did lay it into the CCS system.
23     Q.   Okay. And impound, an impound or the term
24  impound in the mortgage business, means that there's an
25  escrow account associated with the loan?

Electronically signed by Rita Meyer (101-199-755-0709)    dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 34

1    A.  Yes.  It is synonymous with escrow, to my
2  knowledge.
3    Q.  Based on your review of the screen print that's
4  Exhibit 37, do you see any other fields of information
5  that you haven't already described that would also be
6  available in the CCS system?
7    MR. HELLER:  Object to the form.
8    A.  It appears the property was in a flood zone.
9  We potentially would input the flood zone and the map
10  information.
11    Q.  Up in the right-hand corner of -- I'm sorry.
12  Up in the upper left-hand corner of the screen, in the
13  top box of Exhibit 37, I guess it's repeated below as
14  well, there's the identification of a lender as branch.
15  Can you tell me what that means?
16    A.  I know that with some of the lenders, if they
17  want to send the information to us even down to a branch
18  level, that they could actually give us that data and
19  that's what would go into the branch field.
20    Q.  So here there's no identification behind the
21  term lender or branch; is that correct?
22    A.  That's correct.
23    Q.  This can be identified in your system as a
24  lender-placed policy that was issued on behalf of
25  Countrywide Home Loans.

Page 35

1    A.  I don't see Countrywide anywhere.
2    Q.  I understand there's no indication on the
3  screen.  I'm asking in your system, this can be
4  identified as a lender-placed policy issued on behalf of
5  Countrywide Home Loans.
6    MR. HELLER:  Object to the form.
7    A.  Again, I don't see any reference to Countrywide
8  on the screen.
9    Q.  When you answered, when you identified the
10  number of policies in the -- for the State of Florida
11  issued in connection with loans serviced by Countrywide
12  there was a way to do that in the system, correct?
13    A.  (Nods Head).
14    Q.  You have to say audibly because she can't
15  understand a nod, sorry.
16    A.  Sorry. Yes.
17    Q.  Okay.  So the fact that there's no CW or
18  Countrywide on the particular screen associated with the
19  particular borrower, does not mean that you can't
20  identify or group together all those policies issued for
21  Countrywide.
22    A.  Well, the fact I could get the information says
23  that I can, you know, identify the ones that are issued
24  to Countrywide.
25    Q.  Take a look at the second page of Exhibit 37.

Page 36

1  Can you tell me what this is, Bates page 10-00101?
2    A.  This is a hard copy of the billing file that
3  was sent to Countrywide in which the Drury loan was,
4  Countrywide was billed for the purchase of lender-placed
5  insurance.
6    Q.  And the line that appears as opposed to the
7  lines that are obviously missing, that relates to the
8  Drury loan?
9    A.  Yes.
10    Q.  Now, the -- going kind of column by column
11  here.  Does this report show that the lender-placed
12  policy was issued by Balboa on 4-16-2006?
13    A.  This is the billing reports that would show we
14  billed Countrywide on 4-16.
15    Q.  So that's the date on which, on which the
16  transaction date is, that column is identified, is the
17  date on which Balboa billed Countrywide for the
18  lender-placed policy?
19    A.  Yes.
20    Q.  And the certificate for the lender-placed
21  policy would not -- would then have been issued following
22  the payment of that policy premium?
23    A.  Yes.
24    Q.  The next column identifies the loan number; is
25  that correct?

Page 37

1    A.  Yes.
2    Q.  And that would be the Countrywide Home Loan
3  loan number?
4    A.  Yes.
5    Q.  The next column identifies the type of, of
6  lender-placed policy that was issued; is that correct?
7    A.  Yes.
8    Q.  The next column it says, trans.  Does that
9  identify the action taken by Balboa on this transaction
10  date?
11    A.  Yes.
12    Q.  And by, by including the term issue, that would
13  mean that the transaction was for the issuance of the
14  lender-placed policy.
15    A.  Predicated on payment of the premium.
16    Q.  And would there be, would there, in connection
17  with this particular report, be anything else that might
18  have appeared in this column?  In other words, instead of
19  saying issue, could it say cancel?
20    A.  Yes, it could.
21    Q.  Could it say refund or partial refund?
22    A.  No.  It would just say cancel.
23    Q.  So whether it's a full cancellation of the
24  policy or partial cancellation of the policy, in this
25  column term trans, it would say cancel, correct?

Electronically signed by Rita Meyer (101-199-755-0709)     dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 38

1     A.   Yes.
2     Q.   And then the cancellation would simply relate
3  back to the, relate to the transaction date.  Is when the
4  communication was made to cancel.
5     MR. HELLER:  Object to the form.
6     A.   It would be the communication from, from Balboa
7  back to Countrywide that we received their cancellation
8  request.
9     Q.   Okay.  Thank you.  The column called full
10  amount, does that reflect the premium that's being
11  requested to be paid for the policy?
12     A.   Yes.
13     Q.   And the column commission amount, would that
14  reflect moneys that were going to someone other than
15  Balboa Insurance Company?
16     A.   It would reflect commission amount paid to a
17  licensed agent.
18     Q.   And in connection with the Drurys then, there
19  was no commission paid to a licensed agent?
20     A.   That's correct.
21     Q.   The next column, maybe you could read what that
22  column is after commission amount.  What is that?
23  Something CBT amount, UBT amount?
24     A.   It's net amount.
25     Q.   Net amount.  Thank you.  Okay.  And because

Page 39

1  there's no commission paid, that's identical to the full
2  premium; is that correct?
3     A.   Yes.
4     Q.   Would that column, in other circumstances, be
5  different, for instance, if there was a partial
6  cancellation of a policy, would that, would that number
7  be potentially less than the full premium?
8     MR. HELLER:  Object to the form.
9     A.   When it's an issue or bill like this, it's only
10  going to be net of any commission that's paid.
11     Q.   Okay.  The next column would be the effective
12  date of the lender-placed policy once paid?
13     A.   Yes.
14     Q.   And the next column would be the expiration
15  date of the lender-placed policy once paid.
16     A.   Yes.
17     Q.   There's actually a separate column to show some
18  cancellation date.
19     A.   Yes.
20     Q.   And is this a daily report that's run?
21     A.   I believe it is now.
22     Q.   Could you just give me some idea of the volume
23  of lender-placed policies that Balboa issues on behalf of
24  Countrywide on a daily basis --
25     A.   I have no clue.  I have no idea.

Page 40

1     Q.   -- from this?
2     MR. HELLER:  If you're done with the exhibit, I
3  need a bathroom break before you switch to another
4  document.
5     MS. BOWMAN:  We're still talking about this one
6  so I'd like to get through this series and then a
7  break.
8     Q.   From the information available in the CCS
9  system, for example, as reflected in Exhibit 37, is it
10  fair to say that you could tell from this report, whether
11  the effective date of the lender-placed policy preceded
12  the issue date of the lender-placed policy --
13     MR. HELLER:  Object to the form.
14     Q.   -- for the particular borrower?
15     A.   Would you ask that one more time.
16     Q.   Sure.  From the information that's available
17  from the CCS system, as for example, reflected in this
18  report that's a part of Exhibit 37, page two, you could
19  tell whether the effective date of the lender-placed
20  policy preceded the issue date of the lender-placed
21  policy; is that correct?
22     MR. HELLER:  Object to the form.
23     A.   Yes.
24     Q.   And you could also tell by how long or how many
25  months or days the lender-placed policy effective date

Page 41

1  preceded the issue date of the policy?
2     A.   Yes.
3     Q.   And if the -- we had the information related to
4  the letter cycle from the CCS system also included in
5  this report, then could you also tell whether the
6  effective date of the lender-placed policy preceded the
7  issuance of the first letter in the letter cycle?
8     MR. HELLER:  Object to the form.
9     A.   Yes.
10     Q.   In connection with the lender-placed policies
11  that were captured by your number count that was the year
12  by year of all Florida lender-placed policies, did that
13  exclude flood policies?
14     A.   Yes.
15     Q.   Balboa doesn't actually write flood policies;
16  is that correct?
17     MR. HELLER:  Object to the form.
18     A.   Balboa does not underwrite flood.
19     Q.   Okay.  We can --
20     THE VIDEOGRAPHER:  This will conclude tape
21  number one.  We're off the Record at 10:30 a.m.
22     (Proceedings recessed at 10:30 a.m.)
23     (Proceedings resumed at 10:41 a.m.)
24     THE VIDEOGRAPHER:  This is tape number two.
25  We're now back on the Record at 10:41 a.m.

Electronically signed by Rita Meyer (101-199-755-0709)                    dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 42

BY MS. BOWMAN:

1  BY MS. BOWMAN:
2      Q.   I'd like you to take a look, Mr. Meadows, back
3  at Exhibit 35 for a moment.  If you recall, this is the
4  notice of taking the corporate deposition for today,
5  which you've been designated on the various topics.
6          I'd like to direct your attention to Topic 27.
7  Have you had a chance to review that topic?
8      A.   Yes.
9      Q.   It inquires about the number of lender-placed
10 policies issued by you, which is Balboa, the notice that
11 was, that were placed on Florida properties and mortgages
12 serviced by CHL for borrower's failure to maintain
13 hazard coverage other than hurricane/wind storm.  Do you see
14 that?
15     A.   Yes.
16     Q.   Did you do anything to look into your ability
17 to provide that information?
18         MR. HELLER:  Object to the form.
19     A.   Yes.
20     Q.   And do you have a number today reflecting that
21 information?
22     A.   What particular time period are you talking
23 about?
24     Q.   That the relevant time period in the notice was
25 2003 to the present.

Page 43

1      A.   The files that we get from Countrywide don't
2  give us the information that, that's being asked for
3  here.
4      Q.   Did you do anything other than or did you
5  review, did you review your existing information to
6  determine that?
7          MR. HELLER:  Object to the form.
8      A.   Again, the file we get from Countrywide does
9  not distinguish this information that you're looking for.
10 They simply say we need a lender-placed policy.
11     Q.   My question was whether you actually reviewed
12 one of those files to determine that or whether that is
13 just based on your historical knowledge.
14     A.   Well, it's based on my knowledge.
15     Q.   And did you specifically look at one of those
16 files to insure that you were correct?
17     A.   No.
18     Q.   So is it your testimony today that based on
19 your knowledge of what is communicated in the file from
20 Countrywide, you cannot determine why Countrywide has
21 requested a lender-placed policy?
22     A.   Can you break that down?  I'm not --
23     Q.   Sure.  Based on, on your knowledge of the file
24 that comes from Countrywide, is it your testimony today
25 that Balboa cannot determine why Countrywide ordered a

Page 44

1  lender-placed policy?
2          MR. HELLER:  Object to the form.
3      A.   Well, Countrywide ordered a owner-placed policy
4  because they are showing that there's a, no required
5  insurance on the, on the, on the property.
6      Q.   Okay.  Are you basing that on specific
7  information contained in the file that's communicated or
8  your general knowledge of the business of lender-placed
9  policies?
10     A.   Well, it's based on my knowledge of the
11 information, yes, that's coming over in the file that it
12 does not, you know, it just says we need a lender-placed
13 policy.
14     Q.   Okay.  So it is your testimony that in the file
15 that's received from Countrywide, there's nothing in
16 there that would tell Balboa that the reason they need
17 the lender-placed policy was based on the failure to
18 maintain hazard coverage other than hurricane/wind storm?
19         MR. HELLER:  Object to the form.
20     A.   In the latter part of 2007, Countrywide began
21 to actually be able to tell us that situation.
22     Q.   How did they do that?
23     A.   Well, through the file that they began to send
24 us at that time in the latter part of 2007.  When
25 Countrywide went and was purchasing, if they saw that a,

Page 45

1  that a preferred policy excluded wind storm or hurricane
2  coverage, they began to actually purchase that coverage
3  separately at that time.
4      Q.   Meaning they ordered from you a lender-placed
5  wind policy, correct?
6          MR. HELLER:  Object to the form.
7      A.   Well, Balboa does not underwrite a
8  lender-placed wind storm policy.
9      Q.   Okay.  So how -- what was in the file that
10 communicated that they needed a lender-placed wind storm
11 policy?
12     A.   As far as what's in the file, I mean I don't
13 know the specifics of what's in the file.  I just know
14 that, you know, they began to purchase wind storm only
15 lender-placed business through another carrier.  And they
16 would notify us of that.
17     Q.   Can you tell me what other carrier it was?
18     A.   Yes.  Lexington Insurance Company.
19     Q.   So in connection with the lender-placed
20 policies issued by Balboa to Countrywide, fair to say
21 that all of those policies were the fire policies you
22 described before?
23     A.   I'm, I'm not clear on your question.
24     Q.   Sure.  In connection, then, during the time
25 frame from 2003 to the present, if Balboa issued a

Electronically signed by Rita Meyer (101-199-755-0709)          dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 46

1 lender-placed policy to Countrywide, it was the fire
2 policy that you described before.
3      A.   Yes.  We issued the lender-placed fire policy
4 which included wind storm coverage.
5      Q.   And that was true regardless of the underlying
6 reason for why Countrywide was ordering a lender-placed
7 policy, correct?
8           MR. HELLER:  Object to the form.
9      A.   You know, Countrywide would, you know, request
10 coverage and, you know, Balboa would actually insure the
11 risk.
12      Q.   And that was by the issuance of the fire
13 policy, correct?
14      A.   Yes.
15      Q.   When Balboa received after, December of 2007,
16 Balboa received a request for a wind-only policy, would
17 that be sent out somehow to Lexington?
18      A.   Well, I had mentioned earlier that Newport
19 Management Corporation actually does the tracking, so
20 again, they, they would know from Countrywide that this
21 particular property didn't have wind storm coverage.
22      Q.   Mm-hmm.
23      A.   And they would go ahead and then put, go
24 through a letter cycle, just as they would on, under
25 lender-placed fire.

Page 47

1      Q.   And that was as a result of Balboa's CCS
2 interface with Newport?
3      A.   Yes.
4      Q.   Who is it that is Newport Management
5 Corporation, in that context, that is engaging in this
6 letter cycle?
7           MR. HELLER:  Object to the form.
8      A.   I don't understand the question.  Sorry.
9      Q.   If you have, if you have Balboa's CCS system
10 communicating with another system that generates a letter
11 cycle, are you saying that the system that generates the
12 letter cycle is Newport Management Corporation?
13           MR. HELLER:  Object to the form.
14      A.   You know, I don't know if it's a Newport
15 Management Corporation system or whether it's a Balboa
16 system.  I mean, it's one or the other.
17      Q.   Okay.  Do you know where, where it is
18 maintained or located?
19      A.   Yes.  Irvine.
20      Q.   And is there an employee of Balboa that's
21 responsible for that system?  The letter-generating
22 system?
23      A.   I don't know.
24      Q.   Does that happen somewhere in IT?
25      A.   You know, typically when you're inputting

Page 48

1 information into a system, it is IT that has that
2 responsibility.
3      Q.   Are the letters issued by an outside vendor?
4      A.   Well, we produce the letters.
5      Q.   Do you mail them as well?
6      A.   We do use an outside vendor for the mailing.
7      Q.   And that all happens as a result of the CCS
8 system initiating or initializing that letter cycle; is
9 that correct?
10      A.   Yes.
11      Q.   Take a look at Topic 28 on Exhibit 35, the
12 corporate notice of deposition.  It's inquiring about the
13 number of lender-placed policies issued by Balboa that
14 were placed on Florida properties and mortgages serviced
15 by CHL for borrower's failure to maintain hurricane,
16 hurricane and wind storm coverage.  Do you see that?
17      A.   Yes.
18      Q.   Would it be correct to say that prior to the
19 latter part of 2007, Balboa did not know whether the
20 lender-placed policy was being requested because of the
21 absence of wind storm coverage?
22      A.   Up until 2007, or latter part of 2007, we did
23 not know if there was exclusions for wind storm,
24 hurricane coverage.
25      Q.   So you didn't know whether or not that was the

Page 49

1 reason for, the request for the lender-placed policy,
2 correct?
3      A.   Right.  We didn't know.
4      Q.   Take a look at Topic 21 for me.  The inquiry is
5 for the number of Florida properties in which you issued
6 a lender-placed policy with a time period covered by the
7 policy would have included a period of time that
8 pre-dated the notification sent to the borrower inquiring
9 about their coverage for loans secured by CHL.
10           Did you do anything to prepare to provide that
11 information today?
12           MR. HELLER:  Object to the form.
13      A.   Can you break down this question and just, you
14 know -- it's not clear to me.
15      Q.   Sure.  Did you prepare to provide testimony
16 about this topic which asks for the number of
17 lender-placed policies placed by Balboa, where the
18 effective date pre-dated the notification to the
19 consumer?
20      A.   No.
21      Q.   That is something you could do; is that
22 correct?
23      A.   Again, ask me what is it you want me to do?
24      Q.   Identify the number of lender-placed policies
25 issued in Florida for CHL where the effective date of the

13 (Pages 46 to 49)

Page 50

1    policy preceded essentially the first letter in the
2    letter cycle.
3           MR. HELLER: Object to the form.
4        A.   That wouldn't be real easy to get.
5        Q.   You actually can print a report like the one
6    that we looked at that has all of the necessary
7    information to make that determination, though; is that
8    correct?
9        A.   It would be producing an awful lot of reports.
10       Q.   For instance, take a look at Exhibit 37. You
11   have here for the Drury lender-placed policy on page two
12   of Exhibit 37, both a column which includes the effective
13   date of the policy and the transaction date; is that
14   correct?
15       A.   Which page are you looking at?
16       Q.   Page two.
17       A.   And ask the question again on this page.
18       Q.   Sure. You have the effective date of that
19   policy appears on that page, correct?
20       A.   Yes.
21       Q.   And you have the transaction date; is that
22   correct?
23       A.   Yes.
24       Q.   And you could also obtain from the CCS system,
25   the start date for the letter cycle; is that correct?

Page 51

1        A.   Yes.
2        Q.   So it would simply be a matter of comparing
3    those columns to get to that number; is that right?
4           MR. HELLER: Object to the form.
5        A.   Just by nature of the letter cycle, though, the
6    first letter is going to go out after the, you know,
7    whatever the lapse date is of the preferred policy.
8        Q.   Okay. My question was, was can you get to
9    that? Is that how you would get to that number?
10          MR. HELLER: Object to the form.
11       A.   If I looked at each screen for each loan.
12       Q.   Couldn't you just look at a report like this
13   and compare the effective date with a report that showed
14   the date on which the letter cycle began?
15          MR. HELLER: Object to the form.
16       A.   Yes, I could look at a report like this.
17       Q.   All right. Take a look at Topic 22 for me. It
18   asks for the number of borrowers who had some casualty or
19   hazard coverage in place at the time you issued the
20   lender-placed policy. Having some of the same hazard,
21   hazards covered on the borrower's Florida property and a
22   premium charged those borrowers.
23          Based on your testimony today, is it correct to
24   say that Balboa doesn't have the information relating to
25   whether the borrower has some casualty coverage in place

Page 52

1    when it issues a lender-placed policy?
2        A.   I'm sorry, but this -- I mean, this is very
3    confusing because I'm really just not certain what you're
4    asking for here.
5        Q.   Listen to the question part. Okay? Is it
6    correct to say, based on your testimony and knowledge,
7    that when Balboa issues a lender-placed policy for CHL on
8    a Florida property, it does not know whether that
9    borrower has any casualty insurance in place.
10       A.   Well, up until the end of 2007, we did not know
11   if there was a particular, you know, dwelling coverage
12   that wasn't covered by that preferred policy.
13       Q.   And you don't know whether there's a policy
14   privately held by the borrower that's in place for the
15   same period they are requesting the lender-placed policy;
16   is that correct?
17       A.   Rephrase that --
18       Q.   Sure.
19       A.   -- please.
20       Q.   You don't know whether there's -- when you
21   receive the information from Balboa, you don't know
22   whether the borrower has a hazard policy in place for the
23   same period as they're asking you to issue the
24   lender-placed policy. You just don't have that
25   information.

Page 53

1           MR. HELLER: Object to the form.
2        A.   Well, in the Countrywide file, they give us
3    what, what they want the effective date to be.
4        Q.   Okay. Right, but you don't have any
5    information about whether the borrower has a hazard
6    policy in place when you issue that lender-placed policy.
7           MR. HELLER: Object to the form.
8        A.   That's correct. I said before we don't get
9    that private information.
10       Q.   And from Balboa's perspective, there is no --
11   when you issue the lender-placed policy, it's for the
12   full premium amount; is that correct?
13          MR. HELLER: Object to the form.
14       A.   I'm not clear on that question.
15       Q.   Sure. There's no consideration by Balboa about
16   what other insurance the borrower might have when it
17   issues a lender-placed policy for purposes of setting the
18   premium; is that correct?
19       A.   Well, Balboa issues and bills a full year's
20   premium.
21       Q.   Taking a look at Topic 19. I'm sorry, Topic
22   20. And you'll see it asks about the number of
23   lender-placed policies issued by Balboa on Florida's,
24   Florida properties serviced by Countrywide where the
25   borrower was sent Exhibit 2. Take a look at Exhibit 2,

14 (Pages 50 to 53)

Page 54

1   it looks like this (indicating.)?
2       Can you answer that topic of inquiry based on
3   that information?
4       MR. HELLER: Object to the form.
5   A.   And that was Number 20?
6   Q.   Yes.
7   A.   Well, Balboa does not issue or underwrite
8   lender-placed wind storm, which is how I'm interpreting
9   this letter.
10  Q.   That's not one of the letters that's issued by
11  Balboa then or sent by Balboa.
12      MR. HELLER: Object to the form.
13  A.   Well, the letter is sent on behalf of
14  Countrywide, but Balboa does not underwrite the wind
15  storm risk when it's a wind storm only policy.
16  Q.   Okay. So is the answer to the question that
17  you couldn't provide that information?
18  A.   No, I can't provide the information.
19  Q.   Can you tell me in the CCS system, whether a
20  query could be run on lender-placed policies issued in
21  Florida that would essentially cull out or, or elect to
22  show only those policies where the effective date of the
23  policy preceded the letter cycle by more than ten days?
24  A.   I don't think we can do that query.
25  Q.   If you wanted to do it, who would you ask?

Page 55

1       MR. HELLER: Object to the form.
2   A.   Well, I'd ask someone in my IT group if it
3   could even be done.
4   Q.   And by your IT group, who do you mean?
5   A.   Mike MacKenzie.
6   Q.   Now, CCS is a system that was developed by
7   Balboa?
8   A.   Yes.
9   Q.   Do you know who in Balboa developed that
10  system?
11  A.   No.
12  Q.   Do you know how long it's been around?
13  A.   I think it dates back into the 80s is when it
14  was first developed.
15  Q.   And who, who would you, who do you involve when
16  you need updates to the CCS system or for it to identify
17  different types of information?
18  A.   When you talk about updates, I mean, can you be
19  more specific on that?
20  Q.   Sure. If you wanted to change the appearance
21  of the history screen, who would you go to talk to?
22  A.   I'd work with our IT group.
23  Q.   And that would be Mr. MacKenzie's group?
24  A.   Yes.
25  Q.   And are they located in Irvine as well?

Page 56

1   A.   Yes.
2   Q.   I'd like to ask you to take a look at what's
3   been previously marked as Exhibit 9 and I have exhibits
4   one through 34 sitting right here. If you could locate
5   Exhibit 9. Do you have that?
6   A.   That's 9.
7   Q.   Okay. Right before we talk about Exhibit 9,
8   can I ask you, the report that appears on Exhibit 37,
9   page two -- that's a print of a page; is that correct?
10  Of one page of the report?
11  A.   Yes.
12  Q.   So this report actually exists in electronic
13  format; is that correct?
14  A.   Yes.
15  Q.   Do you know what the software is that this
16  report runs in? Is it an Excel file or some other kind
17  of file?
18  A.   I don't know.
19  Q.   Who would know the answer to that question?
20  A.   Mr. MacKenzie.
21  Q.   Let's take a look at Exhibit 9. Can you tell
22  me what that is, please?
23  A.   Title page says Countrywide Home Loan Lender
24  Operational Manual.
25  Q.   Is this a lender operations manual that was put

Page 57

1   together by Balboa?
2   A.   I don't know if Balboa was involved in putting
3   this together or not.
4   Q.   Were you involved with the preparation of this
5   lender manual?
6   A.   No. Actually, I'm not even familiar with this
7   document.
8   Q.   Okay. Take a look at, it's going to be the
9   first page of Chapter One, which is Bates page 3-107.
10  Look at the lower right-hand corner of Exhibit 9.
11      Taking a look at the second paragraph beginning
12  Balboa, do you see that?
13  A.   Yes.
14  Q.   And if you could take that, reading down to the
15  end of that page, tell me whether that accurately
16  describes the services being provided by Balboa to
17  lenders like Countrywide.
18      MR. HELLER: Object to the form.
19  A.   Okay. I've read it. Can you please repeat the
20  question?
21  Q.   Yeah. If you could tell me whether this is an
22  accurate description of the services provided by Balboa
23  to Countrywide in connection with lender-placed
24  insurance.
25  A.   Well, as I stated earlier, I mean, I didn't

Electronically signed by Rita Meyer (101-199-755-0709)

dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 58

1 have anything to do with the development of this. This
2 is the first time I've seen it. You know, we provide for
3 products, lender-placed products to Countrywide.
4 Q. So is this inaccurate or accurate?
5 MR. HELLER: Object to the form.
6 A. Is there a specific part that you want me to,
7 you know, answer to here? I mean, there's a lot of
8 material here.
9 Q. Well, there's five bullet points that are
10 identified, services being provided. Are those the
11 services being provided by Balboa?
12 A. I guess if somebody put it in a manual, then we
13 are providing it. But I didn't, I didn't write the
14 manual. You know, Balboa Insurance provides
15 lender-placed insurance.
16 Q. Okay. Is Balboa providing training to
17 Countrywide concerning lender-placed insurance?
18 A. We certainly do interact with them about
19 lender-placed insurance.
20 Q. Do you provide training to them concerning any
21 aspect of ordering lender-placed insurance?
22 A. We provide training as far as understanding the
23 lender-placed product.
24 Q. What about the process by which it's
25 communicated to -- in other words, do you provide

Page 59

1 training to them about the CCS system?
2 A. I mean, I don't.
3 Q. Does anybody in your group?
4 A. Somebody in Steve Grzeskowiak's group might.
5 Q. Who in Steve Grzeskowiak's group would be
6 familiar with the workings of the CCS Balboa system?
7 A. I don't know. I mean, I'd ask Steve.
8 Q. Do Countrywide Home Loans and/or Newport
9 Management Corporation, have access -- well, let's just
10 start with, does Countrywide Home Loans have access to
11 the CCS system?
12 A. No. I don't know if they do or not.
13 Q. What about Newport Management Corporation?
14 A. Yes.
15 Q. Do you know who in Newport Management
16 Corporation has access to the CCS system?
17 A. Again, I would go to Steve.
18 Q. It would be somebody in his group, to your
19 knowledge?
20 A. I -- you know, I'd ask Steve.
21 Q. Okay. Well, what causes your conclusion then,
22 that someone for, or that Newport Management Corporation
23 has access to the CCS system?
24 A. So they could see lender-placed activity.
25 Q. That's the purpose. I'm asking what leads you

Page 60

1 to the conclusion that Newport Management Corporation has
2 access to the CCS system?
3 A. Just in my knowledge of when they are
4 processing data, that they have to have access to that to
5 see the lender-placed activity.
6 Q. Okay. Do you have any direct knowledge of
7 Newport Management Corporation having access to the CCS
8 system?
9 A. When you say direct, I mean, what do you mean?
10 Q. I mean, do you know of a person at Newport
11 Management Corporation that has access to the CCS system?
12 A. I mean, I think Steve has access to the system.
13 Q. And you're equating him with Newport Management
14 Corporation?
15 A. Yes.
16 Q. Do you actually know who he is employed by?
17 MR. HELLER: Object to the form.
18 A. Countrywide.
19 Q. Okay. Do you know of any employees of Newport
20 Management Corporation?
21 MR. HELLER: Object to the form.
22 A. As far as the, you know, the make up of that,
23 you know, that really, I would talk to my attorneys as to
24 how that all works out. You know, who's employees of
25 Newport Management Corporation, who's employees of Balboa

Page 61

1 Insurance Company.
2 Q. You don't know specifically of a particular
3 person that you know is employed by Newport Management
4 Corporation?
5 MR. HELLER: Object to the form.
6 A. No.
7 Q. The next page of the lender manual, 3-108,
8 describes an account management team. Is that -- and you
9 described an account management team, is that correct,
10 when you talked about your department?
11 A. Yes. I mentioned I have account managers that
12 work for me.
13 Q. And is there an account management team that is
14 assigned to the Countrywide, to Countrywide as a lender?
15 A. The account management team referenced in here
16 is not part of my group. It's part of the, of the
17 operations group.
18 Q. Okay. The operations group at --
19 A. Steve Grzeskowiak's group.
20 Q. And by, by the operations group, you mean the
21 insurance tracking group?
22 A. Yes.
23 Q. What, what did you mean then when you described
24 your account management team?
25 A. I have staff that is known as an account

16 (Pages 58 to 61)

**Page 62**

1    executive and they are the representative for each of the
2    clients that reports up to me.
3        Q.  And what do they do in that, in their capacity
4    as the account executives?
5        A.  Their primary mission is to make certain we're
6    meeting all the needs of the client.
7        Q.  Okay. Can you give me an example of something
8    the account manager who's responsible for the
9    relationship with Countrywide might be doing?
10       A.  If Countrywide, you know, determines it has a
11   particular need, then my account manager would work with
12   others within the, you know, with Countrywide and people
13   within the Balboa family to come up with a solution for
14   meeting that need.
15       Q.  Is there a -- does your account manager or
16   account executive have a liaison at Countrywide?
17       A.  Yes. They do have one person.
18       Q.  Who is that?
19       A.  Her name is Martha Dilatory.
20       Q.  And does, to your knowledge, does she work for
21   Mr. Grzeskowiak?
22       A.  No, she works for Countrywide Home Loans.
23       Q.  Taking a look at the next page in the lender
24   manual that's Exhibit 9, do you see that title Lender
25   Service Contact Information?

**Page 63**

1        A.  Yes.
2        Q.  Can you tell me if any of the folks identified
3    there work for you?
4        A.  Kirk Peterson did until he left the
5    organization.
6        Q.  And what was his role?
7        A.  He was my account manager.
8        Q.  And he -- was he responsible for the account
9    for Countrywide?
10       A.  Yes.
11       Q.  When did he leave Balboa Insurance Company?
12       A.  March of this year.
13       Q.  How long had he had, had he held that position
14   of account manager responsible for the CHL account at the
15   time of his departure?
16       A.  About two years.
17       Q.  Was he employed in your group prior to that?
18       A.  Yes.
19       Q.  What did he do before that?
20       A.  He was in the analyst position.
21       Q.  And how long was he in that position?
22       A.  About five years.
23       Q.  What about the next identified person? Miss
24   Kimberly MacNamara, was she employed by you?
25       A.  No.

**Page 64**

1        Q.  Can you explain to me why her e-mail address
2    would have a Balboa insurance.com tag?
3        A.  I guess that's the URL that we all have.
4    That's Balboa Insurance.
5        Q.  Do you know what Ms. MacNamara does?
6        A.  Not specifically, no.
7        Q.  What about generally?
8        A.  Well, generally, she's involved just in more of
9    the day-to-day operations between Steve's group and
10   Countrywide.
11       Q.  Steve's group and Countrywide?
12       A.  Well, Steve Grzeskowiak.
13       Q.  You're saying Steve's group and Countrywide,
14   not that group and Balboa?
15       A.  Well, she does interact with Balboa, yes.
16       Q.  And who does she interact with at Balboa?
17       A.  I mean, quite a few people.
18       Q.  People that work for you?
19       A.  Yes.
20       Q.  What about Sheila Merrick? Does she work in
21   your group?
22       A.  No.
23       Q.  Peggy Johnson?
24       A.  No.
25       Q.  Do you know who employs Ms. MacNamara?

**Page 65**

1        A.  When you say who employs --
2        Q.  Who does she work for?
3        A.  Individually?
4        Q.  Yes.
5        A.  I think she works directly for Sean Turner.
6        Q.  Okay. I meant what company.
7        A.  Again, that gets back to, I'm not certain
8    exactly, you know, which company each person works for,
9    if it's Balboa Insurance or Newport Management.
10       Q.  The same be true for Ms. Merrick?
11       A.  Yes.
12       Q.  Ms. Johnson?
13       A.  Yes.
14       Q.  Take a look at page 111 of the lender manual.
15   Actually, Bates page 111. It's entitled Process Flow
16   Description. Do you have that?
17       A.  Yes.
18       Q.  Taking a look at the section marked Transaction
19   File, if you could review that and tell me whether that
20   is the file that you have been describing that Balboa
21   receives from Countrywide for the purposes of ordering
22   lender-placed insurance.
23       A.  You know I don't know for a fact that that's
24   the actual file, but it does have certain information in
25   it that, you know, I do know is in the file that goes to

17 (Pages 62 to 65)

**Page 66**

1    CCS.
2       Q.   You don't know if that's describing the
3    transaction file that you receive?
4       A.   No.
5       Q.   Are you aware of some other transaction file
6    that might obtain, might contain that kind of
7    information?
8       A.   No. Again, just the fact I didn't create this
9    document. I just don't know what transaction file
10   they're referencing here.
11      Q.   Take a look at the next section of that page.
12   Balboa's receipt and processing of the transaction file.
13   Do you see that?
14      A.   Yes.
15      Q.   Under that it says, Balboa will perform the
16   following. The first item is generate customer
17   notification letters and coverage certificates. Do you
18   see that?
19      A.   Yes.
20      Q.   Does that refresh your recollection that it is,
21   in fact, Balboa that issues the customer identification
22   letters and obviously the coverage certificates?
23      MR. HELLER: Object to the form.
24      A.   Well, that area does better describe the
25   transaction file that we get for CCS as far as, you, know

**Page 67**

1    type of information that we would need in order to do the
2    functions.
3       Q.   Now you're talking about the description of the
4    functions that Balboa will perform? Is that --
5       A.   The general, the functions that CCS will
6    perform, yes.
7       Q.   Okay. So when it says Balboa will perform the
8    following, it's actually talking about Balboa through the
9    CCS system.
10      A.   It says Balboa, you know, it says Balboa
11   receives the file. And then the CCS system is the system
12   that receives these and does these transactions. That's
13   what it states.
14      Q.   Okay. And that -- is that accurate?
15      A.   Well, certainly for this document it's
16   accurate, yes.
17      Q.   And, but I'm asking, the CCS system does
18   generate the customer notification letters.
19      A.   Yes.
20      Q.   And it does generate coverage certificates.
21      A.   Yes.
22      Q.   Does it also update coverage amounts and
23   mailing addresses for loans in a binder cycle and
24   currently under forced placement?
25      A.   If it's in the file, yes.

**Page 68**

1       Q.   And it cancels certificates and issues
2    cancellation letters?
3       A.   Yes.
4       Q.   The CCS system also cancels and reissues
5    certificates as appropriate?
6       A.   Yes.
7       Q.   The CCS system also processes billing data,
8    refunds, certificate numbers, and related information for
9    return to Countrywide via the billing and refund files;
10   is that correct?
11      A.   Yes.
12      Q.   Take a look at page 122 of the lender manual.
13   Do you see the items identified as class code at the
14   bottom of that page?
15      A.   Yes.
16      Q.   Can you tell me, are those codes that the CCS
17   system uses in order to identify a particular request for
18   a lender-placed policy with the -- to relate to the
19   corresponding description?
20      A.   Well, the class codes really just break up how
21   Countrywide wanted to segment their portfolio.
22      Q.   And is that class code included in, picked up
23   by the CCS system?
24      A.   Yes.
25      Q.   Taking a look -- I'm sorry, seeing where you

**Page 69**

1    are, on page 122 of the lender placed, of the lender's
2    manual, the code 51 identifies, is how Countrywide
3    identifies to Balboa that a lender-placed policy
4    requested is in conjunction with a mortgage where there
5    is a, a residential escrow, correct?
6       A.   Yeah. The document says that the description
7    of class code 51 is residential escrow.
8       Q.   Is that correct?
9       A.   I -- I mean, I, obviously, based on this it's
10   correct, but I don't know that for a fact.
11      Q.   All right. If you wanted to determine what
12   class codes were, were appearing in the CCS system for
13   what purpose, what would you look at?
14      A.   I guess I don't understand the question at this
15   stage.
16      Q.   You indicated that the class codes such as 51,
17   52, 53, 54 were picked up by the CCS system; is that
18   correct?
19      A.   Well, actually, the class codes are assigned by
20   the CCS system based on a translation.
21      Q.   Okay. So taking a look at back at Exhibit 37,
22   which is the screen prints related to the Drury
23   lender-placed policy, I'm looking at page 102, which is
24   the third page of that document. It identifies the class
25   here assigned by CCS as class 51, correct?

18 (Pages 66 to 69)

## Page 70

1    A.   Yes.

2    Q.   And based the information in the manual, that

3  would be a lender-placed policy in connection with a loan

4  that has, a residential loan that has an escrow account,

5  correct?

6    A.   Well, it's identifying that the specific loan

7  is a first residential mortgage that's impound.

8    Q.   Okay. Which means it has an escrow account.

9    A.   Yes.

10   Q.   Take a look at lender manual page 124. Bates

11 page 124. Do you see the class codes under the header

12 Letter Cycle?

13   A.   Yes.

14   Q.   It's talking about a letter cycle. That's the

15 letter cycle that you identified is generated by the

16 Balboa CCS system; is that correct?

17   A.   It's only an assumption on my part that that's

18 what it's referencing.

19   Q.   Let's just talk about the letter cycle that's

20 initiated by the CCS system then. What are the, what are

21 the time frames for the issuance or for the beginning of

22 the letter cycle?

23   A.   Well, the time frames will be specified by the

24 system, itself.

25   Q.   Okay. So what, what is to, your understanding,

## Page 71

1  programmed into the system for the generation of the

2  letter cycle for a lender-placed policy on a residential,

3  you know, for a residential borrower that's got an escrow

4  account?

5        MR. HELLER:  Object to the form.

6    A.   Well, I don't know what the time frames are.

7    Q.   For, for when those letters get issued?

8    A.   I don't know what the time frames are.

9    Q.   Okay. Who would?

10   A.   I'd have to, you know, I would have to look at

11 the system and, you know, have someone show me the system

12 so I could understand it.

13   Q.   As far as when the CCS system would produce a

14 letter, a particular letter in a letter cycle?

15   A.   Yes. The system is set up so that it will, you

16 know, determine when a letter is to be produced.

17   Q.   Okay. That's all automated. You just don't

18 know the number of days in between each letter and when

19 they start?

20        MR. HELLER:  Object to the form.

21   A.   Ask the question again.

22   Q.   Sure. The CCS system starts the letter cycle

23 but that's automated; is that right?

24   A.   Yes.

25   Q.   And let's break it down. The first letter that

## Page 72

1  would go out as a result of the CCS system, receiving a

2  request by Countrywide for the issuance of a

3  lender-placed policy, do you know on what day that letter

4  goes out after the CCS system receives that information?

5        MR. HELLER:  Object to the form.

6    A.   Again, I would have to look at the system to

7  know exactly what day that is.

8    Q.   And what would you look at in the system to

9  figure it out?

10   A.   It's called the control record.

11   Q.   Now, would the letter cycle be the same as far

12 as when the first letter was getting issued? I mean, it

13 doesn't depend on a particular borrower; isn't that

14 correct?

15        MR. HELLER:  Object to the form.

16   A.   Well, the control records are generally

17 established by the, by the class and the control record

18 would say for that class, this is when the first letter

19 is to be produced.

20   Q.   And by class, we're talking about the classes

21 identified as 51, 52, 53, 54; is that right?

22   A.   Yes.

23   Q.   We saw Ms. Drury's, in connection with Ms.

24 Drury property in Exhibit 37, that was identified as

25 class 51.

## Page 73

1    A.   Yes.

2    Q.   Do you know if there's a difference between the

3  letter cycle for class 51 and class 52?

4    A.   Again, I'd have to look at the control record

5  to see.

6    Q.   The letter cycle that results, as a result of

7  the CCS system, is that a three-letter, letter cycle?

8    A.   Yes. That's -- there's a first letter, there's

9  a second letter, and then there's a letter that goes out

10 with the certificate.

11   Q.   And what, to your understanding, is the purpose

12 of those letters?

13   A.   Well, the purpose of the letters is to

14 encourage the borrower to, you know, either retain or

15 obtain preferred, preferred coverage.

16   Q.   Taking a look at page, again page 124 of the

17 lender manual. Do you see the first sentence on that

18 page, it starts the Balboa FOH main frame?

19   A.   Yes.

20   Q.   Do you agree with that sentence that Balboa FOH

21 main frame is designed to give the borrower ample time to

22 obtain outside insurance coverage?

23        MR. HELLER:  Object to the form.

24   A.   What specifically do you want me to answer

25 about that first sentence?

Electronically signed by Rita Meyer (101-199-755-0709)                                    dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 74

1    Q.  I was asking you if you agree with that. That
2  the, the Balboa FOH main frame is designed to give the
3  borrower ample time to obtain outside insurance coverage.
4        MR. HELLER:  Same objection.
5    A.  I guess I'd have to know exactly the time frame
6  of the, of the letter cycle to be able to answer that
7  question.
8    Q.  If you needed to know other than looking, if
9  you were going to ask somebody what the time frames were
10  on the letter cycle, who would you ask?
11    A.  Well, again, I would just, you know, ask
12  someone to give me the control record out of the CCS to
13  know what the time frame was.
14    Q.  But your understanding of the, of the purpose
15  of the letters, is that it's to encourage and -- the
16  borrower to obtain private coverage?
17        MR. HELLER:  Object to the form.
18    A.  Yes. I said that's the purpose of the letters.
19    Q.  And can Balboa, in connection with each of the
20  lender-placed policies, reproduce or, or generate the
21  letter that was, letters that were sent by the CCS system
22  to a borrower?
23    A.  Can you repeat that?
24    Q.  Sure.
25    A.  There was a lot there.

Page 75

1    Q.  Can Balboa produce or print the letters that
2  were sent to each borrower from the CCS system?
3        MR. HELLER:  Object to the form.
4    A.  Balboa can reproduce letters.
5    Q.  Okay. So for example, if you wanted to know
6  what letters were sent to Ms. Drury by the CCS system,
7  you could, through the CCS system, generate those
8  letters?
9        MR. HELLER:  Object to the form.
10    A.  We could reproduce the letters from the letter
11  writing system, itself.
12    Q.  Which is separate from CCS?
13    A.  Yes.
14    Q.  It would associate a particular loan number
15  with that letter? How does it do that?
16    A.  I'm not certain exactly how that, how that
17  works.
18    Q.  Who would be?
19    A.  Mike MacKenzie.
20    Q.  With regard to the form of the letter, or the
21  form of the letters that were being used in connection
22  with the particular class code, could you determine,
23  either from the CCS system or the letter writing system,
24  the time frames during which that letter was being used?
25    A.  You know, I'm not certain, but I do believe we

Page 76

1  have versioning capability.
2    Q.  I'm sorry, what was the --
3    A.  To answer your question, the -- as far as the
4  time frames that a specific letter that would be used.
5    Q.  You could by, by looking at the?
6    A.  I believe so, but I don't know for certain.
7    Q.  Who would?
8    A.  Mike MacKenzie.
9    Q.  And so you said you do believe we have
10  versioning capability, is that --
11        MR. HELLER:  Object to the form.
12    Q.  Do you know what version of letter was being
13  produced at a particular period of time?
14        MR. HELLER:  Object to the form.
15    A.  By versioning, that's what I meant.
16    Q.  Okay. Are you familiar with the, with the
17  letters that are generated by the CCS system?
18    A.  I'm familiar in what way?
19    Q.  Familiar with the text of those letters?
20    A.  I have general knowledge of usually what's in
21  the text, yes.
22    Q.  Are you a part of the personnel on behalf of
23  Balboa that reviews and approves those letters?
24    A.  No.
25    Q.  Do you have any input into whether certain

Page 77

1  information is included or not included in those letters?
2    A.  No. I generally rely on internal counsel for
3  that.
4    Q.  And are you referencing somebody specifically
5  when you're talking about internal counsel for Balboa?
6    A.  Could be any one of the attorneys.
7    Q.  And those would be attorneys in house at
8  Balboa?
9    A.  Yes.
10    Q.  And do you know in particular who has the
11  responsibility of reviewing the letters?
12        MR. HELLER:  Object to the form.
13    A.  Well, they all review it, so I don't know
14  really who has accountability.
15        MS. BOWMAN:  Let's go off the Record for a
16  minute.
17        THE VIDEOGRAPHER:  We're off the Record 11: 53
18  a.m.
19        (Discussion off Record)
20        THE VIDEOGRAPHER:  This is tape number three.
21  We're back on the Record at 1:11 p.m.
22  BY MS. BOWMAN:
23    Q.  Mr. Meadows, I'd like you to take another look
24  again at the Exhibit marked 37. The CCS mortgage
25  transaction history for Ms. Drury's loan.

Electronically signed by Rita Meyer (101-199-755-0709)

Page 78

1    I'm looking at page three of that document,
2  Bates page 102. Starting at the bottom of that page, do
3  you see there's some, there's some transaction dates in a
4  series? Do you see those?
5    A.   Yes.
6    Q.   Starting at the bottom, the earliest date of
7  February 22nd, 2006, do you see that?
8    A.   Yes.
9    Q.   What does, what is that indicating when it
10  says, when identifies a document there?
11    A.   What specific field are you referencing?
12    Q.   I'm looking at the field under document where
13  it says you.
14    A.   Yeah. I don't know what that means.
15    Q.   What does, what does the document description
16  mean?
17    A.   Stands for collateral update.
18    Q.   Would that be date upon which you received the
19  communication from the Countrywide system for the need
20  for the placement of a lender-placed policy?
21    MR. HELLER: Object to the form.
22    A.   That's the date we first received the record.
23    Q.   Okay. That would've been the file, the file,
24  transaction file from Countrywide, correct?
25    A.   Yes.

Page 79

1    Q.   The next date up from that is February 26,
2  2006. Do you see that?
3    A.   Yes.
4    Q.   And is it correct to say that that is the date
5  on which Balboa sent the first letter in the letter cycle
6  to Ms. Drury?
7    A.   Yes.
8    Q.   Looking at the date above that, March 12, 2006.
9  Is that, is it accurate to say that that is the date upon
10  which Balboa sent the second letter in the letter cycle
11  to Ms. Drury?
12    A.   Yes. That's the date that the second letter
13  was sent.
14    Q.   The date up from that, April 16th, 2006. Do
15  you see that?
16    A.   Which one again?
17    Q.   April 16th, 2006.
18    A.   Yes.
19    Q.   Is that the date upon which the third letter in
20  the letter cycle would've been sent by Balboa, that
21  included the certificate?
22    A.   That's the date in which the premium was billed
23  to Countrywide.
24    Q.   So is there no indication here of the third
25  letter?

Page 80

1    A.   The date above that on 4-18 where it says
2  funded, that would be the date that the certificate was
3  sent and the letter, it was a cover letter going out with
4  it.
5    Q.   Okay. I'd like you to, in this materials
6  before you that are the exhibits, can you take a look at
7  Exhibit 30, which is probably towards the bottom of that
8  stack. Can you tell me what that is?
9    A.   It's a letter.
10    Q.   Can you tell me if this is the letter that was
11  sent to Ms. Drury by Balboa on February 26, 2006?
12    A.   Well, I can see on the letter, the date
13  February 26, which is the date it was produced. I can
14  see her name on it.
15    Q.   Based on your knowledge of the material and
16  information contained in the letter cycle letters that
17  are sent by Balboa, is this a form of letter that was
18  sent by Balboa to borrowers in connection with a
19  lender-placed policy?
20    A.   Could you repeat that one more time?
21    Q.   Sure. Based on your knowledge about the lender
22  placed or the letter cycle and the letters that were
23  being sent to borrowers, is this a form letter that
24  would've been being sent to borrowers in the Balboa
25  letter cycle?

Page 81

1    A.   Well, this is the first I've seen this letter
2  so I can't really answer whether this is a form letter or
3  not.
4    Q.   You're not familiar with the the, content of
5  the letters in the Balboa letter cycle?
6    A.   I'm not familiar with the specific letters that
7  are sent to Countrywide borrowers.
8    Q.   Okay. But they are generated by Balboa's
9  system, correct?
10    A.   Letters sent to Countrywide borrowers are
11  generated by CCS, yes.
12    Q.   And to your understanding, would those letters
13  sent to Countrywide borrowers be form letters?
14    MR. HELLER: Object to the form.
15    A.   What do you mean by form letter?
16    Q.   Meaning that they, they change the name and the
17  address and the content of the letter is similar or
18  identical.
19    A.   Well, being that I don't, you know, and I've
20  stated before, I don't really get into looking at these
21  letters or, or producing these letters, you know, for,
22  you know, for Countrywide, I can't really answer that
23  question.
24    Q.   Okay. So you don't know even whether or not
25  they are form letters?

Electronically signed by Rita Meyer (101-199-755-0709)                dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 82

1       MR. HELLER: Object to the form.
2       A.   No. I don't.
3       Q.   Have you had occasion to review letters sent to
4   borrowers through the Balboa CCS system?
5       A.   I mean, I have looked at letters that are
6   generated by the CCS system, yes.
7       Q.   Okay. You just don't know whether they were
8   letters that were sent to Countrywide borrowers or not?
9       A.   No, I don't know.
10      Q.   Is there someone in your group who would know
11  what letters were being sent to Countrywide borrowers?
12      A.   I don't know of anybody in my group that would
13  know.
14      Q.   Who programs the CCS system to generate the --
15  these, these letters?
16      A.   IT.
17      Q.   So if we need to know what letters were being
18  sent to Countrywide borrowers, we need to talk to Mr.
19  MacKenzie?
20      A.   Yes.
21      Q.   Taking a look at Exhibit 30, the letter, the
22  letter purports to be from Countrywide Home Loans, do you
23  see that?
24      A.   Yes.
25      Q.   But it's generated by the Balboa CCS system,

Page 83

1   correct?
2       A.   It's generated by CCS.
3       Q.   You have the permission of Countrywide Home
4   Loans to do that?
5       A.   Yes.
6       Q.   Taking a look at the first line of the letter
7   to, dated February 26, 2006 to Ms. Drury. It says, our
8   records indicate that we do not have your homeowner's
9   insurance information on the property referenced above.
10  Do you see that?
11      A.   Yes.
12      Q.   Is it fair to say that when Balboa generates
13  this letter through the CCS system, it does not know what
14  information Countrywide Home Loans has about the
15  borrower's homeowners insurance?
16      MR. HELLER: Object to the form.
17      A.   Well, as I've stated before, the CCS system
18  does not have any information on the borrower's preferred
19  policy.
20      Q.   So at the time that the CCS system sends this
21  letter, Balboa couldn't know one way or the other whether
22  that statement was right. That CHL does not have, have
23  your homeowner's insurance information.
24      MR. HELLER: Object to the form.
25      A.   Well, the fact the letter is from Countrywide

Page 84

1   to the borrower, Countrywide knows.
2       Q.   When Balboa sends a letter through the CCS
3   system, Balboa can't know that.
4       MR. HELLER: Object to the form.
5       Q.   Is that right?
6       MR. HELLER: Object to the form.
7       A.   As I've stated before, the CCS system doesn't
8   have that information.
9       Q.   So when this letter is sent to a borrower like
10  Ms. Drury by Balboa and the CCS system, it could be
11  inaccurate?
12      MR. HELLER: Object to the form.
13      Q.   That CHL doesn't have information about the
14  borrower's homeowner's insurance.
15      MR. HELLER: Object to the form.
16      A.   I can't comment on that.
17      Q.   Do you -- does Balboa know when they send this
18  letter to the Countrywide Home Loans borrower, what
19  information Countrywide Home Loans has about the person's
20  homeowner's insurance?
21      A.   Well, as I've stated before, CCS receives the
22  pertinent information from Countrywide for generation of
23  the letter, and that's all CCS knows. That's all the
24  information that it gets.
25      Q.   Okay. So when Balboa sends this letter, it

Page 85

1   does not know what information CHL has about the home --
2   about the borrower's homeowner's insurance --
3       MR. HELLER: Object to the form.
4       Q.   -- is that correct?
5       MR. HELLER: Object to the form.
6       A.   As I've answered before, CCS does not have any
7   information about the borrower's preferred policy.
8       Q.   So the answer is yes?
9       MR. HELLER: Object to the form.
10      A.   That does not have any information about the
11  preferred policy. CCS doesn't.
12      Q.   So neither does Balboa, correct?
13      MR. HELLER: Object to the form. It's like the
14  sixth time now. Let's move on.
15      A.   CCS does not have the information, preferred
16  policy information.
17      Q.   Do you look it up?
18      MR. HELLER: Object to the form.
19      A.   Me, personally?
20      Q.   No. Balboa.
21      MR. HELLER: Object to the form.
22      A.   Look up what?
23      Q.   Do you make any attempt to determine whether
24  CHL has information about a borrower's homeowner's
25  insurance before this letter is generated?

22 (Pages 82 to 85)

Page 86

1      MR. HELLER: Object to the form.
2      A.  Balboa does not attempt to look it up.
3      Q.  This -- take a look at Exhibit 30 again.  And
4  do you see the, the underlying line that says, if your
5  homeowner's insurance policy information is not received
6  within, within the next 60 days, do you see that?
7      A.  Could I take a moment and just read the whole
8  thing?
9      Q.  Sure.
10     (Stood at Ease).
11     A.  Okay.  What was the question, please?
12     Q.  I was referring you to the information where it
13  says, if your homeowner's insurance policy is not
14  received within the next 60 days.  Do you see that?
15     A.  Yes.
16     Q.  Would that, to your understanding, be the
17  length of time between when you would send the first
18  letter in the letter cycle, to when the certificate would
19  be issued?
20     A.  I don't know if that's the case or not.
21     Q.  Do you know why it says 60 days?
22     A.  No.
23     Q.  When CHL ordered a lender-placed policy during
24  this time frame from 2003 to that period right before the
25  end of December, 2007, right before the end of 2007,

Page 87

1  would each -- would Balboa have placed on each Florida
2  property the hazard fire policy?
3      MR. HELLER: Object to the form.
4      A.  To my knowledge, during that time period,
5  Countrywide would've purchased the lender-placed fire
6  policy.
7      Q.  At the point in time at the end of 2007, when
8  Countrywide began requesting, in some circumstances,
9  wind-only policies, did Balboa's fire policy stop
10  covering wind?
11     MR. HELLER: Object to the form.
12     A.  No.
13     Q.  Take a look at -- sorry.  Taking a look again
14  at Exhibit 30, do you know, now having reviewed that
15  letter, that this would be the first letter in the letter
16  cycle?
17     A.  I don't know.
18     Q.  Who would you ask to find out?
19     A.  Steve Grzeskowiak.
20     Q.  You would agree that the date of the letter,
21  February 26, 2006, matches CCS systems' date for the
22  issuance of the first letter to Ms. Drury in Exhibit 37?
23     MR. HELLER: Object to the form.
24     A.  Well, I can see that the dates match.
25     Q.  Take a look at Exhibit 32 for me.  Can you tell

Page 88

1  me what this is?
2      A.  It's a letter with a certificate of insurance.
3      Q.  Do you agree it's a letter to Ms. Drury dated
4  April 19, 2006?
5      MR. HELLER: Object to the form.
6      A.  I see that the date April 19th and Doris Drury
7  is on the letter.
8      Q.  Would this be the third letter generated in the
9  letter cycle to a borrower that would include a
10  certificate of coverage placement?
11     A.  I don't know if this is the third letter or
12  not.
13     Q.  Are you familiar with the certificate of
14  coverage placement issued by Balboa?
15     A.  Yes.
16     Q.  So then taking a look at this, is this one of
17  them?
18     A.  Yes.
19     Q.  And you indicated before, am I correct, that
20  the certificate of coverage placement would be the third
21  letter in the letter cycle from Balboa.
22     A.  I did state before that the, on CCS, the
23  transaction date on April 18th would've been the third
24  letter with the certificate.
25     Q.  And that would be true as a general proposition

Page 89

1  in the letter cycle that the third letter would be the
2  certificate of placement, of coverage placement.
3      A.  Specific to Countrywide?
4      Q.  Yes.
5      A.  Best of my understanding, yes.
6      Q.  Taking a look at the notice of lender-placed
7  insurance, that is Bates page 109 of this Exhibit 32.  Do
8  you see that?
9      A.  Yes.
10     Q.  And at the top it says, Notice of Lender-placed
11  Insurance, correct?
12     A.  Yes.
13     Q.  And Balboa, said issued by Balboa Insurance
14  Company, correct?
15     A.  Yes.
16     Q.  And it identifies the named insured in
17  connection with the policy as Countrywide Home Loans,
18  Inc.  Do you see that?
19     A.  Yes.
20     Q.  Is that correct?
21     A.  Yes.
22     Q.  In connection with fire policies issued to
23  Countrywide on Florida properties, is Countrywide the
24  only named insured on those policies?
25     MR. HELLER: Object to the form.

Page 90

1    A.   The master policy issued to Countrywide names
2  Countrywide as the insured on the policy. But the
3  policy, itself, does actually provide benefit to the
4  borrower.
5    Q.   Is that true only in Florida or is that true
6  elsewhere?
7    A.   It's true for the risk-based protection policy
8  that was issued to Countrywide for Florida.
9    Q.   But is that true only in Florida?
10   MR. HELLER: Object to the form.
11   A.   Isn't Florida the only issue here?
12   Q.   I'm trying to find out if there's a difference
13 in the lender-placed policy that's issued in Florida from
14 other lender-placed policies that Balboa writes.
15   MR. HELLER: Object to the form.
16   A.   I'm happy to discuss about Florida and
17 risk-based protection.
18   Q.   Okay. I'm asking --
19   MR. HELLER: Excuse me. Answer the question if
20 you know.
21   A.   Well, the policies can differ.
22   Q.   Okay.
23   A.   Of course.
24   Q.   And what I'm asking you is, is the risk-based
25 policy that was issued in Florida, is that kind of policy

Page 91

1  different than other lender-placed policies?
2    MR. HELLER: Object to the form.
3    A.   Different in what way?
4    Q.   I don't know. Is it different?
5    A.   Well, I need -- if you can be more specific
6  about what you mean by different.
7    Q.   Okay. Taking a look at the letter that is a
8  part of Exhibit 32 -- I'm sorry, the notice of
9  lender-placed insurance. It says in the paragraph that's
10 second to the bottom, do you see that it starts, the
11 contract of insurance? Do you see that paragraph?
12   A.   Second to the bottom?
13   Q.   Yes. Starts the contract of insurance.
14   A.   Okay.
15   Q.   It says the contract of insurance is only
16 between the named insured and Balboa Insurance Company.
17 Do you see that?
18   A.   Yes.
19   Q.   Is that true?
20   MR. HELLER: Object to the form.
21   A.   Well, being that Countrywide is the named
22 insured, it is a contract between Countrywide and Balboa
23 Insurance Company.
24   Q.   So that sentence is a true statement.
25   MR. HELLER: Object to the form.

Page 92

1    A.   Yes. It is a contract between Countrywide and
2  Balboa Insurance Company.
3    Q.   Okay. Now, is it a contract only between
4  Countrywide and Balboa Insurance Company?
5    A.   Well, as I stated before, the policy is issued
6  to Countrywide. But the policy also does provide loss
7  settlement rights to the, to the underlying borrower or
8  to another party that has an insurable interest in the
9  property.
10   Q.   The second sentence says, there's no contract
11 of insurance between the borrower and Balboa Insurance
12 Company. Do you see that?
13   A.   I see that.
14   Q.   Is that, is that -- are you saying that is
15 incorrect?
16   MR. HELLER: Object to the form.
17   A.   Well, again, the policy wasn't issued to the
18 borrower. It was issued to Countrywide.
19   Q.   Okay. So there's no contract of insurance
20 between the borrower and Balboa.
21   MR. HELLER: Object to the form.
22   A.   No. I can't really answer. I'm not an
23 attorney, so I can't answer that question.
24   Q.   I'm just asking you whether Balboa Insurance
25 Companies notice of lender-placed insurance, whether that

Page 93

1  is a true statement.
2    A.   I can't answer the question whether that's a
3  true statement or not. I'm not an attorney.
4    Q.   Well, you issue these certificates, don't you?
5    MR. HELLER: Object to the form.
6    A.   We issue the certificate, yes.
7    Q.   You don't know who, who you're issuing
8  insurance to?
9    A.   I already stated that we issue the insurance to
10 Countrywide Home Loans.
11   Q.   Okay. Is there a difference between risk-based
12 protection and other kinds of lender-placed policies?
13   MR. HELLER: Object to the form.
14   A.   As far as how the policy is issued, no.
15   Q.   How about as far as how the policy operates?
16   A.   What do you mean by operate?
17   Q.   I mean how coverage is determined.
18   A.   Are you referencing coverage underneath the
19 policy?
20   Q.   Yes.
21   A.   The coverage under risk-based protection isn't
22 any different than the other lender-placed policies.
23   Q.   How about the right to make the claims against
24 the policy? Is that different with risk-based policies?
25   A.   You can have a difference between policies in

24  (Pages 90 to 93)

Page 94

1    terms of who can make claims against it, yes.
2        Q.   In connection with the residential property
3    fire insurance risk based protection being issued in
4    Florida to Countrywide, who was entitled to make a claim
5    against that policy?
6        A.   Well, the named insured has a right to make a
7    claim.
8        Q.   Anyone else?
9        A.   The named insured.
10       Q.   The named insured is Countrywide Home Loans?
11       A.   Yes.
12       Q.   Would any proceeds paid based on coverage under
13   the policy, be paid to Countrywide Home Loans?
14       A.   I would want to look at the actual policy
15   provisions to answer that question.
16       Q.   Take a look at Exhibit 22.
17       A.   Okay.
18       Q.   Is Exhibit 22, does that contain the policy
19   that you were referencing needing to look at?
20       A.   Yes.
21       Q.   Can you now answer the question of who would be
22   paid the proceeds of any coverage under the policy?
23       A.   Yes. If you go to page five.
24       Q.   Can you tell me the Bates page?
25       A.   117.

Page 95

1        Q.   Thank you.
2        A.   13. Loss payment. And it states there if the
3    amount of loss exceeds your insurable interest, meaning
4    Countrywide, the borrower may be entitled to a simple
5    loss payee to receive payment for any residual amount due
6    for the loss, et cetera, et cetera.
7        Q.   Okay. So the coverage payments flow first to
8    Countrywide, correct?
9        A.   Yes.
10       Q.   And that would be up to the value of their
11   mortgage?
12       A.   To their insurable interest, yes.
13       Q.   And then if there was amounts over that, that
14   was being paid under the coverage, those monies may go to
15   the borrower.
16            MR. HELLER: Object to the form.
17       A.   That is correct.
18       Q.   And that was the benefit to the borrower that
19   you were talking about would exist under the policy?
20       A.   Yes. I mean, as a matter of fact, it would
21   show that if the property was totally destroyed and the
22   Countrywide insurable interest was less than that, that
23   the borrower would actually have the benefit of the
24   policy that was purchased by Countrywide.
25       Q.   By meaning they would get the difference in the

Page 96

1    amount paid to Countrywide to pay off the mortgage and
2    the amount of the coverage.
3            MR. HELLER: Object to the form.
4        A.   They could as long as they repair the property.
5    I mean, they would have to use the money to repair the
6    property. You know, if they --
7        Q.   Okay. So if the amounts, if the amounts paid
8    to Countrywide for the amount of the mortgage do not go
9    to the borrower, just the difference between the coverage
10   and the amounts for the mortgage, then they have, they
11   would have to use that excess amount to repair the
12   property?
13       A.   If, in fact, the property is being repaired,
14   yes.
15       Q.   In those circumstances under this policy, could
16   Countrywide elect to not have the property, to not
17   utilize the funds coming to it to repair the property but
18   simply to satisfy the mortgage?
19            MR. HELLER: Object to the form.
20       A.   The named insured does have that option.
21       Q.   If the insured had -- I'm sorry. If the
22   borrower had a hazard, private hazard policy in place,
23   and nevertheless, there was a lender-placed policy
24   issued, such as the one that's Exhibit 22 on a Florida
25   property, would the lender-placed policy provide

Page 97

1    additional coverage in connection with that property?
2            In other words, if there was a loss covered by
3    the borrower's hazard policy, but under that policy, they
4    weren't paid enough to fix it. Could they then look to
5    this policy to, to complete the repairs?
6        A.   You said a lot. Can you break it down a little
7    bit for me?
8        Q.   Sure. If a borrower has a hazard policy in
9    place, okay? Covers fire. There's a fire. House is
10   burnt, but not burnt down. Can the borrower look to this
11   lender-placed policy to fix the property?
12       A.   Well, the borrower, not being a named insured.
13   You can't look to this policy.
14       Q.   And -- I'm sorry.
15       A.   Go ahead.
16       Q.   And could, could Countrywide, would Countrywide
17   be expected by Balboa, to look first to the private
18   insurance held by the borrower to fix the property?
19       A.   Just repeat that one more time so I make
20   certain I understand it.
21       Q.   The named insured under the lender-placed
22   policy is Countrywide.
23       A.   Yes.
24       Q.   In those circumstances where there was a fire,
25   and the borrower had a hazard policy in place, could

25 (Pages 94 to 97)

Page 98

1    Countrywide seek to recover the loss on that property
2    on -- from the Balboa policy?
3         MR. HELLER: Object to the form.
4         A.   Well, Countrywide would first look to the
5    borrower's policy to cover the loss.
6         Q.   Okay.  And if that policy was inadequate to
7    cover the loss, could Countrywide look to the Balboa
8    policy?
9         MR. HELLER: Same objection.
10        A.   Countrywide could look to the Balboa policy if
11   the borrower's preferred policy was not acceptable to
12   them, yes.
13        Q.   Can you take a look at Exhibit 22, the
14   lender-placed policy?  Could you take a look at the
15   language at the top of Bates page 112?
16        A.   Which language do you want me to look at?
17        Q.   The paragraph that says in no event.
18        A.   What page are you on?
19        Q.   Bates page 112.
20        A.   Okay.
21        Q.   In the, in the circumstances we've been
22   discussing where the borrower has a fire, a, a hazard
23   policy in place that covers fire, could Countrywide look
24   to the lender-placed policy?
25        A.   I had stated earlier that if, if the preferred

Page 99

1    policy of the borrower is not acceptable to Countrywide,
2    then they could look to this policy.  And that is in
3    Section 3 on page 111.  Where it states that, you know,
4    based upon their belief or your belief that no other
5    insurance acceptable to you is in force insuring your
6    interest.  So if they, if they do not have an acceptable
7    insurance policy as the preferred policy, then
8    Countrywide would look to this policy on an excess basis.
9         Q.   So if it was a private policy that covered
10   fire, would the question be whether the fire part of that
11   or the fire coverage was acceptable, that piece of the
12   coverage was acceptable to Countrywide?
13        MR. HELLER: Object to the form.
14        A.   Well, the language I pointed out is not
15   specific to any particular paragraph.
16        Q.   Well, I agree, but what -- then what does that,
17   the third paragraph of part three mean on page 112?
18        MR. HELLER: Object to the form.
19        A.   That is applicable to if, in fact, the
20   preferred policy is acceptable.
21        Q.   So, so the -- your understanding of the third
22   part of section 3 is that the entire policy must be
23   acceptable to Countrywide?
24        MR. HELLER: Object to the form.
25        Q.   It would not be based on a peril-by-peril

Page 100

1    basis?
2         MR. HELLER: Same objection.
3         A.   The preferred policy presented to Countrywide
4    has to have all their required coverages to be
5    acceptable.
6         Q.   Okay.  But you did say that in the context
7    of -- that where a borrower had hazard insurance in
8    place, Countrywide would be expected by Balboa to look to
9    that hazard insurance to cover any covered losses first;
10   is that right?
11        A.   Countrywide will always look to the primary
12   coverage first for coverage on the policy.
13        Q.   But who determines which is the primary
14   coverage?
15        A.   I don't understand the question.
16        Q.   You said they always look to the primary
17   coverage first.
18        A.   Which would be the borrower's preferred.
19        Q.   Policy?
20        A.   Yeah.
21        Q.   So any, any claim that, that Countrywide would
22   make or that Countrywide would pursue -- I'm sorry.
23   Before Countrywide would pursue a claim under the Balboa
24   lender-placed policy, it would have to exhaust the -- any
25   claim against the private policy?

Page 101

1         MR. HELLER: Object to the form.
2         A.   Well, the private policy, the named insured is
3    the borrower, it's not Countrywide.  Therefore, they
4    would expect the borrower to pursue the claim underneath
5    that policy.
6         Q.   Would Balboa pay end the lender-placed policy
7    before the borrower had exhausted the private preferred
8    policy?
9         MR. HELLER: Object to the form.
10        A.   The borrower's preferred policy would have to
11   be exhausted before, before Balboa would pay underneath
12   its policy.
13        Q.   If Balboa issued this lender-placed policy
14   that's Exhibit 22 on a Florida property where there was
15   no preferred private policy, then the first coverage in
16   line would be the Balboa policy, correct?
17        A.   In absence of a preferred policy, that's,
18   that's the reason Countrywide would purchase the Balboa
19   policy.
20        Q.   If there was a hazard policy in place on the
21   property and Countrywide still had the lender-placed
22   policy placed, then the preferred policy may very well
23   have coverages for the same perils as the lender-placed
24   policy; is that correct?
25        MR. HELLER: Object to the form.

Electronically signed by Rita Meyer (101-199-755-0709)                    dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 102

1    A.  No, that's not correct.  Countrywide would've
2  determined that all the required coverages were covered
3  under the preferred policy.
4    Q.  If a, if a, if a home owner -- I'm sorry.  If
5  somebody who owned a Florida property had a preferred
6  policy in place, that -- but it, but it excluded wind
7  storm or hurricane coverage, the lender-placed policy
8  that Countrywide would have obtained between 2003 and
9  right before the end of 2007 was this form fire policy,
10  correct?
11    MR. HELLER:  Object to the form.
12    A.  Countrywide would've purchased insurance from
13  Balboa from the effective date of this policy going
14  forward.
15    Q.  Okay.  And it would've been this form of policy
16  that we see, Exhibit 22, correct?
17    A.  For the State of Florida from May 1st, 2005
18  forward, yes.
19    Q.  Okay.  What about prior to May 1st, 2005?
20    A.  It would've been under a different form.
21    Q.  Would it have been the residential property
22  fire insuring form that was in place by Balboa at the
23  time?
24    A.  It would've been a policy issued to Countrywide
25  by Balboa at the time, yes.

Page 103

1    Q.  And would it have been the residential property
2  fire insurance form that was approved at the time?
3    A.  Again, it would've been the policy that was
4  issued to them at the time.
5    Q.  Okay.  Was there -- has -- is there another
6  form of policy that was issued to Countrywide prior to
7  2005?
8    A.  Yes.
9    Q.  What, and what -- do you know what the
10  difference is between that, that form and the form that's
11  Exhibit 22 would've been?
12    A.  Well, as far as the coverages, there would not
13  have been any difference.
14    Q.  Okay.  So what you're saying is, it would just
15  simply have had a different form number?
16    A.  Yes, it would've had a different form number.
17    Q.  But the coverages issued with, the policy
18  that's Exhibit 22, would've been the same coverages that
19  are included in the lender-placed policy issued by Balboa
20  to Countrywide back to 2003?
21    MR. HELLER:  Object to the form.
22    A.  The coverages under both forms would've been
23  the same.
24    Q.  So the coverages under the lender-placed policy
25  issued by Balboa would've been the same from 2003 to the

Page 104

1  present.
2    MR. HELLER:  Object to the form.
3    A.  Yes.  The forms, the coverages under the forms
4  would've been the same.
5    Q.  Do you know how many or forms of master
6  policies were issued during that period from 2003 to the
7  present?
8    A.  No.
9    Q.  Okay.  Do they change on an annual basis, the
10  form numbers?
11    A.  A form numbers have to do more with the, the
12  filing of the product with the State.
13    Q.  Okay.  So then if a, if a borrower in Florida
14  had a preferred policy, hazard policy in place, and
15  Countrywide nonetheless ordered a lender-placed policy,
16  there would be coverages under those two policies that
17  would be for the same peril.
18    MR. HELLER:  Object to the form.
19    A.  When you say the same peril, I mean, I'm not
20  certain I'm clear on what you mean.
21    Q.  For instance, if somebody, if a Florida
22  borrower had a hazard policy in place, and, and
23  Countrywide had a lender-placed policy issued, would it
24  be your expectation that both of those policies would
25  cover the peril of fire?

Page 105

1    MR. HELLER:  Object to the form.
2    A.  Well, if the borrower has a preferred policy in
3  place, as I've said before, if it's, if it's an
4  acceptable policy to Countrywide, then they wouldn't have
5  purchased the lender-placed policy anyway.
6    THE VIDEOGRAPHER:  Excuse me.  Change the tape.
7  That concludes tape number three.  We're off the
8  Record at 2:11 p.m.
9    (Proceedings recessed at 2:11 p.m.)
10    (Proceedings resumed at 2:23 p.m.)
11    THE VIDEOGRAPHER:  This is Tape Number Four.
12  We're back on the Record at 2: 23 p.m.
13  BY MS. BOWMAN:
14    Q.  Mr. Meadows, I'd like to look again at Exhibit
15  22 and the Section 3 of the lender's general form that we
16  were discussing relating to other insurance.
17    In the context of, in the following context,
18  could you tell me which part of Section 3 would be
19  applicable?  If a borrower had a preferred policy to
20  cover their property that was acceptable to Countrywide,
21  except that it excluded wind storm coverage, which
22  provision of this policy would apply to claims.
23    MR. HELLER: Give me a second to read this
24  before you respond.  Object to the form.
25    A.  Could you repeat it again?

27  (Pages 102 to 105)

Page 106

1  Q.  If, if a Florida borrower had a hazard
2  insurance property, policy on their property, but that
3  policy excluded wind, would this be the lender-placed
4  policy that would've been issued by Balboa?
5      MR. HELLER:  Object to the form.
6  A.  Well, if Countrywide received a preferred
7  policy that excluded wind, they would deem that
8  unacceptable.  Because when is the required peril for
9  coverage.
10  Q.  And this, and this Exhibit 22 would've been the
11  lender-placed policy that would've been put in place.
12      MR. HELLER:  Object to the form.
13  A.  If Countrywide purchased a lender-placed policy
14  as a result of that and from May 1st, 2005 forward, yes,
15  this is the form that would've been used in the State of
16  Florida.
17  Q.  And as we talked about before, the prior forms
18  would've all had the same coverage as this form.
19  A.  Yes, I said the different forms would have the
20  same coverage.
21  Q.  So in that context, then, would -- which part
22  of other insurance, which paragraph of other insurance
23  would apply?
24      MR. HELLER:  Object to the form.
25  A.  If Countrywide received a preferred policy that

Page 107

1  was not acceptable to them, and they decided to purchase
2  lender-placed insurance, it would be the very first
3  sentence.  That basically says based on your belief, that
4  no other insurance acceptable to you is in force.
5  Q.  Okay.
6  A.  That's what they would rely on.
7  Q.  So I'm still struggling with the meaning of the
8  Section 3, which you said would apply only if there was
9  acceptable coverage in place, correct?
10      MR. HELLER:  Object to the form.
11  A.  No.  What I said was if they receive a
12  preferred policy that is not acceptable, then the first
13  sentence is going to apply.  If it's not acceptable, they
14  would purchase lender-placed insurance.  If the preferred
15  policy was acceptable, had all the required perils
16  covered, then they would not purchase lender-placed
17  insurance.
18  Q.  So what would the purpose of paragraph three
19  ever be?
20      MR. HELLER:  Object to form.
21  A.  The purpose of paragraph three would be first
22  of all, it supports them in purchasing a lender-placed
23  policy when there is no acceptable insurance.  And number
24  two, is that if it is acceptable, then, then that's when
25  you get into the last paragraph.  That, then this is not

Page 108

1  excess coverage to the primary coverage.  Because the
2  acceptable insurance is on that property.
3  Q.  So would it be your understanding, based on
4  paragraph three, that -- and that there would be a
5  circumstance in which Countrywide would say that the
6  preferred policy was acceptable, but it nevertheless
7  provided inadequate limits of coverage?
8      MR. HELLER:  Object to the form.
9  A.  I'm not certain what you mean by inadequate
10  limits of coverage.
11  Q.  Well, you said in -- you said paragraph three
12  means this policy's not excess insurance.  If there's a
13  preferred policy in place, that provides acceptable
14  coverage to Countrywide.  Nobody can look to this policy,
15  correct?
16  A.  Repeat that.  I'm sorry.
17  Q.  What you just said was, if there's a preferred
18  policy in place that's acceptable to Countrywide, this
19  policy will not act as excess insurance.  Nobody can look
20  to this policy, correct?
21  A.  If it's acceptable insurance from the preferred
22  policy, then Countrywide would not look to this policy.
23  Q.  Okay.  What is the meaning then of this?  Is
24  the meaning of this second sentence, then, that
25  Countrywide would accept insurance with inadequate limits

Page 109

1  of coverage?
2  A.  Well, inadequate limits of coverage is more
3  relevant to the amount of coverage.
4  Q.  Right.
5  A.  Okay.  Which is coverage in a preferred policy.
6  Countrywide has no way of determining whether Coverage
7  A -- they assume that Coverage A is adequate.
8  Q.  Okay.  Based on what the insurance company
9  determines is necessary for the replacement value of the
10  property?
11  A.  That's the carrier's responsibility to, to
12  determine what is an adequate coverage amount for
13  Coverage A.
14  Q.  So if the preferred insurance company did a bad
15  job and underinsured the property, Balboa won't take
16  responsibility for that and provide excess coverage to
17  Countrywide, correct?
18  A.  If the preferred carrier did do a bad job
19  determining what the dwelling coverage should be, and it,
20  it was inadequate, yes, this, this policy would not have
21  any coverage for Countrywide.
22  Q.  I'd like you to take a look at Exhibit 12.  Can
23  you tell me what those are?
24  A.  Well, they all look like templates of letters.
25  Q.  Are you familiar with them?

28  (Pages 106 to 109)

**Page 110**

1   A.  No.
2   Q.  Take a look at Exhibit 11 for me.
3   A.  Again, these are templates of letters.
4   Q.  Okay.  And if you could take a look at the --
5   which one are we on, 11?
6   A.  Eleven.
7   Q.  Take a look at 11 and 12 next to each other, if
8   you could.  The letters that are, are templates that are
9   Exhibit 12, do you see the reference to wind storm?
10  A.  Yes.  In the first sentence.
11  Q.  Did the CCS system, to your knowledge, send to
12  borrowers letters with specific references to wind storm
13  prior to the end of 2007 when Countrywide began
14  requesting wind-only policies?
15      MR. HELLER:  Object to the form.
16  A.  The fact I've never seen them, I don't know.
17  Q.  But do you know as a general matter?
18  A.  I don't know as a general matter, either.
19  Q.  Is there anybody at Balboa that would?
20  A.  I don't know.
21  Q.  If you wanted to know whether these were the
22  forms that were being sent by the CCS system, who would
23  you ask?
24  A.  Again, I'd go to Mike MacKenzie and ask him.
25  Q.  Going back to Exhibit 22, which is the policy.

**Page 111**

1   I'm looking at Bates page 110.  Do you have that?
2   A.  Yes.
3   Q.  Indicates in the top right corner, it says
4   agent.  Countrywide Insurance Services, Inc.  Do you see
5   that?
6   A.  Yes.
7   Q.  Can you describe for me what Countrywide
8   Insurance Services, Inc.'s role was in the issuance of
9   this policy?
10  A.  Countrywide Insurance Services is an agency.
11  Q.  Okay.  And what, what did, what part of this --
12  I mean, what do they do in the issuance of a
13  lender-placed policy?
14  A.  They don't do anything.
15  Q.  Why do they appear as agent?
16  A.  Because Countrywide does have an agency.
17  Q.  Does Countrywide Insurance Services receive a
18  commission on the premium charged by Balboa for the
19  policy?
20  A.  No.
21  Q.  Has that been true during any period of time?
22  A.  Yes.
23  Q.  During what period of time was CIS receiving a
24  commission on the premium charged by Balboa for a
25  lender-placed policy in Florida?

**Page 112**

1   A.  You know, the best of my recollection, it was
2   back prior to 2002.
3   Q.  What changed?
4   A.  Just a corporate decision not to pay a
5   commission anymore.
6   Q.  So is it fair to say that all of the proceeds
7   of, for the premium of the lender-placed policy go to
8   Balboa?
9       MR. HELLER:  Object to the form.
10  A.  Well, the premium paid by Countrywide goes to
11  Balboa, yes.
12  Q.  So from 2003 to the present, if Balboa issued a
13  lender-placed policy for Countrywide, it would have
14  collected and retained the entire premium.
15  A.  Yes.
16      MR. HELLER:  Object to the form of that last
17  question.
18  Q.  Do you have any familiarity with Countrywide's
19  AS 400 system?
20  A.  No.
21  Q.  Do you have access to it at Balboa Insurance
22  Company?
23  A.  No.
24  Q.  Do you provide input or information to
25  Countrywide Home Loans concerning what information Balboa

**Page 113**

1   Insurance Company needs in that daily transaction file in
2   order to issue a lender-placed policy?
3   A.  Well, we do tell Countrywide the information we
4   need, yes.
5   Q.  That would be the fields of information that we
6   discussed very early in the day, such as the amount of
7   the mortgage, the amount of the prior coverage,
8   borrower's address, loan number, those kinds of things?
9   A.  Well, the specific fields I think I already
10  mentioned were borrower's name, address, property address
11  to be insured, coverage amount, and what was the lapse
12  date or of either the absence of insurance or the
13  insurance that didn't meet, didn't have all the insurance
14  requirements, yes.
15  Q.  Taking a look at Exhibit 37, the CCS screen
16  print related to the Drury loan.  Based on the
17  information here, can you tell me what the issue date of
18  the policy of the lender-placed policy was to Ms. Drury?
19      MR. HELLER:  Object to the form.
20  A.  Well, based on the transaction date in CCS, I
21  would, in fact, I think I said it before that the 4-18
22  date would've been the date that the certificate would've
23  been generated.
24  Q.  Okay.  And the effective date on that policy
25  was May 1st of 2005?

Electronically signed by Rita Meyer (101-199-755-0709)                    dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 114

1      A.   According to CCS, yes.
2      Q.   And the policy was effective through May 1st of
3  2006?
4      A.   According to CCS, yes.
5      Q.   So on the date 4-18, 2006, when the certificate
6  on the lender-placed policy was issued, the lender-placed
7  policy had less than two weeks left of the policy period?
8      MR. HELLER:  Object to the form.
9      A.   Well, it would've had the numbers of days
10  between 4-18 and 5-1.
11      Q.   Okay.  So 30 days in May?  Can we agree on
12  that?  I mean in April?  30 days has September,
13  September, April, June and November?  So there would've
14  been 12 days left on the policy.
15      MR. HELLER:  Object to the form.
16      A.   That seems right.
17      Q.   Now, when Countrywide ordered the lender-placed
18  policy from Balboa in February of 2006, based on your
19  experience in the insurance industry, if the reason
20  Countrywide had bought that, bought the lender-placed
21  policy was because Ms. Drury's insurance excluded wind
22  coverage, could she on February 26, or February 22nd,
23  2006, have gone out and purchased a private wind policy
24  that, with an effective date of May 1st, 2005?
25      MR. HELLER:  Object to the form.

Page 115

1      A.   Well, as far as what she could've done to
2  purchase another wind policy, I don't, I have no idea.
3      Q.   Would, would it be your understanding that a
4  preferred policy would be available on a back-dated
5  basis?
6      MR. HELLER:  Object to the form.
7      A.   No.  I don't, I don't know that much about the
8  preferred business from that standpoint.  I can't answer
9  that question.
10      Q.   Do you, as a part of your business in the
11  product development for Balboa, do you try to keep track
12  of what coverages are being provided by preferred
13  policies in the various states?
14      A.   Different states will put out bulletins, as far
15  as from the departments of insurance.  But as a matter of
16  practice, with thousands of carriers out there, we don't
17  get any changes that they make.
18      Q.   Do you, as a, a matter of developing your own
19  products, look at what private insurance companies are
20  doing in the various states?
21      A.   When we develop our lender-placed products, we
22  need to know what homeowner's policies are covering, yes.
23      Q.   And when you develop that underlying research
24  or information, do you share that with Countrywide?
25      A.   From time to time, if we get information we

Page 116

1  think is pertinent, yes, we will share information with
2  Countrywide.
3      Q.   For example, if you learned that a particular
4  carrier in Florida was no longer going to include wind
5  coverage in their hazard policy, would you have shared
6  that with Countrywide?
7      MR. HELLER:  Object to the form.
8      A.   You know, I can't say for sure whether in a
9  particular instance, whether we did or not or would have.
10      Q.   How would you go about doing it if you would
11  have shared that with Countrywide?
12      A.   If we got information of that nature, we'd call
13  them up on the phone and tell them.
14      Q.   You wouldn't write them a memo or send them an
15  e-mail?
16      MR. HELLER:  Object to the form.
17      A.   Being affiliates, we verbally talk about
18  things, too.
19      Q.   Is there a process by -- I mean is there -- I'm
20  sorry.  Is there a practice within Balboa of not
21  providing any written documentation about such things to
22  CHL?
23      A.   No, there's not that practice.
24      Q.   So it could be provided by phone or by some
25  other communication.

Page 117

1      A.   Yes, it could be by some other communication.
2      Q.   Do you provide to Countrywide bulletins that
3  you receive from the various departments of insurance?
4      A.   If a department of insurance, again, puts out
5  something that's pertinent, then we'll share that
6  information with them.
7      Q.   Do you maintain the information that you
8  receive from the various departments of insurance?
9      A.   You know, I'm not certain exactly how much of
10  it we retain and how much of it we don't.
11      Q.   Who receives that kind of information in your
12  group?
13      A.   In my group, nobody --
14      Q.   Okay.
15      A.   -- directly.
16      Q.   At Balboa Insurance Company, does someone
17  receive that kind of information?
18      A.   Yes.  There is someone at Balboa that receives
19  it.
20      Q.   Who is that?
21      A.   Well, there's a number of people that could.  I
22  mean, whether it's in the legal area or plants area,
23  government relations, I mean, any of them could receive
24  it, but I don't know one specific person that does.
25      Q.   How would you get it?

30  (Pages 114 to 117)

## Page 118

1   A.  I would get it if they pass it on to me.
2   Q.  Would that be some sort of interoffice mail
3   or --
4   A.  It could be interoffice mail, it could be, you
5   know, through an e-mail.
6   Q.  And what -- if you had received that
7   information through someone else at Balboa, what would
8   you have done with it?
9   A.  I would've read it.
10  Q.  Would you have maintained it in any fashion?
11  A.  I generally rely on whoever actually, you know,
12  is getting it that actually retained if I need to
13  reference it again.
14  Q.  So you don't keep a little file or an
15  electronic file that says updates from the Florida
16  Department of Insurance?
17  A.  Not when I can go to access it from another
18  source.
19  Q.  Would the folks that you're referencing in
20  compliance with government relations, et cetera, would
21  they be located in Irvine as well?
22  A.  Yes.
23  Q.  Are there other carriers -- I'm sorry.
24  Lender-placed insurance companies doing business in
25  Florida?

## Page 119

1   A.  Yes.
2   Q.  Can you tell me which ones?
3   A.  Assurant Group.  Zurich.  Those are the two I
4   know for sure.
5   Q.  There was also the insurance company that you
6   identified as issuing the wind-only policies to
7   Countrywide, which was --
8   A.  That was Lexington Insurance Company.
9   Q.  Okay.  And so they also do business in Florida?
10  A.  Lexington Insurance Company is a surplus lines
11  company and I don't know for a fact, you know, what all
12  states they may actually be doing business in.  I'm just
13  not familiar with their business.
14  Q.  Do you know whether Assurant Group has a
15  wind-only policy?
16  A.  I don't know for sure that they underwrite one,
17  no.
18  Q.  Do you know whether Zurich does?
19  A.  I don't know if they underwrite one, either.
20  Q.  You're positive Balboa does not?
21  A.  Yes.
22  Q.  If you could take a look at Exhibit 27.  Are
23  you familiar with this agreement?
24  A.  No.
25  Q.  Can you tell me what the business of Balboa,

## Page 120

1   LLC is?
2   A.  No.  I don't know.
3   Q.  Are you familiar with any of the other
4   companies listed on the first page of Exhibit 27?
5   A.  Yes.
6   Q.  And your -- in the business of Balboa Insurance
7   Company, which of these companies would you deal with?
8       MR. HELLER:  Object to the form.
9   A.  Ameriplan Insurance Company.  Newport Insurance
10  Company.  Those are the only other two that I actually
11  deal with.
12  Q.  There's a reference down towards the bottom of
13  that paragraph, on the first page of Exhibit 27 it says
14  Newport Management Corporation.  Do you see that?
15  A.  I see Newport Management.  I mean, I don't see
16  Newport Management Corporation.
17  Q.  It's actually right in front of -- do you see
18  Newport Management?
19  A.  I'm sorry, I missed it, yes.  We do deal with
20  them.
21  Q.  What about Countrywide Insurance Services,
22  Inc.?
23  A.  No.
24  Q.  Countrywide Insurance Services, Inc. of
25  Arizona?

## Page 121

1   A.  No.
2   Q.  Countrywide Insurance Services of Texas.
3   A.  No.
4   Q.  Those companies do appear as the agent in
5   connection with the issuance of Balboa policies?
6       MR. HELLER:  Object to the form.
7   A.  They are on the policy, but I don't do, I don't
8   deal with them.
9   Q.  When Balboa issues a lender-placed policy to
10  Countrywide Home Loans, you referred earlier to Balboa's
11  underwriting of that policy; is that correct?
12  A.  I don't recall referring to the underwriting of
13  the policy.
14  Q.  Okay.  What, what did you mean by underwriting,
15  then, in the context of the issuance of a lender-placed
16  policy?
17      MR. HELLER:  Object to the form.
18  A.  Looking at the distribution of risk for that
19  particular named insured.
20  Q.  Can you, can you explain to me -- well, does
21  that, does that occur in connection with the issuance of
22  every lender-placed policy to CHL?
23      MR. HELLER:  Object to the form.
24  A.  I mean I, you know, CHL, as far as underwriting
25  the, as far as underwriting the portfolio, it really

31  (Pages 118 to 121)

Page 122

1  wasn't done, simply because they're an affiliate. And
2  you know, Balboa was going to be providing the
3  lender-placed coverage.
4      Q.   Okay. So you're saying that Balboa, if it was
5  determining whether to provide lender-placed coverage for
6  a lender other than Countrywide, would have underwritten
7  the portfolio, meaning looked at the distribution of risk
8  in the portfolio?
9      A.   When we have an opportunity with the lender, we
10 are going to look at the overall portfolio in the
11 distribution of risk. With a commercial policy like
12 lender placed, you either underwrite the whole risk or
13 you don't underwrite any of it.
14     Q.   So you either work with the lender or you
15 don't, is that what you're saying?
16     A.   Yes.
17     Q.   But that was something you didn't have to do
18 with CHL because based on the fact that you were an
19 affiliate, you knew you were going to be providing that
20 insurance.
21         MR. HELLER: Object to the form.
22     A.   Essentially, you know, being an affiliate, we
23 issued a lender-placed policy to Countrywide.
24     Q.   When, when Countrywide requests a policy, like
25 it did for Ms. Drury, where the effective date of the

Page 123

1  policy precedes the date on which you receive the request
2  for the lender-placed insurance, does Balboa do anything
3  to determine whether there has been a loss prior to
4  issuing the lender-placed policy?
5      A.   Well, I had mentioned before when a loan is, is
6  reported to getting in the letter cycle out of CCS, you
7  know, it's an automated function. And if it gets to the
8  point where Countrywide is going to purchase the
9  insurance, that's -- that happens.
10     Q.   Okay. So the request is automated from
11 Countrywide to Balboa.
12     A.   Request for?
13     Q.   For lender-placed insurance.
14     A.   Countrywide is actually requesting that a loan
15 be put into letter cycle.
16     Q.   And that at the end of the letter cycle, if you
17 don't have information from Countrywide that everything
18 is a-okay, then the lender-placed policy is issued,
19 correct?
20     A.   Yes.
21     Q.   So my question is, is prior to issuing that
22 lender-placed policy some time during the letter cycle,
23 does Balboa do anything to determine whether or not there
24 has been a loss which they're going to be covering under
25 that lender-placed policy?

Page 124

1      A.   No.
2      Q.   They don't perform an inspection of the
3  property?
4      A.   Well, in the lender placed business, you don't
5  do inspections of property. I mean, again, you're
6  insuring the total portfolio or you're not insuring any
7  of it. It's a commercial policy and you issue
8  certificates against it.
9      Q.   And that would include certificates for
10 residential properties in Florida.
11     A.   Yes.
12     Q.   Does Balboa ever, at any point during the
13 letter cycle, have contact with the borrower?
14     A.   I don't know if they do or not.
15     Q.   Do you have a customer service group inside
16 Balboa Insurance Company that deals with borrowers on
17 insurance-related matters?
18     A.   Countrywide has its own customer care group
19 that handles all the matters.
20     Q.   Does Balboa participate in any of the insurance
21 tracking activities for Countrywide?
22     A.   No. That's Newport Management Corporation.
23     Q.   Is there any separate compensation to Balboa
24 coming from Countrywide other than the premium for the
25 insurance policy?

Page 125

1          MR. HELLER: Object to the form.
2      A.   Countrywide just pays us the premium.
3      Q.   They don't pay you any kind of additional
4  moneys for producing the letters in the letter cycle?
5          MR. HELLER: Object to the form.
6      A.   Well, I do believe they pay a tracking fee.
7      Q.   What is that?
8      A.   It's a fee for the, the different duties that
9  Newport Management is doing on their behalf.
10     Q.   And how would that result in a payment to
11 Balboa?
12     A.   It doesn't come to Balboa. A tracking fee is
13 paid to Newport Management Corporation.
14     Q.   Are you indicating, then, that Balboa, in some
15 way, is involved in that tracking process?
16     A.   No. Balboa's not involved in the tracking
17 process. Newport Management is.
18     Q.   Right. So from the standpoint of the letters
19 issued by the CCS system through Balboa, that would
20 not -- are you saying that that may or may not be covered
21 under the tracking fee?
22     A.   I mean, ask that again.
23     Q.   Sure. I'm trying to, trying to understand what
24 connection you're making between the tracking fee that's
25 paid to Newport Management and your issue, and Balboa's

Electronically signed by Rita Meyer (101-199-755-0709)                    dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 126

1   issuance of the letters in the letters cycle.
2       A.  Letters in the letters cycle is not a component
3   of that tracking fee.
4       Q.  So Balboa doesn't receive anything, to your
5   knowledge, from Countrywide for issuing the letters in
6   the letter cycle?
7       A.  No we just get paid the premium when they
8   purchase insurance.
9           MR. HELLER:  While you're looking for that
10          exhibit, take a bathroom break.
11          THE VIDEOGRAPHER:  We're off the Record at
12          3:10.
13          (Proceedings recessed at 3:10 p.m.)
14          (Proceedings resumed at 3:22 p.m.)
15          THE VIDEOGRAPHER:  Back on the Record at 3:22.
16  BY MS. BOWMAN:
17      Q.  Mr. Meadows, would the CCS system that is
18  Balboa's system, have a record of all Florida
19  lender-placed policies issued by Balboa to Countrywide
20  from 2003 to the present?
21      A.  Yes.
22      Q.  Would the information that was available in
23  CCS, be the same as the information available in
24  connection with Ms. Drury's loan?  I mean lender-placed
25  policy?

Page 127

1           MR. HELLER:  Object to the form.
2       A.  Well, when you ask the same as Ms. Drury, can
3   you be more specific?
4       Q.  Sure.  We've been looking at Exhibit 37, which
5   is the transaction history on Ms. Drury's policy.  Would
6   this same type information in the CCS system
7   on all Florida lender-placed policies since 2003?
8           MR. HELLER:  Object to the form.
9       A.  Well, all the loans submitted by Countrywide on
10  the file to CCS should have similar information.
11      Q.  Can you take a look at Exhibit 26 in the stack
12  in front of you?  Are you familiar with these policies?
13      A.  No.
14      Q.  To your knowledge, do any of them apply to your
15  group at Balboa?
16      A.  These, these don't have anything to do with my
17  group at Balboa.
18      Q.  Do you all have a quality control group within
19  Balboa Insurance Company that would engage in any kind of
20  auditing or monitoring of your group?
21      A.  Can you repeat it, just one more time, just so
22  I really understand what you're asking?
23      Q.  Sure.  Is there a group inside Balboa Insurance
24  Company that would engage in any kind of quality control
25  efforts or auditing of your group?

Page 128

1       A.  Well, Balboa does have an internal audit group.
2       Q.  And do they routinely perform audits of the
3   work being done by your group?
4       A.  I wouldn't say they routinely conduct audits on
5   my group.  From time to time they do.
6       Q.  Can you tell me what kinds of audits they do
7   perform on your group?
8       A.  It would be more surrounding the input of rates
9   into the system.
10      Q.  You mean into the CCS system that calculates
11  the request, when you get a request for a lender-placed
12  policy?
13      A.  The lender-placed rates for, for the lender, a
14  lender-placed product and its more of a quality check
15  just to see that it's an accurate rate.
16      Q.  That it's calculating the rates appropriately
17  as filed with the --
18      A.  Yes.
19      Q.  -- regulatory agencies?
20      A.  Yes.
21      Q.  Any other kinds of audits?
22      A.  No.  That's the main one.
23      Q.  Does your group or anybody in Balboa Insurance
24  Company, evaluate or engage in any quality control
25  efforts to determine the number of lender-placed policies

Page 129

1   that are being flat canceled by Countrywide?
2           MR. HELLER:  Object to the form.
3       A.  Well, nobody in my group actually does any kind
4   of quality checking as to why they're being flat
5   canceled.
6       Q.  Just so we can make sure we're on the same
7   page, what do you mean by your use of the term flat
8   canceled?
9       A.  That once a policy is purchased or coverage is
10  purchased by Countrywide, that subsequently, Countrywide
11  gets evidence of insurance that would show that there was
12  never any lapse in coverage.
13      Q.  And does a flat cancellation of a lender-placed
14  policy result in the full refund of a premium?
15      A.  If they're shown to be no lapse in coverage,
16  that it's continuous, then there would be a full refund
17  of the premium.
18      Q.  So in the context of the different kinds of
19  cancellations of policies that, that Balboa might do,
20  would you equate a flat cancellation with the refund of
21  an entire premium?
22      A.  Again, when a premium's been paid and then
23  there's evidence to show there's never been any lapse,
24  then that premium that was paid is refunded back.
25      Q.  Is that called flat, flat canceled?

33  (Pages 126 to 129)

1     A.  That is known to be terminology used, yes.

2     Q.  So Balboa never looks at the number of flat

3 cancellations and makes any inquiries to Countrywide?

4     MR. HELLER:  Object to the form.

5     A.  Never looks at flat cancels and what?

6     Q.  And makes any inquiry to Countrywide about the

7 number of flat cancels.

8     MR. HELLER:  Object to form.

9     A.  Well, we do look at flat cancellations and

10 we'll report, report that to Countrywide.

11     Q.  Is that just on a number basis?

12     A.  By number --

13     Q.  The number of flat cancels?

14     A.  Yes.

15     Q.  And how often do you provide that report?

16     A.  Twice a year.

17     Q.  Do you ever get any feedback from Countrywide

18 concerning their investigation of the bases for the flat

19 cancellations?

20     MR. HELLER:  Object to the form.

21     A.  I have not gotten any feedback from

22 Countrywide.

23     Q.  Are there any other reports other than flat

24 cancels that Balboa provides to Countrywide on a routine

25 basis?

1     A.  Twice a year we'll, we'll certainly review with

2 them the, the premium production, review losses, same

3 time as when we do flat cancels.

4     Q.  What's the purpose of that?

5     A.  Well, Countrywide being the named insured, it's

6 feedback for them.

7     Q.  Could Countrywide, as the insured under the

8 lender-placed policies, do they engage in any negotiation

9 of the rates set by Balboa?

10     MR. HELLER:  Object to the form.

11     A.  Not to my knowledge.

12     Q.  Has Countrywide ever sought asked Balboa to pro

13 rate certain policies or -- I'm sorry. Has Countrywide

14 ever asked Balboa to pro rate a policy because they were

15 placing it in circumstances where the, there was

16 insurance in place for some perils, but not for all

17 required perils?

18     MR. HELLER:  Object to the form.

19     A.  Can you please break that down a little bit for

20 me?

21     Q.  Sure. Has Countrywide ever asked Balboa to pro

22 rate a policy in Florida?

23     A.  When you mean pro rate, I'm not clear on that.

24     Q.  Okay. To apply a reduced premium to a policy

25 in Florida.

1     A.  Not --

2     MR. HELLER:  Same objection.

3     A.  Not to my knowledge.

4     THE VIDEOGRAPHER:  I'm sorry, tape change,

5 please. This concludes tape number four. We're off

6 the Record at 3: 35 p.m.

7     (Stood at Ease)

8     THE VIDEOGRAPHER:  This is tape number five

9 we're back on the Record at 3: 36 p.m.

10 BY MS. BOWMAN:

11     Q.  Mr. Meadows, we already looked at circumstances

12 where Balboa issued a lender-placed policy where the

13 effective date preceded by several months the date that

14 Countrywide first requested the lender-placed policy; is

15 that correct?

16     A.  Which, you know which one? I mean, which

17 specific example are you talking about?

18     Q.  Talking about Ms. Drury's policy.

19     A.  And so your question is?

20     Q.  We've already looked at circumstances where

21 Balboa issued a policy with an effective date that

22 preceded the date on which Countrywide requested the

23 lender-placed policy, correct?

24     A.  Yes.

25     Q.  Can you tell me how far back will Balboa issue

1 a policy? In other words, as of the date that

2 Countrywide requests the policy, is there any cut off to

3 the number of months back that Balboa will go to start

4 that policy or have an effective date?

5     A.  Well, it's standard within the lender-placed

6 industry that coverages, when purchased, are

7 retrospective in nature. Just by, just as a result of

8 the letter cycle that has to be gone through, due to the

9 result of when the lender gets information that they

10 didn't have before, that could be months after, after the

11 actual lapse date of the existing policy in force. So

12 the -- it's standard that it's going to be retrospective

13 in nature. As to how far back, it will go back to

14 whenever Countrywide had an insurable interest in it. It

15 can't go back any further than that. Or it could go back

16 no further than the effective date of the master policy

17 that was issued. Underneath that, underneath that

18 policy.

19     Q.  So how do you determine the effective date of

20 the master policy that would be issued?

21     A.  Well, the master policy we looked at here, had

22 an effective date on it.

23     Q.  Sure. But what I'm saying is, is it, you issue

24 the master policy that's currently effective? Is that --

25 Balboa issues the master policy that's currently in

Electronically signed by Rita Meyer (101-199-755-0709)         dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 134

1  effect; is that correct?
2       MR. HELLER: Object to the form.
3       A.  I'm still not certain what you're trying to ask
4  in the question.
5       Q.  You said the master policy had an effective
6  date of May 1st of 2005 --
7       A.  Yes.
8       Q.  -- correct? And you said that Balboa will
9  issue a policy that dates prior to the request for the
10  lender-placed policy that goes back to the beginning of
11  the effective period for that master policy; is that
12  right?
13       MR. HELLER: Object to the form.
14       A.  What I'm saying is that, you know, Countrywide
15  has an obligation to make certain there's continuous
16  insurance coverage.
17       Q.  Okay.
18       A.  And if, in fact, they found that back to May
19  1st of 2005, that there was no continuous insurance
20  coverage, then our policy permits to go back to 2005.
21  That policy date is in our system and is part of the
22  quality check to make certain that we don't go back
23  beyond that date.
24       Q.  Okay. I guess that's what I'm trying to figure
25  out is, does that mean that the, the master policy that

Page 135

1  became effective May 1st, 2005, is that the policy in
2  place that, that's at the time of the request?
3       MR. HELLER: Object to the form.
4       Q.  How do you know which master policy to look at
5  for that effective date?
6       MR. HELLER: Same objection.
7       A.  Well, again, that's within the system. Based,
8  based on when that master policy was issued.
9       Q.  Okay. So but the master policy is not issued
10  every year?
11       A.  Well, I believe the master policy that we
12  looked at is, is until canceled.
13       Q.  Okay. So the reason that that effective date
14  was, is, may be used in connection with the lender-placed
15  policy, is because that's the master policy that is
16  providing the coverage at the time of the request for the
17  lender-placed insurance and it has not been canceled?
18       A.  No.
19       Q.  Maybe this will clarify. Take a look at the
20  Countrywide Home Loans lender operations manual. Take a
21  look at the page marked Bates page 113. In the middle of
22  that page, do you see the reference to coverage term?
23       A.  Yes.
24       Q.  It says the maximum coverage term for each
25  eligible mortgage is 12 months; is that correct?

Page 136

1       A.  When coverage is purchased, it is for a
2  12-month period.
3       Q.  Okay.
4       A.  If it's retrospective, and there's more than 12
5  months that you're going to be, then you're going to be
6  buying, you know, different coverages for, for additional
7  12-month terms. Let me give you an illustration.
8       Q.  Okay. Great.
9       A.  If Countrywide had a loan that showed no
10  continuous coverage that had a, had showed that the
11  continuous coverage stopped or ceased before 5-1 of
12  2005 --
13       Q.  Mm-hmm.
14       A.  -- Countrywide would retrospectively purchase
15  protection back to 5-1 of 2005. That's as far back as
16  they can go because that's the effective date that that
17  policy, master policy was issued.
18       Now, it will be then in 12-month terms.
19  Starting on 5-1 of 2005, it would be in 12-month terms.
20  There would be multiple 12-month terms.
21       Q.  Okay. Now, my question is, is that 5-1-05
22  date, that's based on the issuance of the, the effective
23  date of the master policy?
24       A.  That's the effective date of the master policy.
25       Q.  And so if that master policy was still in place

Page 137

1  in 2008, same master policy had not been canceled by
2  Balboa, could Countrywide go back and lender, and place
3  lender-placed policies retroactively still through
4  5-1-05?
5       MR. HELLER: Object to the form.
6       A.  You know, as I stated earlier on the
7  retrospective basis, lenders have an obligation to make
8  certain there's continuous insurance for their investors
9  as well. And yes, they could, if there was a lapse, they
10  could go back to 5-1 of 2005.
11       Q.  Okay.
12       A.  Retrospectively back to that date.
13       Q.  And what determines how far they can go back
14  is whatever master policy is in effect when the request
15  for lender-placed policy is made --
16       MR. HELLER: Object to the form.
17       Q.  -- is that right?
18       MR. HELLER: Object to the form.
19       A.  The, the master policy only reflects under that
20  policy, how far back they can go. Based on the effective
21  date of the policy.
22       Q.  Right. But I'm saying, how do you determine
23  which master policy you're referring to? In other words,
24  what -- they can't rely on a canceled master policy,
25  correct?

35 (Pages 134 to 137)

1    MR. HELLER: Object to the form.
2    A.   Well, if a master policy was, was canceled, you
3  know, they would not be able to go back, you know, after
4  that cancel date. They would not be able to place
5  anything after that cancel date.
6    Q.   Right. That ran back to the effective date of
7  that canceled policy?
8    A.   Not back to the effective date of the canceled
9  policy. They can only go back to the date the policy was
10  canceled. They can't place it after that date. So if I
11  issue a policy today, as an example, that has a, you
12  know, January 1st, 2007 effective date, and I cancel that
13  same policy January 1st, 2008, I can't place anything
14  underneath that policy after January 1st, 2008. But I
15  can still place, because it's only on a prospective basis
16  that that policy is canceled. I can still, if I had to
17  place underneath that policy during that policy term,
18  when it was in effect. The cancellation is only on a
19  prospective basis. You don't, you don't back date the
20  cancellation to the effective date.
21    Q.   Okay. So a master policy has an effective date
22  and it has a cancellation date; is that correct?
23    A.   If a, if a -- every policy, if it's canceled,
24  will have a cancellation date.
25    Q.   Okay. So during that period of time, the

1  policy is considered effective, correct?
2    A.   Until canceled, it is considered effective,
3  yes.
4    Q.   And so until canceled, then Countrywide can --
5  here. Let me try to provide an illustration because I
6  think we're just talking past each other.
7    For instance, if there was a master policy that
8  was in place with an effective date of January of 2004
9  and it was canceled January of 2005. Countrywide
10  determines they need to place a lender-placed policy.
11  There's never been any, any adequate insurance in place
12  on this loan all the way back to January of 2004. But
13  they don't decide that until February of 2005. They
14  cannot go back in February of 2005, and lender place a
15  policy under the '04 to '05 master policy; is that
16  correct?
17    MR. HELLER: Object to the form.
18    A.   No.
19    Q.   No?
20    A.   That's not correct.
21    Q.   Okay. So in February of 2005, they can go back
22  and lender place a policy in connection with the
23  borrower's property that runs from January, 2004, to
24  January, 2005?
25    MR. HELLER: Object to the form.

1    A.   If there was a lapse in insurance and there was
2  not continuous insurance, then, yes, they could do that.
3    Q.   So after --
4    A.   And retrospectively purchase the insurance.
5    Q.   That's even after the cancel date?
6    MR. HELLER: Object to the form.
7    A.   Cancel date of?
8    Q.   January of '05.
9    A.   It would then --
10    MR. HELLER: Same objection.
11    A.   It would then be a different policy that they
12  would be purchasing the coverage under.
13    Q.   So they would end up having to -- if they found
14  out in February of '05, that there had never been
15  adequate insurance on this property since January of '04,
16  but the January '04 policy, master policy had been
17  canceled in January '05, then they would have to go back
18  and purchase two lender-placed policies?
19    MR. HELLER: Object to the form.
20    A.   They would go back and purchase coverage under
21  two different master policies, yes.
22    Q.   And would -- that would result in two premiums
23  being charged to the borrower?
24    MR. HELLER: Object to the form.
25    A.   If the coverage period is more than 12 months,

1  then there would be additional premiums, yes.
2    Q.   But it only happens if the coverage period is
3  more than 12 months?
4    A.   If the coverage period is just for 12 months,
5  they would only be charged the 12-months premium.
6    Q.   It would still be two policies under the
7  different master policies?
8    A.   If that 12-month period crossed over the two
9  different policies, yes.
10    Q.   Okay. All right. That's what I was trying to
11  figure out.
12    Other than the information that's included in
13  Exhibit 37, would Balboa have any information regarding
14  Ms. Drury's lender-placed policy?
15    MR. HELLER: Object to the form.
16    A.   This is the only information that Balboa would
17  have on, on her policy.
18    Q.   Is there any kind of a separate system that
19  this information would, in whole or in part, be
20  transferred to?
21    A.   Well, yes. There's the Countrywide system.
22    Q.   As far as the feedback to Countrywide?
23    A.   Yes. And the Countrywide system is the system
24  of record when it comes to insurance.
25    Q.   And is there any other Balboa system that that

Electronically signed by Rita Meyer (101-199-755-0709)                    dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 142

1    information would be transferred to in whole or in part?
2        A.   No.
3        Q.   To your knowledge, is the — are the letters
4    sent by Balboa through the CCS system, different for
5    impound versus non-impound accounts?
6        A.   I don't know if the letters sent by CCS are
7    different or not for those two.
8        Q.   I have to ask Mr. MacKenzie?
9        A.   Actually, that's one you're going to ask Steve
10   Grzeskowiak.
11       Q.   Does, does anybody in Balboa ever access the AS
12   400 Countrywide system?
13           MR. HELLER:  Object to form.
14       A.   Not to my knowledge.
15           MS. BOWMAN:  Let's go off the Record for just a
16   minute.
17           THE VIDEOGRAPHER:  We're now off the Record at
18   3:56 p.m.
19           (Proceedings recessed at 3:56 p.m.)
20           (Proceedings resumed at 4:14 p.m.)
21           THE VIDEOGRAPHER:  Now back on the Record at
22   4:14 p.m.
23   BY MS. BOWMAN:
24       Q.   Mr. Meadows, earlier today, we talked about the
25   fact that in some time the end of 2007, if Countrywide

Page 143

1    were to determine that a borrower's homeowners's policy
2    excluded wind coverage, that they, at that point, could
3    request, would request through Balboa, a wind-only policy
4    placement; is that correct?
5        A.   No.  Actually, I stated that Balboa does not
6    underwrite the wind-only risk.
7        Q.   Right.  But the request would still come to
8    Balboa from Countrywide?
9        A.   Well, actually, the request would actually go
10   through NMC, who's the tracker.
11       Q.   Okay.  And would that request for the lender
12   only, I mean for the wind-only policy, get picked up by
13   Balboa's system and then be requested by Balboa?
14       A.   Well, it would get picked up by the, by the
15   CCS, potentially by the CCS system, but the reporting of
16   any coverages that are purchased has to go to Lexington.
17       Q.   So does Balboa purchase those policies on
18   behalf of CHL from Lexington?
19       A.   No, we don't purchase them.
20       Q.   So what would the purpose of that information
21   going into the CCS system be?
22       A.   To be able to develop the reports to send over
23   to Lexington so they, they had their information in terms
24   of premium, and, and what kind of risk they were taking.
25       Q.   So Balboa's CCS system captures the information

Page 144

1    related to the request for the wind policy and then
2    transmits that to Lexington.
3        A.   Yes.
4        Q.   Okay.  Now, if Countrywide determined for a
5    particular borrower that there was no hazard coverage in
6    place, then in that time frame, after, towards the end of
7    2007 to the present, would they then place, simply place
8    a fire policy through Balboa?
9        A.   If Countrywide determined after that time frame
10   that the homeowner, the borrower did not have any
11   preferred coverage and they had to buy insurance, yes,
12   that would still be purchased through Balboa and the
13   Balboa policy still does have wind storm coverage.
14       Q.   Would Balboa still place a, a lender-placed
15   fire policy for Countrywide in the circumstances where
16   the only coverage missing was wind?
17       A.   What's the --
18           MR. HELLER:  Object to the form.
19       A.   What's the point in time reference?
20       Q.   After the, the end of December, towards the end
21   of December, 2007, when Countrywide began purchasing
22   wind-only policies.
23           MR. HELLER:  Object to the form.
24       A.   Well, if Countrywide determined that the
25   borrower that had a preferred policy that excluded wind

Page 145

1    coverage, they would only purchase the lender-placed wind
2    storm.
3        Q.   Through Lexington?
4        A.   Through Lexington, yes.
5        Q.   They wouldn't have the option of purchasing the
6    Countrywide or the Balboa full coverage policy?
7            MR. HELLER:  Object to the form.
8        A.   They choose not to.
9        Q.   Does Balboa have a, have any position
10   concerning whether they would provide coverage under the
11   Balboa fire policy in those circumstances?
12           MR. HELLER:  Object to the form.
13       A.   That's really a Countrywide decision.
14       Q.   About whether they lender place a full-coverage
15   policy or a wind-only policy?
16           MR. HELLER:  Object to the form.
17       A.   Yes.
18       Q.   Balboa would be obligated under its master
19   policy, to issue a full-coverage policy to Countrywide if
20   that is, in fact, what it selected, correct?
21           MR. HELLER:  Object to the form.
22       A.   If Countrywide made a decision that they still
23   wanted to buy a Balboa policy, we would issue the policy.
24       Q.   I'm going to hand you what I've marked as
25   Exhibit 38.

37 (Pages 142 to 145)

1        (Received and so Marked)
2    Q.   And can you tell me what this is?
3    A.   It's an affidavit signed by me.
4    Q.   Did you prepare the affidavit?
5        MR. HELLER: Object to the form.
6    A.   The attorneys prepared it.
7    Q.   In connection with the making of the affidavit,
8    it indicates in paragraph one, sentence two, that you
9    make the affidavit upon personal knowledge and/or a
10   review of the business records available to me at Balboa,
11   Countrywide Insurance Services, Inc., and Countrywide
12   Home Loans, Inc.; is that correct?  That's what it says?
13       MR. HELLER: Object to the form.
14   A.   I agree that's what it says.
15   Q.   In connection with providing the information
16   that is set forth in the affidavit which is Exhibit 38,
17   did you review any records of Countrywide Insurance
18   Services?
19   A.   No.
20   Q.   Did you review any records of Countrywide Home
21   Loans?
22   A.   No.
23   Q.   Did you review any records of Balboa Insurance
24   Company?
25   A.   Yes.

1    Q.   Paragraph four, you indicate I have reviewed
2    the complaint in this action.  Do you see that?
3    A.   Yes.
4    Q.   Does that refresh your recollection that you
5    actually reviewed the complaint in this case?
6        MR. HELLER: Object to the form.
7    A.   The attorneys did talk to me about the
8    complaint.
9    Q.   But you didn't review it in the sense that you
10   read it?
11   A.   I may have read the complaint, yes.
12   Q.   In connection with the information that's
13   provided in paragraph five of your affidavit, when you
14   say that the, your review of Balboa's business records
15   revealed that during the time frame from January 1st,
16   2003, to December 31st, 2007, there were 100,000 hazard
17   insurance policies lender placed in Florida, is that,
18   does that include all lender-placed policies in Florida?
19   A.   Yes.  For the period shown, that would've
20   included all lender-placed policies.
21   Q.   Would it have included the lender-placed
22   policies that were subsequently flat canceled?
23   A.   Yes.
24   Q.   Now, when you identified -- I'm sorry.  So
25   there would be, out of those 100,000 lender-placed

1    policies in Florida, some that would've been flat
2    canceled for which no premium was retained by Balboa; is
3    that correct?
4    A.   Again, if the premium was paid and there was no
5    lapse in coverage, then the full premium would've been
6    refunded and that's also known as a flat cancellation.
7    Q.   Would your expectation be that between January
8    1st, 2003, and December 31st, 2007, there were some
9    policies that were flat canceled?
10   A.   Yes.  I would expect policies to be flat
11   canceled.
12   Q.   Now, in connection with your calculation of the
13   100,000 hazard insurance policies, did you undertake to
14   determine how many of those lender-placed policies were
15   put, were placed during time periods where the homeowner
16   also had some hazard coverage in place?
17   A.   When I looked at our records, I only looked at
18   the policies that were actually, the coverage that was
19   purchased by Countrywide during that period.
20   Q.   So you did not make any attempt to determine if
21   any of those lender-placed policies were purchased in
22   circumstances where the borrower had a preferred hazard
23   policy in place of any type?
24       MR. HELLER: Object to the form.
25   A.   At the time I looked at these business records,

1    I didn't, I didn't look at that, no.
2    Q.   So that number does not reflect the number of
3    lender-placed policies issued where the borrower already
4    had a preferred hazard policy in place.
5        MR. HELLER: Object to the form.
6    A.   No, it does, it does include it.  Because I
7    showed the total policies issued for that, for that time
8    period.
9    Q.   But it's not limited to that.
10       MR. HELLER: Object to the form.
11   A.   Well, the total policies issued for that time
12   period would be all those that went for a full 12 months.
13   It would be those that reflect canceled, it would be
14   those that were partial canceled.
15   Q.   Okay.  And that number, the 100,000 number, so
16   it's fair to say is not limited to those circumstances in
17   which the borrower had a lender-placed policy and also
18   during that same time, had a hazard policy in place
19   through a preferred insured.
20       MR. HELLER: Object to the form.
21   A.   Well, at the time that these policies are
22   issued and purchased by Countrywide, you know, they don't
23   know at that time if -- their understanding is the
24   borrower does not have a preferred policy.
25   Q.   I'm just, I'm asking a different question which

Page 150

1  is, this number, 100,000, has absolutely no relationship
2  to a determination that there was a lender-placed policy
3  and a hazard policy carried by the homeowner in place at
4  the same time, correct?
5        MR. HELLER: Object to the form.
6        A.   The, the policy shown, the number of policies
7  shown were those policy coverages purchased by
8  Countrywide, and out of that population, there would be
9  instances where the borrower did have a preferred policy
10 with no lapse, resulting in a flat cancel.
11       Q.   Okay.  And my question is simply, the 100,000
12 number is, does not reflect those instances in which
13 there was a lender-placed policy in place at the same
14 time there was some sort of hazard policy in place by the
15 homeowner.
16       MR. HELLER: Object to the form.
17       A.   I'll repeat the same answer.  It, you know, it
18 does reflect those that may have had a preferred policy,
19 but at the time it was purchased, Countrywide didn't know
20 that.  Subsequently, they found out about a preferred
21 policy and canceled it.
22       Q.   So you're saying it includes those policies but
23 it's not limited to those.
24       MR. HELLER: Object to the form.
25       A.   There would also be purchases where there truly

Page 151

1  was a lapse.
2        Q.   So I'm saying that the, that, that that the number's
3  not limited in that way.  In other words, it might
4  include those circumstances where there was a, a
5  lender-placed policy and a hazard policy in place, but
6  it's not limited to those circumstances.
7        A.   The, the number is, is representative of those
8  that ended up having a preferred policy in place, or had
9  no preferred policy, and truly had no preferred policy in
10 place.
11       Q.   Okay.  And you didn't make any attempt to
12 distinguish between the two for the purposes providing
13 that number.
14       MR. HELLER: Object to the form.
15       A.   Not at the time, no.
16       Q.   Based -- your premium calculation there, is
17 that based on actual moneys collected and retained by
18 Balboa?  Or simply the premiums on all those 100,000
19 policies?
20       A.   That's actually based on the premiums billed by
21 Balboa to Countrywide at the time of issue.
22       Q.   So that number would not be reduced by premiums
23 refunded based on cancellations.
24       A.   As I represented, it does not show any refunds
25 that were going back.  It shows all the premiums that

Page 152

1  were collected at the time the coverage was issued.
2        Q.   Where does it say that?
3        A.   Um, as --
4        Q.   Where does it say it doesn't reflect refunds?
5        A.   Well, (B) says Balboa collected in excess of
6  $10 million in premiums from Florida borrowers for the
7  subject lender-placed hazard insurance policies.
8  Collected premiums on those issues.  It's related to the
9  issues.
10       Q.   Okay.  So it's related directly to the 100,000
11 number.
12       A.   Yes.
13       Q.   Okay.  And neither of those numbers includes
14 refunds or flat cancellations?
15       A.   No.
16       MS. BOWMAN: Okay.  Your turn.
17            CROSS EXAMINATION
18 by Mr. Heller:
19       Q.   Let's find Exhibit 37.  Here we go.
20       Mr. Meadows, Ms. Bowman, during her
21 examination, directed your attention to, several times to
22 Exhibit 37.  Place that back in front of you.
23       Referencing Exhibit Number 37, Ms. Bowman asked
24 a series of questions about whether Balboa could extract
25 the information on the first page of Exhibit 37, I'll

Page 153

1  reference the Bates number 10-00100 and the enlarged copy
2  of the bottom screen on the third page of the exhibit,
3  10-00102.
4        Ms. Bowman asked you questions about whether or
5  not Balboa could extract information on those screens and
6  run a query that would capture that data.
7        Do you recall those questions, sir?
8        A.   Yes.
9        Q.   Referring you to -- and I believe Ms. Bowman
10 did refer you to the middle page of Exhibit 37, with the
11 Bates number 10-00101.  I believe you were then asked
12 whether the extracted information, the captured
13 information from those CCS screens on the other two
14 pages, could be presented in a format similar to the
15 middle page.  Do you recall those questions?
16       A.   Yes.
17       Q.   What is the answer, sir?  Could, could, using
18 the CCS system, could Balboa simply capture information
19 from all of those fields on the first two, on the first
20 and third page of Exhibit 37, and present it in this
21 format that shows on the middle page?
22       A.   Well, the middle page, and I, you know, in my
23 response, neglected to say that all of the other
24 transactions on there wouldn't necessarily be from
25 Florida.  They would be from all states.  Okay?  So to

Electronically signed by Rita Meyer (101-199-755-0709)                                    dfd7bbc8-9a35-4442-872b-76341a77f7cb

**Page 154**

1    utilize that really wouldn't work since it had all the
2    other states on it if we're only going to be looking for
3    those in the State of Florida.
4         As a result, then going back to the CCS
5    screens, we would really have to go through each Florida
6    situation and look at each screen in order to get the
7    same information.
8         Q.   Would you describe that as a time-consuming
9    process?
10        A.   Yes.
11        Q.   How so?
12        A.   It's a manual process.  In order to go through
13   each screen and then pick up, you know, those that are
14   Florida and then pull the information off.
15        Q.   Try to find Exhibit Number 11 and 12 next.
16   Sorry for reaching in front of you.  It may be Ten.
17   Let's keep that, let's keep Number Ten in front of you.
18   Let me try to find --
19        A.   Here's 11.
20        Q.   Keep --
21        A.   Here's 12.
22        Q.   All right.  Let me see.  We do want 11 and we
23   do want 12.  Let's look at 11 and 12.
24        I believe you testified that 11 and 12 are
25   letter forms, correct, sir?

**Page 155**

1        A.   Yes.
2        Q.   And what is Ten?
3        A.   Ten is also a letter template.
4        Q.   Let me take a look at Ten.  Sorry again to
5    reach in front of you.
6         Mr. Meadows, do you know if Exhibits 10, 11 or
7    12 are created by Balboa or by Countrywide Home Loans or
8    by Newport Management Corporation?  Do you know which?
9        A.   Not really.  I'm not sure which, which company
10   creates them.
11        Q.   Do you know which of the three companies sends
12   forms like that to customers?
13        A.   Yes.  Actually, it's Newport Management that
14   sends the forms.
15        Q.   Who would the -- who would be the authority on
16   the forms within Exhibits 10, 11 and 12, with respect to
17   those forms being sent to customers?
18        MS. BOWMAN:  Objection, leading.
19        A.   Steve Grzeskowiak.
20        Q.   Who do you believe would be the authority on
21   those forms generally?
22        A.   Steve.
23        Q.   Today, Ms. Bowman asked you about insuring for
24   an entire policy period.  I know she asked you a number
25   of questions about that.  A few of her questions related

**Page 156**

1    to whether or not Balboa conducts an inspection to
2    determine whether or not there's been property damage
3    before issuing a certificate from the master policy.  Do
4    you recall that?
5        A.   Yes.
6        Q.   Can you explain why property-specific
7    inspections are not done?
8        A.   Well, in the lender-placed industry, you know,
9    I mentioned before that the lender-placed underwriter,
10   and this is a common practice within the industry as a
11   whole, issues a, issues a policy naming the lenders and
12   the insured, they have to protect the whole portfolio for
13   both the lenders, the servicer and for the investor.  And
14   the -- they can purchase insurance underneath that
15   regardless of, you know, what kind of condition the
16   property is in.  They have to protect that, that property
17   at all times for the lender to make certain that if the
18   preferred policy is, has lapsed or didn't continue, that
19   then there's coverage for the lender.
20        The, the fact that you also, in lender placed,
21   have many of the purchases that are made that do end up
22   getting canceled, the, the prospect of attempting to go
23   out and inspect every, every property just isn't
24   practical.
25        Q.   If a forced placed insurance policy is issued

**Page 157**

1    on a particular property in February of calendar year
2    2006, let's say April in 2006, and the policy is
3    effective back to May of '05, is the investor protected
4    for a loss that occurs within that period, let's say, in
5    December, '05?
6        A.   Yes.  I mean, the investor and the lender are
7    protected underneath the master policy that was issued
8    during that time period.  Regardless of how, how far
9    retrospectively you might place the insurance, if the
10   loss, if you find out about a loss that has occurred
11   after that occurs, you're still going to protect that
12   investor and lender.
13        Q.   Try to find another exhibit.  Referring you,
14   Mr. Meadows, to Exhibit 22.  Is that the master Balboa
15   insurance policy from which a certificate for
16   forced-place insurance was issued for the Drury loan?
17        A.   Yes.
18        Q.   Is it correct that that master policy and the
19   forced-placed policy that, that was issued from it,
20   provided fire and wind/hurricane coverage?
21        A.   Yes.
22        Q.   Do you know whether the premium for a wind-only
23   policy would have been higher, meaning more money, or
24   lower, meaning less money, than the combined fire,
25   wind/hurricane policy that was forced placed?

Electronically signed by Rita Meyer (101-199-755-0709)                                    dfd7bbc8-9a35-4442-872b-76341a77f7cb

## Page 158

1    MS. BOWMAN: Object to form.
2    A.   Well, a lender-placed wind storm policy would
3    be more expensive.  And the reason is, is that the, the
4    risk that's being taken in underwriting, just that wind
5    storm peril, is all concentrated in a very high risk area
6    of the state.  So you have a very high risk of
7    catastrophic losses that could occur from a high, from a
8    wind storm, particularly a hurricane.  And that then
9    causes the catastrophic reinsurance to be purchased by
10   that, by that carrier to be much, much higher than what
11   it would normally be.  You're not able to spread that
12   risk for that wind peril over a larger area
13   geographically.  It's concentrated in that, in that area
14   where the risk is the highest.  And that's why I know
15   that the lender-placed wind would be higher.
16   Q.   When you say the lender-placed wind, you're
17   referring to the separate wind-only policy?
18   A.   The separate wind-only policy that's
19   underwritten by Lexington.
20   Q.   And is that true for separate wind-only
21   policies generally that are more expensive?
22   MS. BOWMAN: Object to form.
23   A.   Well, yes.  Yes, it is.  Because there, the,
24   other than the state pools that may have been created by
25   a state that can offer wind-only coverage, there is no

## Page 159

1    other preferred carrier that I'm aware of out there that
2    actually underwrites it.
3    Q.   With respect to wind -- excuse me.  With
4    respect to wind-only forced-placed insurance, is that, is
5    that generally more expensive than the combined
6    fire/wind?
7    A.   Generally speaking, yes, it is.
8    Q.   Are you familiar with the term extended
9    coverage as its used within the insurance business?
10   A.   Yes.
11   Q.   Does that include wind storm/hurricane
12   insurance?
13   MS. BOWMAN: Object to form, leading.
14   A.   Yes.
15   Q.   When you were referring to, throughout your
16   testimony, the CCS system used by Balboa, is that a
17   system that operates alone or one that interfaces with
18   other systems?
19   A.   Well, CCS does interface with the Countrywide
20   system.
21   Q.   Ms. Bowman asked you a number of questions
22   relating to CCS and whether or not Balboa had information
23   about the type of coverage a particular borrower might
24   have.
25   Do you recall sitting here now, whether your

## Page 160

1    responses were focused on the information within CCS
2    alone, or whether you were accounting for the information
3    that would be in the Countrywide systems?
4    A.   Well, when I think of the responses, I mean I
5    was focused on CCS and what information is in that.  But
6    the Countrywide system has, is the system of record for
7    insurance and has all the information there.
8    MR. HELLER: No other questions.  Thank you.
9    THE VIDEOGRAPHER: We need a tape change.  This
10   concludes tape number five.  Off the Record at 4:48.
11   (Stood at Ease)
12   THE VIDEOGRAPHER: Back on the Record at 4:49.
13   REDIRECT EXAMINATION
14   by Ms. Bowman:
15   Q.   Mr. Meadows, Mr. Heller just asked you some
16   questions about the Balboa CCS system versus the
17   Countrywide system.  Do you understand the Countrywide
18   system to be the AS 400 system?
19   A.   The Countrywide servicing platform is an AS
20   format.
21   Q.   And you testified previously, did you not, that
22   using that, Balboa do not have access to that AS 400
23   system; is that correct?
24   A.   Individuals from Balboa, to my knowledge, don't
25   have access to it.

## Page 161

1    Q.   When you were actually issuing a lender-placed
2    policy to Countrywide, what the information you're
3    relying on is the information in the CCS system; is that
4    correct?
5    A.   Balboa relies on that information, yes.
6    Q.   You're not -- Balboa doesn't look at the
7    information in the AS 400 when it issues a lender-placed
8    policy; is that correct?
9    A.   When I'm looking at lender-placed business for
10   Countrywide, I'll access the CCS, yes.
11   Q.   Not the AS 400?
12   A.   I don't access the AS 400.
13   Q.   So when you were limiting your, your responses
14   to me earlier today to the information in the CCS system,
15   that was because that's the information was available to
16   Balboa, correct?
17   A.   Yes.
18   Q.   In connection with your statements to Mr.
19   Heller about the meaning of the term extended coverage,
20   can you tell me, are you familiar with, with the
21   meaning of the term extended coverage under Florida law?
22   MR. HELLER: Object to the form.
23   A.   Well, to my knowledge, extended coverage is the
24   same meaning regardless of what state.
25   Q.   Have you researched the statutes in the State

Electronically signed by Rita Meyer (101-199-755-0709)          dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 162

1    of Florida to determine whether the extended coverage has
2    the same definition in Florida as it might elsewhere?
3         MR. HELLER:  Object to the form.
4    A.   No, I have not.
5    Q.   And would you -- you would be aware, based on
6    your experience in the insurance industry, that wind
7    storm coverage is routinely excluded in states such as
8    Florida from a homeowner's policy.
9    A.   I'm familiar that carriers are excluding wind
10   storm coverage.
11   Q.   And that in those circumstances, wind storm is
12   not included in the extended coverage under those
13   policies?
14        MR. HELLER:  Object to the form.
15   A.   In those, in those policies on the dec. page,
16   though, it will disclose that wind storm is, is excluded.
17   Q.   Right.  But those policies still have things
18   that are, are understood to be extended coverage; is that
19   correct?
20        MR. HELLER:  Object to the form.
21   Q.   The ones that exclude wind storm.
22        MR. HELLER:  Same objection.
23   A.   Well, if a policy is issued and it shows on the
24   dec. page that extended, that wind storm is excluded,
25   then in that instance, the extended coverage --

Page 163

1    Q.   Does not?
2    A.   -- does not, yes.  But if, but if a policy does
3    not exclude wind coverage, then extended coverage does
4    cover wind coverage.
5    Q.   Okay.  The policies that exclude wind coverage,
6    they would still be considered, they would still be
7    called homeowner's policies with extended coverage,
8    though; is that correct?
9         MR. HELLER:  Object to the form.
10   A.   They would be homeowner's policies with
11   extended coverage.
12   Q.   Mr. Heller asked you some questions relating to
13   the costs of wind storm policies.  Prior to the end of
14   December, 2007, are you aware of any lender-placed
15   insurer that was issuing wind-only policies in Florida?
16   A.   No.
17   Q.   Mr. Heller described, described to you a set of
18   circumstances where a lender-placed policy was requested
19   by Countrywide in April of 2006, the effective date for
20   which would've been May 1st, 2005.  Do you recall that
21   series of questions?
22   A.   Yes.
23   Q.   And he asked you about a loss, whether it could
24   be covered that took place in December of 2005.  Do you
25   recall those questions?

Page 164

1    A.   Yes.
2    Q.   If, at the time Countrywide requested the
3    lender-placed policy in April, 2006, it knew about the
4    loss in December, 2005, would Balboa still issue the
5    policy?
6         MR. HELLER:  Object to the form.
7    A.   Yes.
8    Q.   And that's based on the fact that Balboa is
9    obligated to issue any lender-placed policy requested
10   under the master policy by Countrywide, correct?
11   A.   That's correct.
12   Q.   Are there circumstances in which Balboa could
13   deny a request for coverage?
14   A.   Yes.
15   Q.   And what would be those circumstances?
16   A.   If they had no insurable interest.  It was
17   determined they had no insurable interest in the
18   property.
19   Q.   That only happen in -- would that only be true
20   if the mortgage was paid off?
21        MR. HELLER:  Object to the form.
22   A.   That's certainly one instance, but there are
23   other situations.
24   Q.   Can you give me an example?
25   A.   Just in, you know, when they would purchase a

Page 165

1    loan from somebody else.  And maybe the purchased didn't
2    go through correctly and they really ended up not, from a
3    legal standpoint, having an insurable interest.
4    Q.   Meaning they didn't own the loan?
5    A.   Correct.
6    Q.   Would there ever be a casualty circumstance
7    that resulted in Balboa being able to, to refuse to issue
8    coverage?
9    A.   When you mention casualty, how are you viewing
10   that?
11   Q.   In other words, would there ever be a time
12   where Balboa could say to Countrywide, we're not going to
13   issue coverage in connection with that property because
14   there's no house on it, because it was blown away by the
15   hurricane?
16        MR. HELLER:  Object to the form.
17   A.   Well, I view casualty coverage as liability.
18   Q.   Okay.
19   A.   And Countrywide does not purchase liability.
20   Q.   Liability.
21   A.   Correct.
22   Q.   So in connection with Mr. Heller's example of
23   the request for a policy in April, 2006, for a
24   lender-placed policy dated May 1st, 2005, if Balboa were
25   to determine that the home on the property was completely

42  (Pages 162 to 165)

Page 166

1  destroyed in December, 2005, would it consider
2  Countrywide as having no longer having an insurable
3  interest?
4       MR. HELLER: Object to the form.
5       A. Well, no, I wouldn't consider they had an
6  insurable interest on that loan and, you know, the fact
7  that the master policy issued has an automatic coverage
8  endorsement, that's, you know, really what would be
9  invoked in order to cover that loss for them.
10      Q. The -- if you could take a look at the letters
11 again that Mr. Heller references, Exhibits 11 and 12.
12 Isn't it correct, Mr. Meadows, that those letters are
13 generated by the CCS system?
14      MR. HELLER: Object to the form.
15      A. Well, I had mentioned before that these are
16 letter templates and I'm not familiar with them and I'm
17 not certain which system actually generates them. I
18 don't know.
19      Q. The letters cycle is invoked by the CCS system;
20 is that correct?
21      A. Yes.
22      Q. Okay. So what you're saying is you don't know
23 what system prints them?
24      MR. HELLER: Object to the form.
25      A. I don't know that these are the letters that

Page 167

1  are actually used within the CCS system is what I'm
2  saying.
3       Q. Okay. So when you're talking about, we were
4  talking earlier about the letter cycle that is invoked
5  when, by the CCS system, when Countrywide requests a
6  lender-placed policy, it was accurate to say that those
7  are, that's implemented by the CCS system?
8       MR. HELLER: Object to the form. You mean
9  those letter cycles or those -- these documents?
10      Q. Those -- the, the letters in the letter cycle.
11      A. Well, letters in the letter cycle that are
12 committed to the CCS system are produced by the, by that
13 particular system. These specific documents are
14 templates which I don't know what they are.
15      Q. You don't know what those --
16      A. I don't know if they're generated by CCS. I
17 also don't know if there's another system that I have no
18 knowledge of that generates a letter, either.
19      Q. Then how can you say it was -- that they are
20 sent by Newport Management Corporation?
21      A. I'm not sure I understand your question.
22      Q. How could you say that those letters were sent
23 by Newport Management Corporation?
24      A. I don't recall I said that these letters
25 specifically were sent by Newport Management.

Page 168

1       Q. You don't know who sends those letters?
2       A. Because I don't know who sends these letters,
3  correct.
4       Q. And the, the letters sent, or the letters in
5  the letter cycle from the CCS system, that's Balboa's
6  system, correct?
7       A. You know, it's been -- I'll admit it's been a
8  little bit confusing for me and the CCS system is
9  actually a Newport Management System. It's not a Balboa
10 system. It's a Newport management system. It's Newport
11 Management is doing the tracking. They do actually send
12 the letters, which I stated.
13      Q. Okay. How, how is the CCS system a Newport
14 Management System? How do you reach that conclusion?
15      A. Well, it was my confusion from earlier, that's
16 all it was. And it's just recollection, you know, it's
17 just recall on my part.
18      Q. But CCS is the system that's used by Balboa for
19 the issuance of lender-placed policies.
20      A. Well, Newport, they have the system of CCS and
21 Balboa does utilize that system to issue it, but the
22 actual system, itself, is managed by Newport Management.
23      Q. Take a look at Exhibit 9. It's the lender
24 manual. Here it is. Take a look at Bates page 113,
25 please.

Page 169

1       Do you see the sentence "Balboa forced order
2  insurance system CCS"?
3       A. Yes.
4       Q. So the CCS system is Balboa's system.
5       A. Again, you know, I had mentioned before I'm not
6  familiar with this document and I had no part in
7  developing it. And even though I see what it says, but
8  you know, I don't agree with it.
9       Q. Who maintains the CCS system? Is that Mr.
10 MacKenzie's group?
11      A. IT does maintain the systems.
12      Q. Who would you say at Newport Management
13 Corporation uses the CCS system?
14      A. I really don't know who at Newport uses it.
15      Q. But it's their system.
16      A. That's what I said.
17      Q. Tell me earlier when you testified to the
18 number of policies issued, lender-placed policies issued
19 in Florida, you said that you obtained that information
20 from the CCS system; is that correct?
21      A. That's what I said, yes.
22      Q. And so you can obtain from the CCS system,
23 information related only to Florida lender-placed
24 policies?
25      A. As I mentioned earlier, too, is that if I

43 (Pages 166 to 169)

Page 170

1   wanted to get just Florida lender-placed policies, I have
2   to go one by one into that system.
3       Q.  So you went one by one and counted the 100,000
4   lender-placed policies in the CCS system to make your
5   affidavit?
6           MR. HELLER:  Object to the form.
7       A.  Well, that information I provided was, was
8   simplistic information that, that could just look at the
9   state and just say how many policies were issued in that
10  state.
11      Q.  Okay.  And can't you, at the same time,
12  identify -- you identified those, that number of
13  policies, correct?  You could also identify them by loan
14  number, right?
15      A.  I -- yes, I could do a query and, you know, you
16  know, on those policies, get the loan number, yes.
17      Q.  And, and by generating those loan numbers, you
18  could also generate a, by running a query, information
19  related to the lender-placed policies associated with
20  those loan numbers.
21          MR. HELLER:  Object to the form.
22      A.  Well, I could get the policy number, yes.
23      Q.  You could also get the effective date of the
24  policy.
25      A.  I mean, I've said all along I can get that

Page 171

1   information out of CCS, yes.
2       Q.  By running a query.
3       A.  I can, you know, I can run a query, yes.
4       Q.  And --
5       A.  It may take a while, depending on how deep
6   you want to go in terms of the information.
7       Q.  Sure.  And by, by running a query, the system
8   itself, is, is sorting through the information in the CCS
9   system, correct?  You say running a query.  You're
10  talking about an electronic query in the system.
11      A.  It would be, it would be a report that would
12  have to be coded in order to determine what are the data
13  elements I want and then would have to go out and
14  actually pull that information.
15      Q.  Okay.  And it could do that for all of the
16  various categories of information that we discussed, such
17  as the loan number associated with the Florida
18  lender-placed policy, correct?
19          MR. HELLER:  Object to the form.
20      A.  If you have data inside a system, you can, you
21  know, it all depends on how much time it would take to
22  develop the report that you want, how long it would take
23  to code it and actually run it.
24      Q.  Okay.  And from your understanding, it could be
25  done for all of the items of information in CCS.

Page 172

1       A.  You could develop a report for any information
2   that's in CCS.
3       Q.  And then it would be simply a matter of having
4   the electronic process run, which may take hours or days,
5   but then it would produce that report?
6           MR. HELLER:  Object to the form.
7       A.  That -- you can produce a report, yes.
8           MS. BOWMAN:  Okay.  I don't have anything else.
9                   RECROSS EXAMINATION
10  By Mr. Heller:
11      Q.  Mr. Meadows, when Ms. Bowman was following up
12  on your explanation of extended coverage, I believe she
13  asked you whether a Florida insurance policy with
14  extended coverage that excluded wind storm was still a, a
15  Florida hazard policy with extended coverage.  Do you
16  remember those questions?
17      A.  Yes.
18      Q.  Isn't the correct characterization -- is the
19  correct characterization of that policy that Ms. Bowman
20  described, a Florida hazard insurance policy with
21  extended coverage plus a wind storm exclusion?
22      A.  That's what I was trying to say is that you can
23  have a, a homeowner's policy with extended coverage but
24  it includes that specific peril, which would be wind
25  storm.

Page 173

1       Q.  Extended coverage includes wind storm and an
2   insurance company can exclude wind storm specifically
3   from the coverages?
4           MS. BOWMAN:  Object to the form.
5       A.  Carriers can choose to exclude wind storm from,
6   from the coverage.  If the carrier issues a homeowner's
7   policy and they want to include wind storm, then it would
8   be a part of the wind storm, would be part of the
9   extended coverage under that coverage.
10      Q.  When you, somebody in the industry see the word
11  extended coverage, the understanding is unless it's
12  specifically excluded somewhere, it includes wind storm?
13      A.  Yes.
14          MS. BOWMAN:  Objection, leading.
15      A.  That's correct.
16          MR. HELLER:  I have nothing further.  We will
17  read.
18          THE VIDEOGRAPHER:  That concludes tape number
19  six in the deposition.  We're off the Record at 5:11
20  p.m.
21      (Proceedings concluded at 5:11 p.m.)
22
23
24
25

Electronically signed by Rita Meyer (101-199-755-0709)                    dfd7bbc8-9a35-4442-872b-76341a77f7cb

Page 174

```
 1            CERTIFICATE OF OATH
 2   THE STATE OF FLORIDA
     COUNTY OF ORANGE:
 3
 4        I, RITA G. MEYER, RDR, CRR, CBC, the undersigned
 5   authority, certify that JOHN MEADOWS personally appeared
 6   before me and was duly sworn.
 7
 8        WITNESS my hand and official seal this 8th day of
 9   July, 2008.
10
11
12
13
14
15
             RITA G. MEYER, RDR, CRR
16
17
18
19
20
21
22
23
24
25
```

Page 176

```
 1                ERRATA SHEET
 2   DEPOSITION OF: JOHN MEADOWS - JULY 2, 2008.
     CASE STYLE:  Drury vs.  Countrywide
 3   CASE NO.:  6:08-cv-152-ORL-28DAB
 4      At the time of the reading and signing of the
     deposition, the following changes were noted:
 5
     PAGE # LINE #    CORRECTION        REASON
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20
        Under penalties of perjury, I have read my
21   deposition in this matter and it is true and correct,
     subject to any changes in form or substance as reflected
22   above.
23
24   Dated:_____  Signed:_____
25
```

Page 175

```
 1         CERTIFICATE OF REPORTER
 2   STATE OF FLORIDA:
     COUNTY OF ORANGE:
 3
 4        I, RITA G. MEYER, RDR, CRR, CBC, and Notary Public
     in and for the State of Florida at Large, do hereby
 5   certify that the aforementioned witness was by me first
     duly sworn to testify to the whole truth; that I was
 6   authorized to and did report said deposition in
     stenotype; and that the foregoing pages numbered 1
 7   through 173, inclusive, are a true and correct
     translation of my shorthand notes of said deposition.
 8
 9        I further certify that said deposition was taken
     at the time and place hereinabove set forth and that the
10   taking of said deposition was commenced and completed as
     hereinabove set out.
11
12        I further certify that I am not a relative,
     employee, attorney or counsel of any of the parties, nor
13   am I a relative or employee of any of the parties,
     attorneys or counsel connected with the action, nor am I
14   financially interested in the outcome of the action.
15        The foregoing certification of this transcript
     does not apply to any reproduction of the same by any
16   means unless under the direct control of the certifying
     reporter.
17
          IN WITNESS WHEREOF, I have hereunto set my hand
18   this 8th day of July, 2008.
19
20
21
22
23   _____
     RITA G. MEYER, RDR, CRR, CBC
24   My Commission # DD650050
     Expires May 12, 2011
25   942143
```

Electronically signed by Rita Meyer (101-199-755-0709)                    dfd7bbc8-9a35-4442-872b-76341a77f7cb